IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GRANT TURNER, et al.,

*Plaintiffs*,

v.

U.S. AGENCY FOR GLOBAL MEDIA, et al.,

*Defendants*.

**Case No. 20-cv-2885**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

GIBSON, DUNN & CRUTCHER LLP

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Mylan L. Denerstein (*pro hac vice pending*)
Zainab Ahmad (admission pending)
Lee R. Crain (D.D.C. Bar No. NY0337)
Alexandra Grossbaum (*pro hac vice pending*)
Lauren Kole (*pro hac vice pending*)
200 Park Avenue
New York, New York 10166-0193
Tel:  (212) 351-4000
MDenerstein@gibsondunn.com
Zahmad@gibsondunn.com
LCrain@gibsondunn.com
AGrossbaum@gibsondunn.com
LKole@gibsondunn.com

Joshua S. Lipshutz (D.C. Bar No. 1033391)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel: (202) 955-8500
JLipshutz@gibsondunn.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................. 6

    I.    Federal Law Requires The USAGM Networks To Be Independent And
    Insulated. ....................................................................................... 6

    II.    Defendants Take Office And Attack The USAGM Networks'
    Independence. ................................................................................ 8

LEGAL STANDARD ..................................................................................... 16

ARGUMENT ............................................................................................... 16

    I.    Plaintiffs Assert Their Own Claims And The Claims Of Journalists, Who
    Are Hindered In Protecting Their Own First Amendment Rights. ..................... 16

    II.    Plaintiffs Are Likely To Succeed On The Merits. ................................. 19

        A.    Defendants Are Violating The Statutory And Regulatory Firewall
        Against Political Interference In Journalistic Activities. ........................ 19

        B.    Plaintiffs' First Amendment Claims Are Likely To Succeed. ................. 29

        C.    Plaintiffs' Breach Of Fiduciary Duty Claim Is Likely To Succeed. ........ 40

    III.    Plaintiffs And The Network Journalists Will Be Irreparably Injured
    Absent Injunctive Relief. ................................................................ 41

    IV.    The Balance of Equities And Public Interest Strongly Favors Injunctive
    Relief. ......................................................................................... 44

CONCLUSION ............................................................................................. 45

# TABLE OF AUTHORITIES

Page

**Cases**

*Al-Aulaqi v. Obama,*
    727 F. Supp. 2d 1 (D.D.C. 2010) ............................................................................17

*Am. Broad. Cos. v. Cuomo,*
    570 F.2d 1080 (2d Cir. 1977)..................................................................................42

*Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.,*
    595 F. Supp. 2d 110 (D.D.C. 2009) ........................................................................41

*Armour & Co. v. Freeman,*
    304 F.2d 404 (D.C. Cir. 1962) ................................................................................43

*Bird v. W. Valley City,*
    No. 2017 WL 4326485 (D. Utah Sept. 28, 2017) ...................................................39

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973)................................................................................................17

*Camacho v. Brandon,*
    317 F.3d 153 (2d Cir. 2003)....................................................................................18

*CBS, Inc. v. F.C.C.,*
    629 F.2d 1 (D.C. Cir. 1980) ....................................................................................30

*Citizens United v. FEC,*
    558 U.S. 310 (2010)................................................................................................37

*City of Chicago v. Morales,*
    527 U.S. 41 (1999)..................................................................................................36

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988)..........................................................................................23, 36

*Claybrooks v. Am. Broad. Cos., Inc.,*
    898 F. Supp. 2d 986 (M.D. Tenn. 2012)................................................................31

*Cobell v. Norton,*
    240 F.3d 1081 (D.C. Cir. 2001) ..............................................................................40

*Cooksey v. Futrell,*
    721 F.3d 226 (4th Cir. 2013) ..................................................................................33

*DeGuiseppe v. Vill. of Bellwood,*
    68 F.3d 187 (7th Cir. 1995) ....................................................................................42

**TABLE OF AUTHORITIES**
(continued)

Page

*Doe v. City of Albuquerque*,
    667 F.3d 1111 (10th Cir. 2012) ........................................................................18

*Doe v. Mattis*,
    928 F.3d 1 (D.C. Cir. 2019) ............................................................................44

*Elrod v. Burns*,
    427 U.S. 347 (1976) ....................................................................................19, 42

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ........................................................................................36

*First Nat'l Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978) ........................................................................................30

*Furash & Co. v. McClave*,
    130 F. Supp. 2d 48 (D.D.C. 2001) ..................................................................40

*Gomez v. Trump*,
    2020 WL 5367010 (D.D.C. Sept. 4, 2020) ....................................................45

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ..................................................................41, 44

*Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ..................................................................42, 44

*Hartman v. Moore*,
    547 U.S. 250 (2006) ........................................................................................37

*Hoover v. Radabaugh*,
    307 F.3d 460 (6th Cir. 2002) ..........................................................................35

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston Inc.*,
    515 U.S. 557 (1995) ........................................................................................30

*Jones v. D.C.*,
    177 F. Supp. 3d 542 (D.D.C. 2016) ................................................................43

*Karem v. Trump*,
    404 F. Supp. 3d 203 (D.D.C. 2019), *aff'd as modified*, 960 F.3d 656 (D.C. Cir.
    2020) ................................................................................................................42

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ..............................................................16, 41, 44

## TABLE OF AUTHORITIES
(continued)

Page

*Knight First Amend. Inst. v. Trump*,
  302 F. Supp. 3d 541 (S.D.N.Y. 2018), *aff'd*, 953 F.3d 216 (2d Cir. 2020) ............................39

*Laird v. Tatum*,
  408 U.S. 1 (1972) ..................................................................................................................33

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) .................................................................................................45

*Lepelletier v. F.D.I.C.*,
  164 F.3d 37 (D.C. Cir. 1999) ...............................................................................................17

*Lovell v. City of Griffin*,
  303 U.S. 444 (1938) .............................................................................................................29

*McDermott v. Ampersand Publ'g, LLC*,
  593 F.3d 950 (9th Cir. 2010) .................................................................................30, 31, 33

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974) .............................................................................................................30

*Morgan Stanley DW Inc. v. Rothe*,
  150 F. Supp. 2d 67 (D.D.C. 2001) ........................................................................................42

*Nalco Co. v. U.S. E.P.A.*,
  786 F. Supp. 2d 177 (D.D.C. 2011) ......................................................................................43

*Nken v. Holder*,
  556 U.S. 418 (2009) .............................................................................................................44

*Open Technology Fund v. Pack*,
  __ F. Supp. 3d ___, 2020 WL 3605935 (D.D.C. July 2, 2020) ..................................... *passim*

*Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002)..................................................................................................19

*Patriot, Inc. v. U.S. Dept. of Hous. & Urban Dev.*,
  963 F.Supp. 1 (D.D.C. 1997) ...............................................................................................43

*Powers v. Ohio*,
  499 U.S. 400 (1991) .............................................................................................................17

*Ralis v. RFE/RL*,
  770 F.2d 1121 (D.C. Cir. 1985) ...............................................................................19, 20, 29

**TABLE OF AUTHORITIES**
(continued)

Page

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015)............................................................................37

*Reese Bros., Inc. v. U.S. Postal Serv.*,
   531 F. Supp. 2d 64 (D.D.C. 2008) .........................................................17

*Regan v. Time, Inc.*,
   468 U.S. 641 (1984).................................................................................37

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
   515 U.S. 819 (1995).................................................................................37

*S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*,
   2020 WL 3265533 (D.D.C. June 17, 2020) ...........................................44

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
   467 U.S. 947 (1984).................................................................................17

*Sherrill v. Knight*,
   569 F.2d 124 (D.C. Cir. 1977) ..........................................................23, 37

*Stevens v. N.Y. Racing Ass'n, Inc.*,
   665 F. Supp. 164 (E.D.N.Y. 1987) .........................................................37

*Stewart v. D.C. Armory Bd.*,
   789 F. Supp. 402 (D.D.C. 1992) .............................................................16

*Tripp v. Dep't of Defense*,
   284 F. Supp. 2d 50 (D.D.C. 2003) ..........................................................29

*Weaver v. U.S. Info. Agency*,
   87 F.3d 1429 (D.C. Cir. 1996) ................................................................36

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*,
   __ F.3d __, 2020 WL 5232076 (D.D.C. Sept. 2, 2020)....................17, 19

*Williams v. Town of Greenburgh*,
   535 F.3d 71 (2d Cir. 2008)......................................................................33

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)....................................................................................16

**Statutes**

5 U.S.C. § 706......................................................................................................19

**TABLE OF AUTHORITIES**
(continued)

<u>Page</u>

22 U.S.C. § 6201 .................................................................................................29

22 U.S.C. § 6202 ...............................................................................1, 7, 19, 20

22 U.S.C. § 6204 ...........................................................................2, 7, 20, 24, 40

**Regulations**

22 C.F.R. §§ 531, *et seq.* ............................................................... *passim*

**Constitutional Provisions**

U.S. Const. amend. I. ...................................................................... *passim*

**Other Authorities**

H.R. Conf. Rep. 105-432 (1998) .........................................................................7

S. Rep. No. 103-107 (1993) .................................................................................7

S. Rep. No. 107-60, § 509 (2001) ......................................................................29

**Rules**

Local Civil Rule 65.1 ...........................................................................................1

**Treatises**

11A Charles Alan Wright et al., Fed. Prac. & Proc. § 2948.1 (3d ed. 2013 & 2015
Supp.) ...........................................................................................................43

Pursuant to Local Civil Rule 65.1(d), Plaintiffs request that this motion be heard on an expedited basis so that Plaintiffs' irreparable harm may be cured as quickly as possible.

## PRELIMINARY STATEMENT

Plaintiffs bring this motion for a preliminary injunction to stop insidious, unlawful, and unconstitutional politicization of some of the nation's most important and cherished media outlets, and to eliminate interference by the current administration that threatens our national interests and violates the freedom of the press.  Defendants are the recently installed leaders of the United States Agency for Global Media ("USAGM" or the "Agency"), a little-known agency that runs the iconic Voice of America, Radio Free Europe/Radio Liberty, Radio Free Asia and other networks.  Compl. ¶¶ 2, 21–27.  Plaintiffs are some of the many public servants who serve USAGM or its networks, which have a weekly audience of some 350 million people including in countries like Iran and China where the notion of a free press, and of credible, independent journalism, is entirely foreign. Compl. ¶¶ 2, 16–21.  The USAGM networks export America's greatest products—free speech and freedom of the press—and serve the vital national goals of combatting disinformation worldwide, fighting propaganda and deception with truth and shoe-leather journalism.  Compl. ¶ 28.

The primary currency of these networks is their credibility, which turns largely on their political independence.  Even though the networks are state-owned and state-funded, they are affirmatively not state-run.  In fact, federal law requires the USAGM networks to "conduct[]" themselves "in accordance with the highest professional standards of broadcast journalism."  22 U.S.C. § 6202(a)(5).  One such standard—a practice built into the fabric of every great media organization—requires journalism to be free of interference from an organization's business team like the advertising or sales people.  *See, e.g.*, Bennett Decl. ¶¶ 10–19; Sugawara Decl. ¶¶ 7–15;

Carroll Decl. ¶¶ 7–9, 15–16; Capus Decl. ¶¶ 9–11, 13–17; Ex. 1[1]; Ex. 2 at 71; Ex. 33; Compl. ¶ 6. That separation ensures the credibility of a news organization and the trust of its audience. Absent independent journalism people can trust, journalism cannot survive.

The same is true with the USAGM networks, albeit on a slightly different model. The USAGM networks have to be insulated not from ad sales and sponsors, but from federal stakeholders like members of the Executive Branch—those that may believe a story, even if true, should be suppressed to advance a short-term political or diplomatic interest. As in the private sector, this independence protects against mission-critical risks: it ensures that USAGM networks retain their independence and credibility and, therefore, their audience and influence. Ex. 3; Doe Decl. ¶¶ 4–7; Bennett Decl. ¶¶ 17–22; Sugawara Decl. ¶¶ 13–16; Capus Decl. ¶¶ 9–11, 13–17.

But unlike the private sector, the firewall protecting publicly funded journalism is enshrined in law: federal law provides that the CEO of USAGM "shall respect the professional independence and integrity of" Voice of America and the other USAGM networks. 22 U.S.C. § 6204(b). Regulations explain further that the "firewall" prohibits "any person within the Executive Branch or Network, but outside the newsroom," from even "attempt[ing] to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks . . . in the performance of their journalistic and broadcasting duties and activities." 22 C.F.R. § 531.3(c). If anything, then, the firewall that exists to separate USAGM-funded journalism from any political considerations is even more robust than its private-sector analogue. *See* Bennett Decl. ¶¶ 17–22; Sugawara Decl. ¶¶ 13–16; Capus Decl. ¶ 15; *see* Roe Decl. ¶ 3; Compl. ¶¶ 35–41.

