IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GRANT TURNER, et al,

   *Plaintiffs*,

v.

U.S. AGENCY FOR GLOBAL MEDIA, et al.,

   *Defendants*.

**Case No. 20-cv-2885-BAH**

**BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 16 MEDIA ORGANIZATIONS AS AMICI CURIAE SUPPORTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................................ii

INTEREST OF AMICI CURIAE ........................................................................................................ 1

INTRODUCTION ................................................................................................................................ 6

ARGUMENT ........................................................................................................................................ 8

    I.    The success of the USAGM networks as credible news organizations is inseparable from the editorial firewall insulating them from political "tampering." ...................................... 8

    II.   Journalists at the USAGM broadcasters receive the same First Amendment protections as journalists at private news organizations. ........................................................................ 11

CONCLUSION ................................................................................................................................... 16

**TABLE OF AUTHORITIES**

**Cases**
*Adams v. Trustees of University of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011) ................... 14
*Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356 (D.C. Cir. 2018) ................................... 15
*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) ..................................................................... 7, 14
*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ........................................................................ 12, 13, 14
*Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260 (1988).......................................................... 14
*Husain v. Springer*, 494 F.3d 108, 124 (2d Cir. 2007) .................................................................. 15
*Jangjoo v. Broadcasting Bd. of Governors.*, 244 F. Supp. 3d 160 (D.D.C. 2017) ................ 13, 14
*Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005) ........................................................ 13
*Koala v. Khosla*, 931 F.3d 887 (9th Cir. 2019) .............................................................................. 15
*M.N.C. of Hinesville, Inc. v. U.S. Dep't of Defense*, 791 F.2d 1466 (11th Cir. 1986).................. 12
*Matal v. Tam*, 137 S. Ct. 1744 (2017) .................................................................................... 12, 13
*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974)...................................................... 7, 10
*Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011) .......................................................... 12
*Newspapers Guild of Greater Phila., Local 10 v. NLRB*, 636 F.2d 550 (D.C. Cir. 1980) ........... 16
*Ralis v. RFE/RL, Inc.*, 770 F.2d 1121 (D.C. Cir. 1985).............................................................. 6, 10
*Tripp v. Dep't of Defense*, 284 F. Supp. 2d 50 (D.D.C. 2003) ...................................................... 11
*Walker v. Texas Div. Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015).......................... 13

**Statutes**
22 C.F.R. § 531.3(b) ........................................................................................................................ 7
22 C.F.R. § 531.3(c).......................................................................................................................... 7
22 U.S.C. § 6202(a) ................................................................................................................ *passim*
22 U.S.C. § 6202(b) ......................................................................................................................... 6
22 U.S.C. § 6204(b) ................................................................................................................... 7, 13
Foreign Relations Authorization Act, Fiscal Year 1977, Pub. L. No. 94-350, 90 Stat. 823 (1976)
 ……………………………………………………………………………………………6, 8, 9
National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, 130 Stat. 2548
  (2016) ...................................................................................................................................... 10
Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277,
  112 Stat. 2681 (1998)............................................................................................................ 9, 10
Tex. Transp. Code Ann. § 504.005(a) ........................................................................................... 13
United States International Broadcasting Act of 1994, Pub. L. No. 103-236, 108 Stat. 382 (1994)
 ....................................................................................................................................................... 9

**Other Authorities**
Alan L. Heil, Voice of America: A History (2003) ....................................................................... 11
Anthony Lewis, *Nixon and a Right of Reply*, N.Y. Times (Mar. 24, 1974),
  https://perma.cc/95M5-G5F3 .................................................................................................. 10
David S. Law, *The Paradox of Omnipotence: Courts, Constitutions, and Commitments*, 40 Ga. L.
  Rev. 403 (2006)......................................................................................................................... 15
Gregory Mitrovich, Hoover Inst., Cold War Broadcasting Impact (2004)...................................... 9
H.R. Rep. No 93-510, *as reprinted in* 1973 U.S.C.C.A.N. 2271 (1973).................................. 8, 11
Les Neuhaus, *Ethiopia Drops Charges Against Journalists*, Associated Press (Mar. 22, 2006),
  https://tinyurl.com/y3kg5dql.................................................................................................... 6

