**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| GRANT TURNER, *et al.*,                    ) | |
|                                          ) | |
|        *Plaintiffs*,        ) | |
|                                          ) | |
| v.                                       ) | Case No. 1:20-cv-02885-BAH |
|                                          ) | |
| U.S. AGENCY FOR GLOBAL MEDIA           ) | |
| MEDIA, *et al.*,                          ) | |
|                                          ) | |
|        *Defendants*.        ) | |
| _____) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 1

LEGAL STANDARD ....................................................................................................... 4

ARGUMENT ..................................................................................................................... 5

I.      Plaintiffs are unlikely to succeed on the merits of their claims. ................................... 5

        A.      This Court lacks jurisdiction. ............................................................................ 6

                1.      Plaintiffs improperly seek wholesale change of agency operations
                        through judicial intervention. ........................................................................ 6

                2.      Plaintiffs lack standing and cannot assert the rights of third parties ........... 7

                        i.      Plaintiffs lack standing because their claimed injuries are
                                not caused by the challenged conduct. ............................................. 8

                        ii.     As "former leaders" of AGM, Plaintiffs lack the requisite
                                close relationship with those whose interests they seek to
                                protect. ................................................................................................... 16

                        iii.    The third parties face no hindrance in bringing their own
                                suits. ......................................................................................................... 17

        B.      Plaintiffs' claims fail on the merits. ................................................................. 18

                1.      Plaintiffs lack a valid cause of action. ..................................................... 19

                2.      Defendants' conduct is consistent with the IBA in any event. ................. 24

                3.      Defendants' conduct does not violate the First Amendment .................... 27

II.     Plaintiffs cannot show irreparable harm to themselves that would justify injunctive relief. ......... 36

III.    The public interest weighs heavily against judicial management of an executive tool of
        foreign policy. ............................................................................................................. 39

CONCLUSION ................................................................................................................ 43

# TABLE OF AUTHORITIES

## CASES

*Aamer v. Obama,*
   742 F.3d 1023 (D.C. Cir. 2014) .................................................................................. 23, 25, 42

*Achagzai v. Broad. Board of Governors,*
   Civ. A. No. 14-768 (RDM), 2016 WL 471274 (D.D.C. Feb. 8, 2016).................................... 31

*Aid for Women v. Foulston,*
   441 F.3d 1101 (10th Cir. 2006) ........................................................................................ 37

*Aishat v. U.S. Dep't of Homeland Sec.,*
   288 F. Supp. 3d 261 (D.D.C. 2018)..................................................................................... 18

*Alexander v. Sandoval,*
   532 U.S. 275 (2001)............................................................................................................ 18

*Allen v. Wright,*
   468 U.S. 737 (1984).......................................................................................................... 8, 19

*Am. Rd. & Transp. Builders Ass'n v. EPA,*
   865 F. Supp. 2d 72 (D.D.C. 2012), *aff'd,* 2013 WL 599474 (D.C. Cir. Jan. 28, 2013)............ 19

*Arriva Med. LLC v. U.S. Dep't of Health & Human Servs.,*
   239 F. Supp. 3d 266 (D.D.C. 2017)...................................................................................... 36

*Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.,*
   No. 20-1784, 2020 WL 5745974 (6th Cir. Sept. 24, 2020) ....................................................... 9

*Broad. Bd. of Governors v. Am. Fed. of Govt. Emps.,*
   66 F.L.R.A. 380 (2011)........................................................................................................ 25

*Bush v. Lucas,*
   462 U.S. 367 (1983)............................................................................................................. 13

*Cardinal Health, Inc. v. Holder,*
   846 F. Supp. 2d 203 (D.D.C. 2012)...................................................................................... 36

*Carducci v. Regan,*
   714 F.2d 171 (D.C. Cir. 1983).............................................................................................. 13

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ................................................................................................... 7, 17

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ....................................................................................................... 7

*Comm. for Nuclear Responsibility, Inc. v. Seaborg,*
    463 F.2d 796 (D.C. Cir. 1971) .................................................................................... 41

*Comm. in Solidarity v. Sessions,*
    929 F.2d 742 (D.C. Cir.1991) ..................................................................................... 36

*Craig v. Boren,*
    429 U.S. 190 (1976) ................................................................................................. 9, 16

*Davis v. Billington,*
    681 F.3d 377 (D.C. Cir. 2012) .................................................................................... 13

*Dep't of Labor v. Triplett,*
    494 U.S. 715 (1990) .................................................................................................... 16

*Dresser Indus., Inc. v. Baldridge,*
    549 F. Supp. 108 (D.D.C. 1982) ................................................................................. 41

*E. Bay Sanctuary Covenant v. Trump,*
    349 F. Supp. 3d 838 (N.D. Cal. 2018) ........................................................................ 37

*Elec. Privacy Info. Ctr. v. Drone Advisory Comm.,*
    369 F. Supp. 3d 27 (D.D.C. 2019) .............................................................................. 18

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ........................................................................................... 11, 13, 14

*Fleming v. Spencer,*
    718 F. App'x 185 (4th Cir. 2018) ................................................................................ 13

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005) .......................................................................... 13, 15, 19

*Friends of the Earth, Inc. v Laidlaw Envt'l Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ....................................................................................................... 7

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ............................................................................................... 28, 29

iii

*Graham v. Ashcroft,*
   358 F.3d 931 (D.C. Cir. 2004) .................................................................................. 11, 13, 15

*Griswold v. Connecticut,*
   381 U.S. 479 (1965) ......................................................................................................... 16

*Grosdidier v. Chairman, Broad. Bd. of Governors,*
   560 F.3d 495 (D.C. Cir. 2009) ................................................................................. 15, 25

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ......................................................................................................... 21

*Jangjoo v. Broad. Board of Governors,*
   244 F. Supp. 3d 160 (D.D.C. 2017) ................................................................... 28, 29, 30

*Jones v. D.C.,*
   177 F. Supp. 3d 542 (D.D.C. 2016) ............................................................................... 35

*June Medical Services v. Russo,*
   140 S. Ct. 2103 (2020) .......................................................................................... 9, 10, 16

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ......................................................................................... 7, 9, 16, 17

*Lepelletier v. FDIC,*
   164 F.3d 37 (D.C. Cir. 1999) ............................................................................................ 9

*Lewis v. Casey,*
   518 U.S. 343 (1996) .............................................................................................. 6, 35, 37

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ......................................................................................................... 19

*Linda R.S. v. Richard D.,*
   410 U.S. 614 (1973) ......................................................................................................... 10

*Louie v. Dickson,*
   964 F.3d 50 (D.C. Cir. 2020) ............................................................................................ 7

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................................................... 7

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ........................................................................................................... 6

iv

*Mapes v. Reed*,
   2020 WL 5545397 (D.D.C. Sept. 16, 2020) ........................................................................... 11

*Matal v. Tam*,
   137 S. Ct. 1744 (2017) ............................................................................................................ 33

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ................................................................................................................ 20

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) .................................................................................................................. 4

*Mpoy v. Rhee*,
   758 F.3d 285 (D.C. Cir. 2014) ........................................................................................... 29, 30

*Navab-Safavi v. Glassman*,
   637 F.3d 311 (D.C. Cir. 2011) ................................................................................................ 29

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................................ 38

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ..................................................................................... 14, 25, 27

*Obama v. Klayman*,
   800 F.3d 559 (D.C. Cir. 2015) .................................................................................................. 4

*Oetjen v. Cent. Leather Co.*,
   246 U.S. 297 (1918) ................................................................................................................ 39

*Open Tech. Fund v. Pack* (*OTF*),
   __ F. Supp. 3d __, 2020 WL 3605935 (D.D.C. July 2, 2020) ......................................... *passim*

*Pickering v. Board of Education of Township High School District 205, Will County*,
   391 U.S. 563 (1968) ................................................................................................................ 28

*Powers v. Ohio*,
   499 U.S. 400 (1991) ................................................................................................................ 16

*Ralis v. RFE/RL, Inc.*,
   770 F.2d 1121 (D.C. Cir. 1985) .......................................................................................... 22, 34

*Sampson v. Murray*,
   415 U.S. 61 (1974) .................................................................................................................. 35

*Samuels v. Dist. of Columbia*,
    770 F.2d 184 (D.C. Cir. 1985) ................................................................................... 18

*Sands v. Nat'l Labor Relations Bd.*,
    825 F.3d 778 (D.C. Cir. 2016) ..................................................................................... 9

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005) ................................................................................... 39

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ...................................................................................................... 37

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................................... 7, 10

*Steadman v. Governor, U.S. Soldiers' and Airmen's Home*,
    918 F.2d 963 (D.C. Cir. 1990) ................................................................................... 13

*Steenholdt v. FAA*,
    314 F.3d 633 (D.C. Cir. 2003) ................................................................................... 21

*The Presbyterian Church (U.S.A.) v. United States*,
    870 F.2d 518 (9th Cir. 1989) ..................................................................................... 19

*Tripp v. DOD*,
    284 F. Supp. 2d 50 (D.C. Cir. 2003) .......................................................................... 33

*Trudeau v. Fed. Trade Comm'n*,
    384 F. Supp. 2d 281 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006) ...................... 35, 36

*U.S. Info. Agency, Voice of Am. v. Fed. Labor Relations Auth.*,
    960 F.2d 165 (D.C. Cir. 1992) ................................................................................... 27

*United States Sugar Corp. v. EPA*,
    830 F.3d 579 (D.C. Cir. 2016) ................................................................................... 22

*United States v. Fausto*,
    484 U.S. 439 (1988) .......................................................................................... *passim*

*United States v. Stevens*,
    559 U.S. 460 (2010) ...................................................................................................... 9

*Vann v. Kempthorne*,
    534 F.3d 741 (D.C. Cir. 2008) ................................................................................... 19

*Vitarelli v. Seaton*,
  359 U.S. 535 (1959)................................................................................................. 13

*Warth v. Seldin*,
  422 U.S. 490 (1975)........................................................................................ 8, 10, 36, 37

*Weaver v. United States Information Agency*,
  87 F.3d 1429 (D.C. Cir 1996) ................................................................................. 34

*Webster v. Doe*,
  486 U.S. 592 (1988)................................................................................................. 21

*Whitman-Walker Clinic, Inc. v. HHS*,
  __ F. Supp. 3d __, 2020 WL 5232076 (D.D.C. Sept. 2, 2020)................................. 17

*Williams v. Lew*,
  819 F.3d 466 (D.C. Cir. 2016) ................................................................................... 8

*Winder v. Erste*,
  566 F.3d 209 (D.C. Cir. 2009) ................................................................................. 30

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)......................................................................................... 4, 35, 38, 41

