# Exhibit 1

*USAGM October 26, 2020 Final Rule*

AGENCY:  United States Agency for Global Media

ACTION:  Final Rule.

SUMMARY:  The United States Agency for Global Media is repealing the regulation entitled *Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36,150 (June 15, 2020).

DATES:  This rule is effective as of October 26, 2020.

FOR FURTHER INFORMATION CONTACT:  Daniel Rosenholtz

SUPPLEMENTARY INFORMATION:

**Background.**

The United States Agency for Global Media ("USAGM") is an agency of the federal government that exercises authority over non-military United States government broadcasting.  USAGM, which was created by the International Broadcasting Act of 1994 under a different name, currently operates five networks—Voice of America ("VOA"), the Office of Cuba Broadcasting ("OCB"), Radio Free Europe/Radio Liberty ("RFE/RL"), Radio Free Asia ("RFA") and the Middle East Broadcasting Networks ("MBN") (collectively the "USAGM Networks" or "Networks").

On June 4, 2020, the Broadcasting Board of Governors ("BBG"), USAGM's leadership at the time, promulgated a regulation governing

1

internal agency operations, *Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36,150 (June 15, 2020) (codified at 22 C.F.R. Part 531) (the "Regulation") that purported to implement section 305(b) of International Broadcasting Act ("IBA") (22 U.S.C. § 6204(b)).

The Regulation was promulgated only when it became apparent that the leadership of USAGM was about to change via Senate confirmation of a USAGM Chief Executive Officer ("CEO"). *See Firewall and Highest Standards of Professional Journalism,* 85 Fed. Reg. at 36,150 (expressly identifying the pending end of the Board's tenure as the motivating factor for the timing and issuance of the Regulation). Senate confirmation of a CEO caused the BBG to dissolve, and transferred all of its powers to the CEO. *See* 22 U.S.C § 6203(b)(1).

At its core, the Regulation asserts that "a firewall exists between anybody involved with any aspect of journalism (*e.g.*, the creation, editing, reporting, distributing, etc., of content) and everyone else in the organization," and that this former Board-preferred policy is violated when anyone outside of the "newsroom" "attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence

any of the USAGM Networks, including their leadership, officers, employees, or staff, in the performance of their journalistic and broadcasting duties and activities."  22 C.F.R. § 531.3(b), (c).  This regulatory instruction by its terms suggests USAGM is a typical broadcasting organization, which squarely contradicts USAGM's statutory mandate to promote particular United States values and interests.  *See, e.g.*, 22 U.S.C. § 6202(a)(1)–(2) (mandating that United States international broadcasting be consistent with United States foreign policy objectives, international telecommunications policies, and United States treaty obligations); *id.* § 6202(a)(8) (mandating the promotion of "respect for human rights, including freedom of religion").  Unlike private broadcasting organizations, the mission of USAGM from its statutory origins has been to support United States foreign policy goals by furthering American values and facilitating the dissemination of objectively accurate factual news and information overseas.  *See* United States Information and Educational Exchange Act of 1948, Pub. L. No. 80-402 § 2, 62 Stat. 6, 6 (1948); *see also*, *e.g.*, *id.* § 6201(2) (noting that the values furthered by the agency such as the "[o]pen communication of information and ideas among the peoples of the

world," further international peace and stability, and serve "the
interests of the United States"); *id.* § 6202(a)(1), (3) (requiring United
States broadcasting to "be consistent with the broad foreign policy
objectives of the United States" and with United States treaty
obligations); *id.* § 6202(b)(1), (3) (mandating that United States
international broadcasting include "news which is consistently reliable
and authoritative, accurate, objective, and comprehensive" and
constitutes a "clear and effective presentation of the policies of the
United States Government and responsible discussion and opinion on
those policies"); *id.* § 6202(b)(4) (requiring United States international
broadcasting to include "the capability to provide a surge capacity to
support United States foreign policy objectives during crises abroad").

Upon taking office, the CEO directed a review of the Regulation
and sought external legal counsel.

The Regulation is hereby repealed.

I.     **There Is Tension Between the Regulation on the One Hand, and USAGM's Statutory Mission and Article II of the Constitution on the Other.**

A.     **USAGM's Statutory Mission.**

Since United States international broadcasting was first codified in 1948, the statutory objective was—and still is—"to enable the Government of the United States to promote a better understanding of the United States in other countries . . . [including by] an information service to disseminate abroad information about the United States, its people, and policies . . . ."  United States Information and Educational Exchange Act of 1948, Pub. L. No. 80-402 § 2, 62 Stat. 6, 6 (1948) (codified at 22 U.S.C. § 1431).

