# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GRANT TURNER, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Case No. 1:20-cv-02885-BAH |
| | ) |
| U.S. AGENCY FOR GLOBAL MEDIA MEDIA, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

## DECLARATION OF MICHAEL PACK IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Michael Pack, make the following Declaration pursuant to 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1.   I am the Senate confirmed Chief Executive Officer of the United States Agency for Global Media ("USAGM"). I make this Declaration in my official capacity, based on my own personal knowledge, on information contained in the records of USAGM, or on information provided to me by USAGM personnel, and I could and would competently testify to the truth of the matters stated herein.

## Background

2.   I am by profession a documentary filmmaker with experience as both a media and non-profit executive. Over my career, I have made more than fifteen award-winning nationally

1

broadcast documentaries (most broadcast nationally on PBS) as well as corporate and educational films.

3. Over my long career, I have had tenures of operating and managing Manifold Productions, an independent film and video production company. I co-founded Manifold Productions in New York City in 1977, expanded it to Los Angeles in 1988, and it is currently located in Chevy Chase, MD. This role has involved managing all aspects of the company including financial, legal, and personnel matters, as well as overseeing the creative aspects of the various productions, serving as executive producer, producer, director, and writer.

4. My most recent film, *Created Equal: Clarence Thomas in His Own Words*, a two-hour documentary, opened in movie theaters on January 31st, 2020, and was broadcast nationally via PBS on May 18th, 2020 at 9 PM. *The Washington Post* called it "a marvel of filmmaking," and the *Washington Examiner* said it is "magnificent and necessary."

5. My film prior to that, *RICKOVER: The Birth of Nuclear Power*, is a two-hour biography of Admiral Hyman G. Rickover, the man who conceived and created the first nuclear submarine, nuclear aircraft carrier, and commercial nuclear power plant, against great odds. *The New York Times* called attention to "a fabulous documentary on PBS about Admiral Rickover," as did Mona Charen in *National Review*, dubbing it a "great documentary on Hyman Rickover." *City Journal* declared that "[o]n paper, it's fascinating. But on screen, Rickover's life crackles, thanks to the sure hand of director Michael Pack." The film won the following awards: GI Film Festival, Best Feature Documentary; Peter Rollins Film Award; and Worldfest Houston International Film Festival, Gold Award.

6. Other credits include *Rediscovering Alexander Hamilton*, hosted by Richard Brookhiser (2011); *God and the Inner City*, narrated by Phylicia Rashad (2003); *Rediscovering*

*George Washington*, hosted by Richard Brookhiser (2002*); The Fall of Newt Gingrich*, narrated by Blair Brown (2000); *The Rodney King Incident*: *Race and Justice in America*, narrated by Robert Prosky (1998); *Inside the Republican Revolution: The First Hundred Days*, hosted by Don Lambro (1995); *Hollywood vs. Religion*, hosted by Michael Medved (1995); *Campus Culture Wars: Five Stories about Political Correctness*, narrated by Lindsay Crouse (1993); *America's Political Parties,* hosted by Ben Wattenberg and David Gergen (1988 & 1992); *Fire from the Sun: The Search for Fusion Energy*, hosted by E. G. Marshall (1990); *Hollywood's Favorite Heavy: Businessmen on Prime Time TV*, hosted by Eli Wallach (1987); among others. All have been award-winning and nationally broadcast on PBS, except *The Rodney King Incident*, which premiered on TLC.

7. In 1992, I was appointed Director of WorldNet, which is now the television component of Voice of America ("VOA"). In this role, I led a re-alignment of WorldNet's strategic mission to focus more on the production of original broadcast-quality programs, in addition to satellite press conferences and acquisitions. Additionally, I directed the launch of the first foreign language news and public affairs program, *Window on America*, which is still broadcast today. Administratively, I oversaw the restructuring of the budgeting process for greater transparency and increased senior management accountability.