Far from upholding their duty to support the firewall, Defendants have actively been working to destroy it. They include the recently installed CEO of USAGM, Michael Pack, and his

---

[1]  Citations to "Ex. __" are to exhibits attached to the Declaration of Lee R. Crain filed in support of this motion.

team of political appointees—a group of people who have engaged in a campaign of unconstitutional and unlawful misconduct to do exactly what the firewall prohibits: "attempt[ing] to *direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks* . . . in the performance of their journalistic and broadcasting duties and activities." 22 C.F.R. § 531.3(c) (emphasis added); Compl. ¶ 7.

Defendants' systematic dismantlement of the firewall began with the removal of those best positioned to protect it—including Plaintiffs and others, the guardians of the firewall who know it best and sought to stop Defendants' unlawful conduct.  Compl. ¶¶ 8, 16–20.  They removed, for instance, Plaintiff Grant Turner—the former acting Chief Executive Officer and Chief Financial Officer—who knows intimately the firewall's precepts and its importance.  *Id.* at ¶¶ 8, 16.  They also removed the former General Counsel of USAGM who *wrote* the firewall regulation itself.  *Id.* at ¶¶ 55, 61; Ex. 56 at 2.  They removed the Standards Editor of Voice of America—a journalist with over 40 years' experience in journalistic ethics and best practices—detailing him to USAGM itself and giving him literally nothing to do, all for the purpose of sidelining Voice of America's strongest and best institutional knowledge of how the firewall works.  Turner Decl. ¶¶ 22–23; Lennon Decl. ¶ 15; Walsh Decl. ¶¶ 17–18; Powers Decl. ¶ 27; Doe Decl. ¶ 18; Bennett Decl. ¶¶ 23–24; Sugawara Decl. ¶ 14; Roe Decl. ¶¶ 5–9; Compl. ¶¶  55–61.  Defendants have also fired journalists, attempted to reassign them, and prohibited Voice of America from hiring or retaining foreign journalists it needs to run its dozens of foreign language broadcast services.  Walsh Decl. ¶¶ 20–21; Turner Decl. ¶¶ 31–35; Bennett Decl. ¶¶ 26–30; Sugawara Decl. ¶¶ 20–24; Roe Decl. ¶¶ 19–22; Compl. ¶¶ 68–75.

Defendants have further engaged in an improper and aggressive course of investigatory conduct designed to effectuate control and chill journalistic activity.  Doe Decl. ¶¶ 8–16; Bennett

Decl. ¶¶ 31–35; Compl. ¶¶ 78–109.   Defendants have conducted investigations on behalf of USAGM into the conduct of network journalists on the other side of the statutory firewall—even though historically only journalists or independent auditors—*not* USAGM political appointees—have conducted such investigations, in order to preserve journalistic independence.   Turner Decl. ¶ 29; Doe Decl. ¶¶ 8–16; Bennett Decl. ¶ 31; Ex. 15; Ex. 26; Ex. 56 at 6; Compl. ¶¶ 79–109.   The investigations Defendants have launched are transparently partisan—investigating the "bias" of content they believe disfavors the current administration's message but ignoring or even promoting content that comports with their own viewpoints.   Over the course of these investigations, Defendants—who are not journalists and have no experience with journalistic ethics—have ordered the termination of journalists, interrogated journalists about whether stories are "balanced," and have demanded that journalists name names of others who might be investigative targets.   Doe Decl. ¶¶ 8–16; Bennett Decl. ¶¶ 31–35 Roe Decl. ¶¶ 10–12; Compl. ¶¶ 85–86, 93–95.   It is precisely these types of investigations that have (understandably) deterred journalists from coming forward to put a halt to Defendants' lawlessness, leaving the task to USAGM employees like Plaintiffs.   Defendants have also grown more emboldened, asking to sit in on news coverage meetings, for instance—all for the purpose of chilling journalistic activity and controlling content. Turner Decl. ¶ 36; Powers Decl. ¶¶ 25–26; Roe Decl. ¶ 18; Compl. ¶¶ 78, 88, 131–32.

Defendants' actions are unconstitutional and unlawful, and this Court should issue a preliminary injunction directing they cease for three reasons.   *First*, Plaintiffs are likely to succeed on the merits.   Defendants have plainly violated the statutory and regulatory firewall that exists to prohibit the very type of misguided political interference in which they engage.   Defendants have also violated the First Amendment's free speech and free press clauses, have retaliated against

people who have engaged in protected expressive conduct, and have engaged in unlawful discrimination based on perceived viewpoint.

*Second*, Defendants' misdeeds have caused and continue to cause irreparable harm to USAGM employees like Plaintiffs, the USAGM network journalists for whom Plaintiffs seek vindication, and the USAGM networks themselves. Plaintiffs consist of the former career civil service leadership of USAGM whom Defendants have tried to purge from their positions. Many of them have spent broad swaths—if not all—of their professional careers building USAGM and its networks into a credible media force with global audiences in the hundreds of millions. These are dedicated public servants of the utmost integrity whom Defendants have maligned without basis as incompetent and even potential spies. Ex. 4; Ex. 5. Defendants' conduct threatens the credibility of the USAGM organization and its networks, and that of Plaintiffs and others employed there. Capus Decl. ¶¶ 16–17, 21, 25, 28; Roe Decl. ¶¶ 9, 17; Compl. ¶ 139. Defendants' actions have not only hampered Plaintiffs' and USAGM network journalists' ability to do their jobs, to hire, and to recruit, but have also chilled journalists' ability to engage in expressive activity protected by the First Amendment. Defendants must be stopped. *See, e.g.*, Turner Decl. ¶¶ 39–49; Powers Decl. ¶¶ 37–40; Bennett Decl. ¶ 40; Sugawara Decl. ¶ 27; Doe Decl. ¶¶ 17–19; Capus Decl. ¶¶ 16, 21, 27; Compl. ¶¶ 140–41.

*Third*, the balance of equities and public interest clearly favors an injunction. Defendants have no legitimate interest in violating the law and Constitution as they have, and their continued efforts to do so will damage Plaintiffs and the USAGM networks' journalists irreparably.

If Voice of America and the other USAGM networks are to survive Defendants' stewardship, this Court must act to enforce the firewall the way Congress intended. Plaintiffs move for a preliminary injunction to vindicate these essential principles and to fight for the agency

and the mission they believe in.  They also bring this action to vindicate grave national interests: as Defendants work to destroy the USAGM networks, the vacuum will be filled by authoritarians and propagandists whose messages will monopolize global airwaves without networks like the Voice of America, Radio Free Europe/Radio Liberty, and Radio Free Asia as credible voices to the contrary.  "The firewall is *critical* to ensuring that the editors, reporters, and other journalists of the USAGM network[s] make the decisions on what stories to cover and how they are covered, and that those decisions are ultimately governed by the highest standards of professional journalism."  22 C.F.R. § 531.3(d) (emphasis added).  This Court should enter a preliminary injunction ordering the Defendants to stop violating the Constitution and the law, and requiring them to enforce the firewall.

## BACKGROUND

### I.   Federal Law Requires The USAGM Networks To Be Independent And Insulated.

Government-funded journalism, reporting, and broadcasting has been a staple of the United States' efforts to combat disinformation and propaganda abroad since World War II.  Ex. 6; Ex. 7; Compl. ¶ 3.  In the decades after the war, coverage expanded to Eastern Europe and the Soviet Union, and later to Cuba, Asia, and the Middle East, particularly in countries where governments prohibit access to a free press and freedom of information.  Ex. 6; Ex. 7; Compl. ¶ 28.  America's government-funded journalism is housed under USAGM, an independent agency whose mission is "to inform, engage, and connect people around the world in support of freedom of democracy."  Ex. 8.  Its cumulative weekly audience includes approximately 350 million people around the globe.  Ex. 8; Compl. ¶ 2.

In 1994, Congress passed the statute that today governs Voice of America and its sister networks—the International Broadcasting Act (the "IBA").  *See Open Technology Fund v. Pack*, __ F. Supp. 3d ___, 2020 WL 3605935, at *2 (D.D.C. July 2, 2020) ("*OTF*"); Compl. ¶ 34.  The

IBA's legislative record makes clear that the journalistic independence of the networks was of paramount importance.  Compl. ¶¶ 35–37.  The IBA was meant to codify the existence of a firewall designed to insulate anyone involved with any aspect of journalism (e.g., the creation, editing, reporting, etc. of content) from all other government personnel.  *See* S. Rep. No. 103-107 (1993) at 75; H.R. Conf. Rep. 105-432 (1998) at 126–27 (firewall prevents political interference and ensures accuracy credibility of journalism).  And Congress provided that the networks must "conduct[]" themselves "in accordance with the highest professional standards of broadcast journalism." 22 U.S.C. § 6202(a)(5).  Congress amended the IBA in 2016 to establish the USAGM CEO to head federal broadcasting efforts—a position requiring Senate confirmation.  The CEO, under the IBA, is required to adhere to the firewall, and "respect the professional independence and integrity" of the networks.  *Id.* § 6204(b); *accord OTF*, 2020 WL 3605935, at *3.

In June 2020, USAGM's bipartisan Board unanimously passed a new regulation entitled *Statutory Firewall and Highest Standards of Professional Journalism*, codified at 22 C.F.R. Part 531, *et seq.*  The regulation was meant "to clarify the practical meaning and impact of the statutory firewall" and made clear that "[t]he firewall is essential to ensuring the continued credibility and therefore effectiveness of the journalism provided by USAGM funded networks." 85 Fed. Reg. 36150 (June 15, 2020).  It "codif[ied] a common-sense definition of the firewall, consistent with the law, the highest standards of professional journalism, and longstanding practice."  *Id.* at 36150–51.  The regulation provides that the "firewall" prohibits "any person within the Executive Branch or Network, but outside the newsroom" from even "attempt[ing] to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks . . . in the performance of their journalistic and broadcasting duties and activities."  22 C.F.R. § 531.3(c).

**II.     Defendants Take Office And Attack The USAGM Networks' Independence.**

In June 2018, the White House announced President Trump's intent to nominate Defendant Michael Pack as the first Senate-confirmed USAGM CEO.  Ex. 9; Compl. ¶ 42.  At the time, multiple media outlets expressed concern that the administration would use the nomination to influence and control these journalistic outlets to conform to the administration's preferred messaging.  Ex. 9; Compl. ¶ 42.  In light of those fears, numerous Senators slowed the confirmation process, taking additional time to inquire as to Pack's experience and qualifications.  Ex. 9; Compl. ¶ 43.  Two years later, the Senate confirmed Pack on June 4, 2020.  *See* Ex. 10; Compl. ¶ 45.  The President, who repeatedly criticized USAGM and Voice of America during the long Pack confirmation process, made clear that he believed Pack would change fundamentally the organization he was about to lead.  Ex. 11; Ex. 12; Ex. 45; Compl. ¶¶ 22, 43–46.

On June 17, 2020, Pack held his first—and only—meeting with the senior staff of USAGM, including Plaintiffs Grant Turner, Marie Lennon, Shawn Powers, Matt Walsh, and Oanh Tran.  Powers Decl. ¶ 14; Compl. ¶ 46.  Pack had planned to fire the senior staff at that meeting, but his plan was delayed when Representative Elliot Engel, Chairman of the House Foreign Relations Committee, issued a public statement warning against that course of action the night before.  Ex. 13; Compl. ¶¶ 46–47.  Instead of terminating senior leadership then and there, Pack attended that initial meeting, lasting a whole ten minutes, and read from a script that laid out his immediate plans.  Powers Decl. ¶ 14; Walsh Decl. ¶ 9; Compl. ¶ 47.  He told the staff that they were prohibited from communicating with external parties, approving any administrative action, or spending any money—each critical functions of the Agency.  Turner Decl. ¶ 12; Walsh Decl. ¶ 9; Powers Decl. ¶ 14; Compl. ¶ 48.  He also informed the staff that Emily Newman (his Chief of Staff) would be sending an email with the new reporting structure and would officially be revoking all delegated authorities—the authority which allowed senior staff to, for example, spend funds, hire staff, and

approve contracts.  Lennon Decl. ¶ 9; Walsh Decl. ¶ 9; Powers Decl. ¶ 14.  The email that followed officially put that plan into action.  Walsh Decl. ¶ 10; Compl. ¶ 49.

These changes had immediate effect on USAGM and its thousands of employees.  Basic tasks like ordering toilet paper and contracting for cleaning services—particularly essential during a pandemic—languished.  Turner Decl. ¶ 41; Compl. ¶ 50.  Scores of essential contracts lapsed. *Id.*; Walsh Decl. ¶ 23; Roe Decl. ¶¶ 23–24.  And at least two of the networks were brought to the brink of missing payroll.  Compl. ¶ 50.