Matthew C. Weed, Cong. Research Serv., R43521, U.S. International Broadcasting: Background and Issues for Reform (2016) .................................................................................................. 12

Ranjan Borra, *The Problem of Jamming in International Broadcasting*, 11 J. Broadcasting 355 (1967) .............................................................................................................................................. 9

*Reporters Committee Letter: Congress Must Protect Voice of America's Editorial Independence*, Reporters Comm. for Freedom of the Press (Apr. 28, 2020), https://perma.cc/34QC-8G5D .... 5

S. Rep. No. 107-60 (2001) ......................................................................................................... 7, 12

U.S. Agency for Global Media, Audience and Impact: Overview for 2019 (2019) ........... 6, 10, 11

*VOA's First Broadcasts*, VOA News (Mar. 8, 2012), https://tinyurl.com/y2ccoc28 ..................... 8

## INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press (the "Reporters Committee") and sixteen media organizations. Lead amicus the Reporters Committee is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media.[1] Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today serves as a leading voice for the legal interests of journalists and news organizations.

The Committee to Protect Journalists is an independent, nonprofit organization that promotes press freedom worldwide. We defend the right of journalists to report the news without fear of reprisal. CPJ is made up of about 40 experts around the world, with headquarters in New York City. A board of prominent journalists from around the world helps guide CPJ's activities.

Free Press is a national, nonpartisan, non-profit organization with approximately 1.5 million members in the United States and around the world. It works to defend Internet freedom and press freedom, including the right of journalists and others to gather and report on information as well as the public's right to see, hear and read that information—both of which are crucial to a functioning democracy. Free Press has participated in numerous court and agency proceedings on media, telecommunications, and technology law topics, including those involving First Amendment issues, since the organization's founding in 2003.

---

[1]   No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae or their counsel made a monetary contribution to the preparation or submission of this brief.

Freedom of the Press Foundation ("FPF") is a non-profit organization that supports and defends public-interest journalism in the 21st century. FPF works to preserve and strengthen First and Fourth Amendment rights guaranteed to the press through a variety of avenues, including building privacy-preserving technology, promoting the use of digital security tools, and engaging in public and legal advocacy.

The Media Institute is a nonprofit foundation specializing in communications policy issues founded in 1979. The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism. Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

MPA – The Association of Magazine Media ("MPA") is the industry association for magazine media publishers. The MPA, established in 1919, represents the interests of close to 100 magazine media companies with more than 500 individual magazine brands. MPA's membership creates professionally researched and edited content across all print and digital media on topics that include news, culture, sports, lifestyle and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

The National Press Club Journalism Institute is the non-profit affiliate of the National Press Club, founded to advance journalistic excellence for a transparent society. A free and independent press is the cornerstone of public life, empowering engaged citizens to shape democracy. The Institute promotes and defends press freedom worldwide, while training journalists in best practices, professional standards and ethical conduct to foster credibility and integrity.

The National Press Club is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

The News Leaders Association was formed via the merger of the American Society of News Editors and the Associated Press Media Editors in September 2019. It aims to foster and develop the highest standards of trustworthy, truth-seeking journalism; to advocate for open, honest and transparent government; to fight for free speech and an independent press; and to nurture the next generation of news leaders committed to spreading knowledge that informs democracy.

The Online News Association is the world's largest association of digital journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. Membership includes journalists, technologists, executives, academics and students who produce news for and support digital delivery systems. ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

PEN American Center ("PEN America") is a non-profit association of writers that includes novelists, journalists, editors, poets, essayists, playwrights, publishers, translators, agents, and other professionals. PEN America stands at the intersection of literature and human rights to protect open expression in the United States and worldwide. We champion the freedom to write, recognizing the power of the word to transform the world. Our mission is to unite writers and their allies to celebrate creative expression and defend the liberties that make it possible, working to ensure that people everywhere have the freedom to create literature, to convey information and ideas, to express their views, and to make it possible for everyone to access the views, ideas, and literatures of others. PEN America has approximately 7,500 members and is affiliated with PEN International, the global writers™ organization with over 100 Centers in Europe, Asia, Africa, Australia, and the Americas.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

Reporters sans frontières is one of the largest international press freedom and freedom of information NGOs in the world. Through its U.S. chapter, Reporters Without Borders USA, RSF advocates for press freedom in the United States and globally, and provides legal assistance and training to journalists so they can protect themselves in the field and online.