*Wisc. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................................. 36

**STATUTES**

5 U.S.C. § 701 ........................................................................................................... 21

5 U.S.C. § 704 ........................................................................................................... 19

5 U.S.C. § 1214 ......................................................................................................... 12

5 U.S.C. § 2302 ......................................................................................................... 11

5 U.S.C. § 4302 ......................................................................................................... 12

5 U.S.C. § 7103 ......................................................................................................... 12

5 U.S.C. § 7106 ......................................................................................................... 12

5 U.S.C. § 7121 ......................................................................................................... 12

5 U.S.C. § 7501 *et seq.* ............................................................................................ 11

5 U.S.C. § 7702 ........................................................................................................... 11

5 U.S.C. § 7703 ........................................................................................................... 12

22 U.S.C. § 1461-1a .................................................................................................... 39

22 U.S.C. § 1474 .................................................................................................... 15, 25

22 U.S.C. § 6201 ................................................................................................ 1, 26, 39

22 U.S.C. § 6202 .................................................................................................. *passim*

22 U.S.C. § 6204 .................................................................................................. *passim*

**REGULATIONS**

85 Fed. Reg. 36,150 (June 15, 2020) ........................................................................... 1

**OTHER AUTHORITIES**

Inspection of the Broadcasting Board of Governors, State OIG Report ISP-IB-13-07
  https://www.stateoig.gov/system/files/203193.pdf .................................................. 40

*Statement on Signing the National Defense Authorization Act for
  Fiscal Year 2017* (Dec. 23, 2016) ........................................................................... 40

*Terrorist Attack in Benghazi: The Secretary of State's View: Hearing before the H. Comm. on
  Foreign Affairs*, 113th Cong., No. 113-11 (Jan. 23, 2013) ....................................... 40

Wright & Miller, 13A Fed. Prac. and Proc. Juris. § 3531.9 (3d ed. 2020) .................... 9

Plaintiffs, five senior management officials at the United States Agency for Global Media now on paid investigative leave pending security investigations, ask this Court to supplant USAGM's presidentially appointed and Senate-confirmed chief executive officer, with whom they disagree.  They rest this claim for preliminary injunctive relief not on any alleged harm to themselves—indeed, they have elsewhere challenged the personnel actions pending against them before the U.S. Office of Special Counsel, which is actively investigating their allegations right now—but on alleged harm to third parties with whom they bear no close relationship.  These claims fall outside of district court jurisdiction for lack of standing, among other reasons.  And even if Plaintiffs could properly bring them within this Court's subject-matter jurisdiction, they are without merit and in no event justify the truly extraordinary remedy Plaintiffs seek.

## BACKGROUND

The United States funds and operates a network of broadcast media organizations throughout the world to "promote the right of freedom of opinion and expression" and to advance "the goals of United States foreign policy."  22 U.S.C. § 6201.  These broadcast organizations are supervised and governed by the U.S. Agency for Global Media (USAGM).[1] Among other requirements, Congress directed that all government-funded and operated international broadcasts under the USAGM umbrella "shall" be "consistent with the broad foreign policy objectives of the United States," and "shall include" "a balanced and

---

[1] Before 2018, the agency was known as the Broadcasting Board of Governors.  See *Open Tech. Fund v. Pack* (*OTF*), __ F. Supp. 3d __, 2020 WL 3605935, at *3 (D.D.C. July 2, 2020) (citing 85 Fed. Reg. 36,150, 36,150 n.1 (June 15, 2020)), *appeal filed*, No. 20-5195 (D.C. Cir. July 16, 2020).

1

comprehensive projection of United States thoughts and institutions." *Id.* § 6202(a)(1), (b)(2); *see also id.* § 6202(c)(2) (same for Voice of America broadcasts). In addition, Congress directed that U.S. international broadcasting efforts "shall" promote democratic values such as "respect for human rights, including freedom of religion" and "shall . . . be consistent with" U.S. treaty obligations and policy commitments such as "the international telecommunications policies . . . of the United States." *Id.* § 6202(a)(2), (8). Further, U.S. international broadcasting efforts under the AGM umbrella "shall . . . not duplicate the activities of private United States broadcasters" or other democratic nations' government-supported broadcasting entities. *Id.* § 6202(a)(3)–(4).

In December 2016 Congress passed and then-President Obama signed the 2017 National Defense Authorization Act, amending the International Broadcasting Act (IBA). This law dramatically restructured governance of the USAGM broadcast networks by dissolving what many had come to view as an ineffectual board structure and centralizing control in a single Chief Executive Officer. Congress vested the CEO with the many powers previously held by the board, including the authority to "direct and supervise all broadcasting activities," 22 U.S.C. § 6204(a)(1); to "assess the quality, effectiveness, and professional integrity" of broadcast activities, *id.* § 6204(a)(2); to "ensure" broadcast activities are consistent with the standards Congress established, including that they be "balanced and comprehensive," *id.* §§ 6204(a)(3), 6202(b)(2); and to "appoint such personnel for the [CEO] as the [CEO] may determine to be necessary," *id.* § 6204(a)(11). Congress subjected these authorities to the proviso that the CEO "shall respect the professional independence and integrity of" the various broadcast services, *id.*

§ 6204(b), consistent with the general congressional mandate that U.S. international broadcasting "be conducted in accordance with the highest professional standards of broadcast journalism," *id.* § 6202(a)(5), and maintain technical excellence, *see id.* § 6202(a)(6)–(7), (b) (requiring, among other things, the provision of reliable and balanced news, reliable research, transmitter, and relay capacity, and technical support for independent indigenous media).

When the Senate confirmed Defendant Michael Pack's nomination as USAGM CEO in June 2020, he began to exercise the powers conferred on him by Congress to advance the United States' interests and Congress's statutory directives. *See* 22 U.S.C. § 6204(a) (identifying CEO's authorities); *id.* § 6202 (setting forth broadcast standards). CEO Pack's top priorities included ensuring that broadcasts adhered to Congress's directive that coverage be "balanced and comprehensive," *id.* § 6202(b)(2). It is undeniable that the changes advanced by CEO Pack and the other Defendants have riled many of the old guard who prefer the old ways. Congress, however, recognized that the agility of more-centralized control vested in a single CEO would combat organizational ossification and ultimately improve the USAGM network's effectiveness in advancing the national interest.

Plaintiffs are former executives of USAGM who are now on investigative leave pending security reviews. *See* Compl. ¶¶ 16–20. Plaintiffs have separately challenged these employment actions and neither their employment status nor their security clearance status is a proper subject of this litigation. Plaintiffs offer no credible claim of harm to themselves that may be adjudicated in these proceedings. Rather, Plaintiffs purport to represent the rights of the governmental entities and grantees that operate under USAGM, and to represent the rights of

employees of those organizations. As redress for perceived harms to these third parties, they ask the Court, in essence, to take over USAGM's managerial responsibilities for the USAGM broadcast services.

Plaintiffs' motion for a preliminary injunction fails to satisfy any of the requirements for such extraordinary relief. First, the relief Plaintiffs seek is extraordinary even by the standards of preliminary injunctions, and in any event not an appropriate exercise of the judicial power. Second, Plaintiffs are unlikely to succeed on the merits because they lack standing to raise these claims, lack a valid cause of action, and because Defendants' conduct is consistent with law. Third, Plaintiffs have failed to make a clear showing of irreparable harm to *themselves*, as is necessary to warrant an injunction. Finally, the equities and the public interest weigh heavily against a court supplanting the Senate-confirmed leader of an instrument of United States foreign policy.

## LEGAL STANDARD

A preliminary injunction is extraordinary relief; it is never granted as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in in the public interest." *Id.* at 20, 24. "In this context, the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (Williams, J., concurring). Moreover, a plaintiff cannot prevail without a "clear showing" on

each of those factors. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Winter*, 555 U.S. at 23–24, 31–32 (holding that "proper consideration of" balance of equities and public interest "alone requires denial of the requested injunctive relief" and thus finding no need to address likelihood of success).

<h2 style="text-align:center">ARGUMENT</h2>

This is a bit of an unusual case.  While Plaintiffs elsewhere challenge personnel actions pending against them, here they challenge broad aspects of agency management.  But they argue neither that the challenged conduct harms them, nor that their proposed preliminary injunction would prevent or lessen their own claimed injuries.  Rather, they hope to litigate unnamed third parties' alleged injuries and redress *their* harm by essentially displacing the current agency leadership from control over the agency they lead.  The Court should reject this invitation for such an extraordinary intervention: Plaintiffs do not satisfy the requirements for *any* injunctive relief, much less the extreme remedy they propose.

**I.      Plaintiffs are unlikely to succeed on the merits of their claims.**

Plaintiffs cannot show likelihood of success on the merits of their claims for at least three reasons.  First, the judicial power does not extend to the truly extraordinary relief Plaintiffs seek: judicial management of an executive agency.  Second, Plaintiffs cannot show Article III standing.  Their alleged injury is not caused by the challenged conduct, and no aspect of the broad remedy they seek would redress it; they therefore lack standing.  Evidently recognizing those limitations, Plaintiffs attempt to rely on alleged injuries to journalists employed by VOA under the so-called third-party standing doctrine.  But that argument does them no good; the

5

third-party standing doctrine does not excuse the requirement that a plaintiff establish standing in

his own right, but merely expands the range of merits arguments available to a plaintiff who can

show his own standing.  And, in any event, Plaintiffs lack a sufficiently close relationship with

the VOA journalists whose rights they seek to litigate.  Third, even if Plaintiffs could surmount

these jurisdictional problems, they would be unlikely to succeed in their claims: they have no

valid cause of action and Defendants' conduct is consistent with the law.

> ### A.     This Court lacks jurisdiction.

The judicial power does not extend to general management of an agency's operations in

pursuit of a private plaintiff's preferred policies.  Among other doctrines, the law of Article III

standing prevents just such outcomes.  Plaintiffs lack standing, and so this Court lacks

jurisdiction.

> #### 1.     Plaintiffs improperly seek wholesale change of agency operations through judicial intervention.

A plaintiff "cannot seek *wholesale* improvement of [a federal] program by court decree,

rather than in the offices of the [agency] or the halls of Congress, where programmatic

improvements are normally made."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

"[I]t is not the role of courts, but that of the political branches, to shape the institutions of

government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*,

518 U.S. 343, 349 (1996).  Yet here, Plaintiffs seek straightforward programmatic relief: hands-

on management of the USAGM's day-to-day operation by the Court.  Their proposed order

literally asks the Court to order USAGM to "[c]ease violating the First Amendment, and the

statutory and regulatory firewall," and to "[c]ease hiring, firing, or otherwise interfering with

journalistic personnel decisions," as well as to order the CEO to apparently approve J-1 visa sponsorship and extension requests sight-unseen and to decide which meetings the general counsel can attend.  *See* Pls.' Proposed Order at 1–2, ECF No. 12-72.  In their Complaint they ask that the Court appoint an "independent monitor" to "ensure compliance" with the law. Compl. at 83 (Prayer for Relief (a)(x)).