When VOA was codified in statute in 1976, Congress made clear that VOA's purpose was to serve American interests abroad.  VOA was to "communicat[e] directly with the peoples of the world by radio" to serve the "long-range interests of the United States" as governed by enumerated principles which have been codified in the VOA Charter. "VOA will serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive"; "represent America . . . and . . . present a balanced and comprehensive projection of

significant American thought"; and "present the policies of the United

States clearly and effectively, and . . . present responsible discussion

and opinion on these policies."  Foreign Relations Authorization Act, FY

1977, Pub. L. No. 94-350 § 206, 90 Stat. 823, 831–32 (1976).

The current statutory mission of USAGM is to serve United States

interests through Government sponsored news abroad.  Under the IBA,

United States international broadcasting must:

- "[B]e consistent with the broad foreign policy objectives of the

  United States." *Id.* § 6202(a)(1).

- "[B]e consistent with the international telecommunications

  policies and treaty obligations of the United States."  *Id.*

  § 6202(a)(2).

-  "[I]nclude a balanced and comprehensive projection of United

  States thought and institutions, reflecting the diversity of United

  States culture and society."  *Id.* § 6202(b)(2).

- "[I]nclude clear and effective presentation of the policies of the

  United States Government and responsible discussion and opinion

  on those policies, including editorials, broadcast by the Voice of

America, which present the views of the United States Government." *Id.* § 6202(b)(3).

- Maintain "the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad." *Id.* § 6202(b)(4).

- "[P]romote respect for human rights, including freedom of religion." *Id.* § 6202(a)(8).

VOA is further required to "present a balanced and comprehensive projection of significant American thought and institutions" (*id.* § 6202(c)(2)) and to "present the polices of the United States clearly and effectively, and . . . also present responsible discussion and opinion on these policies." (*Id.* § 6202(c)(3)). These tasks are seen as essential to serving "[t]he long range interests of the United States." *Id.* § 6202(c).[1]

Because of this special mission, USAGM and its Networks do not function as a traditional news or media agency and were never intended

---

[1] *See also* 22 U.S.C. § 6209(b)(1) (if CEO consolidates grantees he must require the consolidated grantee to "counter state-sponsored propaganda which undermines the national security or foreign policy interests of the United States and its allies"); *id.* § 6201(2) (statutory purpose of IBA to "[o]pen communication of information and ideas among the peoples of the world"); Foreign Relations Authorization Act, Fiscal Years 1988 and 1989, Pub.L. 100-204, Title IV, § 403, 101 Stat. 1381 (Dec. 22, 1987) ("The Congress finds that the overriding national security aspects of the $1,300,000,000 facilities modernization program of the Voice of America require the assurance of uninterrupted logistic support under all circumstances for the program.  Therefore, it is in the best interests of the United States to provide a preference for United States contractors bidding on the projects of this program.").

to do so.  *See, e.g.*, *id.* § 6202(a)(3) (prohibiting United States international broadcasting from "duplicat[ing] the activities of private United States broadcasters"); *see also id.* 6202(a)(4) (prohibiting United States international broadcasting from "duplicat[ing] the activities of government supported broadcasting entities of other democratic nations").  By design, their purpose and focus is foreign relations and the promotion of American objectives—not simply presenting news or engaging in journalistic expression.  For example, the Networks are to articulate the American perspective while countering international views that undermine American values and freedom, or that might aid our enemies' messaging, by providing a "clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies."  *Id.* § 6202(b)(3).  They also counter soft-power through news in countries without a free media by presenting "a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen."  *Id.* § 6202(b)(7).

By law, the USAGM networks must "not duplicate the activities of private United States broadcasters" (*id.* § 6202(a)(3)) or "the activities

of government supported broadcasting entities of other democratic nations." (*Id.* § 6202(a)(4)).  Under the Smith-Mundt Act of 1948 (as amended) USAGM may broadcast only news "intended for *foreign* audiences abroad." *Id.* § 1461(a) (emphasis added).  And "[n]o funds authorized to be appropriated to the Department of State or the Broadcasting Board of Governors shall be used to influence public opinion in the United States." *Id.* § 1461-1a(a).