8. In 1993, I was hired by the Corporation for Public Broadcasting ("CPB"), a government-funded private corporation supporting public broadcasting, to serve on the newly created International TV Council, where I served as co-chair. The Council was intended to coordinate co-productions between American public television producers and their counterparts in Central/Eastern Europe and the former Soviet Union. These programs were intended to assist the nations of the former Soviet bloc in their transition to democratic and free-market based

societies.  This role included overseeing efforts from various sectors and building inter-governmental relations.

9. In 2002, I was nominated by President Bush and confirmed by the Senate to serve on the National Council on the Humanities, which oversees the National Endowment for the Humanities.  During its thrice-yearly meetings, the Council reviews grants and nominates recipients of the National Humanities Medal and the Jefferson Lectureship.  I served from July 2002 to February 2005.

10. In 2004, I was named Senior Vice President for Television Programing at CPB. In this role, I oversaw all television production grants for public television's federal funder, CPB. This included directing new endeavors, such as a new series *America at a Crossroads*, a $20 million programming initiative consisting of documentaries that addressed the challenges facing the United States following 9/11.

11. From 2015–2017, I served as the President and CEO of the Claremont Institute, a California-based think tank dedicated to restoring the principles of the American Founding. In this capacity, I was responsible for all aspects of the Institute, including strategic planning, branding, and fundraising. I oversaw the opening of a DC- based office and the first five-year strategic plan to build a long-term development strategy.

### USAGM's Mission

12. In my experience, there is a common misconception of USAGM's mission. USAGM's unique role and overarching purpose is "promot[ing]" *America* abroad.  22 U.S.C. § 1431.  USAGM is not just another commercial news network like CNN or Fox News Channel or MSNBC.

13.     It is my firm view that advancing USAGM's mission, "to inform, engage, and connect people around the world in support of freedom and democracy," is essential to the U.S. national interest, especially now. Adversaries of America have stepped up disinformation and misinformation campaigns to promote visions of the world that disparage the American ideal that government should be "by the people and for the people."[1] For the sake of freedom and democracy, American values must be preserved and fought for in the global war of ideas.

14.     USAGM does this through a variety of means, all of which must "be consistent with the broad foreign policy objectives of the United States." *Id.* § 6202(a)(2). The International Broadcasting Act sets forth a number of principals which govern USAGM's operations. For example:

    a.     USAGM Networks provide programing and "news which is consistently reliable and authoritative, accurate, objective, and comprehensive." *Id.* § 6202(b)(1).

    b.     Additionally, USAGM networks present "a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society." *Id.* § 6202(b)(2).

    c.     USAGM networks also endeavor to provide "clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies, including editorials, broadcast by the Voice of America, which present the views of the United States". *Id.* § 6202(b)(3).

15.     Because USAGM networks are not just another news outlet, I understand there to be a number of unique legal restrictions on USAGM's coverage of the news.

---

[1] Abraham Lincoln, Gettysburg Address (Nov. 19, 1863).

a. The Smith-Mundt Act of 1948. USAGM may only broadcast news "intended for *foreign* audiences abroad." 22 U.S.C. § 1461(a) (emphasis added). "No funds authorized to be appropriated to the Department of State or the Broadcasting Board of Governors shall be used to influence public opinion in the United States." *Id.* § 1461-1a(a).

b. USAGM networks are prohibited by law from "duplicat[ing] the activities of private United States broadcasters." *Id.* § 6202(a)(3). By law, USAGM does not compete with commercial, for-profit broadcasters, like CNN or the Fox News Channel.

**A Consensus:  USAGM Is Flawed**

16. In my opinion, USAGM has been ineffective in discharging this critical mission. There is bipartisan agreement to that effect. As then-Secretary of State Hillary Clinton testified to the House Committee on Foreign Affairs in 2013:

> . . . I have said this to this committee before, a lot of new members on it, we have abdicated the broadcasting arena. Yes, we have private stations, CNN, FOX, NBC, all of that. They are out there. They convey information. But we are not doing what we did during the Cold War, our Broadcasting Board of Governors is practically defunct in terms of its capacity to be able to tell a message around the world. So we are abdicating the ideological arena, and we need to get back into it.