Shortly thereafter, Defendants commenced a series of events designed to fundamentally undermine the networks' independence, in direct conflict with the statutory and regulatory firewall and the First Amendment.

*1. Removing The Guardians Of The Firewall.*  Defendants first took numerous steps to remove individuals at the Agency and the networks who were best positioned to enforce the firewall.  On August 12, 2020, Defendants placed six of the former leadership of USAGM, including Plaintiffs, on administrative leave on pretextual grounds.[2]  Turner Decl. ¶ 10; Lennon Decl. ¶ 4; Powers Decl. ¶ 35; Ex. 5; Ex. 15; Ex. 16; Compl. ¶ 61.  They removed General Counsel David Kligerman, notably, one of the writers of the firewall regulation itself.  Compl. ¶ 8.  Defendants also removed the Standards Editor at Voice of America, Steve Springer, a key fixture on the journalistic side of the firewall, to prevent him from defending Voice of America against

---

[2]  Defendants suspended these officials' security clearances on the grounds that they were improperly investigated by USAGM, among other false, irrelevant, and pretextual bases.  The security clearance rationale in particular is highly suspect.  As Senator Robert Menendez has explained, at least two of Pack's appointees have serious red flags in their records that could or should have resulted in a denial of security clearances.  Ex. 14; Ex. 15.  And Defendant Namdar is apparently maintaining a private law practice even as she works as counsel to USAGM. *See* Namdar Law, https://www.namdarlaw.com/ (last visited Oct. 13, 2020).  Moreover, if Plaintiffs' security investigations were improperly conducted, so too were the security investigations of *hundreds* of other USAGM employees, yet only Plaintiffs were punished.  Further, Plaintiff Walsh's security clearance was not even investigated by USAGM, but rather by the State Department, and Defendants have not claimed the State Department improperly investigated it.  Walsh Decl. ¶ 6.

future firewall violations.  Turner Decl. ¶¶ 22–23; Lennon Decl. ¶ 15; Walsh Decl. ¶¶ 17–18; Powers Decl. ¶ 27; Doe Decl. ¶ 18; Roe Decl. ¶¶ 6–9; Coe Decl. ¶ 9; Compl. ¶¶ 56–61.  Voice of America leadership has objected strenuously to the removal of Springer in particular and asked that he be returned.  Roe Decl. ¶ 8.  But Defendants have instead detailed him to a "position" at USAGM that has literally no responsibilities.  Roe Decl. ¶ 6; Sugawara Decl. ¶ 18; Compl. ¶ 58.  Plaintiffs, Kligerman, and Springer were the core guardians of the firewall—the people who knew enough to be able to stop Defendants from the inside.  *See, e.g.*, Doe Decl. ¶ 18.  Springer actually created the Agency-wide firewall training courses and the Voice of America Best Practices guide, both of which outline principles and procedures for protecting the firewall.  *See* Ex. 17; Ex. 18; *see* Doe Decl. ¶ 18.  Yet they were removed from their posts for no legitimate reason.[3]

    *2.  Interference With Journalistic Personnel.*  Journalistic hiring and firing decisions are and have always been plainly within the powers of the individual networks, not USAGM, as such personnel decisions impact editorial and journalistic content.  Bennett Decl. ¶¶ 12, 14, 20.  But that did not stop Defendants' interference.  In addition to reassigning Springer, they ordered, for instance, the termination of Bay Fang, the then-Executive Editor of Radio Free Asia, even though that position fell under the protection of the firewall.  Turner Decl. ¶¶ 24–27; Lennon Decl. ¶¶ 14–15; Walsh Decl. ¶¶ 17–18; Powers Decl. ¶ 27; Capus Decl. ¶¶ 22–23; Compl. ¶¶ 62–64.  They also attempted to reassign the journalist Voice of America had hired to be the New York Bureau Chief—seeking to leave that vital position unfilled.  Lennon Decl. ¶ 16; Ex. 52; Compl. ¶¶ 65–67.

    Defendants have also effected the constructive termination of numerous foreign journalists on whom Voice of America depends by refusing to sponsor or renew their J-1 visas—non-immigrant cultural exchange visas that require that a non-resident hold an employment position in

---

[3]  Defendants also prevented a standards editor from serving at the Office of Cuba Broadcasting.  Capus Decl. ¶ 21.

the United States.  Walsh Decl. ¶¶ 20–21; Lennon Decl. ¶¶ 18–19; Turner Decl. ¶¶ 31–35; Bennett Decl. ¶¶ 26–30; Sugawara Decl. ¶¶ 20–24; Roe Decl. ¶¶ 19–22; Ex. 11; Ex. 19; Ex. 20; Compl. ¶¶ 68–75.  Historically, when Voice of America decides to hire a foreign journalist, it prepares the requisite sponsorship papers, and the CEO of USAGM ministerially signs those papers.  Bennett Decl. ¶ 26; Sugawara Decl. ¶ 20; Turner Decl. ¶¶ 31–32; Roe Decl. ¶ 20; Compl. ¶ 70.  Were the CEO to refuse to sign, that would directly impact the hiring of journalists, in violation of the firewall.  Roe Decl. ¶¶ 20–21; Turner Decl. ¶ 32; Compl. ¶ 70.  Indeed, the failure to sign the papers—i.e., to sponsor the visa—effectively eliminates the foreign journalist's position, deprives her of her visa, and requires that she leave the United States.  Turner Decl. ¶ 32; Ex. 11; Ex. 19; Ex. 20; Compl. ¶ 70; *see* Ex. 56 at 2–3.

Since taking office, however, Pack has refused to sponsor or renew the sponsorship of J-1 visas for foreign journalists—whether to allow hiring of new journalists or simply to retain longstanding employees.  Turner Decl. ¶ 31; Roe Decl. ¶ 22; Ex. 11; Ex. 19; Ex. 20; Compl. ¶ 71; Ex. 56 at 2–3.  Pack instead claims he will review J-1 visa applications on a case-by-case basis but has articulated no standards—let alone clearly articulated, content-neutral ones—by which he will do so.  Roe Decl. ¶ 19; Coe Decl. ¶ 13; Ex. 11; Ex. 20; Compl. ¶ 71.  On other occasions, Pack has also refused to fund the contracts of foreign journalists, again effectively permitting him to control the hiring and firing of those journalists.  Roe Decl. ¶ 23; Bennett Decl. ¶¶ 28–29; Sugawara Decl. ¶¶ 22–23; Compl. ¶ 71.

As a result, Voice of America has had to substantially reduce its content, including in critical markets like China, Russia, Iran, Venezuela, and Korea.  Walsh Decl. ¶ 20; Turner Decl. ¶ 33; Roe Decl. ¶¶ 23–24; Compl. ¶ 72; Ex. 55.  Defendants' actions also have left Voice of America without critical editorial and quality-control staff.  Roe Decl. ¶ 24.  The failure to sponsor

J-1 visas also does critical damage to Voice of America's recruiting efforts and reputation, deterring other high-level foreign recruits from joining USAGM networks.  Turner Decl. ¶ 34; Roe Decl. ¶¶ 19, 22; Ex. 53; Ex. 54; Ex. 56 at 2–3; Compl. ¶¶ 73–74.  And Pack's conduct risks substantially chilling all foreign journalists, as the fate of journalists who hold current J-1 visas and future foreign recruits seemingly rests with Pack and his standardless discretion, incentivizing those journalists to curry his favor.  Turner Decl. ¶ 34; *see also* Bennett Decl. ¶¶ 38–39; Sugawara Decl. ¶ 26; Roe Decl. ¶¶ 19–22; Coe Decl. ¶¶ 13, 27; Ex. 53; Ex. 54.

3. ***Interference With And Investigations Of Content*.**  At Pack's direction, USAGM officials including lawyer Sam Dewey have undertaken a course of unlawful interference with a host of journalistic processes—particularly at Voice of America.  Dewey has worked to insert himself into the newsroom, in direct violation of the firewall, by asking to participate in news coverage meetings regarding election reporting and raising concerns about Voice of America stories.  Turner Decl. ¶ 36; Powers Decl. ¶¶ 25–26; Bennett Decl. ¶ 34; Sugawara Decl. ¶ 25; Roe Decl. ¶ 18; Compl. ¶ 77.  Dewey has even requested that Voice of America leadership report to him which Voice of America journalists are working on *every story* being developed at the network.  Bennett Decl. ¶ 25; Sugawara Decl. ¶ 19; Coe Decl. ¶ 12; Compl. ¶ 88.  Dewey has ignored the journalistic chain of command—reaching far within the newsroom and bypassing Voice of America leadership and USAGM procedures in an unlawful attempt to influence coverage.  Roe Decl. ¶¶ 14–15, 18; *see generally* Ex. 21.

Dewey along with other Defendants have also attempted to influence content through a parade of inappropriate investigations into alleged journalistic lapses.  Defendants have interrogated journalists about editorial decisions and attempted to root out perceived "liberal bias," all despite network journalists' proven commitment to impartial and non-partisan reporting.

Turner Decl. ¶ 49; Lennon Decl. ¶ 25; Tran Decl. ¶ 17; Walsh Decl. ¶ 28; Doe Decl. ¶¶ 10–15; Ex. 22 at 7:15–8:05.  Defendants have investigated, for instance, whether a video featuring Joe Biden posted by Voice of America's Urdu service was biased.  Turner Decl. ¶ 29–30; Bennett Decl. ¶¶ 32–33; Roe Decl. ¶¶ 10–15; Compl. ¶ 80.  Out of that investigation, Defendants placed the Urdu service editor on administrative leave and directed the termination of numerous Voice of America contractors—a historically unprecedented decision, and one not only disproportionate to any journalistic "crime" but also wholly outside of Defendants' purview as executives separated from journalistic decisions by operation of the firewall.  Turner Decl. ¶¶ 28–30; Bennett Decl. ¶¶ 32–33; Roe Decl. ¶¶ 10–15; Capus Decl. ¶ 29; Compl. ¶¶ 82–85.

Defendants have also undertaken a large-scale investigation of the production and editorial process of audiovisual profiles of former Second Lady Dr. Jill Biden and First Lady Melania Trump.  Doe Decl. ¶¶ 8–15; Coe Decl. ¶ 11; *see* Ex. 23; Ex. 24; Compl. ¶¶ 89–92.  Specifically, USAGM employees, at Defendants' behest, subjected journalists and editors to questioning about what aspects of the pieces they wrote and edited, required journalists to identify any colleagues that touched the stories, and asked journalists and editors to provide their journalistic judgment as to whether the pieces were balanced.  Doe Decl. ¶¶ 8–16; Coe Decl. ¶ 11; *see* Ex. 23; Ex. 24; Compl. ¶¶ 89–92.  They kept interrogating despite protests from some interviewees that these interviews violated the firewall.  Doe Decl. ¶¶ 8–16; Coe Decl. ¶ 11; *see* Ex. 23; Ex. 24; Compl. ¶¶ 89–92.  This investigation was clearly of content they believed was biased against the President.  Doe Decl. ¶¶ 8–16; Coe Decl. ¶ 11; *see* Ex. 23; Ex. 24; Compl. ¶¶ 89–92.  No similar USAGM investigative efforts were launched when the Spanish language *VOA Noticias* published a Trump campaign-style video encouraging Latinos to vote against Biden.  Ex. 25; Ex. 26; Compl. ¶ 81.

Defendants have also launched investigations into Steve Herman, Voice of America's White House Bureau Chief, after Herman organized a group of journalists to write a letter to Voice of America's acting director that was critical of USAGM's violations of the firewall and gross mismanagement of the broadcasting networks.  Doe Decl. ¶¶ 14–15; Roe Decl. ¶ 16; Coe Decl. ¶¶ 15, 19–20; Capus Decl. ¶¶ 28–30; Ex. 19; Ex. 50; Ex. 51; Compl. ¶¶ 106–08.  Specifically, Defendant Pack tasked Defendants Dewey and Wuco with scouring Herman's reporting history as well as his social media activity for any hint of a political bias.  Roe Decl. ¶ 16; Coe Decl. ¶¶ 19–20; Ex. 50; Ex. 51; Compl. ¶ 106.  Defendants then presented VOA's acting director with a dossier of materials, erroneously arguing that Herman harbored biases against the President and that the acting director should take action against him.  Powers Decl. ¶ 28; Roe Decl. ¶ 16; Coe Decl. ¶¶ 19–20; Compl. ¶ 107.  Defendants message could not be clearer:  USAGM has determined that VOA should take action against Herman.  Powers Decl. ¶ 28.