The Society of Environmental Journalists is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

The Tully Center for Free Speech began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

As organizations committed to defending First Amendment freedoms, including the right to gather and report the news, amici have a powerful interest in ensuring that the constitutional rights of all journalists, including working journalists at USAGM networks, are not infringed, *see, e.g.*, *Reporters Committee Letter: Congress Must Protect Voice of America's Editorial Independence*, Reporters Comm. for Freedom of the Press (Apr. 28, 2020), https://perma.cc/34QC-8G5D, and that the U.S. Agency for Global Media ("USAGM") complies with Congress's instruction to observe "the highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5).

Amici respectfully submit this amici curiae brief pursuant to Local Civil Rule 7(o).

**INTRODUCTION**

The success of publicly funded journalism at Voice of America ("VOA") and its sister networks, as credible sources of news for millions around the world, depends on editorial independence. *See Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C. Cir. 1985). The trust of the audience depends on it; listeners turn to Radio Free Europe, for example, as an alternative to state media, not as their second state-media option. *See, e.g.*, U.S. Agency for Global Media, Audience and Impact: Overview for 2019, at 17 (2019) (finding that videos fact-checking local disinformation are among VOA and RFE/RL's most popular offerings in Russia). And the safety of the reporters depends on it; journalists are always at risk of retaliation for their work, but rarely more so than when tarred as spies or government cut-outs. *See, e.g.*, Les Neuhaus, *Ethiopia Drops Charges Against Journalists*, Associated Press (Mar. 22, 2006), https://tinyurl.com/y3kg5dql (describing charges of "treason" against five VOA reporters who were "accused of attempting to overthrow the government" of Ethiopia). At base, to transform these "independent broadcasters into house organs for the United States Government" would be "inimical to the fundamental mission of those stations." *Ralis*, 770 F.2d at 1125.

To prevent that outcome, the independence of news organizations operating under the USAGM is guaranteed by law. Since VOA was chartered, Congress has required that its work "be accurate, objective, and comprehensive." Foreign Relations Authorization Act, Fiscal Year 1977, Pub. L. No. 94-350, § 503, 90 Stat. 823, 831 (1976). Congress has since mandated that all U.S. international broadcasting "be conducted in accordance with the highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5); that news offerings be "consistently reliable and authoritative, accurate, objective, and comprehensive," *id.* § 6202(b)(1); and that USAGM leadership "respect the professional independence and integrity of the [Broadcasting

6

Board of Governors], its broadcasting services, and the grantees of the Board," *id.* § 6204(b).  As the agency's own regulations explain, that "firewall" is "violated when any person within the Executive Branch or a Network, but outside the newsroom, attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks . . . in the performance of their journalistic and broadcasting duties."  22 C.F.R. § 531.3(c).  These barriers ensure the fact—and, crucially, the credible appearance—of independence.

Just as important, the reporters at the networks—as "working journalists," even if paid with public funds, S. Rep. No. 107-60, at 24 (2001)—are protected by the First Amendment.  The First Amendment "erects a virtually insurmountable barrier" with respect to "government tampering" where "news and editorial content is concerned."  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring).  And while the Constitution did not require Congress to constitute VOA or its sister networks as professional, independent news organizations in the first instance, Congress chose to do so—just two years after *Tornillo* was decided.  That choice has both interpretive and constitutional significance.  Just as the First Amendment can enforce a state's decision to guarantee academic freedom, *see, e.g.*, *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014), it enforces editorial freedom when the government decides to hire reporters as reporters.  And in insisting on adherence to the "highest professional standards" of journalism, 22 U.S.C. § 6202(a)(5), Congress made clear its intent to do just that.