If Plaintiffs believe that USAGM and its networks no longer advance the national interest, such questions are beyond the purview of the judiciary.  As Plaintiffs note at some length, members of Congress in both parties have demonstrated a keen interest in the management of USAGM.  See Compl. ¶¶ 46, 74, 109, 116–119, 137; Mem. of P.&A. in Supp. of Pls.' Mot. for a Prelim. Inj., at 8, 41, ECF No. 12-1 ("PI Mem.").  Congress has ample tools of its own to pursue what it perceives to be the national interest, even where the Executive Branch disagrees with either the proper ends or the best means to achieve them.  Plaintiffs seek through this action what the law forbids: the "usurp[ation of] the powers of the political branches." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

> ### 2. *Plaintiffs lack standing and cannot assert the rights of third parties.*

Plaintiffs rest their claims on the rights of third parties.  *See* PI Mem. at 16.  To do so, they must show three elements: (1) standing in their own right; (2) a "close relationship" with the third party; and (3) some "hindrance" to the third party pursuing his or her own rights.  *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).  Plaintiffs do not meet any of these requirements.

            *i.*      *Plaintiffs lack standing because their claimed injuries are not caused by the challenged conduct.*

As noted above, Article III standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 408.  Plaintiffs bear the burden to establish the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)—that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo*, 136 S. Ct. at 1547.  Moreover, a plaintiff must "demonstrate standing separately for each form of relief sought."  *Friends of the Earth, Inc. v Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)); *see also Louie v. Dickson*, 964 F.3d 50, 54 (D.C. Cir. 2020) (same). Because Plaintiffs' claimed injuries do not arise from the challenged conduct and cannot be redressed by the relief they seek, they lack Article III standing.

Plaintiffs rest their claim to standing on "reputational and economic harm" stemming from their placement on investigative leave.[2]  PI Mem. at 17.  While Plaintiffs seek to invoke actions allegedly taken or threatened against others in support of these claims, this remains fundamentally a dispute between federal employees and their federal employers.  *Warth v.*

---

[2] As Plaintiffs continue to be paid while on investigative leave, it is unclear on what basis they claim economic harm.  And if Plaintiffs have suffered reputational harm, they do not substantiate that harm in any way beyond conclusory statements.  *See, e.g.*, PI Mem. at 42-44 (describing reputational damage to USAGM and its networks); Compl. ¶¶ 138, 152 (conclusory statements); Turner Decl. ¶ 48 (asserting that harm to USAGM "imputes" to him); Walsh Decl. ¶ 27 (same); Powers Decl. ¶ 38 (similar); Tran Decl. ¶ 16 (similar); Lennon Decl. ¶ 25 (conclusory). Plaintiffs' wish that USAGM comply with their view of the law of course does not constitute a cognizable injury giving rise to standing.  See *Williams v. Lew*, 819 F.3d 466, 475 (D.C. Cir. 2016) (citing *Allen v. Wright,* 468 U.S. 737, 754 (1984)).

*Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.").  But Plaintiffs do not ask this Court to restore them from investigative leave to their positions.  *See* Pls.' Proposed Order.  Indeed, Plaintiffs do not even challenge Defendants' conduct in that regard.  Rather, Plaintiffs contend that various actions taken by Defendants violate § 6204(b) and "chill" protected speech of third parties.  *See* PI Mem. at 19–41; Compl. ¶¶ 146–173 (basing claims for relief on "firewall violations"); *id.* ¶¶ 176 (general mismanagement claim).  But those actions plainly are not the source of Plaintiffs' claimed injuries.  Thus, even were the Court ultimately to rule in Plaintiffs' favor and to issue the injunction that they seek, it would not remedy Plaintiffs' claimed injuries.  Simply put, Plaintiffs fail to establish standing because their claimed injuries are not caused by the challenged conduct and accordingly are not capable of redress by a favorable judicial decision in these proceedings.

Plaintiffs seek to evade this straightforward conclusion by asserting that they have so-called third-party standing.  They are wrong.  The third-party standing doctrine offers no escape from the "irreducible constitutional minimum" of standing.  *Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999) ("Because [the appellant] seeks to raise the rights of third parties…he must show that he has standing under Article III, *and* that he satisfies third party, or *jus tertii*, standing requirements." (emphasis in original)); *see also Craig v. Boren*, 429 U.S. 190, 195 (1976); *Sands v. Nat'l Labor Relations Bd.*, 825 F.3d 778, 784 (D.C. Cir. 2016) (similar); *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, No. 20-1784, 2020 WL 5745974, at *3 (6th Cir. Sept. 24, 2020) ("Importantly, the would-be litigant must have established standing in

their own right before they can assert standing on behalf of a third-party.").  In this regard, the

doctrine is often misunderstood: It does not allow a plaintiff to pursue *claims* of third parties.

Rather, the doctrine merely expands the scope of arguments available to a plaintiff pursuing his

own claim.  *See Kowalski*, 543 U.S. at 129 (describing the rule that a party ordinarily cannot

"rest *his* claim to relief on the legal rights or interests of third parties" and the doctrine of third-

party standing as an exception to this rule (emphasis added)); *see generally* Wright & Miller,

13A Fed. Prac. and Proc. Juris. § 3531.9 (3d ed. 2020) (describing doctrine).

     In the typical third-party standing example, a regulated person seeks relief from a statute

that infringes not his own constitutional rights, but those of others.  In *Craig v. Boren*, for

example, a convenience store owner sought relief from enforcement of a statute that infringed

the rights of young men.  429 U.S. at 194.  In *United States v. Stevens*, a criminal defendant

argued that a statute enforced against him was invalid because it violated others' First

Amendment rights.  559 U.S. 460, 473 & n.3 (2010).  And more recently, in *June Medical

Services v. Russo*, abortion providers sought relief from enforcement of a statute that they

claimed would infringe the rights of women.  140 S. Ct. 2103, 2119 (2020).  Relief in such cases

protects the plaintiff from illegal action and, only as a collateral consequence, vindicates third

parties' rights.[3]  *See Warth*, 422 U.S. at 499 ("The Art. III judicial power exists only to redress or

otherwise to protect against injury to the complaining party, even though the court's judgment

may benefit others collaterally.").

---

[3] Such actions are therefore distinct from cases where a party litigates a *claim* belonging to
another, such as *qui tam* suits or suits brought by a guardian *ad litem*, or in class actions.

Here, though, Plaintiffs do not challenge actions taken against them personally.  (They challenge their placement on administrative leave in separate proceedings, not here.)  Rather, they challenge separate conduct—alleged violations of § 6204(b) and suppression of third parties' speech—directed toward others.  Put otherwise, Plaintiffs have "failed to allege a sufficient nexus between [their] injury and the government action which [they] attack[] to justify judicial intervention."  *Linda R.S. v. Richard D.*, 410 U.S. 614, 617–18 (1973).  The remedy Plaintiffs seek is one that might (or might not) benefit third parties, but plainly would not benefit Plaintiffs themselves.  *See* Pls.' Proposed Order.  Plaintiffs cannot demonstrate that their injury either is caused by the challenged conduct or "is likely to be redressed by a favorable judicial decision," *Spokeo*, 136 S. Ct. at 1547; Plaintiffs lack standing and the Court lacks jurisdiction.

It is no puzzle why Plaintiffs do not directly challenge the source of their claimed injury, or seek relief related to it.  The Civil Service Reform Act (CSRA) provides the sole avenue for Plaintiffs to challenge those employment actions and strips district courts of jurisdiction to award related relief.  Plaintiffs' claims rest on the allegation that Defendants "have retaliated against" them, Compl. ¶ 11, when they placed them "on administrative leave," Compl. ¶¶ 16–20, 61.  Because at its core this case concerns an employment dispute, Plaintiffs must pursue relief through CSRA procedures—as they are, *see* PI Ex. 57 (Plaintiffs' OSC Complaint), ECF No. 12-59—and this Court therefore lacks jurisdiction.  *See, e.g.*, *Mapes v. Reed*, 2020 WL 5545397, at *3–4 (D.D.C. Sept. 16, 2020) (dismissing a CSRA dispute masquerading as an independent statutory, constitutional, and APA claim).

11

The CSRA establishes a "comprehensive scheme" that provides reticulated procedures for adjudicating employment disputes brought by federal employees. *Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (Roberts, J.).  Recognizing the need to balance employee rights and "the needs of sound and efficient administration," Congress has established a uniform system for nearly every type of employment dispute involving federal employees.[4]  *United States v. Fausto*, 484 U.S. 439, 445 (1988).  The specific mechanism and procedures for challenging the federal employer's action turns on the employee's position and the nature of the employment action.  Major adverse actions such as removals may be appealed directly to the Merit Systems Protection Board, with judicial review channeled to the Federal Circuit.  5 U.S.C. § 7501 *et seq.*  And as most relevant here, where Plaintiffs cannot point to such adverse action, 5 U.S.C. § 2302(a) identifies personnel actions that constitute "prohibited personnel practices" when taken, withheld, or threatened on grounds including reprisal for "protected disclosures."

Generally speaking, employees who contend—as Plaintiffs do—that they have been subjected to a prohibited personnel practice must file a Complaint with the Office of Special Counsel (OSC)—as Plaintiffs have.  *See* 5 U.S.C. § 1214(a)(1)(A).  That office, in turn, is empowered to investigate the allegations and, if substantiated, to recommend a remedy.  *Id.* § 1214(b)(2)(A)(ii)(B).  If the agency declines to follow the recommendation, OSC may petition to the Merit Systems Protection Board to order corrective action, *id.* § 1214(b)(2)(C), and the Board "shall order such corrective action as the Board considers appropriate," *id.* § 1214(b)(4).

---

[4] Certain claims of employment discrimination, not at issue here, may proceed directly in district court after the completion of required administrative processes.  See 5 U.S.C. 7702(a)(1)(B); *Elgin*, 567 U.S. at 13.

Only after a "final order or decision of the Board" may a complainant obtain judicial review, *id.* § 1214(c)(1), and then only in a Court of Appeals, *id.* § 1214(c)(2); *see id.* § 7703(b)(1)(A) (certain appeals must go to the Federal Circuit); *id.* § 7703(b)(1)(B) (certain appeals may be filed in either the Federal Circuit or "any court of appeals of competent jurisdiction").