The IBA grants the CEO a number of broad authorities to carry out these weighty responsibilities to promote American interests abroad.[2]  In particular the CEO has express power:

- "To direct and supervise all broadcasting activities conducted pursuant to this title." *Id.* § 6204(a)(1).

- "To review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity, of all

---

[2] The consolidation from Board to CEO was the result of a widespread view that USAGM's predecessor agency needed reform that could only come from the energy of a single leader.  *See, e.g.*, *Statement on Signing the National Defense Authorization Act for Fiscal Year 2017*, at 3 (Dec. 23, 2016) (noting strong support for needed "structural reform" of USAGM and "empowerment" of the USAGM CEO); *Markup on H.R. 1853, H.R. 2100, H.R. 2323, H. Res. 213, H. Res. 235: H. Comm. on Foreign Affairs*, 114th Cong. 104–05 (May 21, 2015) (statement of Ranking Member Elliot L. Engel) (describing predecessor bill as a "much-needed overhaul"); *Terrorist Attack in Benghazi: The Secretary of State's View: Hearing before the H. Comm. on Foreign Affairs*, 113th Cong. 25–26 (Jan. 23, 2013) (statement of Hillary Rodham Clinton, Secretary of State) (describing USAGM's abilities to project soft power as "practically defunct").

such activities within the context of the broad foreign policy objectives of the United States." *Id.* § 6204(a)(2).

- "To ensure that United States international broadcasting is conducted in accordance with the standards and principles" set forth in the IBA. *Id.* § 6204(a)(3).

- "To review, evaluate, and determine, at least annually, after consultation with the Secretary of State, the addition or deletion of language services." *Id.* § 6204(a)(4).

- To take a number of different expansive personnel, materiel, and contracting actions. *Id.* §§ 6204(a)(8), (10)–(11), (15)–(19).

- "To redirect or reprogram funds within the scope of any grant or cooperative agreement, or between grantees, as necessary." *Id.* § 6204(a)(21).

- To appoint the Officers and Directors of the USAGM Networks who serve at his pleasure. *Id.* § 6209(d).

The CEO also "shall regularly consult with and seek from the Secretary of State guidance on foreign policy issues." *Id.* § 6209b.

## B.    Article II of the United States Constitution.

Article II imbues the statutory scheme charging USAGM to promote American interests abroad.  USAGM, which is now overseen by a single CEO, is not an "independent establishment."[3]  Its CEO is "appointed by the President, by and with the advice and consent of the Senate."  22 U.S.C. § 6203(b)(1).  The CEO thus has both the power and the duty to execute the applicable laws of the United States under the President's supervision.  *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 135 (1926); *Statute Limiting the President's Authority to Supervise the Director of the Center for Disease Control in the Distribution of an AIDS Pamphlet*, 12 Op. OLC 47, 56–58 (Mar. 11, 1988); *The Jewels of the Princess Orange*, 2 U.S. Op. Att'y Gen. 482, 486–87 (Dec. 31, 1831).

Executive power is at its zenith in the realm of foreign affairs. "[T]he President alone has the power to speak or listen as a representative of the nation."  *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936).  Therefore, the President is the "'sole organ of the federal government in the field of international relations'"

---

[3]  It has long been the case, as the Supreme Court recently reaffirmed, just last term, that "[t]he entire executive Power belongs to the President alone. . . .  [L]esser officers must remain accountable to the President, whose authority they wield."  *Seila Law LLC v. CFPB*, 140 S.Ct. 2183, 2197 (2020).

(*id.* at 320 (internal citation omitted)) and the President has "unique responsibility" for the conduct of "foreign . . . affairs." (*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993)).  Because USAGM's mandate is to further the foreign policy interests of the United States, the President's appointee necessarily must have the authority to participate in the substance of advancing that mission.[4]

## C.    The Regulation.

The Regulation begins by asserting that USAGM is "an independent establishment of the federal government," (*Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. at 36,150) and claims that:

> USAGM networks necessarily enjoy full editorial independence in order to maintain their "professional independence and integrity," per section 305(b) of the IBA.  This statutorily mandated firewall protects the independence of the networks by insulating their editorial decisions from interference from those outside of the network, or from impermissible considerations, as set forth herein.