*Terrorist Attack in Benghazi:  The Secretary of State's View:  Hearing before the H. Commm on Foreign Affairs*, 113th Cong. 25–26 (Jan. 23, 2013) (Statement of Hillary Rodham Clinton, Secretary of State).  Majority Staff Report, *U.S. Int'l Broadcasting in the Digital Age:  Getting Advertising Right*, H. Comm. on Foreign Affairs, 115th Cong. (Dec. 18, 2018) (detailing Smith-Mundt violations by USAGM Networks and related lack of USAGM oversight)

17. In the years before my arrival, USAGM's networks have been plagued by mismanagement and scandal—bribery in one case, allegations of politically motivated firings in another, and the criminal prosecution and conviction of a senior executive in a third. At least

partially as a result, USAGM has for years ranked at the bottom in surveys of mid-sized agencies in terms of morale and job satisfaction.

18. These issues prompted the creation of my current office, USAGM CEO, with new powers set forth in bipartisan legislation approved by Congress and signed into law by President Barack Obama just a few years ago. *See, e.g.*, *Statement on Signing the National Defense Authorization Act for Fiscal Year 2017*, at 3 (Dec. 23, 2016) (noting strong support for needed "structural reform" of USAGM and "empowerment" of the USAGM CEO); *Markup on H.R. 1853, H.R. 2100, H.R. 2323, H. Res. 213, H. Res. 235: H. Comm. on Foreign Affairs*, 114th Cong. 104 (May 21, 2015) (statement of Ranking Member Elliot L. Engel) (describing predecessor bill as a "much needed overhaul").

### USAGM's Current Strategic Challenges

19. I am extremely concerned that USAGM and its Networks suffer from major structural deficiencies that have profoundly negatively impacted our ability to tell "America's story" abroad. Remedying the massive structural failings at USAGM and its Networks requires substantial coordinated and multi-disciplinary efforts both from USAGM staff, and from USAGM's inter-agency partners.

*Security Failures*

20. First and foremost, upon taking office I discovered that from 2010 to the present, USAGM has suffered, and continues to suffer, from a massive series of security failures, violations, and lapses. As I understand it, from 2010 to present, USAGM ignored repeated major negative inspection findings raised by the Office of the Director of National Intelligence ("ODNI"), and the Office of Personal Management ("OPM") as it related both to security clearance investigations and adjudications as well as federal suitability investigations and

7

determinations.  I am told that a substantial number of USAGM staff were improperly cleared, including some with Top Secret and above clearances.  These clearance failures included failures to submit fingerprints and even the use of false Social Security numbers.

21. As a result of these repeated failures, ODNI and OPM have stripped USAGM's investigative and adjudicative authority as to both security clearance determinations and suitability adjudications.  This has crippled USAGM.  For example, at present, I have been informed we are extremely limited in our ability to onboard staff.

22. Resolving these security issues is a top priority for USAGM and taking prompt action on these issues is critical to the ability of the USAGM to continue to function.  The security issues require remediation of years of failures and putting in place a substantial forward looking security infrastructure to provide for the health of USAGM going forward.  USAGM must manage these security efforts expeditiously in fairness to the affected employees and the need to coordinate and cooperate with multiple interagency partners.

*Complaints*

23. Since I have taken office I have received dozens of complaints from employees at the USAGM Networks, ranging from complaints of bias in reporting, to preferential hiring of unqualified individuals, to widespread waste of taxpayer funds on improper travel.  These complaints generally have two common themes.

   a. First, most complaints express a frustration that the alleged improper conduct is somehow interfering with the complainant reporting the news without fear or favor.  That is a powerful message.  These individuals wish to produce accurate, measured, and when appropriate, hard hitting news.

      b.      Second, most complainants fear reprisal from bad apples at the USAGM Networks.  The complainants fear that they will be retaliated against simply because they spoke out against biased coverage, or other problems.