These investigations are unprecedented—contrary to law, policy, and practice.  *See* Carroll Decl. ¶¶ 7–12; Bennett Decl. ¶¶ 31–33; Capus Decl. ¶¶ 28–30; Doe Decl. ¶¶ 13, 16, 17; Roe Decl. ¶¶ 11, 16; Coe Decl. ¶¶ 5, 10–11, 14.  Journalists—not USAGM political appointees—are supposed to investigate journalistic lapses because that is what the firewall requires.  Turner Decl. ¶ 29; Doe Decl. ¶¶ 10, 12, 16; Bennett Decl. ¶ 31; Powers Decl. ¶¶ 20–21; Roe Decl. ¶ 11; *see generally* Ex. 21; Ex. 30 at 2; Compl. ¶¶ 78–79.  The networks promulgate and enforce their own journalistic standards, which are consistent with those of other news agencies.  *See* Ex. 27; Ex. 28; Ex. 29; Ex. 31; *see also* Ex. 32; Ex. 33; Ex. 34.  These investigations not only violate the firewall but also USAGM's Editorial Lapses policy, which makes clear that USAGM employees are to have only a limited role in investigating journalistic lapses—USAGM can only investigate

14

widespread and longstanding lapses by investigating a "random sample" of content only—and no role in dispensing punishment.  Ex. 21; Powers Decl. ¶¶ 20–22; Compl. ¶ 95; *see also* Ex. 56 at 6.

    *4.  Defendants Unlawfully And Grossly Mismanage USAGM.*  Since Defendants took power in June, they have engaged in a pattern of gross mismanagement.  Defendants have frozen contracts and budgets, imposed lengthy hiring freezes and frozen all technical migrations, and refused to renew routine contracts.  Turner Decl. ¶¶ 39–47; Walsh Decl. ¶¶ 11, 23; Bennett Decl. ¶¶ 37–38; Roe Decl. ¶¶ 23–24; Ex. 35; Compl. ¶¶ 110–15.  This mismanagement will result in fewer broadcasts carrying Voice of America stories, diminishing global access to critical information.  Bennett Decl. ¶¶ 37–40; Sugawara Decl. ¶¶ 26–27; Roe Decl. ¶¶ 23–24; Ex. 35. Defendants have also moved money unlawfully, failing to disburse funds that have been allocated through valid appropriations bills that were then signed into law by President Trump.  Powers Decl. ¶¶ 33–34; Turner Decl. ¶ 42; Compl. ¶ 111.  They have also moved funds internally without appropriate authorization.  Turner Decl. ¶ 42; Powers Decl. ¶ 33; Compl. ¶ 111.  And they have ignored requests for responses on key personnel decisions, effectively denying them without basis and severely hamstringing the Agency's ability to fulfill its mandate.  Lennon Decl. ¶ 22; Roe Decl. ¶¶ 23–24; Compl. ¶ 112.

    Defendants have also actively put USAGM employees in harm's way amidst the ongoing COVID-19 pandemic, requiring employees to meet in person—including those with health concerns.  Lennon Decl. ¶¶ 8, 10; Compl. ¶ 113.  In these meetings, Defendants refused to wear protective masks.  *Id.*  Defendants also refused to approve policies or practices that would protect agency employees from COVID-19.  Tran Decl. ¶ 14; Walsh Decl. ¶¶ 24–25; Compl. ¶¶ 113–14.

* * *

Plaintiffs filed this action on October 8, 2020, alleging Defendants violated the Administrative Procedure Act, the First Amendment, the statutory and regulatory firewall, and Pack's fiduciary duties to USAGM.  Plaintiffs now move for a preliminary injunction.

## LEGAL STANDARD

Plaintiffs seeking a preliminary injunction must demonstrate: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable injury in the absence of preliminary relief; (3) that the balance of the equities tips in their favor; and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Stewart v. D.C. Armory Bd.*, 789 F. Supp. 402, 404 (D.D.C. 1992).  "[T]he balance of equities and public interest[] factors [] 'merge when,' as here, 'the Government is the opposing party.'"  *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (citation omitted).  Here, all four factors counsel strongly in favor of preliminary injunctive relief.

## ARGUMENT

**I.      Plaintiffs Assert Their Own Claims And The Claims Of Journalists, Who Are Hindered In Protecting Their Own First Amendment Rights.**

Plaintiffs filed this lawsuit to redress the substantial harms they have suffered at the hands of Defendants, as well as to protect the First Amendment rights of the professional journalists that Plaintiffs have a duty to protect.  Because these journalists would face severe consequences if they were to challenge Defendants' misconduct in court, Plaintiffs are well suited to bring this action to protect these journalists' rights as well.

A plaintiff may bring suit on behalf of a third party upon satisfying three criteria: (i) the plaintiff "must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; (ii) the plaintiff "must have a close relation to the third party"; and (iii) "there must exist some hindrance to the third party's ability to protect his or

her own interests." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, __ F.3d __, 2020 WL 5232076, at *20 (D.D.C. Sept. 2, 2020) (quoting *Powers v. Ohio*, 499 U.S. 400, 411, (1991)).  These three criteria are "easily satisfied" here.  *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 43 (D.C. Cir. 1999).

*First,* Plaintiffs have suffered injuries in fact, including reputational and economic harm that give them a concrete interest in the resolution of this suit, not the least of which is their placement on administrative leave because of their opposition to Defendants' repeated violations of the firewall and their position as among the firewall's best protectors.  *See Whitman-Walker*, 2020 WL 5232076 at *21; *see* Ex. 57 (detailing protected disclosures); Ex. 56 at 2.  *Second*, as guardians of the firewall required by law to protect it and stakeholders of USAGM at large, Plaintiffs share the journalists' interest in enforcing the firewall, protecting the independence and credibility of the networks' reporting, upholding the First Amendment, and sparing USAGM from gross mismanagement.  These mutual interests leave no doubt that Plaintiffs have the requisite "close relationship" with the networks and their journalists and "will be [] motivated, effective advocate[s]" for the journalists' rights.  *Powers*, 499 U.S. at 414.

*Third*, the journalists at USAGM networks like Voice of America are plainly hindered in protecting their own interests.  Notably, the requirement that there be "some impediment to the real party in interest's ability to assert his own legal rights," *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 31 (D.D.C. 2010), is "relax[ed]" where, as here, there is a danger that the government has chilled First Amendment rights.  *Reese Bros., Inc. v. U.S. Postal Serv.*, 531 F. Supp. 2d 64, 68, 70 (D.D.C. 2008) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) and *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)).  Indeed, courts in this district have found that the third

prong is satisfied where "the court discerns *merely a danger of chilled speech*."  *Reese Bros., Inc.*,
F. Supp. 2d at 69 (emphasis added).

There can be no doubt that Defendants here have both chilled network journalists' First
Amendment rights and impeded, including through campaigns of retaliation, journalists' ability to
protect those rights.  As Defendants' actions to date have shown, and as the declarations of Johns
Doe, Roe, and Coe filed in support of this motion make clear, journalists who add their name to
this suit would risk retaliation from Defendants in the form of demotion, termination, or public
smearing of their credibility.  Doe Decl. ¶¶ 20–25; Coe Decl. ¶¶ 22–27; Roe Decl. ¶¶ 27–29; Ex.
56 at 2; Compl. ¶ 145; *see Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) (holding that
third party was sufficiently hindered from protecting interests where he faced possibility of
retaliation from employer).  Indeed, Defendants have already worked to retaliate against Steve
Herman merely for signing a private letter expressing concerns.  *See, e.g.*, Doe Decl. ¶¶ 20–25;
Coe Decl. ¶¶ 22–27; Roe Decl. ¶¶ 27–29; Compl. ¶ 145.  David Kligerman—the purged former
General Counsel of USAGM—perhaps put it best in recent congressional testimony: "[t]here is a
climate of fear and intimidation at the Agency, based on what I have witnessed or heard. VOA
journalists are courageous and professional, but they are also human."  Ex. 56 at 6.

Moreover, even if Defendants did not retaliate against the journalists, the mere act of
adding their name to a lawsuit against current government officials would lead the public to
(erroneously) perceive the journalists as biased against the current administration and incapable of
producing balanced and impartial reporting.  This would only further obstruct the journalists'
ability to engage in constitutionally protected activity, i.e., journalistic speech.  *See Doe v. City of
Albuquerque*, 667 F.3d 1111, 1135 (10th Cir. 2012) (finding that government action violated the
First Amendment where government failed to prove that it left open ample alternative channels of

communication).  Indeed, credibility, objectivity, and independence are a journalist's currency.  *See Ralis v. RFE/RL*, 770 F.2d 1121, 1125 (D.C. Cir. 1985) ("Congress's intent has been manifest that [USAGM networks] are to enjoy independence in programming and broadcasting decisions.").  Forcing the journalists to file a named lawsuit to protect their interests and First Amendment freedom would irreparably harm their careers and ability to engage in protected speech, giving Defendants (and some members of the public) a basis to incorrectly smear these journalists as biased and to remove them from their beats.  *See* Ex. 49.  These substantial risks of irreparable harm create the precise "fear of stigmatization," that is sufficient to justify third-party standing.  *Whitman-Walker Clinic, Inc.*, 2020 WL 5232076, at \*22 (quoting *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002)); *cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

## II.    Plaintiffs Are Likely To Succeed On The Merits.

### A.    Defendants Are Violating The Statutory And Regulatory Firewall Against Political Interference In Journalistic Activities.[4]

The IBA requires that U.S. government-funded broadcasting "be conducted in accordance with the highest professional standards of broadcast journalism,"  22 U.S.C. § 6202(a)(5), in order to produce content that is "consistently reliable and authoritative, accurate, objective and comprehensive," *id.* § 6202(b)(1).  Critical to achieving that end, the IBA establishes an ironclad firewall between the Agency's leadership and its journalists, providing that "the Chief Executive Officer . . . *shall respect the professional independence and integrity of the Board, its*

---

[4]  Plaintiffs advance claims under the Administrative Procedure Act ("APA") and separately under the IBA, the firewall regulation, and the First Amendment.  Because Plaintiffs can demonstrate that Defendants have violated the IBA, the firewall regulation, and the First Amendment, they necessarily prevail on their APA claims, as they can prove that Defendants' agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2).

*broadcasting services, and the grantees of the Board.*"  22 U.S.C. § 6204(b) (emphasis added).

As the D.C. Circuit explained 35 years ago, "Congress's intent has been manifest that [USAGM

networks] are to enjoy independence in programming and broadcasting decisions."  *Ralis,* 770

F.2d at 1125.  The firewall is thus the bedrock of the Agency's mission to provide "a balanced and

comprehensive projection of United States thought and institutions," 22 U.S.C. § 6202(b)(2),

adhering to "the highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5);

*accord* 22 C.F.R. § 531.1(a).

The precise contours of the statutory firewall are set forth in USAGM regulations.  Those

regulations provide that "USAGM networks necessarily enjoy full editorial independence in order

to maintain their 'professional independence and integrity.'"  22 C.F.R. § 531.1(a).  "Editorial

independence includes, but is not limited to[,] the fact that only individuals within the network

may make any decisions with respect to newsgathering or reporting . . . fully insulated from *any*

political or external pressures or processes that would be inconsistent with the highest standards

of professional journalism."  *Id.* § 531.2(b).  This firewall separates "anybody involved with any

aspect of journalism (e.g. the creation, editing, reporting, distributing, etc., of content) and

everyone else in the organization."  *Id.* § 531.3(b).

USAGM's firewall is therefore violated "when any person within the Executive Branch or

a Network, but outside the newsroom, attempts to direct, pressure, coerce, threaten, interfere with,

or otherwise impermissibly influence any of the USAGM networks, including their leadership,

officers, employees, or staff, in the performance of their journalistic and broadcasting duties and

activities."  *Id*. § 531.3(c).  This language is purposefully broad, ensuring that the firewall has the

maximum force of law.  Notably, the regulation prohibits not only *actual* pressure and coercion

influencing journalistic duties, but also mere *attempts* to engage in such conduct.  And the CEO is

20

prohibited from engaging in any oversight over the networks where he acts inconsistently with what "those in equivalent leadership positions in an organization overseeing other reputable news organizations may provide, in a manner consistent with the highest standards of professional journalism," *id.* § 531.3(e)(3), a standard that this Court recently designated the "'equivalen[cy]' standard." *OTF*, 2020 WL 3605935, at *11 n.19. As this Court recently explained, for example, the USAGM CEO may not "fire a particular staff member or command that a piece be assigned to a particular reporter," nor may he "tell broadcasters what stories to cover or how to cover them." *Id.* at *11.

Here, Defendants have committed a litany of firewall breaches through a multi-faceted campaign to eviscerate the firewall. 22 C.F.R. § 531.3(c).