Were it otherwise, perversely, the United States would never be able to credibly commit to producing professional journalism, because it could not credibly commit to reporters' independence—even if it would serve the government's interests to tie itself to the mast.  *See* 22 C.F.R. § 531.3(b) ("Within any *credible* news organization, a firewall exists between anybody involved with any aspect of journalism . . . and everyone else in the organization.") (emphasis

added). The damage to trust in news organizations like VOA would be irreparable; there would be no way to un-ring the announcement that their autonomy was only ever provisional. That outcome would vindicate VOA's skeptics, who have insisted, for instance, that "broadcasting funded by a government cannot be independent of that government." H.R. Rep. No. 93-510 (1973), *as reprinted in* 1973 U.S.C.C.A.N. 2271, 2280 (minority views of Rep. Michael Harrington). The lesson of experience, though, has been the opposite. U.S. international public broadcasting remains a valuable journalistic enterprise so long as the safeguards established by Congress and the Constitution hold steady. For the reasons set forth herein, amici urge the Court to grant the injunction to reaffirm them.

**ARGUMENT**

**I. The success of the USAGM networks as credible news organizations is inseparable from the editorial firewall insulating them from political "tampering."**

From the outset, publicly funded broadcasting has staked its claim to trust on professionalism. As Voice of America's first transmission in 1942 announced, "The news may be good or bad; we shall tell you the truth." *See VOA's First Broadcasts*, VOA News (Mar. 8, 2012), https://tinyurl.com/y2ccoc28. While Congress believed that U.S. broadcasting would advance "[t]he long-range interests" of the United States, lawmakers always insisted that VOA would promote those interests by—and not instead of—reporting the news. Foreign Relations Authorization Act, Fiscal Year 1977, Pub. L. No. 94-350, § 503, 90 Stat. 823, 831 (1976). "To be effective," they recognized, "Voice of America . . . must win the attention and respect of listeners." *Id.*

That insight has been borne out by experience. By providing truthful information not available in closed societies, VOA and its sister networks earned enormous engagement in the Eastern Bloc and beyond. In an effort to quash that appeal, by 1958, the Soviet Union had

8

invested in an "army of jammers . . . five or six times more expensive than all the broadcasting of the Voice of America in all languages in all parts of the world."  *See* Ranjan Borra, *The Problem of Jamming in International Broadcasting*, 11 J. Broadcasting 355, 360 (1967) (quoting a U.S. delegate to the United Nations).  The USSR claimed, of course, that it did so because of the broadcasts' low quality: "not the voice of America but a sort of wailing over radio."  *Id.* at 361 (quoting Nikita Khrushchev).  In fact, as both Western and Soviet audience research found, listeners tuned in "to access information not available through the Soviet media, or to verify or refute Soviet media claims."  Gregory Mitrovich, Hoover Inst., Cold War Broadcasting Impact 18 (2004).  Notably, during the Chernobyl disaster, VOA provided "invaluable information to East European, Russian, and Ukrainian audiences about the dangers of radiation and the steps they needed to take to avoid radiation poisoning," while state media remained silent.  *Id.* at 12.

Throughout the networks' history, Congress has closely and carefully maintained the independence that underpins that trust.  In VOA's charter, signed into law by President Gerald Ford in 1976, Congress required that the agency's news "be accurate, objective, and comprehensive"; that it not represent any "single segment of American society"; and that it always present "a balanced and comprehensive projection of significant American thought and institutions."  Foreign Relations Authorization Act, Fiscal Year 1977, Pub. L. No. 94-350, § 503, 90 Stat. 823, 831 (1976).  In 1994, when Congress acted to consolidate non-military broadcasting under a single agency, it also established firm professional standards for all of the networks—including the requirement that agency leadership "respect the[ir] professional independence and integrity."  United States International Broadcasting Act of 1994, Pub. L. No. 103-236, § 305, 108 Stat. 382, 436 (1994).  Congress retained that requirement when it reorganized the networks in 1998, *see* Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L.

9

No. 105-277, § 1323, 112 Stat. 2681, 2681–780, and again when it reorganized them further in 2016, *see* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1288, 130 Stat. 2548.  That statutory history reflects Congress's "manifest" intent—consistently expressed over the course of five decades—that the networks "enjoy independence in programming and broadcasting decisions."  *Ralis*, 770 F.2d at 125.