The Court need not dally long over these complex procedures, which reflect only a small part of the CSRA. The point is that Congress has provided a detailed and comprehensive scheme for addressing all manner of federal employment issues, including allegations like Plaintiffs'. The CSRA covers the entire scope of the federal employment relationship, even beyond personnel actions. For example, the CSRA provides management the right to assign work, *see* 5 U.S.C. § 7106(a)(2)(B), and to establish performance appraisal systems, *see id.* § 4302. *See also Fausto*, 484 U.S. at 445 (addressing personnel actions taken in light of appraisal system). And it creates procedures for processing any employee "grievance," including any "claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. § 7103(a)(9)(C)(ii); *see id.* § 7121 (setting out grievance procedures).

As courts have repeatedly held, "these remedial provisions are exclusive, and may not be supplemented by the recognition of additional rights to judicial review having their sources outside the CSRA." *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005). So the CSRA precludes suits brought under the Back Pay Act, even where the CSRA does not itself provide a remedy, because "the absence of provision for [certain] employees to obtain judicial review is . . . manifestation of a considered congressional judgment that they should not have statutory entitlement to review for adverse action." *Fausto*, 484 U.S. at 448–49. It precludes *Bivens* suits

13

alleging First Amendment retaliation claims, in recognition that such constitutional challenges "are fully cognizable within this system," even if remedies are more limited, *Bush v. Lucas*, 462 U.S. 367, 368, 386 (1983), or entirely unavailable, *Davis v. Billington*, 681 F.3d 377, 384–88 (D.C. Cir. 2012).  It precludes constitutional claims seeking injunctive relief.  *Elgin*, 567 U.S. at 8.[5]  It precludes APA suits that allege the agency did not adhere to its own "voluntarily adopted, binding policies that limit its discretion."  *Graham*, 358 F.3d at 932 (quoting *Vitarelli v. Seaton*, 359 U.S. 535, 539 (1959)); *see also Carducci v. Regan*, 714 F.2d 171, 174 (D.C. Cir. 1983) (CSRA precludes APA suits).  It precludes APA suits framed as "collateral, systemwide challenges" to an agency policy for calculating benefits.  *Fornaro*, 416 F.3d at 67, 69.  And it precludes APA suits bringing "systemwide challenge[s] to an agency policy interpreting a statute just as it does to the implementation of such a policy in a particular case."  *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (citation omitted).

In short, the remedies established by the CSRA constitute the exclusive means of redressing most disputes between federal employees and their employers.  Preclusion of Plaintiffs' claims in this case is clear and straightforward: Plaintiffs allege that they have been placed on administrative leave for improper reasons.  *See* Compl. ¶¶ 16–20, 61.  They are already challenging these actions through the CSRA mechanisms established by Congress.  *See* PI Ex. 57.  This Court would turn that scheme on its head if it permits Plaintiffs to

---

[5] For claims seeking equitable relief under the Constitution where judicial review is unavailable, a plaintiff still must exhaust CSRA administrative remedies before filing suit.  *See Steadman v. Governor, U.S. Soldiers' and Airmen's Home*, 918 F.2d 963, 967–68 (D.C. Cir. 1990); *Fleming v. Spencer*, 718 F. App'x 185, 188–89 (4th Cir. 2018).

simultaneously challenge the same actions here or to use their alleged injuries as the basis to assert unrelated legal claims.

Nor would Plaintiffs' invocation of third parties' rights help Plaintiffs.  The CSRA already provides a remedial scheme for charges of a manager's political bias, 5 U.S.C. § 2302(b)(1)(E), (b)(3), and also for "threaten[ed]" retaliation, *id.* § 2302(b)(8).  Because these third parties' claims, if brought by the third parties themselves, would be precluded by the CSRA, they are necessarily precluded when advanced by someone else.  *See Elgin*, 132 S. Ct. at 2133 ("Just as the CSRA's 'elaborate' framework demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review, it similarly indicates that extrastatutory review is not available to those employees to whom the CSRA *grants* administrative and judicial review." (citing *Fausto*, 484 U.S. at 443).

As the foregoing makes clear, and as the D.C. Circuit has expressly held in this very statutory context, "[f]ederal employees may not circumvent the [CSRA's] requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009).  In *Grosdidier*, the plaintiffs were Voice of America (VOA) employees who believed that the USAGM-predecessor Board was systematically violating a statutory preference for hiring U.S. citizens.  *Id.* at 496; *see* 22 U.S.C. § 1474(1).  The plaintiffs brought a putative class action under the APA.  The D.C. Circuit had no trouble affirming the district court's dismissal: "Allowing employees to end-run the CSRA" by pursuing their APA action "would undermine Congress's efforts to foster a 'unitary and consistent Executive Branch position on matters involving

personnel action.'"  *Grosdidier*, 560 F.3d at 497 (quoting *Fausto*, 484 U.S. at 449); *see also* *Graham*, 358 F.3d at 934 (similar); *Fornaro*, 416 F.3d at 67 (similar).  The same result is demanded here: Plaintiffs' sole recourse is the CSRA procedures that they have already invoked.

> ii.    As *"former leaders"* of AGM, Plaintiffs lack the requisite close relationship with those whose interests they seek to protect.

Plaintiffs' lack of standing in their own right is the end of the matter.  The Court can end its analysis there.  But Plaintiffs also lack the close relationship required to invoke third parties' rights.  Plaintiffs claim a special interest in defending the so-called firewall, 22 U.S.C. § 6204(b), as its "guardians."  PI Mem. at 17.  And, they claim, USAGM networks and journalists share an interest in preserving the firewall because it protects their rights.  This is the basis for their purported "close relationship" with the networks and journalists whose rights they seek to protect.

This argument fails on two counts.  First, it is simply wrong to say that § 6204(b) exists to protect the rights of either the networks or their journalists.  The networks exist to advance the United States' interests abroad and § 6204(b) exists because Congress thought it relevant to the successful promotion of those interests.  Plaintiffs may as well claim a shared interest in upholding the Constitution.  A shared interest in the firewall represents a shared interest in protecting the national interest—an interest shared by all, the claimed infringement of which is the archetypal generalized grievance.

Second, Plaintiffs simply lack the "close relationship" with the supposedly affected parties necessary to establish third-party standing.  Consider the types of relationships that have been found to support third-party standing: a vendor's relationship with his vendees, *Craig*, 429

U.S. at 194, a doctor's relationship with his patients, *Griswold v. Connecticut*, 381 U.S. 479, 481

(1965); *June Medical*, 140 S. Ct. at 2118–19; a lawyer's relationship with his clients, *Dep't of*

*Labor v. Triplett*, 494 U.S. 715, 720 (1990); and a defendant's relationship with his jurors,

*Powers v. Ohio*, 499 U.S. 400, 413 (1991).  The relationship at issue here is a far cry from those

exemplars.

Plaintiffs are senior officials on paid investigative leave from their USAGM positions.

Compl. ¶¶ 16–20.  Given their investigative leave status, they have no ongoing managerial

relationship with the USAGM networks or the networks' journalists.  Indeed, as USAGM staff,

Plaintiffs never had a direct managerial relationship with the networks' journalists.  Instead,

Plaintiffs claim the possibility of a future relationship, should their investigative leave be

rescinded and they resume actively performing the duties of their positions.  That is not enough

under *Kowalski*.  There, the Supreme Court held that lawyers could not rely on a "future

attorney-client relationship" to challenge a state law.  543 U.S. at 130.  As the Supreme Court

explained, the "*existing* attorney-client relationship is, of course, quite distinct from the

*hypothetical* attorney client relationship posited here."  *Id.* at 131 (emphasis in original).

Whatever relationship Plaintiffs once had with the third parties they seek to protect, today, like

the lawyers in *Kowalski*, "they have no relationship at all."  *Id.*

       iii.     *The third parties face no hindrance in bringing their own suits.*

Insofar as the Plaintiffs seek to advance the rights of the networks themselves, there is no

hindrance to those entities protecting their own rights.  Voice of America is a government entity;

the government may determine and protect its own interests.  The grantee networks, too, are

wholly capable of advancing their own interests; one such grantee has demonstrated that ability by challenging USAGM's actions in this very Court.  *See OTF*, 2020 WL 3605935.  These organizations face no obstacle in protecting whatever rights they possess.

The journalists, too, face no real obstacle to vindicating their own rights.  Unlike the LGBT patients discussed in *Whitman-Walker Clinic, Inc. v. HHS*, __ F. Supp. 3d __, 2020 WL 5232076 (D.D.C. Sept. 2, 2020), and analogized to in Plaintiffs' briefing, PI Mem. at 19, a journalist is unlikely to be stigmatized, either by the public or by her professional peers, for suing to protect her putative rights.  Indeed, *seventeen* organizations representing journalists have filed an amicus brief supporting Plaintiffs' position.  And they are protected from retaliation by law; standing cannot be premised on a presumption that a party—much less the government—will not follow the law.  *Lyons*, 461 U.S. at 106–107 & n.7.

*        *        *

Because the Court lacks jurisdiction to hear these claims, it should deny Plaintiffs' motion for a preliminary injunction.

### B.        Plaintiffs' claims fail on the merits.

This Court need not and should not reach the merits of Plaintiffs' claims because it lacks jurisdiction to do so.  But Plaintiffs' claims would fail in any event for two reasons.  First, Plaintiffs lack a valid cause of action to pursue their claims.  Second, all of Defendants' challenged actions are consistent with applicable law.

18

1.      *Plaintiffs lack a valid cause of action.*

None of the sources of law under which Plaintiffs purport to bring claims—the

International Broadcasting Act, the First Amendment, or the APA—gives rise to a valid cause of

action in this case.

Whether a statute creates a private right of action depends on whether the statute

"displays an intent to create not just a private right but also a private remedy." *Elec. Privacy*

*Info. Ctr. v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 37 (D.D.C. 2019) (quoting *Alexander v.*

*Sandoval*, 532 U.S. 275, 286 (2001)).  The plaintiff bears a heavy burden to show that Congress

"affirmatively or specifically contemplated private enforcement when it passed the relevant

statute."  *Aishat v. U.S. Dep't of Homeland Sec.*, 288 F. Supp. 3d 261, 267 (D.D.C. 2018)

(quoting *Samuels v. Dist. of Columbia*, 770 F.2d 184, 193 (D.C. Cir. 1985)).  Here, of course,

The International Broadcasting Act provides no cause of action and no mechanism for private

enforcement.  Indeed, it does not even create private rights.