22 C.F.R. § 531.1(a).  Section 305(b) of the IBA, however, provides only that "[t]he Secretary of State and the Chief Executive Officer, in carrying out their functions, shall respect the professional independence

---

[4] *See also Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982) (conducting foreign affairs a "central" "domain" of the President); *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig v. Agee*, 453 U.S. 280, 293–94 (1981)); *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948) (holding that the President is the nation's "guiding organ in the conduct of our foreign affairs").

and integrity of the Board, its broadcasting services, and the grantees of the Board." 22 U.S.C. § 6204(b).

The Regulation then posits that the "newsroom" of each USAGM Network is "fully insulated" from what it calls "*any* political or other external pressures or processes that would be inconsistent with the highest standards of professional journalism." *Id.* § 531.2(b) (emphasis added). At its core, the Regulation asserts it is violated:

> [W]hen any person within the Executive Branch or a Network, but outside the newsroom, attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks, including their leadership, officers, employees, or staff, in the performance of their journalistic and broadcasting duties and activities. It is also violated when someone inside the newsroom acts in furtherance of or pursuant to such impermissible influence.

*Id.* § 531.3(c). The Regulation purports to bind not only USAGM officials, but the entire Executive Branch—up to and including the President of the United States. The Regulation's only exception to this general edict is that:

> The firewall does not prevent a USAGM CEO or Board from undertaking the same type of direction and oversight that those in equivalent leadership positions in an organization overseeing other reputable news organizations may provide, in a manner consistent with the highest standards of professional journalism.

*Id.* § 531.3(e)(3).

13

### D.   The Regulation is in Tension with USAGM's Statutory Mandate and Article II.

There is a significant tension between the Regulation on the one hand, and USAGM's statutory mandate and the CEO's responsibilities and powers under statute and Article II on the other.

The Regulation relies solely on section 305(b) of the IBA for its conclusion that "USAGM networks necessarily enjoy full editorial independence in order to maintain their 'professional independence and integrity.'" *Id.* § 531.1(a).

But section 305(b) clearly does not use the terms "respect" or "independence" in anything approaching the concept of structural, managerial, or policy independence, or the manner in which those terms may apply to any given private news network.  Rather, the statutory reference to "professional independence" requires the preservation of professionalism and technical excellence.  *See, e.g.,* *Oxford English Dictionary* ("professional":  "[c]haracteristic of or suitable for a professional person"; "[t]hat has or displays the skill, knowledge, experience, standards, or expertise of a professional; competent, efficient"; "[t]hat has knowledge of the theoretical or scientific parts of a trade or occupation, as distinct from its practical or

mechanical aspects"; "that raises a trade to a learned profession"); *see also, e.g.*, 22 U.S.C. § 6202(a)(5) (requiring United States international broadcasting to "be conducted in accordance with the highest professional standards of broadcast journalism"); *id.* § 6202(a)(6)–(7) (requiring broadcasting to "be based on reliable information" and "be designed so as to effectively reach a significant audience"); *id.* § 6202(b) (mandating, *e.g.*, the provision of "news which is consistently reliable and authoritative, accurate, objective, and comprehensive," presentations that are "clear and effective," and "reliable research capacity").

By its terms, the IBA's reference to "professional independence" is distinct from other statutory provisions purporting to establish entities independent from managerial or policy control or significant executive supervision.  The phrase "professional independence" appears nowhere else in the United States Code.  Statutory uses of the term "independen[t]" reference separate or freestanding entities, in contrast, and typically employ just the standalone adjective "independent" or "independence."  *See, e.g.*, 5 U.S.C. § 105 ("For the purpose of this title, 'Executive agency' means an Executive department, a Government

15

corporation, and an *independent* establishment." (emphasis added)); 24

U.S.C. § 30 ("head of the department or *independent* agency" (emphasis

added)); 42 U.S.C. § 1962b-1(b) ("each Federal department or

*independent* agency" (emphasis added)); 44 U.S.C. § 1907 (referencing

"executive departments" and "independent agencies").