24.      I have received a specific and detailed official complaint from a United States Ambassador that a USAGM Network in their country is at times producing content supportive of hostile regimes.  We are investigating this complaint as just as we would any other detailed complaint.

25.      I am particularly concerned that these complaints allege that far from "telling America's story" some USAGM services may have been compromised to the point of reflecting the views of governments hostile to the United States or rendered ineffective by other means.  In-depth USAGM investigations are required to address these credible allegations.  These investigations will necessarily involve USAGM officials speaking with journalists, and, to some extent, reviewing content for compliance with journalistic standards.

*Addressing Bias*

26.      I am very concerned about the allegations of widespread bias in USAGM reporting.  Bias is particularly significant to me because it violates the mission of USAGM and its Networks.

27.      As CEO, one of my foremost duties is to ensure our reporting is not biased.  I am required to "ensure" adherence to broadcasting standards and to "oversee" and "supervise" *all* broadcasting activities, and ensure those activities meet the highest professional standards of broadcast journalism.  22 U.S.C. § 6204(a)(1), (3), (5).

28.      Regrettably, VOA has long had a bias problem.

      a.      For example, in 2016, then-VOA Director Amanda Bennet commissioned a Blue-Ribbon "Benchmarking" Report that concluded:

> The perception of biased coverage is real among multiple VOA reporters and editors. Biased coverage threatens the credibility of the overwhelming majority of VOA journalists who strive for fairness, balance and accuracy. It's vital that VOA leadership take visible steps to communicate that bias is unacceptable and that the integrity of VOA reporting is sacrosanct.

A copy of this Report is attached as Ex. 1.

      b.      In the lead up to the 2016 Presidential Election, the VOA Ukrainian Service translated, produced, and then posted on its official social media page a video featuring the actor Robert DiNiro ("DeNiro") in a one sided attack on then-candidate Donald Trump.  Among other things, DeNiro called President Trump "punk," "dog," "pig," "con," "bullshit artist," "mutt," "idiot," "fool," "bozo," and "blatantly stupid." DeNiro also referenced a desire to physical assault then-candidate Trump.  There was no balance in the video.  *See* https://www.youtube.com/watch?v=CGDVUOyQJAM

      c.      In July of 2020, the VOA Urdu Service produced a "news report" on its digital services that purported to "report" on former Vice President and Democrat Presidential Candidate Joe Biden's speech in an online event to American Muslims. But by any objective measure it looked more like a campaign advertisement than an objective story.  In fact, the video contained a large amount of footage that originated with a political advocacy organization.  The video also contained partisan exhortations; did not provide any context for the statements made by candidate Vice-President Biden; made no attempt to provide any perspective from President Trump or other relevant political figures; and made no effort to correct inaccurate information contained therein. In addition, the use of the VOA logo at the end of the video made it seem like VOA was

part of the advertisement and endorsement.  *See*

https://www.youtube.com/watch?v=r2iL0uy6iL8

   d. On August 5, 2020 the French to Africa service Straight Talk Africa produced an hour-long segment entitled *Black Lives Matter Moment in the U.S. and Africa*.  59 minutes of this segment was devoted to a 4 person panel and other content that almost exclusively focused on attacking law enforcement.  No balance was provided.  A copy of the transcript of that segment is attached as Ex. 2.

## My Reform Agenda for USAGM

  29. My overriding objective as the first presidentially appointed, Senate-confirmed CEO of USAGM is to provide leadership that will allow USAGM to more fully achieve its mission, to perform with excellence, and to address its existing structural failures.  As I engage in this task with my leadership team, I have, at times, found it necessary to take actions that have been deemed controversial and with which some vehemently disagreed.  I respect and listen to those with opposing views.  But, at the end of the day, every action I have taken to reform USAGM I took because I believed it lawfully (it goes without saying) furthered an important policy objective.