  ***Unlawful Interference with Journalistic Personnel Decisions.*** Defendants have breached the firewall many times over by impermissibly interfering with numerous personnel decisions of the USAGM networks. Pack's removal of Voice of America's Standards Editor, Steve Springer—who served as the principal defender of the firewall—over repeated objections from Voice of America leadership, is the paradigmatic example of a journalistic decision that no CEO of a private news network would ever interfere with. Carroll Decl. ¶¶ 12, 14; Capus Decl. ¶¶ 19–21; Turner Decl. ¶¶ 22–23; Lennon Decl. ¶ 15; Walsh Decl. ¶¶ 17–18; Powers Decl. ¶ 27; Doe Decl. ¶ 18; Bennett Decl. ¶¶ 23–24; Sugawara Decl. ¶¶ 17–18; Roe Decl. ¶¶ 6–9; Coe Decl. ¶ 9; *cf.* Ex. 37 at 288 (describing editorial personnel decisions made by the Executive Editor, rather than business-side employees, at the Washington Post); Compl. ¶¶ 56–60. The position of Standards Editor indisputably falls on the journalism side of the firewall. Carroll Decl. ¶¶ 12, 14; Capus Decl. ¶ 19; Turner Decl. ¶¶ 22–23; Lennon Decl. ¶ 15; Walsh Decl. ¶¶ 17–18; Powers Decl. ¶ 27; Doe Decl. ¶ 18; Bennett Decl. ¶¶ 23–24; Sugawara Decl. ¶ 18; Roe Decl. ¶ 8; Compl. ¶¶ 56, 59. In that role,

Springer was responsible for training all new employees at Voice of America *and* USAGM on the firewall's obligations through Agency-wide firewall training courses, serving as the point of contact for journalists to raise concerns about firewall violations, and ensuring that Voice of America's reporting remained of the highest quality. *See* Turner Decl. ¶¶ 22–23; Lennon Decl. ¶ 15; Walsh Decl. ¶¶ 17–18; Powers Decl. ¶ 27; Doe Decl. ¶ 18; Bennett Decl. ¶ 22; Carroll Decl. ¶¶ 12–14; Capus Decl. ¶¶ 19, 21; Roe Decl. ¶ 7; Ex. 17; Ex. 18; Compl. ¶¶ 56–57. By removing Springer—and leaving the Standards Editor position unfilled over the strong objections of Voice of America's leadership (Powers Decl. ¶ 27; Roe Decl. ¶ 8)—Pack has breached the firewall. *See* 22 C.F.R. § 531.3(c). As one senior editor explained in an email to Voice of America management,

> [T]hat we still have no agency-wide standards editor [for this] sustained period—but especially during peak US election time—*is frankly journalistic malpractice*. . . . The standards editor during US election season plays an even more influential role, helping communicate the agency's editorial practices so that all journalists can apply a consistent standard in all languages. **Leaving this position empty damages our journalism.** It's as simple as that. **The longer the position remains empty, the more likely we will make errors that undermine our credibility.**

Compl. ¶ 60 (emphasis added); Roe Decl. ¶ 9; *see also* Capus Decl. ¶ 21 (recounting Defendants prohibiting Office of Cuba Broadcasting Standards Editor from commencing work).

Similarly, Pack's and Defendant Cullo's respective decisions to demand the termination of Bay Fang, the Executive Editor of Radio Free Asia, and to try to reassign Voice of America's Bureau Chief of New York position (to someone other than the Voice of America employee slated to fill it) have also breached the firewall. Like a Standards Editor, the positions of Executive Editor and Bureau Chief serve core journalistic functions. Lennon Decl. ¶ 15; Turner Decl. ¶¶ 24–27; Capus Decl. ¶¶ 22–23; Compl. ¶¶ 62–67. An Executive Editor oversees the editorial content of a publication, including direct coverage decisions, while a Bureau Chief manages the newsroom, and is also responsible for coverage decisions. Lennon Decl. ¶ 15; Turner Decl. ¶ 24–27; Capus

Decl. ¶¶ 22–23.  Terminating or reassigning these journalists are decisions that must be made by the journalistic networks, not the CEO.  *See OTF*, 2020 WL 3605935, at *11; *see also* Walsh Decl. ¶¶ 17–18; Lennon Decl. ¶¶ 15–17; Turner Decl. ¶ 27.

Pack has further impermissibly interfered with journalistic personnel decisions by seeking to reduce the diversity of Voice of America's journalistic reporting, and to exert greater control over foreign journalists, by arbitrarily declining to sponsor or renew J-1 visas.  Turner Decl. ¶¶ 31–35; Lennon Decl. ¶¶ 18–19, 23; Tran Decl. ¶ 12; Walsh Decl. ¶¶ 20–21; Bennett Decl. ¶¶ 26–30; Sugawara Decl. ¶¶ 20–24; Roe Decl. ¶¶ 19–22; Coe Decl. ¶ 13; Compl. ¶¶ 68–75.  Pack's pronouncement that he will review the J-1 visa sponsorship and renewal applications of the USAGM networks' foreign journalists on a case-by-case basis—while failing to articulate any standards that will be used to evaluate those applications—breaches the firewall because those are ultimately the type of decisions as to whether to hire or fire particular *journalists* that the firewall does not allow Pack to make.  *See OTF*, 2020 WL 3605935, at *11; Walsh Decl. ¶¶ 20–21; Lennon Decl. ¶¶ 18–19; Turner Decl. ¶¶ 31–35; Sugawara Decl. ¶ 24; Roe Decl. ¶ 21; Compl. ¶¶ 72–75.

Pack's refusal to sponsor or renew J-1 visas imposes a chilling effect on all journalists at the USAGM networks and particularly the visa holders whose ability to remain employed in the United States has become dependent upon Pack's arbitrary discretion.  *See, e.g*., Coe Decl. ¶¶ 13, 27; Roe Decl. ¶¶ 19–22; Ex. 11; Ex. 19; Ex. 20; *see also* Ex. 53; Ex. 54; Compl. ¶ 74.  The exercise of that unfettered discretion tells these foreign journalists to tailor the content of their reporting in a manner that will keep Pack satisfied, lest he decline to renew their visas and return them to their home countries.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988) ("Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech."); *see also Sherrill v.*

*Knight*, 569 F.2d 124, 131 (D.C. Cir. 1977).  This is a blatant attempt to "direct, pressure, coerce, [and] threaten" Voice of America's journalistic and broadcasting content.  22 C.F.R. § 531.1(c).

**Unlawful Interference with Journalistic Content:**  Defendants have also aggressively inserted themselves into day-to-day journalistic operations concerning Voice of America's content—also clearly in violation of the firewall's mandate that the USAGM networks be permitted to exercise editorial independence.  *See* 22 U.S.C. § 6204(b); 22 C.F.R. § 531.3(d); *OTF*, 2020 WL 3605935, at *11 ("[W]hen the USAGM CEO engages in day-to-day control [] the statutory firewall [is] violated."); *see* Carroll Decl. ¶¶ 7–16; Coe Decl. ¶¶ 5, 10–12; Doe Decl. ¶¶ 4-7, 19, Roe Decl. ¶¶ 3, 18; *cf.* Ex. 38 (former *Washington Post* Publisher was "always there for consultation, but he left all final decisions about the news and newsroom to [the *Post*'s executive editor], even when he disagreed with [the editor] at the time"); Compl. ¶¶ 76–77.

Defendant Sam Dewey, for instance, has reached directly into the newsroom—seeking permission to participate in news coverage meetings regarding election reporting and expressing concern to journalists over numerous Voice of America stories.  Roe Decl. ¶¶ 15, 18; Turner Decl. ¶ 36; Powers Decl. ¶¶ 25–26; Doe Decl. ¶¶ 14–15;  Bennett Decl. ¶ 34; Sugawara Decl. ¶ 25; Compl. ¶¶76–77.  Dewey has made clear to journalists that he is watching them, and that their coverage should toe the party line.  Doe Decl. ¶¶ 17–19; Powers Decl. ¶¶ 23, 27, 39; Sugawara Decl. ¶ 19; Coe Decl. ¶ 12; *see also, e.g.*, Ex. 39; Compl. ¶ 77.  Likewise, Dewey's request that Voice of America leadership report to him *which Voice of America journalists* were working on *every story* being developed at the network (his so-called "chain of custody") is, by definition, an attempt to exert control over Voice of America's journalistic activities and to chill the network's journalists into submission.  Bennett Decl. ¶ 25; Sugawara Decl. ¶ 19; *see* Doe Decl. ¶¶ 11, 17; Compl. ¶¶ 88, 95–96.

***Unlawful Journalistic Investigations:***   Defendants have further breached the firewall by actively investigating alleged violations of Voice of America's journalistic standards and attempting to root out perceived "bias" (despite the journalists' commitment to impartial reporting).  Consistent with the highest standards of professional journalism, Voice of America— not USAGM—has historically handled investigations into breaches of Voice of America's journalistic standards.  Turner Decl. ¶ 29; Doe Decl. ¶¶ 10, 12, 16; Bennett Decl. ¶ 31; *see* Capus Decl. ¶ 29; Compl. ¶ 79.  That investigative power is central to journalistic independence:  whether a story was improperly published, should be corrected, or taken down, and whether and how those issues should be investigated, are textbook journalistic decisions—often made through consultation with a network's Standards Editor.  Carroll Decl. ¶¶ 9–14; Capus Decl. ¶¶ 28–30; Roe Decl. ¶¶ 11–12; Bennett Decl. ¶¶ 31–33, 40; Turner Decl. ¶¶ 29–30; *see also* Ex. 30 at 2 (noting that *New York Times* editor tasked with investigating processes behind journalistic lapse).

But Defendants have been transparently engaged in just these types of investigations.

<u>*Urdu Service.*</u>   Defendants first unlawfully directed Voice of America to cease an investigation into whether its Urdu service violated Voice of America's journalistic standards when the service posted a Joe Biden campaign video with insufficient context.  Turner Decl. ¶¶ 28– 30; Coe Decl. ¶ 10; Bennett Decl. ¶¶ 32–33; Compl. ¶ 82.  Directing Voice of America to stop its *own* investigation into whether *its own journalists* adhered to the network's standards unquestionably interferes with the network's journalistic activities in violation of the firewall.  Roe Decl. ¶¶ 11–12; Carroll Decl. ¶¶ 7–16; Compl. ¶ 83.  But Defendants went further, commissioning Sam Dewey, an attorney and political appointee at USAGM, to investigate the Joe Biden video, in place of Voice of America.  Turner Decl. ¶ 30; Bennett Decl. ¶¶ 32–33; Coe Decl. ¶ 10; Compl. ¶ 83.  Dewey conducted a wide-ranging investigation and ultimately directed that Urdu service's

digital managing editor be placed on leave and that four contractors who worked on the video be terminated.  Turner Decl. ¶ 30; Walsh Decl. ¶ 19; Bennett Decl. ¶¶ 32–33; Roe Decl. ¶ 12; Compl. ¶ 85.

This not only directly conflicts with Voice of America's historical disciplinary practices, but is a blatant violation of the firewall.  Turner Decl. ¶ 29; Ex. 21; *see also OTF*, 2020 WL 3605935, at *11; *see also* Ex. 30 at 2 (*New York Times* editor assigned to investigate apparent journalistic lapse at the newspaper).  In so acting, Dewey sent a clear and unmistakable message to Voice of America journalists:  mistakes will be handled by non-journalist political appointees— not Voice of America—and punishment will be severe.  Journalists must therefore toe the line or risk the wrath of those outside the firewall.  And if journalists had any doubt about what that party line consisted of, they need only look at what Dewey did *not* investigate—a Trump campaign video posted by a Spanish language Voice of America service advising Latinos not to vote for Biden.  Ex. 25; Ex. 26; Compl. ¶¶ 80–81.

Dewey's investigative efforts are intended to influence (and are influencing) Voice of America's journalistic content.  After Dewey completed his "investigation" into the Biden video, an Urdu service journalist was so concerned that Dewey might find more pretextual bases to terminate journalists that he went back and deleted video stories the Urdu service had posted regarding the George Floyd protests.  Compl. ¶ 86; Roe Decl. ¶ 14.  Dewey got wind of the deletions and immediately struck, improperly reaching around the firewall and asking the Chief of the Urdu Service to "identify content put out during [the] same time period as these videos that presents the other side of these issues."  Compl. ¶ 87; Roe Decl. ¶¶ 14–15.  In a clear attempt to influence and pressure coverage, Dewey even explained what that "other side" might be: "namely that regardless of the merit of the BLM or other causes, mass rioting is not acceptable.  For

example, are there videos that contain some of the statements by General Barr on these issues or stories about those who lived in underserved communities and had their property damaged?" Compl. ¶ 87; Roe Decl. ¶ 15. Dewey's note further demanded: "Please immediately instruct the entire service that they are ordered and directed by the office of the CEO to search for and preserve any copies of the stories removed." Compl. ¶ 87; Roe Decl. ¶ 15. Dewey's actions make clear that his investigations are not merely good-faith, accidental firewall breaches, but are intentional "attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence" coverage, in plain violation of the firewall. 22 C.F.R. § 531.3(c).