Congress adopted these provisions with a clear understanding of why editorial independence matters at home—and how the First Amendment protects it.  VOA's charter was codified by statute just two years after the Supreme Court decided *Tornillo*, reaffirming that the Constitution condemns "compulsion exerted by government on a newspaper to print that which it would not otherwise print."  418 U.S. at 256.  At the time, the crucial role of an independent and adversarial press as a check on government was fresh in the public consciousness.  *Cf.* Anthony Lewis, *Nixon and a Right of Reply*, N.Y. Times, (Mar. 24, 1974), https://perma.cc/95M5-G5F3 (discussing President Nixon's support for a "right of reply" law similar to that rejected in *Tornillo* three months later and noting that "[o]verhanging the debate is the reality of Watergate").  There should be little doubt, then, that Congress understood the content and importance of journalistic standards when it applied them to VOA and its peers.

Under this framework, the networks' commitment to high-quality journalism has produced explosive audience growth.  Together, according to USAGM's most recent data, they reach a staggering 350 million viewers and listeners every week.  *See* U.S. Agency for Global Media, Audience and Impact: Overview for 2019, at 2 (2019).  Just as important, the audience trusts the networks to tell them the truth.  Seventy-seven percent of Radio Free Asia listeners say they find its journalism credible; the same is true of eighty-three percent of VOA's audience.  *Id.* at 5.  And in Cuba, where USAGM broadcasts Radio and TV Martí, fully "97 percent of the

10

audience found the information trustworthy, while 79 percent said that little or none of what they learned from Martí was available from other sources." *Id.* at 18. It is difficult to imagine how the networks could have achieved that degree of success had they operated as, or been seen as, a Ministry of Truth.

## II. Journalists at the USAGM broadcasters receive the same First Amendment protections as journalists at private news organizations.

As Plaintiffs explain, Defendants' actions clearly violate the statutory and regulatory firewalls that protect the networks' independence. *See* Mot. Prelim. Inj. at 19–29, No. 20-cv-2885 (D.D.C. Oct. 13, 2020). But it cannot be overemphasized that these restrictions also have constitutional significance: they incorporate First Amendment standards against which Congress has insisted that management of the networks be measured. *Cf. Tripp v. Dep't of Defense*, 284 F. Supp. 2d 50, 56 (D.D.C. 2003) (concluding that Congress intended *Stars and Stripes*, the military newspaper, "to operate like other commercial newspapers, and enjoy First Amendment protections and prohibitions"). That point is critical to preserving the hard-won credibility of government-funded broadcasting. "Who in this world," after all, "will believe that these radio stations operate in any way 'like a free press' . . . with 'professional independence' . . . when they are financed principally and directly by the U.S. Government?" H.R. Rep. No. 93-510, 1973 U.S.C.C.A.N. at 2278 (1973) (additional views of Rep. Benjamin Rosenthal). The answer, in part, is that an enforceable guarantee of editorial independence conveys to the audience that the public broadcasters are in the business of news—including news critical of the U.S. government—rather than propaganda. *See* Alan L. Heil, Voice of America: A History (2003) (citing Ivory Coast broadcaster's observation that VOA's "credibility and determination to 'tell the news straight' (Americans are famous for that) is the real reason it is believed in faraway places").

Since there is no serious argument that the First Amendment would allow the government to discipline the editorial choices of a conventional media organization, *see* Mot. Prelim. Inj., *supra*, at 30–39, Defendants will no doubt argue that VOA is not such an organization—that its reporters' work is not protected by the First Amendment because it is either the government's own speech, *see Matal v. Tam*, 137 S. Ct. 1744, 1757–58 (2017), or speech "pursuant to their official duties," *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).[2] Those arguments are wrong: VOA journalists are journalists. To be sure, their position is "unique." S. Rep. No. 107-60, at 24. And, to amici's knowledge, neither the D.C. Circuit nor any other appeals court has addressed the First Amendment framework that should govern disputes between the journalists and bureaucrats over the application of the firewall.[3] But from a first-principles perspective, to treat journalism—even publicly funded journalism—as government or public-employee speech would distort those doctrines. It would vitiate, too, the government's own ability to promise