Nor is there a private cause of action against the federal government under the First

Amendment itself.[6]  *See Am. Rd. & Transp. Builders Ass'n v. EPA*, 865 F. Supp. 2d 72, 83

(D.D.C. 2012), *aff'd*, 2013 WL 599474 (D.C. Cir. Jan. 28, 2013) (noting that § 702 of the APA

has replaced "the *Ex Parte Young* fiction" in suits against federal officers); *see also, e.g.*, *The*

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525–26 (9th Cir. 1989) (similar).

---

[6] First Amendment actions for damages under the *Bivens* doctrine are individual capacity suits.
*Ex Parte Young* actions may still be brought against non-federal officers to enjoin a violation of
law.  *See, e.g.*, *Vann v. Kempthorne*, 534 F.3d 741 (D.C. Cir. 2008) (suit against tribal officer).

Accordingly, *all* of Plaintiffs' claims must proceed, if at all, under the APA.  *See* PI Mem. at 19 n.4; *OTF*, 2020 WL 3605935, at *5 n.8.  As explained above, Plaintiffs' APA claim categorically fails because of CSRA preclusion.  In APA terms, the CSRA provides an "other adequate remedy," 5 U.S.C. § 704, and "impliedly forbids the relief which is sought," *id.* § 702. *See Fornaro*, 416 F.3d at 66 (explaining that the APA waiver of sovereign immunity does not extend to cases within the CSRA's ambit).

Yet Plaintiffs' APA claims based on the IBA fail for two additional threshold reasons. First, Plaintiffs are not proper plaintiffs to enforce § 6204(b).  A statutory cause of action "extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'"  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen*, 468 U.S. at 751).  To bring an APA claim alleging noncompliance with a statute—here, the IBA's § 6204(b)—the interest the plaintiff "asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (citation omitted).  Plaintiffs are not within the zone of interests protected by § 6204(b).

Section 6204(b) requires that USAGM "respect the professional independence and integrity of the Board, its broadcasting services, and the grantees of the Board."  22 U.S.C. § 6204(b).  This provision promotes the *national* interest, not private interests, because Congress recognized that for USAGM to accomplish its foreign policy mission of promoting democratic values it must be able to balance its supervisory functions against a degree of network independence.  *See OTF*, 2020 WL 3605935, at *2; *see also* 22 U.S.C. § 6202(a) (requiring U.S.

20

international broadcasting efforts to support U.S. foreign policy objectives among other American values); *id.* § 6204(a)(2) (assigning the CEO of AGM with the responsible to "assess the . . . professional integrity" of AGM activities within the context of U.S. foreign policy objectives).  Given that purpose, and the discretion it plainly accords USAGM in its application, *see infra* at 21–24, it is doubtful that Congress intended for *any* private party to sue to enforce its terms.  But granting that *some* plaintiff may invoke the APA so long as he is *arguably* within the zone of interests, Plaintiffs in this case still fall too far outside that zone.  The entities with interests most directly protected by the statute are those listed: the (now-advisory) Board, the broadcasting networks, and the grantees.

By their own description, Plaintiffs are "former leaders" of USAGM.  Compl. ¶ 12.  And one direction the zone of protected interests plainly does not extend is toward USAGM management (whether active or on extended leave, as are Plaintiffs).  Nothing in the text or purpose of the statute suggests that Congress intended to permit its enforcement by employees *of USAGM*.  The statute cautions the USAGM CEO—acting through his staff—to consider the networks' independence when pursuing his statutory obligations.  USAGM management's relation to § 6204(b) is one of compliance, not enforcement.  Congress did not intend for USAGM staff, much less *inactive* USAGM staff, to enforce by private action statutory provisions that shield other entities from that staff.

Second, the IBA provides no meaningful standard by which a court might adjudicate Plaintiffs' claims; satisfaction of § 6204(b) is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  Agency action is "committed to agency discretion by law" when a "statute is drawn

21

so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," which renders "meaningful judicial review impossible." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). This is true "even where Congress has not affirmatively precluded review." *Heckler*, 470 U.S. at 830. Hallmarks of a decision committed to agency discretion include a statute that puts the onus on the agency, not the courts, to apply a standard, *see Webster v. Doe*, 486 U.S. 592, 600 (1988), and general criteria that make it difficult for courts to meaningfully second-guess an agency's determination, *see id.* ("advisable in the interests of the United States" is unreviewable).

Section 6204(b) is just such a law.  It calls on the CEO to "respect" the "professional independence" of (among others) the USAGM broadcast networks.  When read in conjunction with the broad supervisory authority that Congress bestowed on the CEO, neither statutory term in § 6204(b) is capable of judicial application.  Congress required the CEO to "supervise and direct" the networks, to "assess the professional integrity" of the networks, and to "ensure" that coverage is "balanced and comprehensive."  22 U.S.C. § 6204(a); *id.* § 6202(b).  The statutory scheme, considered as a whole, requires the CEO to determine the appropriate balance between competing factors—his supervisory demands and the networks' independence.  But how to strike that balance is left to the CEO's discretion.  *Cf. United States Sugar Corp. v. EPA*, 830 F.3d 579, 640 (D.C. Cir. 2016) (subsequent history omitted) ("The Congress required the EPA to *consider* a variety of factors without telling the EPA how to weigh them. That calculus belongs to the EPA's discretion.").  Congress provided no statutory standard by which a court might assess whether, for example, a CEO's actions to "ensure" that coverage is "balanced" and

22

"effective[] . . . within the context of the broad foreign policy objectives of the United States"
also show sufficient "respect" for a network's independence.

To be sure, this Court has suggested that it might draw a line between the CEO's
involvement in "day-to-day operations" (prohibited) and exercise of "evaluative and review
responsibilities" (permitted). *OTF*, 2020 WL 3605935, at * 11 (quoting *Ralis v. RFE/RL, Inc.*,
770 F.2d 1121, 1125 (D.C. Cir. 1985)); *see id.* at *5 n.8. But the line between day-to-day
management and general management is a fuzzy one, and it would be impossible for a court to
apply such a standard in practice. For their part, Plaintiffs have suggested that the line be drawn
by reference to journalistic best practices, under what they term an "equivalency" standard: if the
corporate leadership of a comparable news organization would not take the action, neither may
the USAGM CEO. *See* PI Mem. at 21 (citing *OTF*, 2020 WL 3605935, at *11 n.19). Of course,
this would be utterly unworkable, as Plaintiffs suggestion would hamstring USAGM by
requiring it to constantly update itself on the evolving and potentially unwritten practices of
every major news organization and then to refrain from any practice that even one outlier
organization might avoid. Nothing suggests that Congress contemplated a court taking expert
evidence on journalistic ethics to police this proposed line. Should the CEO's actions be judged
against those of MSNBC or those of Fox News? *The Washington Post* or the *Washington
Examiner*? The bare statutory language "respect for professional independence" does not
provide a basis for the Court to pick among these standards. *Cf. Aamer v. Obama*, 742 F.3d
1023, 1039 (D.C. Cir. 2014) ("This is a court of law, not an arbiter of medical ethics."). Absent

a meaningful standard, the balance struck between supervision and independence is committed to the agency's discretion and not subject to judicial review under the APA.

In sum, Plaintiffs' only plausible cause of action derives from the APA.  But that cause of action is foreclosed for three, independently sufficient reasons: The CSRA forecloses APA relief, Plaintiffs are not within the zone of interests protected by § 6204(b), and that statute provides no meaningful standard for judicial review.

### 2.   *Defendants' conduct is consistent with the IBA in any event.*

Throughout their complaint, Plaintiffs allege that Defendants have violated 22 U.S.C. § 6204(b), which states that "in carrying out [his] functions," the CEO "shall respect the professional independence and integrity of" the USAGM broadcast services.[7]  As this Court has recognized, however, that vague statutory command could be read to rest in some "tension" with the CEO's other statutory duties which he "may and must" carry out, *OTF*, 2020 WL 3605935, at *11—including his statutory duty to "direct and supervise" the USAGM networks, 22 U.S.C. § 6204(a)(1).

Section 6204(b) provides no meaningful standard by which this Court or any other court might judge compliance.  But even accepting Plaintiffs' one-sided and self-serving account of events—which Defendants categorically reject—Plaintiffs are unlikely to prevail.  Each managerial action challenged in this litigation is directly tied to a statutory authority expressly conferred on USAGM management by Congress.  To take just one example: what Plaintiffs call

---

[7] Plaintiffs allege that Defendants have (1) violated the IBA; (2) violated the APA; and (3) violated fiduciary duties.  See PI Mem. at 19 & n.4, 40.  These are just three different spins on what is the same claim: that Defendants are violating § 6204(b).

a "clear firewall violation"—investigating "alleged breaches of journalistic practices", Compl.

¶ 131—is in fact a clear exercise of the CEO's obligation to "assess" the "professional integrity"

of USAGM networks' broadcast activities, 22 U.S.C. § 6204(a)(2).  Indeed, none of the alleged

actions even arguably involves interference with day-to-day operations of the networks:

- Plaintiffs attack the reassignment of Steve Springer from VOA to USAGM headquarters as Special Assistant to the USAGM Chief Operating Officer.  PI Mem. at 21–22; Compl. ¶ 58.  But the USAGM CEO undeniably has statutory authority to "appoint such personnel for the [CEO] as the [CEO] may determine to be necessary."  22 U.S.C. § 6204(a)(11).  Plaintiffs do not allege that Defendants have prevented VOA from assigning someone else to perform the duties of Standards Editor, merely that CEO Pack has retained Mr. Springer's services for himself—an act fully consistent with his statutory authority.  If Mr. Springer himself seeks to challenge his reassignment, he must do so through the CSRA process.

- Plaintiffs attack Defendants for "demand[ing] the termination" of an executive editor of one of the networks, and "try[ing] to reassign" the VOA New York Bureau Chief.  PI Mem. at 22.  Even if this were true, Plaintiffs' own declarations make clear that it is entirely consistent with journalistic best practices for a publisher to "suggest and even urge specific actions," Declaration of Amanda Bennett ¶ 13, ECF No. 12-60.  Section 6204(b) does not prevent the CEO from fulfilling his obligation to "direct and supervise" the networks in this way.

- Plaintiffs allege the "constructive termination" of many foreign journalists through CEO Pack's decision to review J-1 visa sponsorship applications on a case-by-case basis.  PI Mem. 10, 23–24.  But Plaintiffs do not deny, and indeed acknowledge, that the decision to endorse a J-1 visa falls squarely on CEO Pack—indeed, CEO Pack has a statutory obligation to ensure that foreign citizens are hired only "when suitably qualified United States citizens are not available," 22 U.S.C. § 1474(1), a requirement USAGM has sometimes been accused of ignoring, *e.g.*, *Nyunt*, 589 F.3d at 447; *Grosdidier*, 560 F.3d at 496; *Broad. Bd. of Governors v. Am. Fed. of Govt. Emps.*, 66 F.L.R.A. 380 (2011).