Further, as discussed, USAGM Networks are statutorily

prohibited from competing with private "United States broadcasters"

and other "state supported broadcasting" from democratic nations, and

they cannot seek to influence public opinion in the United States.  22

U.S.C. § 6202(a)(3)–(4); *id.* § 1461-1a(a).  Conversely, the USAGM

Networks are required to program specific content to meet "[the] needs

which remain unserved by the totality of media voices available to the

people of certain nations," (*id.* § 6202(b)(5)) and "[i]nclude clear and

effective presentation of the policies of the United States Government

and responsible discussion and opinion on those policies."  (*Id.*

§ 6202(b)(3)).

The IBA provides that the CEO must, among other things, "direct

and supervise all [USAGM] broadcasting activities"; "review and

evaluate the mission and operation of, and to assess the quality,

effectiveness, and professional integrity of, all such activities within the context of the broad foreign policy objectives of the United States"; and "ensure that United States international broadcasting is conducted in accordance with [certain] standards and principles," including that such broadcasting "shall . . . be consistent with the broad foreign policy objectives of the United States," "be consistent with the international telecommunications policies and treaty obligations of the United States," and "be conducted in accordance with the highest professional standards of broadcast journalism." *Id.* §§ 6202(a)(1)–(2), (5), 6204(a)(1)–(3).  The IBA does not prohibit USAGM or the CEO from supervising the broadcasting networks; to the contrary, the IBA *requires* that the CEO oversee those networks for consistency with United States foreign policy and international treaty obligations, as well as the journalistic integrity of their operations.  It is difficult to see how the CEO could fully discharge these statutory responsibilities under the Regulation, which prohibits him from "direct[ing] . . .

USAGM networks . . . in the performance of their journalistic and broadcasting duties and activities."  22 C.F.R. § 531.3(c).

Finally, nothing in the IBA purports to authorize USAGM Networks to engage in broadcasting activities that would impair the President's conduct of foreign affairs as "'the sole organ of the federal government in the field of international relations.'" *Curtiss-Wright Exp. Corp.*, 299 U.S. at 320 (internal citation omitted); *see also id.* 22 U.S.C. § 6202(a)(1) (requiring United States International Broadcasting to be "consistent with the broad foreign policy objectives of the United States"); 22 U.S.C. § 6209b (The CEO also "shall regularly consult with and seek from the Secretary of State guidance on foreign policy issues.").

But the Regulation's blanket prohibition on Executive Branch activities that affect editorial decision making—seemingly in all circumstances and for any reason—could improperly cabin the Executive Branch's ability to protect and advance its interests in foreign affairs, as necessary.

A proper analysis of section 305(b) should have taken into account the relationship between that provision and USAGM's statutory

responsibility to oversee United States international broadcasting networks, as well as the President's authority to conduct foreign affairs. The Regulation failed to consider these relevant factors in its analysis, and instead incorrectly read section 305(b) in isolation to be a bar to effective supervision.

*     *     *

A few examples, including those observed from USAGM's experience operating under the Regulation, illustrate that the Regulation is unworkable because it undermines the ability of USAGM to discharge its core statutorily mandated functions.

*1.*     USAGM's statutory mandate and Article II necessarily *require* USAGM—at times—to control content.  Yet directly mandating particular content would seem within the Regulation's prohibition.

This limitation creates tension with USAGM's proper role in those scenarios that, under USAGM's mandate, would *require* it to regulate content.  Determining USAGM's proper role and assessing USAGM's ability to carry out its statutory mandate under the current Regulation can be unclear and generates operational uncertainty.

For example, could the CEO direct the newsroom to withhold a story that posed a clear and present danger to national security or to the survival of United States military personnel?  Arguably, the Regulation prohibits such direction.  *See, e.g.*, 22 C.F.R. § 531.3(b) ("[A] firewall exists between anybody involved with any aspect of journalism (*e.g.*, the creation, editing, reporting, distributing, etc., of content) and everyone else in the organization.").[5]  VOA has previously taken the position that the aspect of the "firewall" prohibiting control over content is absolute.  *See* Steven Springer, *Transcript of Editorial Firewall Session*, at 5 (May 17, 2018) ("Really can't get any more basic than that. Basically it's saying no one from the US government, no agency or official, can reach in and interfere with our work.  Very plain and simple.").  That absolute position collides with USAGM's statutory