  30. At times, reforming USAGM has required reversing the policy decisions of my predecessors.  That is a normal part of the political process and would happen with any leadership change.  I respect these prior policy decisions, but in the end I disagreed with them.  For example, I believe strongly in fiscal discipline.  This has led me to reduce or refuse to approve expenditures that my predecessor likely would have approved.

**Effects of the Requested Relief.**

31.     I have reviewed the Plaintiffs' Proposed Order. It is my considered opinion that granting the Proposed Order would have the practical effect of turning control of USAGM over to the Court. I would be unable to perform even basic actions to ensure that USAGM Networks' actions are "consistent with the broad foreign policy objectives of the United States" without risking noncompliance. *Id.* § 6202(a)(2).

32.     For example, the Proposed Order seeks an injunction that would bar me from "violating the First Amendment, and the statutory and regulatory firewall." I would not know how to interpret the effect of such an order, but I fear it would bar me from a variety of critical agency functions.

    a.     I would be unsure if I could continue efforts to remediate USAGM's security failures. I would be concerned that Plaintiffs or others would allege that conduct such as requiring individuals to submit valid fingerprints was intended to "direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence" journalists.

    b.     I would be unsure if I could refuse to approve on fiscal or other policy grounds a variety of contracts which fund journalistic activities. I would be unable to determine whether such a decision would "direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence" a journalist.

    c.     I fear that I would be unable to respond to foreign policy crises by ensuring USAGM's resources were effectively deployed. This is a specific part of my statutory mission. I am required to ensure that the USAGM networks have "the capability to provide a surge capacity to support United States foreign policy objectives

during crises abroad." 22 U.S.C. § 6202(b)(4); *accord id.* § 6204(a)(3).  But if the preliminary injunction requested was entered, even if there was a major international crisis occurring in a world hotspot, I am not sure if I would be able to redeploy USAGM resources under my authority to "redirect or reprogram funds within the scope of any grant or cooperative agreement, or between grantees, as necessary." *Id.* § 6204(a)(21).  I would fear the movement of resources from coverage of one country to another would result in claims that I discriminated based on journalistic content and thus had violated the requested preliminary injunction.

33. The Proposed Order seeks a preliminary injunction commanding me to cease "hiring, firing, or otherwise interfering with journalistic personnel decisions at Voice of America, Radio Free Asia, Radio Free Europe/Radio Liberty, the Office of Cuba Broadcasting, or the Middle East Broadcasting Networks, Inc."  I do not know how I would be able to legally comply with such a preliminary injunction if, for example, the Voice of America asserted I was required to approve onboarding newly hired journalists.  USAGM is currently extremely limited in its ability to onboard staff due to its security issues.

34. Plaintiffs seek a preliminary injunction barring my staff and me from "attending or seeking to attend newsroom meetings, speaking to journalists or leadership (except the appointed Directors or Presidents) of Voice of America, Radio Free Asia, Radio Free Europe/Radio Liberty, the Office of Cuba Broadcasting, or the Middle East Broadcasting Networks about editorial decisions, journalistic standards, or coverage decision."  I have been attempting to visit each VOA language service to learn more about their programming, needs, and thoughts for the future of USAGM.  I would unfortunately have to cease this effort to learn more about the VOA's language services under the Proposed Order.

35.     Under the provisions of the Proposed Order related to discipline, I would also be unable to continue investigations that involved some review of content. This would include any efforts to investigate complaints including one from a United States Ambassador who has raised deep concerns that a local USAGM network in the area is promoting—not countering—the messaging of hostile regimes.

36.     If the provisions of the Proposed Order were granted related to investigations and discipline I would be unable to—in any way—ensure compliance with journalistic standards despite my statutory duty to do so. *See* 22 U.S.C. § 6202(a)(1)–(2). No matter how egregious or systematic the violation of journalistic standards I would be compelled to do nothing.

Executed on this 26 of October, 2020.

*[signature]*
MICHAEL PACK