_Biden/Trump Profiles_. The same is true with respect to the unlawful and wide-ranging investigation by USAGM into the Voice of America publication profiling Jill Biden and Melania Trump. *See* Doe Decl. ¶¶ 8–13; Coe Decl. ¶ 11; Ex. 23; Ex. 24; Compl. ¶¶ 89–94. Specifically, USAGM officials have been interviewing numerous journalists and editors to ask whether a caption accompanying the story reflects "bias"—i.e., the statement that the President "has disparaged immigrants and regularly attacks perceived adversaries on Twitter." Doe Decl. ¶¶ 10–13; Compl. ¶ 92. USAGM officials have asked a host of questions about journalistic ethics and the editorial process. Doe Decl. ¶¶ 10–13; Compl. ¶ 92.

Ultimately, USAGM officials made clear that this investigation—one conducted in plain violation of the Editorial Lapses policy in addition to the firewall (Ex. 21; Powers Decl. ¶¶ 20–21; Compl. ¶ 95)—was intended to determine whether the Melania Trump/Jill Biden profiles failed to provide "balanced" coverage, and whether *USAGM* should take action against any journalists or editors as a consequence. Doe Decl. ¶¶ 8–13, 16; Compl. ¶¶ 92–94. As with Dewey's investigation into the Biden video, this investigation by USAGM Human Resources was intended to influence the content of journalistic reporting by sending a message to journalists that failure to

present the administration in a favorable light will be met with interrogation and serious consequence.  Doe Decl. ¶¶ 8–19; Compl. ¶¶ 92–94.  This, too, is a blatant breach of the firewall.

*Herman Investigation.*  USAGM also launched an investigation into one of Voice of America's most prominent journalists: Steve Herman, Voice of America's White House Bureau Chief.  Coe Decl. ¶¶ 19–20; Doe Decl. ¶¶ 14–15; Roe Decl. ¶ 16; Capus Decl. ¶¶ 29–30; Compl. ¶¶ 106–09.  On August 31, 2020, Herman led and organized a group of journalists to write a letter to the acting director of Voice of America, expressing their concern regarding USAGM's repeated violations of the firewall.  Ex. 19; Coe Decl. ¶¶ 14–16; Compl. ¶¶ 99–100.  In response, Defendants Dewey and Wuco, at Pack's apparent direction, launched a retaliatory investigation into Herman, scouring his reporting and scrutinizing his social media activity for any hint of bias.  Ex. 51; Ex. 50; Coe Decl. ¶¶ 19–20; Doe Decl. ¶¶ 14; Roe Decl. ¶ 16; Compl. ¶¶ 106–09.  As part of this improper investigation, Dewey and Wuco put together a 30-page dossier of materials, purporting to build a case that Herman was biased against the Trump Administration and had violated VOA's Best Practices Guide or Social-Media Policies.  Coe Decl. ¶¶ 19–20; Doe Decl. ¶¶ 14–15; Roe Decl. ¶ 16; Compl. ¶ 107.  On September 18, 2020, Dewey and Wuco gave a copy of this dossier to Voice of Americas' acting director, asking him to take action against Herman, and Pack himself has called Voice of America's Acting Director to demand him to take action against Herman. Powers Decl. ¶ 28; Coe Decl. ¶¶ 19–20; Doe Decl. ¶¶ 14–15; Roe Decl. ¶ 16; Compl. ¶ 107.  As of the date of this filing, no action has been taken against Herman, but the investigation itself and the attempt to force Herman's removal is plainly a violation of the firewall.  *See OTF*, 2020 WL 3605935, at *11; *see also* Doe Decl. ¶¶ 16–20; Walsh Decl. ¶¶ 17–19; Lennon Decl. ¶ 17; Turner Decl. ¶¶ 28–30; Capus Decl. ¶¶ 29–30; Ex. 50.

**B.    Plaintiffs' First Amendment Claims Are Likely To Succeed.**

    **i.    The First Amendment Protects The USAGM Networks, Their Journalists, And The Employees That Support Journalistic Activity.**

"The Supreme Court has long held that the notion of the 'press' should be given a broad meaning, stating that 'the press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.'" *Tripp v. Dep't of Defense*, 284 F. Supp. 2d 50, 55 (D.D.C. 2003) (quoting *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938)).   Under this construction, the mere fact that a journalistic outlet is funded (or even owned) by the government does not strip that organization of its First Amendment protection.   Indeed, a court in this district expressly held that *Stars and Stripes*, a newspaper "published and financed" by the Department of Defense, was entitled to the First Amendment protections reserved to the press.   *Id.* at 55–57 & n.3.

So too here.   As with *Stars and Stripes*, Congress intended the USAGM networks "to operate like other commercial newspapers, and enjoy First Amendment protections and prohibitions."   *See id.* at 56.   The USAGM networks are, for one, required to conduct themselves "in accordance with the highest professional standards of broadcast journalism."   22 U.S.C. § 6201(a)(5); *see Ralis*, 770 F.2d at 1125.   And federal law further makes plain that, "USAGM networks necessarily enjoy full editorial independence in order to maintain their 'professional independence and integrity.'"   22 C.F.R. § 531.1(a).   In short, as Congress has made clear, "[a]lthough VOA correspondents are on the federal payroll, they are unique in that they are working journalists."   S. Rep. No. 107-60, § 509 (2001); *see also Ralis*, 770 F.2d at 1121,1225– 26.   Accordingly, here, as in *Tripp*, the "relevant case law, recent legislative history, . . . and [witness declarations] all support [Plaintiffs'] contention that the [USAGM networks] and [their] employees should be afforded First Amendment protections."   284 F. Supp. 2d at 57.

> **ii.    Plaintiffs Are Likely To Succeed In Demonstrating That Defendants Have Attempted To Control, Suppress, And Influence The Content Of Journalistic Speech, In Violation Of The First Amendment**

"[T]he fundamental rule of protection under the First Amendment" gives "a speaker the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston Inc.*, 515 U.S. 557, 572–73 (1995). Indeed, Pack has himself acknowledged that it is unlawful to "tell a journalist how to cover a story or what to say." Ex. 22 at 10:20–10:25. The First Amendment also prohibits any interference with "the exercise of editorial control and judgment," as not "consistent with First Amendment guarantees of a free press." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974)*; see also* 22 C.F.R. § 531.1(a) ("USAGM networks necessarily enjoy full editorial independence in order to maintain their 'professional independence and integrity.'"); *CBS, Inc. v. F.C.C.*, 629 F.2d 1, 30 (D.C. Cir. 1980) ("[T]he first amendment also values broadcaster discretion.").

Journalistic enterprises are, after all, "more than a passive receptacle or conduit for news, comment, and advertising," and any government action that "intru[des] into the function of editors" "fails to clear the barriers of the First Amendment." *Tornillo*, 418 U.S. at 258. Courts have recognized that governmental influence on a newspaper's staffing decisions, for instance, violates the First Amendment, because a "publisher's choice" of reporters and editors "affects the expressive content of its newspapers" and is "bound to affect what gets published." *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 962–63 (9th Cir. 2010); *see also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784–85 (1978) ("In the realm of protected speech, the legislature is constitutionally disqualified from dictating . . . the speakers who may address a public issue.").

Defendants have undertaken a calculated effort to violate the First Amendment rights of the network journalists, by attempting to control, suppress, and influence the content of the coverage that the journalists and the USAGM networks generate. Certain of Defendants' attempts

at influence have been direct.  Dewey's efforts, for instance—including his investigations, his attempts to sit in on news coverage meetings, and his questions about journalistic content and the journalistic "chain of custody"—represent overt government actions that are almost certainly designed to influence reporting to adopt a perspective he perceives as more friendly to the current presidential administration.  Turner Decl. ¶¶ 30, 36; Powers Decl. ¶ 25; Bennett Decl. ¶ 25; Sugawara Decl. ¶ 19; Roe Decl. ¶¶ 14–15, 18; Compl. ¶¶ 76–77, 88.  So too with the investigation conducted by USAGM into a piece of reporting they believed was critical of President Trump. Doe Decl. ¶¶ 8–13; Roe Decl. ¶¶ 10–13; Compl. ¶¶ 78–88.  Such government attempts to control journalistic expression and speech is anathema to the First Amendment.

Other of Defendants' incursions upon the First Amendment have been more insidious. Defendants understand that, even if they cannot tell the networks what to say, they may exert control over journalistic coverage by: (i) interfering with which journalists and essential support staff are employed at the networks; and (ii) obstructing the stream of resources available to the networks.  That these two strategies are forbidden by the First Amendment has not stopped Defendants from implementing them, to devastating effect.  *See McDermott*, 593 F.3d at 962–63 (interference with a newspaper's personnel management violates the First Amendment because it will influence the content of coverage); *Claybrooks v. Am. Broad. Cos., Inc.*, 898 F. Supp. 2d 986, 1000 (M.D. Tenn. 2012) ("[T]he First Amendment protects the right of the producers of these [television] [s]hows to craft and control [their] messages, based on whatever considerations the producers wish to take into account. . . . '[R]ather like a composer,' the defendants are entitled to select the elements (here, cast members) that support whatever expressive message the [television shows] convey or are intended to convey.").

*First*, Defendants have terminated or removed journalists and editors, including Voice of America's Standards Editor and Bay Fang, the Executive Editor of Radio Free Asia, without justification.  Turner Decl. ¶¶ 22–27; Lennon Decl. ¶ 15; Walsh Decl. ¶¶ 17–18; Powers Decl. ¶ 27; Doe Decl. ¶ 18; Compl. ¶¶ 58–59, 62–64.  They have attempted to force out the lawfully hired Voice of America New York Bureau Chief, so the position could be filled by a new candidate that Defendants deem more acceptable.  Lennon Decl. ¶¶ 16–17; Ex. 52; Compl. ¶¶ 65–67.  Defendants have refused to approve or renew any of the J-1 visa sponsorship applications submitted by employees of the broadcasting networks, thereby constructively discharging more than a dozen employees.  Turner Decl. ¶¶ 31–35; Lennon Decl. ¶¶ 18–19, 23; Tran Decl. ¶ 12; Walsh Decl. ¶¶ 20–21; Bennett Decl. ¶¶ 26–30; Sugawara Decl. ¶¶ 20–24; Roe Decl. ¶¶ 19–22; *see* Ex. 20; Ex. 11; Ex. 19; Compl. ¶¶ 68–75.  Unable to retain the employees of their choice or to hire crucial personnel, the USAGM networks' ability to determine the content of their coverage is severely hampered, violating the network's journalists' First Amendment rights.  Turner Decl. ¶¶ 31–35; Lennon Decl. ¶ 15; Walsh Decl. ¶ 20; Roe Decl. ¶¶ 19–24; Compl. ¶¶ 72, 143.

Defendants have also placed many essential personnel on administrative leave, including Kligerman, Powers, Tran, Lennon, Turner and Walsh—USAGM employees who have spent a significant portion of their careers safeguarding the networks' independence.  Turner Decl. ¶ 10; Lennon Decl. ¶¶ 3–4, 25; Tran Decl. ¶¶ 1, 17; Walsh Decl. ¶¶ 6, 28; Powers Decl. ¶¶ 35–36; Compl. ¶ 61.  Defendants' removal of these individuals reflects Defendants' true goal: to exert control over journalistic content without facing pushback from those most equipped to enforce the firewall.  For that reason, Defendants have ensured that many of these positions—including the essential role of Standards Editor of Voice of America—remain vacant.  *See, e.g.*, Roe Decl. ¶¶ 6–9; Lennon Decl. ¶ 15; Walsh Decl. ¶¶ 17–18; Powers Decl. ¶ 27; Compl. ¶¶ 58, 142.

*Second*, Defendants have engaged in systematic efforts to starve the journalists and their news organizations of resources. By example, since he was installed as CEO of USAGM, Pack has frozen budgets, effectively halting or dramatically slowing the disbursement of funds that Congress allocated to USAGM's associated entities, which allow them to operate and fulfill their statutory role as news organizations. Turner Decl. ¶¶ 12–13, 40–41; Walsh Decl. ¶¶ 11, 23; Compl. ¶¶ 110–15. Without this essential funding, the journalists cannot cover the stories of their choosing, preventing them from acting with journalistic independence or employing editorial discretion in violation of their First Amendment rights. Turner Decl. ¶¶ 35, 39–41; Walsh Decl. ¶ 23; Roe Decl. ¶¶ 21–24; Compl. ¶ 143. In sum, Defendants' conduct has and will continue to affect "the expressive content" of the networks' and their journalists' coverage in violation of the First Amendment. *McDermott*, 593 F.3d at 962. ("To the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice.").