---

[2]  The individual USAGM networks have somewhat different organizational relationships to the federal government. *See* Matthew C. Weed, Cong. Research Serv., R43521, U.S. International Broadcasting: Background and Issues for Reform 7–9 (2016) (distinguishing fully "federal" broadcasters, including VOA, from "grantee" broadcasters, such as Radio Free Asia). Amici focus on the rights of VOA and its journalists since, to the extent reporters employed directly by USAGM can assert First Amendment rights against it, it follows a fortiori that grantee broadcasters and journalists can too. *Cf. M.N.C. of Hinesville, Inc. v. U.S. Dep't of Defense*, 791 F.2d 1466, 1471 (11th Cir. 1986) (concluding that, even assuming arguendo that a newspaper distributed by the military itself would "not enjoy First Amendment protection," the First Amendment was implicated by the use of a pervasively regulated private "surrogate" instead).

[3]  The D.C. Circuit has, however, addressed a mirror image dispute. In *Navab-Safavi v. Glassman*, a contractor for VOA's Persian News Network who was "not a journalist" alleged that she had been fired in retaliation for appearing in a music video critical of the Iraq War. 637 F.3d 311, 313–14 (D.C. Cir. 2011). There, the Board argued that its interest in maintaining an appearance of "the highest journalistic credibility" was of constitutional weight. *Id.* at 316. The Court found that point "inarguable," even though it ultimately concluded that it did not justify taking action against the private speech of an employee who was not a journalist. *Id.*

12

work consistent "with the highest professional standards of broadcast journalism." 22 U.S.C. § 6202(a)(5).

As the Supreme Court recently warned, courts must "exercise great caution" before extending the government-speech doctrine because of its potential for "dangerous misuse." *Matal*, 137 S. Ct. at 1758. As relevant here, the Court has only ever identified government speech where the defendant exercised "direct control" that, in VOA's case, the governing statute prohibits. *Id.* at 1760 (quoting *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015)). In *Johanns v. Livestock Marketing Ass'n*, for instance, the Secretary of Agriculture "exercise[d] final approval authority over every word used in every promotional campaign" at issue. 544 U.S. 550, 561 (2005). But for the Secretary of State or the chief executive at USAGM to exercise that degree of control would be a plain firewall violation. *See* 22 U.S.C. § 6204(b). In *Walker*, meanwhile, Texas reserved "sole control over the design, typeface, color, and alphanumeric pattern for all license plates." 576 U.S. at 212 (quoting Tex. Transp. Code Ann. § 504.005(a)). Again, were the Secretary or chief executive to insist on picking the header photo in every VOA story, the Secretary or chief executive would be breaking the law.

For much the same reason, characterizing VOA's journalism as official-capacity speech would make little sense in this case. In *Garcetti*, the Supreme Court concluded that certain statements made by public employees "pursuant to their official duties" are not protected by the First Amendment because regulating them "simply reflects the exercise of employer control over what the employer itself has commissioned or created." 547 U.S. at 421–422. That point would be apposite, of course, if a VOA reporter claimed a First Amendment violation because an *editor* chose to kill a story. *See Jangjoo v. Broad. Bd. of Governors*, 244 F. Supp. 3d 160, 170–73

13

(D.D.C. 2017) (applying *Garcetti* to a retaliation claim brought by a social media manager for Persia News Network against his supervisor).[4] But these particular Defendants have no lawful ability to 'control' VOA's journalistic activities, and no legitimate interest in interfering with editorial judgment. Further, reporters are much like academics in that their work "implicates additional constitutional interests that are not fully accounted for by [the Supreme Court's] customary employee-speech jurisprudence." *Garcetti*, 547 U.S. at 425; *cf. Demers*, 746 F.3d at 411 (excluding university academic speech from *Garcetti* on that ground); *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011) (same). As *Garcetti* acknowledged, the Constitution imposes some constraint on the government's ability to define away the fundamental characteristics of a job it chooses to hire for. 547 U.S. at 424–26. As a result, when a state decides to run a university like a university, First Amendment protections attach. The same should be true when the state decides to run a broadcaster like a broadcaster.