- Plaintiffs object to Defendant Dewey "*seeking permission* to participate in news coverage meetings" and "*expressing concern* to journalists" about specific articles.  PI Mem. 24 (emphasis added).  They also object to Defendant Dewey tracking article assignments.  *Id.*  Although Plaintiffs do not claim that Defendants have actually interfered with coverage decisions or article

assignments, they maintain that these actions are "by definition" a breach of
§ 6204(b). PI Mem. at 24. But again, even if these allegations were true, the
CEO has a statutory duty to "supervise" the networks, to "assess" coverage for its
"professional integrity," and to ensure "balanced" coverage. 22 U.S.C.
§ 6204(a)(1), (2), (3); see *id.* § 6202(b)(2). Observing meetings on news
coverage and tracking assignments is one means by which the CEO might fulfill
these duties.

- As discussed above, Plaintiffs also object to Defendants investigating specific
  allegations of imbalanced reporting. *See* PI Mem. at 25–28. These investigations
  are consistent with the CEO's general statutory powers to "supervise" the
  networks, his more specific power to "assess the . . . professional integrity of"
  broadcast activities, 22 U.S.C. § 6204(a), and his broad obligation to ensure that
  USAGM broadcasts present a "balanced and comprehensive projection of United
  States thought," *id.* § 6202(b)(2), (c)(2).

Plaintiffs may dislike Defendants' actions and perhaps they would have proceeded

differently were any of them USAGM's Senate-confirmed CEO, but that does not mean that they

have demonstrated a likelihood of success on the merits. Defendants have properly exercised

USAGM's broad and explicit supervisory powers, including the statutory requirement to

"respect" the networks' integrity and professional independence. Even so, at this preliminary

stage in the litigation, the Court need not ultimately resolve all interpretive questions related to

the interaction between § 6204(a) and § 6204(b). *See Aamer*, 742 F.3d at 1041 ("[W]e

emphasize that we are addressing only petitioners' *likelihood* of success on the merits, not the

actual merits of their claim."). It is enough to conclude that Plaintiffs are *unlikely* to prevail

while withholding a final determination until later.

Plaintiffs also invoke the so-called "Firewall Regulation" that was promulgated during

Plaintiffs' leadership of USAGM, just before CEO Pack assumed office. *See generally* USAGM

Final Rule, October 26, 2020 (Knapp Decl. Ex. 1). USAGM has since rescinded this regulation.

*Id.* at 4. After an exhaustive review process and interagency consultation which predated this

litigation, the agency has concluded that the regulation suffered numerous faults, including that it too tightly constrained the CEO in the performance of his statutory duties and obligations, was in tension with the statutory terms and requirements of USAGM's congressionally mandated mission, created operational difficulties, and impeded the execution of USAGM's role in carrying out the U.S. foreign policy mission of promoting core American values, *see, e.g.*, 22 U.S.C. §§ 6201, 6202(a).  *See* USAGM Final Rule at 14–30.  Because Plaintiffs seek only prospective relief, any claims that rely on the regulation are moot.

### 3. *Defendants' conduct does not violate the First Amendment*

Plaintiffs predicate their First Amendment claim on caselaw governing private citizens' free speech rights.  But neither Plaintiffs nor the VOA journalists and editors for whom they purport to speak are private citizens.  They are, in the words of one declarant, "civil servant[s]," Declaration of John Roe ¶ 28, ECF No. 12-64, who are employed by the United States to speak on its behalf in a manner that must be "consistent with the broad foreign policy objectives of the United States," 22 U.S.C. § 6202(a)(1).  Supreme Court precedent that is directly on point—but nowhere cited by Plaintiffs—affords such government personnel no First Amendment protection for speech taken pursuant to their official duties.  Plaintiffs are thus unlikely to succeed on their First Amendment Claims.

As an initial matter, Plaintiffs do not invoke their own First Amendment rights as the basis for their claims.  Plaintiffs themselves are not journalists.  Like Defendants, they are USAGM managers.  *See* Compl. ¶¶ 16–20 (Plaintiffs were USAGM's Chief Financial Officer, Director of Management Services, Chief Strategy Officer, Deputy Director of Operations, and

Executive Director); *cf. id.* ¶¶ 22–26.  In other words, under their own theory of the case, far from having their own First Amendment rights at issue, Plaintiffs are managers without control, and Plaintiffs themselves would be subject to "strict limits" on interactions with members of Voice of America networks and prohibited from any control over or input into the content of any journalist's work.  Compl. ¶ 41; *see id.* ¶¶ 39–40.

Plaintiffs invoke the rights of "reporters at Voice of America" or "USAGM journalists"—federal employees working for USAGM or one of its subsidiary agencies—but that invocation cannot suffice.[8]  *See, e.g.*, Compl. ¶¶ 156, 158; *see generally Nyunt*, 589 F.3d 445, 447 (D.C. Cir. 2009) (holding that "federal employees," such as the plaintiff, an "international radio broadcaster . . . [with] Voice of America," "may not bring employment and personnel suits of th[e] kind [there at issue] under the APA"); *U.S. Info. Agency, Voice of Am. v. Fed. Labor Relations Auth.*, 960 F.2d 165, 166 (D.C. Cir. 1992) ("The wages of most federal employees, including those at the VOA, are based on pay tables such as the General Schedule.").[9]  Plaintiffs'

---

[8] Plaintiffs do not set forth any allegations or evidence purporting to address the speech of USAGM's grantees, as opposed to that of the federal employees of VOA.  *See, e.g.,* Declaration of John Coe ¶ 1, ECF No. 12-62 ("I am currently a journalist and/or editor for Voice of America."); *id.* ¶ 8 (claiming defendant's actions "have had a direct and chilling effect at journalists at Voice of America."); Declaration of John Doe ¶ 1, ECF No. 12-63 ("I am currently employed by Voice of America"); *id.* ¶ 8 (claiming a "chilling effect" Defendants' alleged actions "have on Voice of America and its journalists."); Roe Decl. ¶ 1 ("Currently, I am a member of Voice of America's senior management team."); *id.* ¶ 5 (claiming Defendants' alleged actions "have had a direct and chilling effect on journalists at Voice of America").

[9] If any such journalists are contractors, rather than employees, the analysis is the same.  *See, e.g., Jangjoo v, Broad. Board of Governors*, 244 F. Supp. 3d 160, 171–72 & n.4 (D.D.C. 2017) (dismissing Voice of America contractor's First Amendment claim against agency because the plaintiff's "statements were made in his capacity as a public employee, discussing a matter within the scope of his ordinary duties.").

claims do not rest on allegations that these journalists' speech *as citizens* are chilled; rather, they claim that their speech "pursuant to their official duties" is being chilled by the fear that they may face "employer discipline" for it. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *see* Compl. ¶¶ 155–159 (alleging that Defendants violated the First Amendment by "interfering with the manner in which Voice of America covers editorials," "chill[ing] news coverage," and "chilling protected journalistic activity").

Such allegations do not give rise to a First Amendment claim. *Garcetti*, 547 U.S. at 421–22. In *Garcetti*, a deputy district attorney brought a First Amendment claim alleging that he was disciplined for preparing a memorandum as part of his official duties recommending that a prosecution being pursued by his office be dropped. *Id.* at 413-15. The Court, citing its analysis in *Pickering v. Board of Education of Township High School District 205, Will County,* 391 U.S. 563 (1968), and subsequent cases, recognized that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom" and that "[w]hen [public employees] speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Garcetti*, 547 U.S. at 418–19. As a result of these concerns, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes," and thus have "no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* at 418, 421. The Court further noted that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421–22.

Since *Garcetti*, the D.C. Circuit has made clear that public employee speech is made

"'pursuant to . . . official duties" and not protected even when the speech at issue is outside the

employee's job description, and that this "official duties" exception encompasses speech *about*

the employee's job duties in certain circumstances. *See, e.g., Mpoy v. Rhee*, 758 F.3d 285, 290-

91 (D.C. Cir. 2014). Since *Garcetti*, courts have routinely applied the *Garcetti/Pickering* test in

analyzing First Amendment retaliation claims asserted by Voice of America personnel. *See, e.g.*,

*Jangjoo*, 244 F. Supp. 3d at 170-73; *see also Navab-Safavi v. Glassman*, 637 F.3d 311, 317

(D.C. Cir. 2011).

Here, the speech on which Plaintiffs' claims are based is speech made pursuant to

USAGM journalists' "official duties." *Garcetti*, 547 U.S. at 421. The speech at issue is, indeed,

the core duty that the journalists were hired to perform. *See, e.g.*, PI Mem. at 30 (characterizing

claim as an attempt by Defendants to "[i]nfluence the [c]ontent of [j]ournalistic [s]peech");

Compl. ¶ 159 (alleging that Defendants' actions are "chilling protected journalistic activity");

Roe Decl. ¶ 14 (complaining review of VOA story has "affected Voice of America's coverage

and content"); *id.* ¶ 17 (objecting to agency placing editorials on VOA website); Coe Decl.

¶¶ 10–11 (describing "investigation[s]" into content of VOA stories); Doe Decl. ¶¶ 8–14 (same).