---

[5] The assertion that the Regulation bars *any* restriction of content is particularly striking because throughout American history, the private press have at times acceded to requests from the Executive Branch to refrain from the publication of certain material that, if otherwise distributed, would have imperiled United States national interests.  For example, during armed conflict, newspapers and other outlets, complying with government appeals, have withheld information involving troop positions as well as imminent tactics, protecting the lives of American men and women in uniform. *See, e.g.*, Gabriel Schoenfeld, *Necessary Secrets: National Security, the Media, and the Rule of Law* (New York, New York: W.W. Norton 2010); Daniel Smyth, *Avoiding Bloodshed? US Journalists and Censorship in Wartime*, War & Society. Vol. 32, Iss. 1. 2013.  At other times, the reason for refraining from the publication of specific content has arisen from concerns involving America's security more broadly.  For example, the *New York Times* complied with government requests in 2004 by holding an article about the National Security Agency's Terrorist Surveillance Program for more than a year due to a "convincing national security argument."  Byron Calame, *More on the Eavesdropping Article*, The Public Editor's Journal, *New York Times* (Dec. 31, 2005).

mission and Article II.  But so long as the Regulation exists, it creates operational uncertainty that has slowed down or otherwise interfered with necessary action.

*2.*     Absent the ability to enforce basic standards of conduct through investigations and discipline, USAGM cannot effectively discharge its statutory duties, such as to "direct and supervise all broadcasting activities," "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity" of USAGM Network broadcasts, and "ensure that United States international broadcasting is conducted in accordance with the standards and principles" set forth in the IBA governing journalistic standards.  22 U.S.C. § 6204(a)(1)–(3).

For example, some argue that the Regulation bars the CEO from promulgating policies governing employee conduct, such as the existing USAGM Social Media Policy, USAGM, V-A BAM 530-Social Media Policy (July 8, 2019).  *See*, *e.g.*, Elliot Engel, *Engel Statement on USAGM Officials Breaching the "Firewall" and Targeting VOA Journalist* (Oct. 5, 2020).

But this creates an unworkable situation because the CEO is required to "ensure" adherence to broadcasting standards and to "direct" and "supervise" *all* broadcasting activities.  22 U.S.C. § 6204(a)(1), (3).  Personal social media posts by journalists can affect their "[f]airness, objectivity & balance" (VOA Best Practices Guide, at 8–9 (June 2020)) which in turn are components of "the highest professional standards of broadcast journalism."  22 U.S.C. § 6202(a)(5); s*ee also* The New York Times, *Social Media Policy* (Oct. 13, 2017).  Such posts can undermine all USAGM Networks and accordingly justify heightened governmental restrictions on reporters' conduct.  *See Navab-Safvavi v. Glassman*, 637 F.3d 311, 317 (D.C. Cir. 2011) (regulating private speech of VOA journalists necessary to achieve particularly strong governmental interest in presenting a clear message on United States foreign policy).

For there to be effective management of the USAGM Networks (or simply consistency in this area), the CEO must have authority to set and enforce such policies.  But again, the Regulation injects a great deal of ambiguity and confusion.  This ambiguity stalls, and sometimes

stops, important action critical to USAGM Network operations.  This, too, counsels for repeal of the Regulation.

*3.*     Similarly, the CEO has express statutory authority "[t]o redirect or reprogram funds within the scope of any grant or cooperative agreement, or between grantees, as necessary."  22 U.S.C. § 6204(a)(21).  But making the decision to drastically reduce or increase a grantee's budget based on an acute, critical foreign policy need of the United States could arguably "influence" "journalistic and broadcasting duties and activities," as prohibited by the Regulation.  22 C.F.R. § 531.3(c).  And there is at least a question about whether such action falls under the Regulation's general exception.  If it does not, the Regulation runs into the sound policy reason underlying the statute:  USAGM must be able to reprogram funds quickly to focus resources on global hotspots as crises suddenly unfold in order to tell America's story where it matters most.  *Cf.* 22 U.S.C. § 6202(b)(4) (requiring that United States international broadcasting have "the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad").  This uncertainty and tension further counsel repeal of the Regulation.

\*      \*      \*

The foregoing examples demonstrate that the Regulation is unworkable in the context of managing USAGM consistently with the CEO's statutory mandate and the Agency's purposes, and should therefore be repealed.

## III.   The Regulation's Vagueness Also Renders It Unworkable.

The Regulation is so vague that it creates immense difficulty for USAGM officials attempting to determine the rules by which their conduct will be judged.  This lack of "fair notice" and operational functionality has burdened the CEO and other USAGM officials in the discharge of their duties—and will continue to do so unless and until it is repealed.  Vagueness delays action that requires expedition and needlessly consumes substantial scarce resources better spent elsewhere.[6]  Operationally, this vagueness renders the Regulation unworkable and further counsels its repeal.