### iii.    Plaintiffs Are Likely To Succeed In Demonstrating That Defendants Chilled The Journalists' First Amendment Rights

"[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see also Williams v. Town of Greenburgh*, 535 F.3d 71, 78 (2d Cir. 2008) (holding that to prove a deprivation of free speech, plaintiff must "come forward with evidence showing either that (1) defendants silenced him *or* (2) defendants' actions had some actual, non-speculative chilling effect on his speech" (alteration and internal quotation marks omitted; emphasis added)). "Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013) (citation omitted).

Here, Defendants' actions would deter (and have deterred) a person of ordinary firmness from exercising their First Amendment rights in at least three ways.  *First*, Defendants have gone to great length to ensure that each journalist at every broadcasting network knows that Pack and others outside of the firewall are closely monitoring their coverage.  This is perhaps best illustrated by the political investigations into journalistic decisions and Defendant Dewey's requests that he attend coverage meetings for the 2020 election and receive a list of which Voice of America journalists are working on every story in development.  Compl. ¶ 88; Turner Decl. ¶¶ 30, 36; Powers Decl. ¶¶ 25–26; Bennett Decl. ¶ 35; Sugawara Decl. ¶¶ 19, 25; Roe Decl. ¶ 18; Coe Decl. ¶ 12.  In fact, Defendants' actions have *already* chilled content—resulting in journalists at Voice of America's Urdu Service taking down journalistic content out of fear of reprisal, (*see* Ex. 11; Coe Decl. ¶¶ 8, 14, 18, 21; Roe Decl. ¶ 14; Compl. ¶ 86; *see also* Doe Decl. ¶¶ 17–19),  and Voice of America's central newsroom killing stories that they would otherwise pursue, (Powers Decl. ¶ 27; Doe Decl. ¶¶ 17, 19; Roe Decl. ¶¶ 25–26; Compl. ¶ 140).  Journalists have even expressed that their coverage is more cautious and slower and that they have declined to tackle hard-hitting issues.  Doe Decl. ¶¶ 17–19; Roe Decl. ¶¶ 25–26; Compl. ¶ 140.  This epitomizes unconstitutional chill.  Compl. ¶ 140; Roe Decl. ¶ 13 (Senior newsroom manager in email explaining:  "We have reached a point where we, in the News Center, are at least as worried about self-censorship as we are about bias and think we need to be equally vigilant against both.").

*Second*, Defendants have made clear that their surveillance of speech is not an empty threat; they have shown themselves willing to dispense severe punishments, showing no respect for journalistic independence or the firewall.  Defendants' entire course of conduct is exemplified by the manner in which Defendant Pack commenced his reign as CEO of USAGM:  with the rapid-fire removal of network heads, (Turner Decl. ¶ 25; Lennon ¶ 14; Ex. 9; Ex. 13; Ex. 40; Ex. 16;

Compl. ¶ 51), the "reassignment" of Voice of America's Standards Editor to a job that has no duties, and his placing various employees, including Plaintiffs, tasked with guarding the firewall on administrative leave, (Turner Decl. ¶¶ 10, 22–24; Lennon Decl. ¶ 4, 15, 25; Walsh Decl. ¶¶ 6, 18–19, 28; Powers Decl. ¶¶ 27, 35–36; Tran Decl. ¶ 1, 17; Compl. ¶¶ 56–58, 61). *See Hoover v. Radabaugh*, 307 F.3d 460, 466–67 (6th Cir. 2002) ("Termination is an adverse action that would chill speech in a person of ordinary firmness."). So too with Dewey's investigation of the Urdu Service, which concluded with the termination of four contractors who had worked on the Biden video with which Defendants took issue and the placement of the service's digital managing editor on leave. Turner Decl. ¶¶ 28–30, 36; Walsh Decl. ¶ 19; Compl. ¶¶ 78–85. And when a group of fourteen Voice of America journalists sent a letter to the acting director of Voice of America expressing their concern with the many ways in which USAGM has violated the firewall and weakened the networks, USAGM responded with a series of Tweets, publicly threatening the letter's signatories. Coe Decl. ¶¶ 15–16; Ex. 19; Ex. 41; Ex. 5; Compl. ¶¶ 99–101. USAGM has even gone so far as to pressure Voice of America's acting director to fire the most prominent of these fourteen journalists, Steve Herman, Voice of America's White House Bureau Chief. Coe Decl. ¶¶ 19–20; Doe Decl. ¶¶ 14–15; Roe Decl. ¶ 16; Compl. ¶¶ 106–09; Powers Decl. ¶ 28.

*Third*, Defendants have promulgated new rules governing journalistic conduct that are designed to cow journalists into a state of fearful submission. Capus Decl. ¶¶ 26–27; Coe Decl. ¶¶ 17–18; Compl. ¶¶ 102–05. On October 4, 2020, Defendant Pack sent a policy memo to all journalists at the USAGM networks with the subject "Guidance on Conflicts of Interest." Ex. 49; Coe Decl. ¶ 17; Compl. ¶ 102. In the memo, Pack pronounced new conflicts of interests policies which prohibit journalists from reporting on an issue in which a journalist has a "personal interest" or has "publically [*sic*] personally expressed a political opinion." Ex. 49 at 1; Ex. 51; Compl. ¶¶

35

102–03.  Pack's new policy further provides that, if journalists refuse to recuse themselves in the face of a purported conflict of interest, their supervisors are required to order their recusal.  Ex. 49 at 3; Ex. 51; Compl. ¶ 105; Doe Decl. ¶¶ 20–22; Coe Decl. ¶¶ 17–19.

This government-imposed policy is not only another impermissible attempt by USAGM executives to control journalistic content, but is also unconstitutionally overbroad and vague.  *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (a regulation must inform "regulated parties . . . what is required of them so they may act accordingly" and provide "precision and guidance . . . so that those enforcing the law do not act in an arbitrary or discriminatory way."); *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (same); Capus Decl. ¶ 27.  By way of example, a literal reading of the policy would lead to the absurd result of prohibiting *any* journalist at Voice of America from covering the Administration's handling of the COVID-19 pandemic, because each journalist is affected by it.  Compl. ¶ 104.  The policy also confers upon USAGM essentially unfettered discretion to suppress speech—allowing it to punish reporters based on the very "*post hoc* rationalizations*" the First Amendment prohibits.  *See Lakewood*, 486 U.S. at 758, 770 (prohibiting government officials from exercising unbridled discretion to control First Amendment protected); Capus Decl. ¶¶ 26–27; Compl. ¶¶ 104–05.  Journalists will never know when or how USAGM will enforce it, rendering the policy certain to chill expressive activity.  *See Fox*, 567 U.S. at 253–54 ("When speech is involved, rigorous adherence to" the prohibition on vague regulations "is necessary to ensure that ambiguity does not chill protected speech."); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1436 (D.C. Cir. 1996) (noting that government punishment of a Voice of America employee for publishing material that was "inaccura[te], inconsisten[t] with current foreign policy, or [posing] significant potential to affect U.S. foreign relations in an adverse manner . . . would raise serious constitutional issues.").

### iv.  Plaintiffs Are Likely To Succeed In Demonstrating Defendants Engaged In Perceived-Viewpoint-Based Discrimination

The First Amendment "prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out," *Hartman v. Moore*, 547 U.S. 250, 256 (2006), and bars discrimination "based upon the content of the journalist's publications," *Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987) (citing *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977), or the viewpoint expressed by a speaker, *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  Even when a restriction is not content- or viewpoint-based on its face, it is impermissible where circumstantial evidence demonstrates it was motivated by content or viewpoint.  *See Stevens*, 665 F. Supp. at 175 (finding likely that a restriction was content-based where the person imposing it stated that it was based on specific journalists' coverage).  Content- and viewpoint-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *accord Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints."); *Regan v. Time, Inc.*, 468 U.S. 641, 648–49 (1984) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.").

Here, Defendants' have targeted USAGM network journalists based on their perceived viewpoint, all in violation of the First Amendment.  Defendants believe that the content of the USAGM networks' news coverage is insufficiently friendly to the Administration's politics, and have developed a mistaken belief that certain USAGM network journalists harbor a liberal bias. Turner Decl. ¶ 49; Lennon Decl. ¶ 25; Tran Decl. ¶ 17; Walsh Decl. ¶ 28; Doe Decl. ¶ 11. Defendants are also undertaking a widespread effort to "drain the swamp" and purge the "Deep

State" without any evidence that Plaintiffs or the journalists whose lives Defendants are working actively to destroy are anything but dedicated and impartial public servants.[5]  Ex. 42; Ex. 22 at 9:55–10:10; Ex. 4; Compl. ¶ 22.  They are investigating.  Ex. 11; Turner Decl. ¶¶ 28–30, 36; Walsh Decl. ¶ 19; Doe Decl. ¶¶ 8–16; Bennett Decl. ¶¶ 31–33; Roe Decl. ¶¶ 10–16; Compl. ¶¶ 78–97. And they are punishing.  Turner Decl. ¶¶ 28–30, 36; Walsh Decl. ¶ 19; Bennett Decl. ¶ 33; Compl. ¶ 85.  All in response to what they perceive Plaintiffs' and the journalists' viewpoints to be.

Pack's actions as CEO of USAGM leave no doubt that he shares an antipathy for the USAGM networks' news coverage and the perception that it reflects liberal bias.  Turner Decl. ¶ 49; Lennon Decl. ¶ 25; Tran Decl. ¶ 17; Walsh Decl. ¶ 28; Doe Decl. ¶ 11.  In an interview on *The Federalist*, Pack said that the USAGM networks' journalism had "drift[ed] to the left" and required his additional oversight.  Ex. 22 at 7:20–7:45; Compl. ¶¶ 120–22.  Pack went on to say that his "job really is to drain the swamp and root out corruption" and expressed a desire to "expose [purported wrongdoers at USAGM] to the media."  Ex. 22 at 10:02–10:10, 14:15–14:30.  Pack specifically referenced the President's comment that Voice of America's coverage was "disgusting" and identified the Urdu service's Biden video as an example.  *Id.* at 14:28–15:00.  He said that Voice of America and USAGM had "contempt for the standards of journalism," as well as their own missions, and that it is "sort of up to me to fix them all."  *Id.* at 22:42–24:05.  In one particularly disturbing exchange, an interviewer suggested that Pack ban masks and turn off the air-conditioning in USAGM's offices, creating patently dangerous working conditions during the global COVID-19 pandemic.  *Id.* at 17:24–17:29.  Pack responded, "We'll have to look into that

---

[5]  The President himself has made clear exactly what Defendants were supposed to do upon taking over USAGM, accusing USAGM (prior to Defendants' reign) of peddling Chinese and Iranian "propaganda," (Ex. 11; Ex. 43; Ex. 44; Compl. ¶ 44) and declaring that "what's coming out of the Voice of America, it's disgusting.  The things they say are disgusting toward our country.  And Michael Pack would get in and do a great job, but he's been waiting for two years — can't get him approved."  Ex. 12; see also Ex. 45.

one." *Id.* at 17:29–17:31; *see also* Ex. 4; Compl. ¶ 115.  Pack clearly believes that the journalists' news coverage is unfair to the Administration and displays a left-wing bias.  His actions— including interference with personnel management and journalistic content—are part of his efforts to "drain the swamp" and punish USAGM network journalists for their perceived viewpoints. Turner Decl. ¶ 49; Lennon Decl. ¶ 25; Tran Decl. ¶17; Walsh Decl. ¶ 28; *see* Doe Decl.  ¶ 10–19.

Other USAGM employees, including Defendants in this suit, have followed Pack's lead in targeting perceived bias with swift retaliation.  This discrimination against a perceived viewpoint is readily discernable in Defendants' disparate response to two near-identical missteps by USAGM's broadcast networks.  The first plainly erred in favor of Defendants' conservative viewpoint:  *VOA Noticias* posted a video from a Trump campaign official advising Latinos to vote against Biden. Ex. 25; Ex. 26; Compl. ¶¶ 80–81.  Defendants did not even attempt to investigate this incident. Ex. 25; Ex. 26; Compl. ¶ 81.  The second incident favored liberal politics:  Voice of America's Urdu service posted what was essentially a two-minute clip of Biden campaigning, without any context.  Turner Decl. ¶ 28; Walsh Decl. ¶ 19; Compl. ¶ 82.  This journalistic lapse was met with Defendants' full wrath:  a full-scale McCarthy-esque investigation propagated by Dewey, resulting in the purging of the Urdu service's digital managing editor and the termination of four contractors who had worked on the Biden video.  Turner Decl. ¶¶ 28–30, 36; Walsh Decl. ¶ 19; Compl. ¶¶ 83–85.  Such content- or perceived-viewpoint-based discrimination plainly violates the First Amendment.  *See Knight First Amend. Inst. v. Trump*, 302 F. Supp. 3d 541, 575 (S.D.N.Y. 2018) (noting that when the President blocked Twitter users who disagreed with him, those users "indisputably [were] blocked as a result of viewpoint discrimination"), *aff'd*, 953 F.3d 216 (2d Cir. 2020); *see also Bird v. W. Valley City*, No. 2017 WL 4326485, at *10 (D. Utah Sept. 28, 2017) (retaliation based on "real or perceived first amendment activities" is unconstitutional).