Comparison with the First Amendment framework that governs student newspapers is also instructive. Under *Hazelwood School District v. Kuhlmeier*, a state institution that chooses to launch a newspaper need not award it the First Amendment latitude of a major metropolitan daily. 484 U.S. 260, 273 (1988). But a state actor *may* do so. Just as Congress has with USAGM, state actors may create news organizations subject to full First Amendment protections from state interference in their editorial discretion; schools can decide, for instance, that their educational interests are better served by ceding control than by reserving it. To that end, "all the circuits that have considered the issue have determined that, at the very least, when a public

---

[4] *Jangjoo* also highlights that, to the extent the government-speech doctrine applies to VOA, it would be a shield available to those who have a legal right to control the content of the network's speech: the newsroom's chain of command. 244 F. Supp. 3d at 173 n.6 (concluding that the government-speech doctrine barred a First Amendment claim based on an employee's disagreement with a *supervisor* about what to post to the network's social media accounts).

14

university creates or subsidizes a student newspaper and imposes no *ex ante* restrictions on the content that the newspaper may contain, neither the school nor its officials may interfere with the viewpoints expressed in the publication without running afoul of the First Amendment." *Koala v. Khosla*, 931 F.3d 887, 903 n.9 (9th Cir. 2019) (quoting *Husain v. Springer*, 494 F.3d 108, 124 (2d Cir. 2007)). The key question is always what kind of institution the state set up in the first place—and the boundaries of that project become constitutional constraints, not just school rules. So too here. Congress, had it wanted to, could have founded broadcasters that did nothing but transmit State Department talking points. Instead, Congress established a short, closed list of constraints on broadcasting content, *see* 22 U.S.C. § 6202(a), and otherwise guaranteed the networks an independence equal to that of private news organizations. That is, Congress mandated professional journalism of the highest quality, a mandate that law, regulation, and functional norms have protected for decades. VOA is clearly a First Amendment institution.

Holding USAGM to Congress's vision—and the broadcasters' professional reality for the last fifty years—squares with the core First Amendment principle that the government must play by the rules it chooses to adopt. It is uncontroversial, for instance, that "[o]nce the state has created a limited public forum" for certain speech, "it must respect the boundaries that it has set." *Husain*, 494 F.3d at 121; *see also Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018) (assuming that, even in a nonpublic forum, the government cannot change the rules with intent to censor). That principle is not just a restraint on the state; it empowers the state to earn others' trust, by tying its own hands. *See* David S. Law, *The Paradox of Omnipotence: Courts, Constitutions, and Commitments*, 40 Ga. L. Rev. 407, 410 (2006). That power is critical if the government is to be in the business of journalism, where "credibility is

15

central to the[] ultimate product and to the conduct of the enterprise." *Newspaper Guild of Greater Phila., Local 10 v. NLRB*, 636 F.2d 550, 560 (D.C. Cir. 1980).

Since its inception, public broadcast journalism's challenge has been to win the trust of its audience—to bury any impression that Radio Free Europe, for example, is an American *Pravda*. Since its inception, public broadcasting has been dogged by the criticism that government cannot produce credible reporting—that its own interests will always trump journalistic rigor. For half a century, though, journalists at VOA and its sister networks have shown that the "highest professional standards" of the field are congruent with the interests of the United States, and vice versa. 22 U.S.C. § 6202(a)(5). Congress enshrined that compatibility in law; the First Amendment backstops it.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to grant the preliminary injunction.


Dated: October 22, 2020               Respectfully submitted,

                                      /s/ Bruce D. Brown

                                      BRUCE D. BROWN
                                      (D.C. Bar No. 457317)
                                         *Counsel of Record for Amici Curiae*
                                      KATIE TOWNSEND
                                      GABRIEL ROTTMAN
                                      REPORTERS COMMITTEE FOR
                                      FREEDOM OF THE PRESS
                                      1156 15th Street NW, Ste. 1020
                                      Washington, DC 20005
                                      Telephone: 202.795.9300
                                      bbrown@rcfp.org

                                      *Counsel for Amici Curiae*

16