Plaintiffs do not complain of any purported retaliation against journalists for speech as private

"citizens about matters of public concern." *Garcetti,* 547 U.S. at 419. Instead, their complaint

exclusively revolves around the allegations that their presidentially appointed and Senate

confirmed agency head—who is charged by statute with "direct[ing] and supervis[ing] all

broadcasting activities" under his agency and "ensur[ing] that United States international

broadcasting is conducted in accordance with the standards and principles" set forth by

Congress—is attempting to fulfill his statutory obligations, 22 U.S.C. § 6204(a)(1) & (a)(3),

thereby chilling "news coverage" expressed in the Voice of America's official content.[10]  *See,*

*e.g.*, Compl. ¶ 93.  Any alleged discipline or retaliation for the speech these journalists were

---

[10] Plaintiffs' claim that one journalist was investigated for participating in a letter to the Acting
Voice of America Director "expressing concerns about USAGM's management and compliance
with the law," Doe Decl. ¶ 14; *see also* Coe Decl. ¶¶ 15–20;  Roe Decl. ¶ 16, is no exception.
This type of internal letter "air[ing] grievances" against leadership and "claiming that they were
engaging in mismanagement and other abuses of their authority" is the exact type of conduct the
court in *Jangjoo* found to be speech "in [a VOA employee's] official capacity, not in his
personal capacity" and thus not protected by the First Amendment. 244 F. Supp. 3d at 171; *see
also Mpoy*, 758 F.3d at 290-91 ("'In our cases applying *Garcetti*, we have consistently held that
a public employee speaks without First Amendment protection when he reports conduct that
interferes with his job responsibilities, even if the report is made outside his chain of
command.'" (quoting *Winder v. Erste,* 566 F.3d 209, 215 (D.C. Cir. 2009)).  Plaintiffs also
suggest that USAGM's conflict of interest policy is somehow improper.  But they do not allege
that any individual—let alone any Plaintiff or declarant—faced any discipline as a result of
speech as a private citizen. What's more, their own evidence demonstrates that conflict of
interest policies—including those that authorize reassignment based on the appearance of a
conflict of interest—are consistent with standard journalistic practices.  *See, e.g.*, ECF No. 12-35
at 14 (LA Times Ethics Guidelines noting that "The Times may restrict a staff member's
assignment" based on potential conflicts of interest); ECF No. 12-36 at 10-16 (Associated Press
conflicts of interest policy); ECF No. 12-34 at 7, 25 (NY Times "Ethical Journalism" handbook
precluding journalists from reporting in certain cases that could give rise to the appearance of a
conflict of interest).  These private sector policies submitted by Plaintiffs provide far more
draconian limits than the USAGM policy about which Plaintiffs complain; while the USAGM
policy merely suggests VOA journalists "should consider whether recusal or mitigation is
required" where they have expressed a political opinion on social media, ECF No. 12-51 at 4,
several private news organizations prohibit certain speech in private capacity from their
employees altogether.  *See, e.g.,* ECF No 12-34 at 16 (NY Times policy prohibiting employees
from "wear[ing] campaign buttons," "giv[ing] money to . . . any political candidate or election
cause," or "march[ing] or rally[ing] in support of public [office]," or "sign[ing] ads taking a
position on public issues"); ECF No. 12-35 at 12 (LA Times policy that "Staff members may not
engage in political advocacy" and "should avoid public expressions . . . of their political
views.").

hired to make on behalf of the United States, under the supervision of USAGM leadership, does not violate the First Amendment.

Nor can Plaintiffs plausibly contend that the VOA journalists whose rights they seek to assert have the unfettered right to put forth whatever content they wish on the government-owned, -operated, and -funded news service that employs them.  As one of Plaintiffs' declarants candidly admits, Voice of America's editors and journalists like him are "civil servants."  Roe Decl. ¶ 28; *see* PI Mem. at 38 (describing journalists whose speech is purportedly being threatened as "public servants").  Congress made clear the limited role of a VOA journalist when it established the mandatory statutory requirement that VOA's reporting be consistent with a particular goal:   The reporting "shall . . . be consistent with the broad foreign policy objectives of the United States."  22 U.S.C. § 6202(a)(1); *see id.* at § 6202(a)(2)–(c) (setting forth other restrictions and limitations on Voice of America and other United States international broadcasting, including that it "not duplicate the activities of private United States broadcasters," "not duplicate the activities of government supported broadcasting entities of other democratic nations," and "promote respect for human rights, including freedom of religion").  Indeed, as one court in this District has noted, VOA's "content constitutes government speech that is not protected by the First Amendment."  *Achagzai v. Broad. Board of Governors*, Civ. A. No. 14-768 (RDM), 2016 WL 471274 (D.D.C. Feb. 8, 2016).

Amici contend that *Garcetti* is inapposite because the speech in question here is that of journalists, despite candidly conceding that there is no authority supporting that proposition. Amicus Br. at 12, ECF No. 22-1.  They also concede that *Garcetti* would be applicable if an

*editor*, as opposed to Defendants, were to control the content of the government's broadcasting. *Id.* at 13.  But the concession that *Garcetti* applies to the speech of government journalists where an editor makes the decision the journalist opposes is fatal to their claim.  Not only does the distinction between an editor and Defendants (whose role is arguably closer to that of the publisher in the context of private journalism), have no basis in law, but it is also contrary to both the statutory limitations on the content that VOA can produce, 22 U.S.C. § 6202, and the statutory mandate that USAGM's CEO "direct and supervise all broadcasting activities," "review and evaluate the mission and operation of, and . . . assess the quality, effectiveness, and professional integrity of, all such activities within the context of the broad foreign policy objectives of the United States" and "ensure that United States international broadcasting is conducted in accordance with the standards and principles contained in [22 U.S.C. §] 6202."  22 U.S.C. § 6204(a)(1)-(3).

Amici's attempt to support a limitation on the CEO's authority to fulfill his statutory mandate with an analogy to cases involving student journalists at public schools fails for the same reason.  As they concede, "[u]nder *Hazelwood School District v. Kuhlmeier*, a state institution that chooses to launch a newspaper *need not award it the First Amendment latitude of a major metropolitan daily*," but "*may* do so."  Amicus Br. at 14 (first emphasis added).  This is fatal to their argument.  Here, even assuming the applicability of this line of authority to the context of broadcasting that exists to advance the foreign policy interests of the United States, Congress spoke clearly in choosing *not* to provide USAGM networks that level of First Amendment status, both setting forth clear limits on the networks' content and establishing the

responsibility and authority to police those limits.  *See* 22 U.S.C. §§ 6202(a), 6204(a).  Their

suggestion that one of these statutory limits, the vague provision that United States international

broadcasting shall "be conducted in accordance with the highest professional standards of

broadcast journalism," *id.* § 6202(a)(5), trumps all other provisions in the same subsection and

overcomes every explicitly enumerated authority and responsibility granted to USAGM's CEO

in section 6204(a) simply cannot bear scrutiny.

In contrast to Amici, nowhere have Plaintiffs even cited *Garcetti*.  Nor have they

attempted to contend with either their or VOA journalists' position as federal employees

speaking on behalf of the government.  *Cf. Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) ("'[I]t is

not easy to imagine how government could function' if it were subject to the restrictions that the

First Amendment imposes on private speech. . . . The Free Speech Clause does not require

government to maintain viewpoint neutrality when its officers and employees speak about [a

course of action embarked upon by the government].").  Nor do they cite any case holding that

Voice of America's employees' speech in the course of their employment is governed by a

different standard.  The cases that they cite—which for the most part address the situation in

which government actions purportedly impinge on the speech of private journalists or other non-

government speakers—are wholly inapposite.  Indeed, only three of Plaintiffs' cases address

government media at all.

The first of those three cases, *Tripp v. DOD*, 284 F. Supp. 2d 50, at *8 (D.C. Cir. 2003),

says nothing about the government's ability to control the content of media entities that are part

of the government, staffed by journalists that are government employees.  It simply concludes

that a specific newspaper affiliated with the Department of Defense (1) that "does not represent the official position of the U.S. government [or] the DOD"; (2) is "editorially independent, [and] largely financially independent" from the government; and (3) that Congress has declared "enjoy[s] the full protection of the First Amendment" shall be treated as a newspaper for purposes of determining whether journalists in its employ are protected by the reporter's privilege when discovery is sought about its sources. *Id.* at 56-57.

The second case, *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121 (D.C. Cir. 1985), is not a First Amendment case at all, but an Age Discrimination in Employment Act case. It holds that—in contrast to USAGM *agency* VOA, which is at issue here—USAGM grantee Radio Free Europe and Radio Liberty is "a private entity which is not a 'government controlled corporation'" in the meaning of that statute. *Id.* at 1131. *Ralis* has no relevance to the issues here.

Finally, Plaintiffs cite dicta in *Weaver v. United States Information Agency*, 87 F.3d 1429, 1436 (D.C. Cir 1996), that speculates about potential "constitutional issues" not at issue in that case. But Plaintiffs rightly do not emphasize *Weaver* in their argument because it is not relevant here: that case simply upheld a prepublication review requirement for employees of certain federal agencies. And although *Weaver* flagged potential "constitutional issues" in dicta, it did not even attempt to decide those issues, which in any event were resolved by *Garcetti* a decade later.

In sum, *Garcetti* controls Plaintiffs' claims here, and compels the conclusion that there is no First Amendment protection for the speech at issue. Their First Amendment claims are thus unlikely to succeed on the merits.

35

II.    **Plaintiffs cannot show irreparable harm to themselves that would justify injunctive relief.**

To obtain an injunction, a plaintiff must show that "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20; *see also Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281, 296–97 (D.D.C. 2005) ("A showing of irreparable harm is the sine qua non of the preliminary injunction inquiry."), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006). Indeed, any injunction must be tailored to redress the plaintiff's specific harm. *See Lewis*, 518 U.S. at 358 ("[W]e can eliminate from the proper scope of this injunction provisions directed at" practices alleged to have harmed third parties because "they have not been found to have harmed any plaintiff in this lawsuit.").

Any preliminary relief that this Court enters must be targeted to address *these Plaintiffs'* injury. And Plaintiffs' claim of harm "runs headlong into the well-worn rule from *Sampson v. Murray* that loss of employment is not irreparable harm except in a 'genuinely extraordinary situation.'" *OTF*, 2020 WL 3605935, at * 14 (quoting *Sampson*, 415 U.S. 61, 92 n.68 (1974)). This is plainly not such an extraordinary situation. For one, Plaintiffs continue to be paid. For another, Plaintiffs are already pursuing—and apparently expect—correction of any personnel actions taken against them. *See* Compl. ¶ 16–20, 61. Each of these facts underscores that Plaintiffs' vague allusions to reputational harm are inadequate to overcome the *Sampson* rule: Plaintiffs not only *are still employed*, but also fully expect to *resume the duties of their positions*. *Cf. Sampson*, 415 U.S. at 91 (any reputational damage from discharge "would be fully corrected" by administrative remedy). Plaintiffs make no effort to substantiate their claim of reputational damage, *see* PI Mem. at 43-44; *supra* at 8 n. 2, and accordingly have not met their burden to

36

show that any reputational harm would be irreparable.  *Cf. Jones v. D.C.*, 177 F. Supp. 3d 542, 547–48 (D.D.C. 2016) (terminated coaches could not show irreparable harm based on reputational damage); *Trudeau*, 384 F. Supp. 2d at 297 (allegations of reputational harm too speculative and unsupported to constitute irreparable harm).