---

[6] To be sure, USAGM's interpretation of its own regulations receives deference.  *See Auer v. Robbins*, 519 U.S. 452 (1997).  But that merely mitigates—and does not solve—the substantial operational issues flowing from the uncertainties caused by the breadth and ambiguity of the Regulation.

## A.    The Regulation's Prohibition.

The Regulation reaches *any* conduct to "direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence" *any* staff within the "newsroom" "in the performance of their journalistic and broadcasting duties and activities."  22 C.F.R. § 531.3(c).  This language sweeps in a substantial range of actions by the CEO and USAGM staff, but it is not clear which, or to what degree.  Several key definitions make clear its problematic vagueness.

*1.*    The range of actions that *could* be construed to constitute an "attempt" to "direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence" is undefined.  What constitutes such an attempt?  What constitutes "coercion," "pressure," or "interfere[nce]"?  Must it be objective or subjective?  If objective, objective against what standard?  And what renders an influence "impermissabl[e]"?  What degree of causal connection must there be between action and effect?  What work does performance of "journalistic and broadcasting duties and activities" capture?  All the work of federal employees in the "newsroom"?  Or just some of it?  The Regulation does not clearly answer these questions.

*2.*    What constitutes the "newsroom"?  The Regulation initially defines that term as follows:

> Newsroom refers to the news division of a USAGM-Network.  The scope of the news division depends on the structure of the Network.  Depending how a Network is organized the head of that Network may or may not be considered to be within the news division.  The Board of a Network is considered to be outside the news division.  Those within the news division must adhere to the highest professional standards of journalism in carrying out their responsibilities.  Even if outside the newsroom, as set forth herein, the head of a network is still required to act in accordance with the highest standards of professional journalism in carrying out their roles with respect to the journalism, and thus ensuring the professional "independence and integrity" of the network.

*Id.* § 531.4(e).

But this definition is supplemented by a second definition of the "newsroom" in the definition of those outside the "firewall."  Under *that* definition, the newsroom is also composed of anyone who, under the "highest standards of professional journalism," is "involved with carrying out any aspect of journalism (*e.g.*, the creation, editing, reporting, distributing, etc., of content) . . . ."  *Id.* § 531.4(c).

This distinction matters substantively.  Under a pure structural approach, a publisher is likely outside of the newsroom's organizational chart.  But looking to the publisher's substantive role, the publisher

26

may "edit" stories under unusual circumstances, such as when a story is controversial or if there is concern about a libel action.

The second definition interjects substantial ambiguity.  Two examples illustrate this point.

No serious newspaper allows the publication of material likely to result in a libel action without legal review.  Assume the lawyer who reviews the story "edits" for legal reasons.  Does the lawyer sit inside the newsroom?  Almost certainly not.  The lawyer "edits" the story, but not within the realm of the day-to-day "editing" conception of the word "editing."  It is a special type of "editing."  Is that example inapposite, as it is not an everyday "common" usage of the term "edit," or does the term "edit" receive a broad definition?  The Regulation does not provide an answer.  Looking to the predicate clause regarding the "highest standards of professional journalism" is circular—almost all reputable newspapers subject certain stories to heightened legal review and a lawyer might "edit" in that limited circumstance.  Does the term vary with the story, *i.e.*, is the lawyer within the newsroom only as to those stories the lawyer "edits"?

Most broadcasters have program directors that sit outside of the Newsroom.  But when stories involve matters of critical import, or are highly controversial, program directors can and do step in and "edit" or otherwise provide controls.  But again, this is a special sort of "extra" editorial review that is outside the normal instance.  So the analysis above applies.

## B.    The Regulation's General Exception.

The ambiguity as to what the Regulation prohibits is compounded by the general *exception* in the Regulation, that the CEO *can* "undertak[e] the same type of direction and oversight that those in equivalent leadership positions in an organization overseeing other reputable news organizations may provide."  22 C.F.R. § 531.3(e)(3). This exception, too, is unclear.