### C.     Plaintiffs' Breach Of Fiduciary Duty Claim Is Likely To Succeed.

Congress imposed fiduciary duties on USAGM CEO in the very statutes that created the office, requiring that the "Chief Executive Officer, in carrying out [his or her] functions . . . respect the professional independence and integrity of the Board, its broadcasting services, and the grantees of the Board." 22 U.S.C. § 6204(b); *id.* § 6202(a)(5), (b)(1), (b)(2).  Congress's decision to use the title "Chief Executive Officer" further evidences its intent to impose fiduciary duties on the office.  "Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Cobell v. Norton*, 240 F.3d 1081, 1098–99 (D.C. Cir. 2001) (citation omitted).  Under the common law, a CEO owes fiduciary duties to the corporation he or she serves—including "'an undivided and unselfish loyalty to the corporation.'" *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 53 (D.D.C. 2001) (citation omitted).

Pack, acting in his official capacity as CEO, has plainly breached that duty.  In his brief tenure as CEO, he has imperiled USAGM's journalistic independence and integrity and threatened the very viability of the networks' operations.  Pack has fired essential personnel and banished others to administrative leave.  Turner Decl. ¶¶ 10, 22–25; Lennon Decl. ¶¶  4, 14–15, 25; Tran Decl. ¶¶ 1, 17; Walsh Decl. ¶¶  6, 18–19, 28; Powers Decl. ¶¶  27, 35–36; Ex. 9; Ex. 13; Ex. 40; Ex. 16; Compl. ¶¶ 55–61.  He has frozen operating budgets, preventing fulfillment of orders for even bare necessities like toilet paper.  Turner Decl. ¶¶ 12–13, 40–41; Walsh Decl. ¶¶ 11, 23; Compl. ¶¶ 110–15.   He has refused to disburse funds that were allocated through valid appropriations bills.  Ex. 46; Compl. ¶ 111.  He has launched investigations into perceived journalistic lapses, doling out harsh punishments for mistakes.  Turner Decl. ¶¶ 28–30, 36; Walsh Decl. ¶ 19; Bennett Decl. ¶ 33; Roe Decl. ¶¶ 10–12; Compl. ¶¶ 78–85.  And he has attempted to insert his own operatives into journalistic meetings to influence coverage decisions.  Turner Decl.

¶ 36; Powers Decl. ¶ 25; Bennett Decl. ¶ 34; Roe Decl. ¶ 18; Compl. ¶¶ 76–77.  Indeed, Pack has so egregiously violated his fiduciary duties that a bipartisan group of senators announced that they have "serious questions about the future of the [USAGM] under [Pack's] leadership."  Ex. 36; Ex. 47; *see also* Ex. 48; Compl. ¶¶ 116–19.  This gross corporate mismanagement is a far cry from what is required of a fiduciary.  *See Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 595 F. Supp. 2d 110, 116 (D.D.C. 2009).

That Pack's breach of his fiduciary duty has caused harm to Plaintiffs, the USAGM network journalists on whose behalf they bring this action, and to USAGM and its associated entities writ large, cannot be seriously doubted.  *See Armenian Genocide Museum & Mem'l, Inc.*, 595 F. Supp. 2d at 116 ("[T]he elements necessary to state a legally cognizable breach of fiduciary duty [include that] the breach was a proximate cause of an injury.").  Pack has trampled on the USAGM network journalists' First Amendment rights in influencing the content of their journalistic speech.  Certain Plaintiffs have been placed on administrative leave.  Turner Decl. ¶ 10; Lennon Decl. ¶¶ 4, 25; Tran Decl. ¶¶ 1, 17; Walsh Decl. ¶¶ 6, 28; Powers Decl. ¶¶ 35–36; Compl. ¶ 61.  And Plaintiffs and USAGM network journalists have been forced to bear witness to Pack's  destruction of the networks' reputations.  Turner Decl. ¶¶ 34, 48; Lennon ¶¶ 10, 21–25; Tran Decl. ¶¶ 15–16; Walsh Decl. ¶ 21, 26–27; Powers Decl. ¶¶ 30, 37–40; Ex. 19.  Plaintiffs are therefore likely to prevail on their claim that Defendants breached their fiduciary duties.

## III.   Plaintiffs And The Network Journalists Will Be Irreparably Injured Absent Injunctive Relief.

Defendants' unlawful conduct has caused, and will continue to cause, irreparable harm to Plaintiffs and the USAGM network journalists whose rights Plaintiffs seek to vindicate.  "[A] prospective violation of a constitutional right constitutes irreparable injury for . . . purposes" of "seeking equitable relief."  *Karem*, 960 F.3d at 667 (citing *Gordon v. Holder*, 721 F.3d 638, 653

(D.C. Cir. 2013)).  Accordingly, the loss of any "First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (same).  Even the "potential for chilling . . . speech" threatens a First Amendment violation, and in turn, irreparable harm.  *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) ("[R]etaliation need not be monstrous to be actionable under the First Amendment; it need merely create the potential for chilling . . . speech on matters of public concern.").  The First Amendment harm Defendants have effected, and would continue to effect if left unchecked, is therefore inherently irreparable.

Defendants' breach of the firewall and unabashed tampering with journalistic content have resulted in analogous irreparable harms, including the loss of the USAGM networks' journalistic independence, integrity, and credibility.  Defendants' breaches of the firewall are chilling journalistic conduct, resulting in slowed news coverage and killed stories.  "[G]iven that the news is time-sensitive and occurs spontaneously," preventing USAGM network journalists from freely conversing and publishing content without fear of reprisal, and removing USASGM personnel who sought to enforce the firewall, are harms that "cannot be remedied retrospectively" and thus require immediate relief.  *Karem v. Trump*, 404 F. Supp. 3d 203, 217 (D.D.C. 2019), *aff'd as modified*, 960 F.3d 656 (D.C. Cir. 2020) ("Each day that [the reporter] is deprived of that interest . . . he suffers a harm that cannot be remedied in retrospect."); *see also Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977) (interference with ABC Network's ability to broadcast live coverage of post-election activities constituted irreparable injury).

Defendants have also caused irreparable harm in damaging the reputations of USAGM, the networks, the journalists, and Plaintiffs.  Compl. ¶ 138.  Courts routinely award injunctive relief due to "irreparable harm from the loss of . . . customer trust and goodwill."  *Morgan Stanley DW*

*Inc. v. Rothe,* 150 F. Supp. 2d 67, 77 (D.D.C. 2001); *see also Patriot, Inc. v. U.S. Dept. of Hous. & Urban Dev.*, 963 F.Supp. 1, 5 (D.D.C. 1997) ("plaintiffs have demonstrated irreparable harm in damage to their business reputation"); *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (irreparable harm where defendant's conduct "could not fail to damage [plaintiff's] good name"). Since "[i]njury to reputation and goodwill is not easily measured in monetary terms," it is "often viewed as irreparable." *Jones v. D.C.*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) (citing 11A Charles Alan Wright et al., Fed. Prac. & Proc. § 2948.1 (3d ed. 2013 & 2015 Supp.)). Even proof that "it will be difficult . . . to attract new customers" demonstrates "some degree of irreparable injury." *Nalco Co. v. U.S. E.P.A.*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011).

Defendants' unlawful conduct here has unquestionably damaged the reputation of USAGM, its employees (including Plaintiffs), the USAGM networks, and their journalists. Ex. 19. The high quality of USAGM's journalism, and the positive reputation of USAGM as an agency more broadly, is only possible because of the Agency's commitment to journalism independent from government influence. Doe Decl. ¶¶ 4–7; Coe Decl. ¶¶ 5–6, 22; Roe Decl. ¶¶ 22, 24; Capus Decl. ¶¶ 9–10, 15–17. But Defendants have seemingly sought to transform USAGM from the independent journalistic outlet that Congress intended to state-controlled media. Compl. ¶ 54. Once the viewership of USAGM catches wind of Defendants' improper political influence (to the extent it has not already (*see* Ex. 20; Ex. 35)), USAGM's news outlets will no longer serve as a source of credible coverage and will lose the respect and goodwill of their audience around the globe. Doe Decl. ¶¶ 4–7, 19; Turner Decl. ¶ 48; Bennett Decl. ¶ 40; Compl. ¶ 139. That loss of trust and goodwill will irreparably harm the networks' journalists, whose professional reputations, like those of Plaintiffs, are intertwined with that of USAGM. Doe Decl. ¶¶ 18–25; Compl. ¶¶ 138, 144. Similarly, once Plaintiffs Turner, Lennon, Powers, Walsh, and Tran return to their posts at

USAGM, their tasks will be substantially more difficult.  Turner Decl. ¶ 48; Powers Decl. ¶¶ 23, 38; Tran Decl. ¶ 16; Walsh Decl. ¶ 27.  Some of these individuals have spent the bulk of their adult lives building USAGM; every day Defendants are not stopped is another day Plaintiffs' life's work is irreparably damaged and the future rebuilding made immeasurably more difficult.  Turner Decl. ¶ 48; Powers Decl. ¶¶ 23, 37–40; Tran Decl. ¶ 16; Walsh Decl. ¶ 27; Lennon Decl. ¶ 25.

This Court should preliminarily enjoin Defendants' unlawful conduct to stop them from destroying the independence of USAGM journalists, along with their professional reputations, goodwill, and credibility, and to stop Defendants from continuing to exacerbate this irreparable harm that Plaintiffs—when they return to USAGM—will have to work strenuously to remedy.

## IV.    The Balance of Equities And Public Interest Strongly Favors Injunctive Relief.

Where a party seeks a preliminary injunction against government officials, the balance of equities and public's interest "merge."  *Karem*, 960 F.3d at 668 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Thus, the inquiry "generally calls for weighing the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined."  *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019).

The merged "balance of equities" and "public interest" factor cuts strongly in favor of injunctive relief here.  Courts in this district have consistently held "[i]t is always in the public interest to prevent the violation of a party's constitutional rights*," S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, 2020 WL 3265533, at *33 (D.D.C. June 17, 2020), especially where the "exercise of free speech" is at issue.  *See Pursuing Am.'s Greatness*, 831 F.3d at 511; *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest.").  Absent preliminary relief, Plaintiffs' First Amendment rights, and the First Amendment rights of USAGM network journalists, will remain under siege.

Denying injunctive relief, by contrast, would cause no harm to the government other than prohibiting Pack and other political appointees from pursuing their unlawful campaign to breach the firewall.  That harm is obviously not cognizable.  And lest there be any doubt, the D.C. Circuit has recognized that "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  Instead, "there is substantial public interest in having the government agencies abide by the federal laws that govern their existence and operations." *Id.* (internal citations omitted); *accord Gomez v. Trump,* 2020 WL 5367010, at *34 (D.D.C. Sept. 4, 2020).

Here, Defendants' continued breaches of the statutory and regulatory firewall constitute unlawful agency action that threatens not only the USAGM networks' reputations as independent and credible news source, but also the networks' ability to carry out their most basic functions such as the hiring of foreign journalists for their numerous language services.  Turner Decl. ¶¶ 34, 48; Lennon ¶¶ 10, 21–25; Tran Decl. ¶¶ 15–16; Walsh Decl. ¶ 21, 26–27; Doe Decl. ¶¶ 4–6, 18–19; Carroll Decl. ¶¶ 5–14; Ex. 19.  The damage to the USAGM networks also poses critical risks to our national interests:  without free and independent American broadcasting around the world, the misinformation and propaganda campaigns of the world's autocrats will face no legitimate, credible opposition, leaving this country less safe and its interests diminished.  Ex. 19; Ex. 4.  The balance of the equities here weigh decidedly in favor of granting preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for a preliminary injunction and enter an order substantially similar to the order Plaintiffs have proposed.

Dated:  Los Angeles, California
        October 13, 2020

GIBSON, DUNN & CRUTCHER LLP

By:   _/s/ Theodore J. Boutrous, Jr._
Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Mylan L. Denerstein (*pro hac vice pending*)
Zainab Ahmad (admission pending)
Lee R. Crain (D.D.C. Bar No. NY0337)
Alexandra Grossbaum (*pro hac vice pending*)
Lauren Kole (*pro hac vice pending*)
200 Park Avenue
New York, New York 10166-0193
Tel:  212.351.4000
MDenerstein@gibsondunn.com
Zahmad@gibsondunn.com
LCrain@gibsondunn.com
AGrossbaum@gibsondunn.com
LKole@gibsondunn.com

Joshua S. Lipshutz (D.C. Bar No. 1033391)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
JLipshutz@gibsondunn.com

*Counsel for Plaintiffs*