There is no need to dwell on Plaintiffs' more exotic claim of irreparable harm: that Plaintiffs must labor harder if they are ultimately restored to active duty in their positions.  PI Mem. at 43–44.  That claim has no merit.  For one, Plaintiffs seem to concede that they will be able to repair any putative harm once they have returned to active duty within USAGM's senior management ranks; even if it takes more time, such harm is hardly irreparable.  For another, it remains speculative whether Plaintiffs will be restored to such active duty.  That question is the subject of an entirely separate administrative proceeding.  But a plaintiff must make a clear showing of irreparable harm that is "imminent and certain, rather than remote and speculative." *Trudeau*, 384 F. Supp. 2d at 297 (citing *Comm. in Solidarity v. Sessions*, 929 F.2d 742, 745–46 (D.C. Cir.1991) and *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Likewise, it is no answer that Plaintiffs assert the rights of third parties to support Plaintiffs' own claims.  Even if Plaintiffs could assert those rights, *but see supra* at 16–18, the irreparable harm inquiry focuses on harm *to the plaintiff*.  *See, e.g.*, *Arriva Med. LLC v. U.S. Dep't of Health & Human Servs.*, 239 F. Supp. 3d 266, 283–84 (D.D.C. 2017); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012).  This arises naturally from the Article III requirement that the Court's order redress *the plaintiff's* injury.  "The Art. III judicial power," after all, "exists only to redress or otherwise to protect against injury *to the complaining party*,

even though the court's judgment may benefit others collaterally." *Warth*, 422 U.S. at 499 (emphasis added).  In the injunction context, harm to non-parties may sometimes be relevant to the public interest factor, but it is not relevant to the irreparable harm prong of the injunction inquiry.  A court order, including a preliminary injunction, that redresses only harm to third parties—even where the plaintiff can invoke those third parties' rights to support his own claim—does not satisfy the redressability requirement of Article III standing.  *Cf. Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) ("That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" (quoting *Warth*, 422 U.S. at 502)).

Concededly, courts have not always been vigilant in patrolling this line.  *See, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 864 (N.D. Cal. 2018) ("Because the Immigration Organizations have standing to assert their clients' rights, the Court considers the irreparable injury to the asylum-seekers."); *see also Aid for Women v. Foulston*, 441 F.3d 1101, 1120 n.22 (10th Cir. 2006) (noting that "[b]ecause our cases require a showing of 'irreparable injury to the movant,' injury to Plaintiffs' minor patients may be insufficient to satisfy the requirement for a preliminary injunction," but declining to resolve the issue (citation omitted)).  Quite simply, these (nonbinding) rulings are in error: an individual plaintiff cannot obtain an injunction based on the claims of those who are not party to the litigation at all.  Because here Plaintiffs are not themselves subject to the allegedly illegal conduct that purportedly infringes

third parties' rights, they suffer no cognizable harm—irreparable or otherwise—from those actions. "[I]t is not the role of courts . . . to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis*, 518 U.S. at 349.

### III.   The public interest weighs heavily against judicial management of an Executive Branch instrument of foreign policy.

Even if the Court were to conclude that Plaintiffs have shown both a likelihood of success on the merits and irreparable harm—indeed, even without reaching those issues—it should still deny Plaintiffs' motion because the balance of equities and assessment of the public interest in this matter tip sharply in favor of the government. *See Winter*, 555 U.S. at 23–24 (holding that "proper consideration of" balance of equities and public interest "alone requires denial of the requested injunctive relief" and thus finding no need to address likelihood of success). "The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 420 (2009). As the Supreme Court has explained, "[a] preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations and quotation marks omitted). Here, the truly extraordinary remedy Plaintiffs seek would improperly displace the duly appointed agency head from exercising effective control over an important tool of foreign policy.

Plaintiffs seek to use this lawsuit to resolve a dispute over how best to manage USAGM. CEO Pack is the Senate-confirmed CEO of USAGM.  To be sure, he and his senior leadership team have instituted substantial changes to the running of USAGM since his confirmation. Plaintiffs comprise much of the career management team that predated CEO Pack's arrival, and they clearly oppose many of the changes he has implemented.  They want this Court to manage USAGM instead.  But it does not serve the public interest to replace the considered policy changes of the Senate-confirmed CEO with the preferred policies of the agency's preexisting career management, enacted by court order.

Even more fundamentally, USAGM-funded broadcasting not only "enhance[s] the promotion of information and ideas" but concurrently "advanc[es] the goals of United States foreign policy."  *See* 22 U.S.C. § 6201; *see also id.* § 6202(a)(1) (such broadcasting shall be "consistent with the broad foreign policy objectives of the United States"); *id.* § 6202(b)(4) (such broadcasting shall include "surge capacity to support United States foreign policy objectives"); *id.* § 6202(c) (VOA advances the "long-range interests of the United States" by "communicating directly with the peoples of the world by radio"); *id.* § 6209b (USAGM CEO to seek "guidance on foreign policy issues" from Secretary of State).  Indeed, by law, USAGM and its networks are prohibited from targeting American audiences.  *See* 22 U.S.C. §§ 1461(a), 1461-1a(a); *see* Pack Decl. ¶ 15.  One of USAGM's primary missions is to provide an alternative source of news in places where information flow is restricted.  Pack Decl. ¶ 13; *see* 22 U.S.C. § 6201(4).  Ensuring that both American perspectives and credible voices from within such nations are widely broadcast builds public support abroad for U.S. policy initiatives, fosters democratic values in

those nations, and generally advances U.S. interests.  Pack Decl. ¶¶ 12–14.   Those efforts are

undercut when broadcasts present incomplete, inaccurate, or biased coverage—a condition which

CEO Pack and his leadership team are focused on remediating.  Pack Decl. ¶ 23–30.

 "The conduct of the foreign relations of our Government is committed by the

Constitution to the Executive and Legislative—the political—Departments of the Government,

and the propriety of what may be done in the exercise of this political power is not subject to

judicial inquiry or decision." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005)

(quoting *Oetjen v. Cent. Leather Co.,* 246 U.S. 297, 302 (1918)).   Defendant Pack was

nominated by the President and confirmed by the Senate to fulfill the duties of USAGM CEO.

In that role, CEO Pack and his team have acted to correct deficiencies in the management of

USAGM and its networks.  Those deficiencies are well documented.  The agency has received

persistent complaints that some USAGM networks' coverage decisions undermine national

interests, including by favoring certain views over others.  *See, e.g.*, Pack Decl. ¶¶ 23–28.  There

are allegations of—and in one instance, a criminal conviction for—serious misconduct.  *See*

Pack Decl. ¶ 17.  For years, USAGM improperly adjudicated security reviews and suitability

determinations.  See Pack Decl. ¶¶ 20–21.  Indeed, deficiencies like these were among the

reasons that motivated bipartisan support—including from the board itself—for replacing the

former governing board with a single CEO.  *See, e.g.*, Inspection of the Broadcasting Board of

Governors, State OIG Report ISP-IB-13-07, at 5–6 (noting "dysfunction" and the Board's own

recommendation to appoint a CEO), https://www.stateoig.gov/system/files/203193.pdf;

*Statement on Signing the National Defense Authorization Act for Fiscal Year 2017*, at 3 (Dec. 23,

2016); *Terrorist Attack in Benghazi: The Secretary of State's View: Hearing before the H. Comm. on Foreign Affairs*, 113th Cong., No. 113-11, at 25–26 (Jan. 23, 2013) (statement of then-Secretary of State Hillary Clinton).

In an effort to "ensure" that coverage by USAGM networks comply with the statutory command that it be "balanced" and comport "with the highest professional standards" of journalism, 22 U.S.C. § 6202, CEO Pack exercised his authority to "direct and supervise" and to "assess the quality, effectiveness, and professional integrity of" USAGM broadcast activities. His management team's efforts to ensure compliance with statutory mandates were taken to bolster the reputation and continued viability of USAGM networks in the face of numerous public scandals involving gross mismanagement and misconduct that compromised the integrity of networks under the USAGM umbrella.  See Pack Decl. ¶ 29–30.  CEO Pack undertook these actions to begin to correct the documented lapses in the USAGM networks' conduct and management that he assessed were undermining U.S. foreign policy goals.  An injunction preventing USAGM from addressing these failings would further deteriorate a valuable tool of U.S. foreign policy.  Indeed, the scope of Plaintiffs' proposed order would so seriously hamper the CEO that the agency could scarcely function.  *See* Pack Decl. ¶¶ 31–36.

Plaintiffs evidently believe that they would do a better job advancing the nation's foreign policy interests than Defendants.  *See* PI Mem. at 45.  But this Court should not substitute either its judgment or that of Plaintiffs for that of USAGM's presidentially appointed and Senate-confirmed leadership on how best to pursue those goals.  *Cf. Winter*, 555 U.S. at 23 (holding any "irreparable injury" shown was "outweighed by the public interest and the Navy's interest" in

effective training).  That is especially so in the field of foreign relations.  *See Dresser Indus., Inc.*

*v. Baldridge*, 549 F. Supp. 108, 110 (D.D.C. 1982) (public interest weighed against injunction

when challenged actions were, "in [the government's] view, essential to the accomplishment of

important foreign policy objectives").

There are serious doubts about both the Court's jurisdiction and the merits of Plaintiffs'

claim that Defendants have violated § 6204(b).  There are likewise serious doubts about

Plaintiffs' claims of First Amendment harm to non-parties.  While an award of preliminary relief

always entails risks of error, the risk of an erroneous decision now falls most heavily on

Defendants.  If an injunction is entered and later removed, the government will have been

prevented from pursuing its foreign policy goals in the interim.  *Cf. Comm. for Nuclear*

*Responsibility, Inc. v. Seaborg*, 463 F.2d 796 (D.C. Cir. 1971) (denying injunctive relief in face

of asserted harm to foreign policy even where plaintiffs were likely to succeed on merits).  If, on

the other hand, an injunction is denied now and entered later, the third parties not before the

Court may be "compelled to endure" temporarily unlawful interference that they themselves

have not challenged, but "would ultimately be able to engage" in the conduct "as they wish."

*Aamer*, 742 F.3d at 1043–44.  And as for Plaintiffs, who are seeking relief for themselves in

separate proceedings, they will suffer not a whit.

## CONCLUSION

For the time being, Plaintiffs have no role in the management of USAGM or its networks.

They seek, through this action, to reassert control of USAGM by claiming to represent the

interests of USAGM's subordinate networks and its staff.  The Court should reject their attempt

to do so and deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: October 26, 2020             Respectfully submitted,

JEFFREY B. CLARK
Acting Assistant Attorney General

CHRISTOPHER HALL
Assistant Branch Director
Federal Programs Branch

/s/ *Michael F. Knapp*
MICHAEL F. KNAPP (Cal. Bar No. 314104)
CHRISTOPHER LYNCH
   (D.C. Bar No. 1049152)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-2071
Fax: (202) 616-8470
Email: michael.f.knapp@usdoj.gov

*Counsel for Defendants*

45