For starters, what is a "reputable news organization"?  The Regulation's definition does not answer the question, defining that term as "a news organization that adheres to the highest professional standards of journalism and has a firewall which insulates the news side of the operation to ensure that editorial decisions are not influenced in a manner or by factors inconsistent with the highest

standards of professional journalism." *Id.* § 531.4(i).  The term "highest professional standards of journalism" is then defined as "highest professional standards in the field of journalism." *Id.* § 531.4(f).  This does not provide clear guidance.

Moreover, within that definition, how does one define the term "firewall"?  Are there variations in what constitutes an acceptable "firewall"?  How does one determine what is permissible "direction" or "oversight"?  If news organizations disagree, which standards control, and how is that decided?  Is the reference to American "news organizations" or does one look to foreign nations?  This last question is particularly important, as different nations—even those who share a strong tradition of a free press—have different traditions regarding some journalistic standards.  For example, Britain is democratic and has a strong and storied tradition of a free press.  But its libel laws are much more plaintiff-friendly.  Some British papers reflect this in terms of the publisher's authority over the newsroom.

*     *     *

At the end of the day, the Regulation creates substantial hurdles to everyday USAGM operations through its lack of clarity.  Under the

Regulation *any* decision that could engender controversy and could somehow be argued to violate Regulation, must go through a long and time consuming legal and operational review—no matter how minor the decision. This is contrary to the purposes of a regulation of internal agency procedure, which should be to clarify and facilitate agency operations. It also undermines the purpose of centralizing control of USAGM in a single CEO. These points strongly support repeal of the Regulation.

Repeal due to the Regulation's vagueness is also supported by another related fundamental factor—accountability. The Regulation's vagueness breaks and obfuscates clear lines of authority and accountability within the organization. For example, if United States Government employees can break a story by knowingly and willfully publishing classified information, the voters and Congress should know why, and most importantly, whose call it was. And if the President or his officers decide against taking such a risk, they should have the clear ability to do so and to ensure that the decision is carried out by the organization.

**Conclusion.**

The Regulation was voted on by the BBG via an email notation vote hours before the CEO was confirmed by the United States Senate. The putative statutory basis for the Regulation has existed for many years and USAGM:  (1) did not promulgate a regulation during that time; and (2) did not seem to suffer any major issues—on this point—for want of a regulation.  The Regulation is repealed.

**Effective Date.**

Analogous to the immediate operation of the Regulation now being repealed, this repeal is already effective upon the Agency having been promulgated by the CEO.  *Cf. Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. at 36,151.  Publication will codify the repeal into the Federal Register.  Those provisions pertaining to non-supervisory employees deemed subject to collective bargaining requirements set forth under the Federal Service Labor-Management Relations Statute and the Agency's negotiated labor-management agreements would only become effective subject to the terms and conditions within those bargaining agreements.

**Rulemaking Requirements.**

1.  This final rule has been determined to be exempt from review for purposes of Executive Order 12866.

2.  This rule does not impose information collection and recordkeeping requirements.  Consequently, it need not be reviewed by the Office of Management and Budget under the provisions of the Paperwork Reduction Act of 1995.

3.  This rule does not contain policies with Federalism implications as this term is defined in Executive Order 13132.

4.  The provisions of the Administrative Procedure Act (5 U.S.C. 553, *et seq*.,) requiring notice of proposed rulemaking, the opportunity for public participation, and a delay in effective date, are inapplicable because, just like the underlying regulation hereby being repealed (*Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. at 36151), this rule involves a rule of agency organization, procedure, or practice.  (5 U.S.C. 553(b)(A)).  Further, no other law requires that a notice of proposed rulemaking and an opportunity for public comment be given for this final rule.  Because a notice of proposed rulemaking and an opportunity for public comment are not

required to be given for this rule under 5 U.S.C. or by any other law, the analytical requirements of the Regulatory Flexibility Act (5 U.S.C. 601, *et seq*.) are not applicable.

Accordingly, this rule is issued in final form. Although there is no formal comment period, public comments on this rule are welcome on a continuing basis. Comments should be submitted to Daniel Rosenholtz, 330 Independence Avenue SW, Washington DC 20237 (email at: Rule_Comments@usagm.gov).

**List of Subjects in 22 CFR Part 531.**

For the foregoing reasons, the United States Agency for Global Media amends 22 CFR, Chapter V, by repealing and replacing 531, as follows:

**PART 531—[RESERVED]**

[RESERVED]