IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GRANT TURNER, et al.,

*Plaintiffs*,

v.

U.S. AGENCY FOR GLOBAL MEDIA, et al.,

*Defendants*.

Case No. 20-cv-2885

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

GIBSON, DUNN & CRUTCHER LLP

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Mylan L. Denerstein (admitted *pro hac vice*)
Zainab Ahmad (admitted *pro hac vice*)
Lee R. Crain (D.D.C. Bar No. NY0337)
Alexandra Grossbaum (admitted *pro hac vice*)
Lauren Kole (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166-0193
Tel:  (212) 351-4000
MDenerstein@gibsondunn.com
Zahmad@gibsondunn.com
LCrain@gibsondunn.com
AGrossbaum@gibsondunn.com
LKole@gibsondunn.com

Joshua S. Lipshutz (D.C. Bar No. 1033391)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel: (202) 955-8500
JLipshutz@gibsondunn.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

    I.    Plaintiffs Are Likely To Succeed In Demonstrating This Court Has
        Jurisdiction. ........................................................................................ 2

        A.    Plaintiffs Properly Seek Relief From The Court ....................... 3

        B.    Plaintiffs Have Standing To Assert Third-Party USAGM
               Journalists' Rights. .................................................................. 3

        C.    The Civil Service Reform Act Is Irrelevant .............................. 9

    II.    Plaintiffs Assert Multiple Valid Causes of Action. ............................ 11

    III.    Plaintiffs Are Likely To Succeed In Proving Defendants Violated The
        Statutory And Regulatory Firewall And The First Amendment. ......................... 14

        A.    The IBA Plainly Codifies The Firewall Into Federal Law. ................... 14

        B.    Defendants' "Repeal" Of The Firewall Regulation 50 Minutes
               Before Filing Their Opposition Brief Is Ineffective. .............................. 16

        C.    Defendants Are Likely To Succeed On Their First Amendment
               Claim. ...................................................................................... 21

    IV.    Plaintiffs Would Suffer Irreparable Harm Absent Relief And The Equities
        Weigh Decidedly in Plaintiffs' Favor. .................................................. 24

CONCLUSION ................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Achagzai v. Broad. Bd. of Governors*,
2016 WL 471274 (D.D.C. Feb. 8, 2016) ............................................................23

*Arriva Med. LLC v. U.S. Dep't of Health & Human Servs*.,
239 F. Supp. 3d 266 (D.D.C. 2017) ....................................................................24

*Bush v. Lucas*,
462 U.S. 367 (1983) ............................................................................................11

*Camacho v. Brandon*,
317 F.3d 153 (2d Cir. 2003)...............................................................................7, 9

*Cardinal Health, Inc. v. Holder*,
846 F. Supp. 2d 203 (D.D.C. 2012) ....................................................................24

*Carducci v. Regan*,
714 F.2d 171 (D.C. Cir. 1983) ............................................................................11

*Davis v. Billington*,
51 F. Supp. 3d 97 (D.D.C. 2014) ......................................................................9, 10

*Demers v. Austin*,
746 F.3d 402 (9th Cir. 2014) ..............................................................................22

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019).........................................................................................20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020)...............................................................................18, 20, 21

*District of Columbia v. U.S. Dep't of Agric*.,
444 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................24

*Doe v. Nat'l Bd. of Med. Examiners*,
199 F.3d 146 (3d Cir. 1999)..................................................................................4

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012)..............................................................................................9, 10

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016)..........................................................................................19

*First Pac. Bancorp, Inc. v. Helfer*,
224 F.3d 1117 (9th Cir. 2000) .............................................................................13

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003) .........................................................................3, 5

## TABLE OF AUTHORITIES

*Fornaro v. James*,
    416 F.3d 63 (D.C. Cir. 2005) ..........................................................................11

*FTC v. World Patent Mktg., Inc.*,
    2017 WL 3508639 (S.D. Fla. Aug. 16, 2017) ................................................21

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) .................................................................................22, 23

*Graham v. Ashcroft*,
    358 F.3d 933 (D.C. Cir. 2004) ........................................................................11

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
    560 F.3d 495 (D.C. Cir. 2009) ........................................................................11

*Gully v. Nat'l Credit Union Admin. Bd.*,
    341 F.3d 155 (2d Cir. 2003) ..............................................................................4

*Husain v. Springer*,
    494 F.3d 108 (2d Cir. 2007) ............................................................................22

*J.D. v. Azar*,
    925 F.3d 1291 (D.C. Cir. 2019) ......................................................................25

*Jangjoo* v. *Board of Broadcasting Governors*,
    244 F. Supp. 3d 160 (D.D.C. 2017) ................................................................23

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ........................................................................11

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ..........................................................................................8

*Lamb v. Holder*,
    82 F. Supp. 3d 416 (D.D.C. 2015) ..................................................................10

*Lewis v. Casey*,
    518 U.S. 343 (2016) ..........................................................................................3

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ..................................................................................11, 12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................................2

*Mapes v. Reed*,
    2020 WL 5545397 (D.D.C. Sept. 16, 2020) ..................................................10

# TABLE OF AUTHORITIES

*McBryde v. Comm. to Review Circuit Council Conduct*,
   264 F.3d 52 (D.C. Cir. 2001) ................................................................4

*Meese v. Keene*,
   481 U.S. 465 (1987) ................................................................4, 5

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974) ................................................................18

*Nat'l Ass'n of the Deaf v. Trump*,
   2020 WL 5411171 (D.D.C. Sept. 9, 2020) ................................................................13

*Nat'l Broad. Co. v. F.C.C.*,
   516 F.2d 1101 (D.C. Cir. 1974) ................................................................18

*Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*,
   730 F.3d 208 (3d Cir. 2013) ................................................................4

*Nat'l Lifeline Ass'n v. FCC*,
   921 F.3d 1102 (D.C. Cir. 2019) ................................................................18, 19

*Nat'l Wildlife Fed'n v. Burford*,
   676 F. Supp. 271 (D.D.C. 1985), *aff'd*, 835 F.2d 305 (D.C. Cir. 1987) ................................................................24

*Navab–Safavi v. Broad. Bd. of Governors*,
   650 F. Supp. 2d 40 (D.D.C. 2009) ................................................................9

*Navab-Safavi v. Glassman*,
   637 F.3d 311 (D.C. Cir. 2011) ................................................................22

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ................................................................11

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019) ................................................................11

*Open Tech. Fund v. Pack*,
   __ F. Supp. 3d. __, 2020 WL 3605935 (D.D.C. July 2, 2020) ................................................................7, 11, 12, 15, 20, 23

*Parsons v. U.S. Dep't of Justice*,
   801 F.3d 701 (6th Cir. 2015) ................................................................4

*Powers v. Ohio*,
   499 U.S. 400 (1991) ................................................................7

*Ralis v. RFE/RL, Inc.*,
   770 F.2d 1121 (D.C. Cir. 1985) ................................................................12, 14

## TABLE OF AUTHORITIES

*Reese Bros., Inc. v. U.S. Postal Serv.*,
  531 F. Supp. 2d 64 (D.D.C. 2008) ................................................................9

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
  908 F.3d 476 (9th Cir. 2018) ......................................................................17

*Sea-land Serv., Inc. v. Dep't of Treasury*,
  137 F.3d 640 (D.C. Cir. 1998) ...................................................................18

*SEC v. Chenery*,
  318 U.S. 80 (1943) ......................................................................................18

*Shukh v. Seagate Tech., LLC*,
  803 F.3d 659 (Fed. Cir. 2015) ......................................................................4

*Suzal v. Dir., U.S. Info. Agency*,
  32 F.3d 574 (D.C. Cir.1994) ......................................................................10

*Tripp v. Dep't of Defense*
  284 F. Supp. 2d 50, 55–57 & n.3 (D.D.C. 2003) ......................................23

*Tyndale House Publishers, Inc. v. Sebelius*,
  904 F. Supp. 2d 106 (D.D.C. 2012) ......................................................24, 25

*United States v. Fausto*,
  484 U.S. 439 (1988) ................................................................................9, 11

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*,
  __ F.3d __, 2020 WL 5232076 (D.D.C. Sept. 2, 2020) ...............................3

## Constitutional Provisions

U.S. Const., amend. I ................................................................................ *passim*

U.S. Const., Art. II ................................................................................... *passim*

U.S. Const., Art. III .................................................................................. *passim*

## Statutes

5 U.S.C. § 704 .................................................................................................11

5 U.S.C. § 706 .................................................................................................17

22 U.S.C. § 6202 ...................................................................................... *passim*

22 U.S.C. § 6204 ........................................................................7, 13, 14, 22

## TABLE OF AUTHORITIES

**Regulations**

22 C.F.R. § 531, *et seq*...................................................................................... *passim*

**Other Authorities**

85 Fed. Reg. 36150 ..............................................................................................16, 19

H. R. 6395, 116th.......................................................................................................17

H.R. Conf. Rep. 105-432 at 125–26 (1998)................................................................7

H.R. Conf. Rep. No. 105-432, at 126 (1998) ...........................................................15

Merriam-Webster, https://bit.ly/35HEfwO ...............................................................14

S. Rep. 103-07 (1993)..............................................................................................15

S. Rep. No. 107-60 (2001) ..................................................................................18, 22

## INTRODUCTION

Plaintiffs move for a preliminary injunction to stop Defendants from violating federal law and the First Amendment, both of which forbid them from interfering with the journalistic independence of storied outlets like Voice of America and its sister networks—independence enshrined in the "firewall" protecting journalists from political meddling.  With 12 witness declarations and dozens of exhibits—and now three more supplemental declarations submitted with this reply—Plaintiffs have proven Defendants' unlawful activity, proven the massive resulting damage, and plainly established that every day Defendants are not enjoined from continuing to breach the firewall causes more and more irreparable harm.

Defendants do not dispute the record because they can't.  Instead, they advance a series of flawed arguments that demonstrate that they do not understand the agency they purport to manage. They claim, for instance, that Plaintiffs lack standing, even though the reputational damage Plaintiffs have suffered is *directly attributable to Defendants' demolition of the firewall*.  *See, e.g.*, Powers Supp'l. Decl. ¶¶ 19–23.  They claim that the Civil Service Reform Act ("CSRA") bars the claims in this case—which they recast as mere "employment disputes."  But this is not an employment action, and the journalists for whom Plaintiffs have third-party standing to sue include hundreds of federal contractors to whom CSRA does not apply.  Moreover, as bipartisan members of Congress have now made clear, Crain Supp'l. Decl. Exs. 3–5, Defendants misapprehend the firewall as it was adopted into federal statute.  Contrary to Defendant Michael Pack's contentions, *see* Knapp Decl. Ex. 1 ("Repeal") at 19, editorial independence does not *hamper* foreign policy— editorial independence is an essential attribute of foreign policy.   Simply put, editorial independence is what stops Voice of America from becoming Radio Pyongyang, Cull Decl. ¶ 18, or, as *amici* adeptly put it, an Orwellian "Ministry of Truth," Amici Br. of Reporters Committee for Freedom of the Press & 16 Media Organizations ("RCFP Amici Br.") 11 (Dkt. No. 22-1).

But the true extent of Defendants' actions—and the clearest proof that injunctive relief is needed at the earliest available opportunity—comes from Defendants' attempt to repeal the very firewall regulation that supports some of Plaintiffs' claims.  Just fifty minutes before Defendants filed their opposition brief in this case, Defendants purported to repeal the firewall regulation that prohibits any "attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks . . . in the performance of their journalistic and broadcasting duties." 22 C.F.R. § 531.3(c).  Defendants, as part of this "repeal"—which is unlawful and should be preliminarily enjoined—claim that the regulation is unworkable.  But, given the timing, it's clear Defendants realized that with that regulation on the books, their position in this case was unwinnable.  Staggeringly, the "repeal" asserts that the International Broadcasting Act ("IBA") and Article II of the Constitution *require* Mr. Pack to control editorial content, Repeal at 19—despite clear statutory text, history, and logic to the contrary.  This Court should reject this unlawful power grab and make clear that Defendants do *not* have the authority to control content as they claim.  Federal law and the First Amendment forbid it.

In sum, Plaintiffs have shown a likelihood of success on the merits, they have shown irreparable harm, and they have demonstrated that the balance of equities does not favor permitting Defendants to violate the USAGM networks' independence for one more day.  This Court should grant Plaintiffs' motion.

## ARGUMENT

## I.   Plaintiffs Are Likely To Succeed In Demonstrating This Court Has Jurisdiction.

In an effort to steer this Court away from their indefensible actions, Defendants grasp at a series of jurisdictional arguments.  But Defendants' arguments overlook facts and law that render their positions specious.  Plaintiffs are likely to succeed in demonstrating the Court has jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

A.      **Plaintiffs Properly Seek Relief From The Court.**

Defendants first argue that this Court lacks jurisdiction because Plaintiffs improperly seek "wholesale improvement of [a federal] program by court decree" and "straightforward programmatic relief" through "hands-on management" of USAGM's operations.  Def. Opp. 6.  Not so.  Plaintiffs seek judicial intervention to redress imminent and continuing actual harm to themselves and numerous third parties, and ask the Court merely to apply clear legislative and regulatory standards, *see* 22 U.S.C. § 6202(a)(5); 22 C.F.R. § 531.3(c), and the First Amendment.  That is a proper "role of courts"—"to provide relief" where "actual harm . .  has been suffered, or . . . will imminently be suffered."  *Lewis v. Casey*, 518 U.S. 343, 349 (2016).  Plaintiffs do not seek this Court's intervention to "usurp" agency operations, Def. Opp. 7, but merely to ensure that Defendants abide by the law and cease harming Plaintiffs and the third parties for whom they have third-party standing to sue.

B.      **Plaintiffs Have Standing To Assert Third-Party USAGM Journalists' Rights.**

Plaintiffs also have standing to assert third-party journalists' rights.  *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, __ F.3d __, 2020 WL 5232076, at *20 (D.D.C. Sept. 2, 2020).  Defendants' arguments to the contrary fail.

*Injury.*  Defendants emphasize that Plaintiffs are not asking this Court to restore Plaintiffs (who are on leave) to their positions, and that a favorable judicial decision will not redress that injury.  That is merely an attempt to distract the Court's attention from the injuries actually pleaded.  Plaintiffs are not seeking redress through this litigation of the unlawful actions taken against their employment; they have identified multiple other concrete injuries they are suffering as a result of the dismantling of the USAGM firewall.  That is all that matters here.

As Defendants appear to concede, Def. Opp. 8 n.2, it is well-established that reputational harms are sufficient to constitute an injury in fact for standing purposes.  *See, e.g.*, *Foretich v.*

3

*United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003) ("injury to reputation can constitute a cognizable injury sufficient for Article III standing"); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 711 (6th Cir. 2015) ("Reputational injury, on the other hand, is sufficient to establish an injury in fact."); *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 220 (3d Cir. 2013) *abrogated on other grounds by Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018) ("As a matter of law, reputational harm is a cognizable injury in fact"); *Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 161 (2d Cir. 2003) ("The Supreme Court has long recognized that an injury to reputation will satisfy the injury element of standing.") (collecting cases).  And, in particular, allegations of harm to "professional reputation"—*i.e.* "how people who can affect [a plaintiff's] future and his livelihood, and whose judgment may be informed by the information, will perceive him"—have been consistently found to satisfy the injury-in-fact requirement.  *Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 153 (3d Cir. 1999); *see also, e.g.*, *McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 57 (D.C. Cir. 2001) (characterization of judge as having engaged "in a pattern of abusive behavior," constituted harm even where official characterization imposed no legal ramifications); *Nat'l Collegiate Athletic*, 730 F.3d at 220–21 (reputational harm to professional sports leagues from state law permitting sports gambling because the challenged law was "increasingly associating the Leagues' games with gambling"); *Shukh v. Seagate Tech., LLC*, 803 F.3d 659, 664–66 (Fed. Cir. 2015) (exclusion from inventorship on a patent could constitute cognizable reputational injury to inventor because "a scientist's professional reputation is influenced by the number of patents on which that scientist is named").

In *Meese v. Keene*, 481 U.S. 465 (1987), for instance, a California senator sought to distribute Canadian films addressing the effects of nuclear war, but the films constituted "political propaganda" under the Foreign Agents Registration Act of 1938.  *Id.* at 467.  Fearing damage to

his public reputation from being deemed a "disseminator of foreign political propaganda" the senator sought to enjoin the Act.  *Id.*  Even though the Act did not have a "direct effect on his exercise of First Amendment rights," the court found that the plaintiff had alleged a cognizable injury by asserting that "his personal, political, and professional reputation would suffer and his ability to obtain re-election and to practice his profession would be impaired."  *Id.* at 473.

Similarly, here, Plaintiffs have identified damage to their own political and professional reputations due to Defendants' attack on the firewall.  While the plaintiff in *Meese* sought to enjoin the application of a statute, and Plaintiffs here seek an injunction ordering compliance with one, the underlying injuries are of the same kind.  Plaintiffs have substantiated their injuries through their undisputed declarations, which clearly attest to the fact that "[t]he networks' credibility has been tarnished" as a result of Defendants' misconduct, and that this erosion of credibility has directly damaged Plaintiffs themselves.  *See* Turner Decl. ¶ 48; *see also* Walsh Decl. ¶ 27; Powers Decl. ¶ 38; Tran Decl. ¶ 16; Lennon Decl. ¶ 25; *Meese*, 481 U.S. at 473–75 (reputational harm established by affidavit); *Foretich*, 351 F.3d at 1211 (same).  Indeed, that reputational harm has already taken its toll in recent weeks.  Plaintiff Shawn Powers is a prime example:  Mr. Powers, who was a tenured professor of global media and communications before he gave up tenure to serve his country's international broadcasting efforts, is an active member of the international broadcasting community.  Powers Supp'l. Decl. ¶¶ 19–21.  That is his area of academic expertise, and the area on which his professional reputation is based.  *Id.*  For years, he and other Plaintiffs have participated in the prestigious meetings of the Directors General 7—the group of publicly funded international broadcasters from most of the world's leading democratic countries, which includes the British Broadcasting Corporation, Germany's Deutsche Welle, and France Medias Monde.  *Id.*  But Mr. Powers and other Plaintiffs were recently disinvited from these (and other,

similar) meetings *because of* Defendants' attacks on the firewall and the implications of those attacks on Plaintiffs' reputations. *Id.* Plaintiffs' reputational harms from being members of an organization that no longer supports journalistic independence, *see* Repeal at 19, are clear Article III injuries that result from the dismantling of the firewall and can be redressed by a Court order that Defendants comply with the law and rebuild that wall.

Plaintiffs are also likely to demonstrate that every day Defendants are permitted to violate the firewall—and every day they are permitted to claim they have the right to control content, *see* Repeal at 19—causes Plaintiffs irreparable harm. Plaintiffs are likely to be restored to their positions. Powers Supp'l. Decl. ¶ 24. The task of picking up the pieces when they return becomes more difficult each day that Defendants diminish the credibility of the USAGM networks, lose critical audiences, and shatter USAGM's reputation. Plaintiffs have standing to ask this Court to stem the tide now, before it is too late for them to undo the damage Defendants have wrought.

***Relationship.*** Plaintiffs have a sufficiently close relationship with the USAGM journalists to represent their interests here: As guardians of the firewall, Plaintiffs share the journalists' interest in enforcing the firewall, protecting the independence and credibility of the networks' reporting, upholding the First Amendment, and sparing USAGM from Defendants' gross mismanagement. Indeed, Defendants have themselves confirmed that Plaintiffs remain USAGM employees and bound to USAGM policies—including those implementing the firewall. Powers Supp'l. Decl. ¶ 23. In response, Defendants argue that this relationship is insufficient because (1) in their view, Plaintiffs and the USAGM journalists do not have a shared interest in enforcing the firewall, and (2) Plaintiffs' relationship with the journalists is not the type of relationship that has been found to support third-party standing in a handful of Supreme Court cases. Both arguments fail.

Defendants claim that the firewall does not exist "to protect the rights of the networks or their journalists" and that Plaintiffs and the USAGM journalists thus lack a shared interest in enforcing it.  Def. Opp. 16.  That is wrong.  In the Act, Congress expressly provides that the CEO "***shall respect the professional independence and integrity of the Board, its broadcasting services, and the grantees of the board***," which encompass the networks and their journalists.  22 U.S.C. § 6204(b) (emphasis added); *accord Open Tech. Fund v. Pack*, __ F. Supp. 3d. __, 2020 WL 3605935, at *2 (D.D.C. July 2, 2020) ("*OTF*") (noting the statute "protect[s] against interference with and maintaining the professional independence of the agency's journalists and broadcasters and thus their credibility as sources of independent news and information") (quoting President Obama's signing statement appended to the statute creating the CEO position).  The Act's legislative history likewise establishes that the very purpose of the firewall is to protect the "integrity of the journalism" and to ensure that "the journalists themselves will be shielded from political interference." H.R. Conf. Rep. 105-432 at 125–26 (1998). Plaintiffs, as employees of USAGM, and the USAGM network journalists themselves, clearly share a mutual interest in enforcing the firewall and restoring USAGM's and its networks' credibility.

Defendants next argue that Plaintiffs do not have a "close relationship" to the USAGM journalists because other cases finding this element of third-party standing satisfied have involved relationships between vendors and vendees, doctors and their patients, and lawyers and their clients. Def. Opp. 16–17.  This is a non-sequitur.  Courts have found a broad swath of relationships sufficient to satisfy the "close relationship" requirement, because what ultimately matters is whether the plaintiffs "will be [] motivated, effective advocate[s]" for the third parties' rights. *Powers v. Ohio*, 499 U.S. 400, 414 (1991); *see also Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) (sufficiently close relationship existed between city council member and his legislative

aide).[1]  Such is the case here:  The mutual interest of Plaintiffs and the USAGM journalists in enforcing the firewall, and preventing the damage to their professional reputations as well as that of USAGM, ensures that Plaintiffs have a sufficiently close relationship with the journalists and will adequately protect their interests in this litigation.

 *Hindrance.*  Defendants do not dispute the sworn testimony of Declarants Doe, Coe, and Roe delineating in detail the hindrances they face in exercising their rights and protecting their interests.  *See* Doe Decl. ¶¶ 20–25; Coe Decl. ¶¶ 22–27; Roe Decl. ¶¶ 27–29; Ex. 56 at 2; Compl. ¶ 145.  And they cannot.  Indeed, Mr. Pack's exceptionally broad conception of his power, as evidenced by his improper repeal of the firewall regulation and invocation of an unlawful right to control content, Repeal at 19, only further validates journalists' fears that prevent them from vindicating their own rights.  *See also* Ex. 49.  And even if journalists did not face a threat of retaliation from Defendants, adding their names to this lawsuit would risk the public's erroneous perception of the journalists as biased and incapable of producing impartial reporting, crippling their ability to engage in constitutionally protected journalistic activities in the future.  Pl. Br. 17–19.

 Defendants respond that these journalists face "no real obstacle to vindicating their own rights" because, in their view, "a journalist is unlikely to be stigmatized . . . for suing to protect her putative rights."  Def. Opp. 18.  But Defendants have no evidence to support that speculative proposition.  And at bottom, the critical inquiry for the purposes of the hindrance requirement is whether these journalists are "merely" faced with "a danger of chilled speech"—a standard

---

[1]  *Kowalski v. Tesmer*, 543 U.S. 125 (2004) is not to the contrary.  There, lawyers and their future, hypothetical clients never formed any relationship, whereas here, Plaintiffs were (and as current USAGM employees are) guardians of the firewall who long worked to protect and support the journalists whose rights they now seek to vindicate.  By contrast to the "hypothetical" relationship in *Kowalski, id.* at 131, Plaintiffs have worked with, protected, and supported the USAGM journalists for nearly a collective century.  Turner Decl. ¶¶ 6–7; Lennon Decl. ¶¶ 3–4; Walsh Decl. ¶¶ 5–6; Powers Decl. ¶¶ 6–9; Tran Decl. ¶¶ 2–4.

Defendants tellingly ignore and implicitly acknowledge has been satisfied in failing even to attempt to rebut evidence of their documented propensity for retaliation and discrimination against perceived viewpoints and the resulting chill on journalistic speech. *See Reese Bros., Inc. v. U.S. Postal Serv.*, 531 F. Supp. 2d 64, 68, 70 (D.D.C. 2008); *see also Camacho*, 317 F.3d at 160 (third party was sufficiently hindered where he faced possibility of retaliation from employer); Pl. Br. 33–39; Coe Decl. ¶¶ 19–20 (recounting retaliation against Steve Herman).

      **C.**      **The Civil Service Reform Act Is Irrelevant**

Defendants next claim this Court lacks jurisdiction due to the Civil Service Reform Act ("CSRA"). That's wrong for two obvious reasons. *First*, CSRA does not apply to contractors, and hundreds of the journalists on whose behalf Plaintiffs sue are contractors. *Navab–Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 67 n. 14 (D.D.C. 2009), *aff'd sub nom. Navab–Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011); Turner Supp'l Decl. ¶ 10. Because these journalists would be left entirely without recourse absent this Court's review, this Court's doors must remain open. *See Davis v. Billington*, 51 F. Supp. 3d 97, 108 (D.D.C. 2014).

*Second*, even as to Plaintiffs and the civil servants on whose behalf Plaintiffs have third-party standing to sue, CSRA has no application here because this is not an employment dispute but rather an attempt to remedy violations of the firewall and journalistic ethics. CSRA is a "system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988). Plaintiffs do not contest their placement on leave in this court, and this action seeks to remedy not any individual's employment gripes but rather fundamental firewall violations that suppress and chill journalism. Defendants admit as much, acknowledging that, "Plaintiffs do not ask this Court to restore them from investigative leave to their positions. . . . Indeed, Plaintiffs do not even challenge Defendants' conduct in that regard." Def. Opp. 9.

Indeed, many of the claims at issue in this case would simply not be cognizable under CSRA, and, again, as courts in this district have held, the district courts must remain open when "'CSRA does not provide an adequate alternative route to judicial review.'"  *Davis*, 51 F. Supp. 3d at 108 (citation omitted).  Take, for instance, USAGM's removal of the Standards Editor.  While it is possible that his reassignment to a post with no duties is something *he* could challenge under CSRA, Defendants cannot possibly argue that the numerous journalists and USAGM employees that rely on the Standards Editor and desperately miss his counsel have recourse under the CSRA regime.  Turner Decl. ¶¶ 22–23; Lennon Decl. ¶ 15; Walsh Decl. ¶¶ 17–18; Powers Decl. ¶ 27; Doe Decl. ¶ 18; Roe Decl. ¶¶ 6–9; Coe Decl. ¶ 9.

Nor does CSRA bar Plaintiffs' constitutional claims.  *Suzal v. Dir., U.S. Info. Agency*, 32 F.3d 574, 586 (D.C. Cir.1994) ("[T]he district courts are open to challenges seeking equitable relief on constitutional grounds . . . when the CSRA does not provide an adequate alternative route to judicial review"); *Lamb v. Holder*, 82 F. Supp. 3d 416, 423 (D.D.C. 2015) (same).  *Elgin* is not to the contrary.  There, the Court held that CSRA precluded certain constitutional claims because those claims were employment disputes in disguise:  "*vehicle[s]* by which [petitioners sought] to reverse [] removal decisions."  *Elgin*, 567 U.S. at 22 (emphasis added); *Mapes v. Reed*, 2020 WL 5545397, at *4 (D.D.C. Sept. 16, 2020) (explaining that *Elgin* "simply took the further step of holding that employees challenging *the constitutionality of the statute under which they were removed* also may not sue in federal district court" (emphasis added)).  Tellingly, each case Defendants cite for the proposition that Plaintiffs' APA and constitutional challenges fall within the purview of CSRA involved claims that were raised specifically to counter an employment-related action taken against the plaintiff—cases irrelevant to the issue here, where Plaintiffs do not

raise their constitutional challenges as a means to rebut their placement on leave.[2]   Indeed, Plaintiffs do not dispute their placement on administrative leave in this action at all.   CSRA has nothing to do with this case.   This Court has jurisdiction.

## II.   Plaintiffs Assert Multiple Valid Causes of Action.

Defendants argue Plaintiffs lack a cause of action.   That again is wrong.   *First*, Defendants cannot dispute that Plaintiffs can seek injunctive relief under the Constitution.   Courts in this district regularly grant such relief.   *E.g.*, *Karem v. Trump*, 960 F.3d 656, 667–68 (D.C. Cir. 2020).

*Second*, Defendants' protest to Plaintiffs' APA claim fails on its face.   As an initial matter, Defendants do not dispute that Plaintiffs challenge "final agency actions."   5 U.S.C. § 704. Defendants argue only that Plaintiffs' APA claims fail because Plaintiffs are outside the IBA's zone of interest, and the IBA lacks a "meaningful standard" to adjudicate Plaintiffs' claims. Defendants are incorrect on both counts.   *See OTF*, 2020 WL 3605935, at *5 n.8 (finding that plaintiffs who alleged a violation of the IBA's statutory firewall "have been adversely affected by final agency action, and thus they may proceed under the APA.").[3]

The zone of interests test is "not especially demanding," and the "benefit of any doubt goes to the plaintiff."   *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (internal quotation omitted).   This light burden is easily met here.   *See O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019) (organizations providing legal services to refugees "easily" met

---

[2]   *See Bush v. Lucas*, 462 U.S. 367, 368 (1983) (petitioner removed because of public statements claimed termination violated First Amendment); *Graham v. Ashcroft*, 358 F.3d 933 (D.C. Cir. 2004) (FBI employee alleging that "the Bureau violated its own regulations in the course of censuring him"); *Carducci v. Regan*, 714 F.2d 171, 174 (D.C. Cir. 1983) (due process challenge to reassignment); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (APA challenge to promotion of foreign employee over plaintiff); *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (APA challenge to hiring noncitizens).   The remainder of the cases Defendants cite seek some sort of employment-related benefit, like backpay, which is not at issue here.   *See United States v. Fausto*, 484 U.S. 439 (1999) (suspended employee seeking back pay); *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005) (seeking higher disability benefits).
[3]   Defendants' argument that CSRA precludes Plaintiffs' APA claims, Def. Opp. 20, fails, because the CSRA is not relevant to this action, *see supra* Arg. Pt. I.C.

"permissive" zones of interest test to challenge asylum rule).  As USAGM employees and stakeholders, Plaintiffs have an interest in USAGM's compliance with the statutory firewall, itself essential to the agency's success.[4]  *See* Powers Supp'l. Decl. ¶ 23; Turner Decl. ¶¶ 48–49; Walsh Decl. ¶¶ 26–28; Powers Decl. ¶¶ 37–40.  Further, the journalists on whose behalf Plaintiffs have third-party standing to sue plainly satisfy the zone of interest test (and Defendants do not argue otherwise, *see* Def. Opp. 21), because the firewall protects their journalistic independence, their careers, and their First Amendment rights.  *See* Coe Decl. ¶¶ 5–6, 21; Doe Decl. ¶¶ 17–19; Roe Decl. ¶¶ 13, 25–26.

Defendants' argument that the IBA lacks a meaningful standard to enforce is contradicted both by this Court's prior decision in *OTF* and the undisputed factual record.  In *OTF* the Court explained that the statutory firewall gave USAGM "evaluative and review responsibilities," while leaving "day-to-day control . . . to the stations themselves."  2020 WL 3605935, at *11 (quoting *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C. Cir. 1985)).  Despite Defendants' claim that this standard would be "impossible for a court to apply," (Def. Opp. 23), this Court has already provided examples of how USAGM might violate the firewall, including by "tell[ing] broadcasters what stories to cover or how to cover them," or by "fir[ing] a particular staff member."  *Id.*  The Court even recognized that the firewall regulation set forth a clear "equivalen[cy]" standard, *OTF*, 2020 WL 3605935, at *12 n.19—a standard that also emanates from statutory text requiring USAGM networks to comport with the "highest professional standards of broadcast journalism,"

---

[4] Defendants claim that Plaintiffs lack a cause of action under the APA because "Congress did not intend for USAGM staff [] to enforce" the statutory firewall by private action. Def. Opp. 21. But the APA does not require that Congress register its intent that a plaintiff can enforce a statutory provision. The zone of interest test "'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue. That lenient approach is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes . . . that do not themselves include causes of action for judicial review." *Lexmark*, 572 U.S. at 130 (citation omitted).

22 U.S.C. § 6202(a)(5).  Plaintiffs have introduced a slew of undisputed evidence relevant to these standards, including from numerous veteran journalists and an expert in the history of international journalism.  *See, e.g.*, Bennett Decl. ¶¶ 15, 23–36; Sugawara Decl. ¶¶ 7, 12, 17–25; Carroll Decl. ¶¶ 12–14; Capus Decl. ¶¶ 23, 27; Cull Decl. ¶¶ 9, 12, 18.  *Defendants*' claim that *they* have no idea as to how to apply the statutory standards does not preclude this Court from doing so.

*Third*, even if the APA did not allow Plaintiffs to challenge agency action as violative of federal statute and regulation (it does), the IBA creates a private right of action as well.  In a section entitled "Professional independence of broadcasters," Congress provided that the CEO of USAGM must "respect the professional independence and integrity of the . . .broadcasting services."  22 U.S.C. § 6204(b).  This provision, whose title refers to broadcasting journalists, along with other provisions that require USAGM networks to comply with the highest professional standards of broadcast journalism, creates a private cause of action.  *See Nat'l Ass'n of the Deaf v. Trump*, 2020 WL 5411171, at *6 (D.D.C. Sept. 9, 2020).  Congress's intent to create a private equitable remedy is evident from the fact that, without one, there would be no remedy for substantive violations of the statutory firewall that don't constitute final agency actions.  *Id.*  "[B]ecause the remedy at hand is an equitable one," the Court should be "more inclined to perceive" in any congressional silence "a presumption that an individual may pursue a claim . . . .  [W]here no enforcement mechanism is explicitly provided by Congress or an administrative agency, it is appropriate to infer that Congress did not intend to enact unenforceable requirements."  *First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1125 (9th Cir. 2000).

In short, Plaintiffs have multiple causes of action that all allow them to seek the same equitable relief.  *See* Def. Opp. 24 n.7.

**III.   Plaintiffs Are Likely To Succeed In Proving Defendants Violated The Statutory And Regulatory Firewall And The First Amendment.**

Defendants do not dispute that they have actively worked to quash the networks' independence and to dismantle the statutory firewall. Instead, they argue that the IBA does *not* require a firewall or independence. That is just plain wrong.

**A.   The IBA Plainly Codifies The Firewall Into Federal Law.**

Contrary to Defendants' contentions, the IBA definitively codifies the firewall into law. The IBA requires United States broadcasting to "be conducted in accordance with the highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5). The undisputed record in this case makes clear that a firewall between publishers (like Pack and the USAGM management working under him) and journalists is one such standard. Pl. Br. 2–3. Moreover, the section of the statute establishing the CEO's position makes doubly clear that Congress wrote the firewall into federal law. Section 6204(a) lays out a litany of CEO powers and responsibilities. But subsection (b) qualifies each power, stating that "in carrying out [his] *functions*, [the CEO] shall *respect* the professional independence and integrity of . . . the broadcasting services." 22 U.S.C. § 6204(b) (emphasis added). Those "functions" are the powers delineated in Section 6204(a), and in deploying any such function, the CEO must "respect"—or "refrain from interfering with"—the networks' independence. "Respect," Merriam-Webster, https://bit.ly/35HEfwO.

In fact, until Michael Pack took power, all three branches of government unanimously agreed that federal law requires a firewall to protect the credibility of the USAGM networks' journalists. The D.C. Circuit confirmed Congress's clear intent construing a predecessor statute to the IBA in *Ralis v. RFE/RL*, saying "Congress's intent has been manifest that [the USAGM networks] are to enjoy independence in programming and broadcasting decisions." 770 F.2d 1121, 1125 (D.C. Cir. 1985). And according to a later House Report accompanying a statute that

amended the IBA, the Act "provides a '*firewall*' [around] the broadcasters to ensure the integrity of the journalism," and under which "the journalists themselves will be shielded from political interference."  H.R. Conf. Rep. No. 105-432, at 126 (1998) (emphasis added).  Congress made clear time and again that it had created an "'asbestos firewall' between the Executive Branch and the daily operation of the radios," S. Rep. 103-07 (1993); Compl. ¶¶ 28–41 (delineating statutory and legislative history); Cull Decl. ¶¶ 7–20.  The executive branch has agreed completely. President Obama, in signing the statute that created the CEO position, stated that the statute "retains the longstanding statutory firewall, protecting against interference with and maintaining the professional independence of the agency's journalists and broadcasters and thus their credibility as sources of independent news and information."  Compl. ¶ 37; *OTF*, 2020 WL 3605935, at *2.  And the Secretary of State's office voted in favor of the firewall regulation, 22 C.F.R. § 531.3(c), which itself confirmed the importance of the statutory firewall and codified historical practices implementing it.  Turner Supp'l. Decl. ¶ 3.

Finally, contrary to Defendants' contentions, the statutory firewall provides meaningful standards for enforcement, as this Court already recognized in *OTF*.  2020 WL 3605935, at *11. And Defendants' actions—including their interference in hiring and firing journalists, attempts to influence coverage decisions, and launching of investigations into journalistic conduct—represent seizures of day-to-day control of the USAGM networks and breaches of the highest standards of professional journalism, and thus violate the statutory firewall.  Of the many firewall violations that Plaintiffs have established, Defendants identify five that they claim to have had statutory authority to perpetrate.  Def. Opp. 25–26.  But Plaintiffs' uncontested evidence demonstrates that each of these actions violated the firewall because they are incompatible with the highest standards

15

of professional broadcast journalism, 22 U.S.C. § 6202(a)(5).[5]  *See, e.g.*, Bennett Decl. ¶¶ 23–31; Turner Decl. ¶¶ 26–29, 31–35; Pl. Br. 19–28.  Put simply, the firewall is binding, and Defendants violated it.  Plaintiffs are likely to succeed on the merits.

### B.    Defendants' "Repeal" Of The Firewall Regulation 50 Minutes Before Filing Their Opposition Brief Is Ineffective.

Plaintiffs' motion seeks an order enjoining Defendants from violating the Firewall Regulation, 22 C.F.R. § 531, *et seq.*  The Firewall Regulation was the product of a multi-year study and review—starting in 2016, long before Pack was even nominated—and was ultimately passed unanimously by the then-governing board, including a representative of the Secretary of State's office.  *See* 85 Fed. Reg. 36150.  The regulation codified what had long been clear under federal statute:  that Voice of America and its sister networks are "independent" and that a "firewall" ensures their protection from political interference.  22 C.F.R. 531.3(c); 22 U.S.C. §§ 6202, 6204.

Fifty minutes before Plaintiffs filed their brief opposing this motion, Defendants issued a press release purporting to repeal the Firewall Regulation.  Supp'l Crain Decl. Exs. 1, 6.  This repeal is brazenly unlawful.  Plaintiffs' motion sought an order preliminarily enjoining Defendants from violating the regulatory firewall, as well as the IBA and the First Amendment.  Proposed Order at a, f, Dkt. No. 12-72.  To effectuate that request, this Court should enjoin Defendants'

---

[5]  Defendants' representations concerning certain of their firewall violations are inaccurate.  For instance, Defendants claim that they reassigned Steven Springer to work for USAGM, so that Defendant Pack could "retain[] Mr. Springer's services for himself."  Def. Opp. 25.  But the record establishes Defendants did not provide Springer with any job responsibilities in his reassigned role; his reassignment was intended purely to sideline VOA's Standards Editor.  *E.g.*, Roe Decl. ¶ 6; Sugawara Decl. ¶ 18.  Similarly, contrary to Defendants' misleading invocation of Amanda Bennett's testimony, Def. Opp. 25, Ms. Bennett—an award-winning journalist—testified that best journalistic practices require that a publisher, analogous to USAGM, never compel an editor to make personnel decisions.  Bennett Decl. ¶ 13.  Finally, Defendants claim that Plaintiffs do not identify any instance in which Defendants interfered with coverage decisions.  Def. Opp. 25–26.  This, too, is false.  Defendant Dewey pressured reporters to defend their coverage and specifically suggested certain pro-administration stories that they might cover.  Compl. ¶ 87; Roe Decl. ¶ 15.  And in any event, Defendants have now conceded that their ultimate aim is to control content.  Repeal at 19.

unlawful "repeal" of that regulation, too, because it also violates the APA:  it is not in accordance with law, is unconstitutional, and is arbitrary and capricious to boot.  5 U.S.C. § 706.

***Not In Accordance With Law.***  The legal theory underlying the Repeal is that the firewall protecting the networks from political interference simply does not exist.  Rather than protecting the networks from political control, the IBA—according to Defendants—and "Article II" "*mandate*" that the CEO "control content."  Repeal at 19 (emphasis added); *see id.* at 14.  That conclusion is plainly contrary to law.  *See supra* Arg. Pt. III.A.  The IBA codifies the firewall:  it forbids Defendants from interfering with the editorial independence of the USAGM networks. The undisputed record in this case makes clear that a firewall between publishers (here, Pack and other USAGM management) and journalists is *essential* to the "highest professional standards of journalism," 22 U.S.C. § 6202(a)(5).  Pl. Br. 2–3.  The notion that the IBA allows—let alone obligates—USAGM's CEO to ignore the longstanding independence of the networks has no support whatsoever in the clear statutory text.[6]   And the Presidential signing statement that accompanied the statute creating the CEO position, Compl. ¶ 37 (citing signing statement), together with the fact that the Secretary of State's office voted in favor of the firewall regulation, Turner Supp'l. Decl. ¶ 3, render specious Defendants' notion that the firewall interferes with Article II and hampers foreign policy powers.  Repeal at 11–12, 18.  Repealing the firewall regulation, and purporting to obliterate the networks' independence, is not in accordance with the IBA and so is "not in accordance with law."  5 U.S.C. § 706(2)(A).  *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 505 (9th Cir. 2018) ("[I]t is black letter law that where an agency purports to act solely on the basis that a certain result is legally required, and that

---

[6]  Were there any doubt of Congress's intent, the currently pending National Defense Authorization Act passed by the House of Representatives provided that USAGM "may not revise part 531 of title 22, Code of Federal Regulations . . . without explicit authorization by an Act of Congress."  H. R. 6395, 116th Cong. (2020).

legal premise turns out to be incorrect, the action must be set aside.") (quoting *SEC v. Chenery*, 318 U.S. 80, 94 (1943)), *rev'd in part, vacated in part on other grounds*, 140 S. Ct. 1891 (2020); *Sea-land Serv., Inc. v. Dep't of Treasury*, 137 F.3d 640, 646 (D.C. Cir. 1998) (agency action "based . . . on an erroneous view of the law" "cannot be sustained" (citation omitted)).

*Unconstitutional.*   Defendants' purported repeal of the regulation and their claimed content-control authority violates the First Amendment.  Repeal at 19; *see id.* at 14.  Congress has always intended the USAGM networks to operate like commercial news media, and for its journalists to enjoy First Amendment protections.  Pl. Br. 29–33; RCFP Amici Br. 8–16.  As the legislative history makes clear, "[a]lthough VOA correspondents are on the federal payroll, they are unique in that they are working journalists."  S. Rep. No. 107-60 at 24  (2001); *See* Compl. ¶¶ 28–41.   As *amici* explain, government control of press content is anathema to the First Amendment, which applies to USAGM journalists.  RCFP Amici 7 (citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring)); *Nat'l Broad. Co. v. F.C.C.*, 516 F.2d 1101, 1111 (D.C. Cir. 1974) (There is a "tradition against inhibition of the journalists' freedom.   That tradition, which exerts a powerful countervailing force, is rooted in the constitutional guarantee of freedom of the press."); *infra* at Arg. Pt. III.C.  Yet that is precisely what Defendants' repeal seeks to effectuate.  Repeal at 19.

*Arbitrary & Capricious.*  Action is arbitrary and capricious if an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1110 (D.C. Cir. 2019) (citation omitted).  The Repeal is arbitrary and capricious for at least four reasons.

*First*, the Repeal reflects capricious abandonment of prior policy.  "In such cases, . . . a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).  The agency must show "'good reasons' for the new policy," and it "cannot ignore its prior factual findings that contradict its new policy."  *Nat'l Lifeline Ass'n*, 921 F.3d at 1111.

Here, Defendants failed to engage with the agency's prior policy at all.  When the firewall regulation was promulgated USAGM concluded that the statutorily mandated firewall was "essential to ensuring the continued credibility and therefore effectiveness of the journalism provided by USAGM funded networks" and that it is "consistent with the law, the highest standards of professional journalism, and [USAGM's own] longstanding practice."  85 Fed. Reg. 36150–01 (June 15, 2020).  Defendants hardly engage with *any* of this prior reasoning.  For example, whereas USAGM previously saw "credibility" as key to its networks' "effectiveness," the Repeal does not address "credibility" or why it matters.  The Repeal offers nothing to suggest that Defendants considered whether the networks could operate credibly or effectively without the firewall (they can't, *see, e.g.*, Cull Decl. ¶ 18) and with a politically appointed CEO exercising content control.  Nor do they provide any reason to dispute the prior regulation's findings that a firewall is core to the highest professional standards of journalism.  *Encino Motorcars*, 136 S. Ct. at 2126 ("[U]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." (citation omitted)).

*Second*, valid agency action must be the result of "reasoned decisionmaking," which is assessed by making a "searching and careful inquiry of the record" to ensure the "decision [is] supported by substantial evidence in the administration record."  *Nat'l Lifeline Ass'n*, 921 F.3d at 1111 (citations omitted).  But the Repeal cites no facts or factfinding supporting any of its

19

contentions.  *See, e.g.*, Repeal at 28.  Instead, the Repeal proffers hypotheticals and speculation to support a seemingly preconceived conclusion that the firewall is "unworkable,"  Repeal at 24, and that the firewall must be done away with due to its "statutory mandate," Repeal at 3–4; *id.* at 12 (citing "USAGM's mandate"); *id.* at 14 (entitling a heading as being about "USAGM's Statutory Mandate").  Defendants' fact-free conclusion that the firewall is "unworkable" is particularly alarming given the substantial evidence to the contrary known both to them and to the Court.  *OTF*, 2020 WL 3605935, at *11; Pl. Br. 19–28; *see also* Turner Supp'l. Decl. ¶¶ 5–9.[7]

*Third*, the decision to repeal the firewall "failed to consider important aspect[s] of the problem."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910 (2020) (internal alterations omitted).  Defendants failed, for instance, to consider the impact of their assertion of broad content-control authority on the credibility of the USAGM networks.  Repeal at 19; *see* Cull Decl. ¶¶ 18, 20; Ex. 6 at 2.  Defendants also failed to consider any alternatives to full repeal, as an agency must.  *Regents*, 140 S. Ct. at 1912 (faulting DHS for scrapping a policy in its entirety on the basis of perceived illegality).  Here, even if Defendants are right that the firewall is illegal or unworkable (they are not), "total rescission was arbitrary and capricious."  *Id.* Defendants should have at minimum considered if *any* parts of the regulation could be retained, or whether some other form of regulation could remain.  Nothing in the Repeal "establish[es] that [Defendants] considered [any] option" other than total rescission.  *Cf. id.* at 1913.

*Fourth*, the Repeal's proffered justifications are pretextual.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).  An agency's "explanation" for its actions "'must be viewed

---

[7]  Defendants' brief states that the Repeal occurred "[a]fter an exhaustive review process and interagency consultation," yet the purported Repeal itself identifies no such process.  Def. Opp. 26.  Rather, it states merely that Defendant Pack "directed a review of the Regulation and sought external legal counsel."  Knapp Ex. 1 at 4. Plaintiffs intend to seek discovery to elucidate the nature of this apparent "exhaustive review process," and the nature of external counsel's involvement.

critically' to ensure that the [action] is not upheld on the basis of impermissible '*post hoc* rationalization.'" *Regents*, 140 S. Ct. at 1908.  Tellingly, the Repeal was issued *50 minutes* before Defendants filed their opposition brief and thus constitutes a misguided tack to improve Defendants' chances in this litigation.  Because Defendants could not rebut *any* of Plaintiffs' evidence or facts, they resorted to attempting to change the law.  Their pretextual *post hoc* rationalizations to justify their litigation strategy render the Repeal illegal.  *See id.* at 1909.

In sum, whether pursuant to statutory or regulatory text, Defendants must "respect" the independence of the USAGM networks and the firewall.  They have failed to do that, and should be preliminarily enjoined from doing so again.

### C.    Defendants Are Likely To Succeed On Their First Amendment Claim.

In the face of Plaintiffs' overwhelming and undisputed factual record, Defendants have effectively conceded that they have:  (i) attempted to control, suppress, and influence the content of journalistic speech; (ii) chilled the journalists' First Amendment rights; and (iii) engaged in discrimination based on perceived viewpoints.[8]  *See FTC v. World Patent Mktg., Inc.*, 2017 WL 3508639, at *14 (S.D. Fla. Aug. 16, 2017) (granting preliminary injunction where defendants failed to provide any evidence rebutting the statements contained in plaintiffs' declarations).  Defendants argue in response only that they are authorized to trample upon core First Amendment freedoms because the journalists' reporting is pursuant to "official duties."  Defendants' argument ignores Congress's express directives and misunderstands the doctrine of public employee speech.  *See* RCFP Amici 11–16.

---

[8]  Defendants do present brief arguments concerning the investigation of Steve Herman and issues concerning their October 4, 2020 conflict of interest policy, but their arguments misconstrue Plaintiffs' allegations.  Def. Opp. 31 n.10.  Defendants' improper investigation into Steve Herman is motivated by a desire to retaliate against his perceived viewpoint, not only his involvement in the letter sent to acting VOA leadership.  And Defendants' conflict of interest policy emits an unconstitutional chill because of its overbreadth and vagueness, conferring on governmental actors (USAGM) unfettered discretion to forbid reporters from covering any subject in which they have a "personal interest."  Ex. 49; Pl. Br. 35–36.

When the government creates a public institution, it is empowered to imbue that institution with constitutional protections to which the institution would not otherwise be entitled. *See Husain v. Springer*, 494 F.3d 108, 121–24 (2d Cir. 2007) (when the state creates a student newspaper and imposes no *ex ante* restrictions on its content, it is granted First Amendment rights). That is precisely what Congress did with the USAGM network journalists. Congress understood that, though they are journalists "on the federal payroll, they are unique in that they are working journalists." S. Rep. No. 107-60, at 24 (2001). The only way to ensure that the networks could provide "news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(b)(1), and "win the attention and respect of listeners," 22 U.S.C. § 6202(c), without devolving into state-funded propaganda, was to grant the networks and their journalists editorial independence from USAGM, and to endow the journalists with First Amendment protection.[9] Indeed, the IBA is replete with evidence of Congress's intent that USAGM networks be conducted as credible, professional news outlets, vested with full First Amendment protections. 22 U.S.C. § 6202(a)(5) (requiring that the networks conduct themselves "in accordance with the highest professional standards of broadcast journalism"); 22 U.S.C. § 6204(b) (mandating that USAGM leadership respect the professional independence and integrity of the . . . broadcasting services").

Courts across the country have long recognized the government's ability to confer First Amendment rights upon federal employees, even when acting pursuant to their official duties. *See, e.g.*, *Demers v. Austin*, 746 F.3d 402, 410–13 (9th Cir. 2014) (declining to extend *Garcetti* to public employee speech "related to scholarship or teaching" because such teaching and writing are a

---

[9] The logical implication of Defendants' argument to the contrary is that the government can never establish an international broadcasting system that is anything but state-run propaganda. Such a severe hampering of legislative authority cannot be right. *See Navab-Safavi v. Glassman*, 637 F.3d 311, 316 (D.C. Cir. 2011) (VOA's interest in maintaining an appearance of "the highest journalistic credibility" was of constitutional weight).

special concern of the First Amendment); RCFP Amici 14 (analyzing case law and positing that when a state decides to run a university like a university, First Amendment protections attach."). In *Tripp v. Dep't of Defense*, a court in this district upheld the First Amendment rights of reporters working for the *Stars and Stripes*, a newspaper "published and financed" and "owned and controlled" by the Department of Defense.  284 F. Supp. 2d 50, 55–57 & n.3 (D.D.C. 2003). Because Congress intended "information . . . published in Stars and Stripes to be free of interference from the DOD chain of command, provided it is balanced, accurate, and of interest to the readership," those reporters were entitled to First Amendment protections, no matter that they were public employees operating pursuant to their official duties.  *Id.* at 56.

*Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006) is inapposite.  *See* RCFP Amici 11–16. *Garcetti*'s limitations of First Amendment protection of government employees (there, a deputy district attorney) stems from "the exercise of employer control over what the employer itself has commissioned or created."  *Id.*  But both the statutory and regulatory firewall make clear that Congress did not grant Defendants employer-power over the network journalists.  *OTF*, 2020 WL 3605935, at *11; 22 C.F.R. § 531.3(c); 22 U.S.C. § 6202(a)(5); Bennett Decl. ¶¶ 17–22  Rather, the power to oversee journalists was vested in supervisors who operate on the journalistic side of the firewall,[10] "in accordance with the highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5).[11]  *See, e.g.*, Bennett Decl. ¶¶ 12–13, 17–22.  Because Defendants lack control over the journalists and the day-to-day operation of the networks, their attempts to influence, chill, and discriminate against the journalists' reporting violate the First Amendment.

---

[10]  Defendants assert, without support, that there is no distinction between an editor, who operates on the journalistic side of the firewall, and Defendants.  Plaintiffs have provided ample evidence that a distinction clearly exists, and that Defendants are akin to publishers who may not breach the firewall.  Bennett Decl. ¶¶ 17–22.

[11]  Thus, in *Jangjoo* v. *Board of Broadcasting Governors*, 244 F. Supp. 3d 160, 173 n.6 (D.D.C. 2017) it was permissible for a VOA journalist supervisor within VOA to exercise control over the journalists' coverage.  The same is true in *Achagzai v. Broad. Bd. of Governors*, 2016 WL 471274, at *8 (D.D.C. Feb. 8, 2016), and the court's passing reference to the government speech doctrine is dicta.

IV.   **Plaintiffs Would Suffer Irreparable Harm Absent Relief And The Equities Weigh Decidedly in Plaintiffs' Favor.**

Every day Defendants violate the firewall causes more irreparable harm, including but not limited to diminishing Plaintiffs' reputations, Powers Supp'l. Decl. ¶¶ 19–23, and chilling protected journalistic activity.   While this damage can never be fully corrected, a preliminary injunction can stem the tide.   *See* Pl. Br. 41–44.

In response, Defendants primarily argue that preliminary injunctions cannot remedy third-party harms, even while conceding that courts have held to the contrary.   Def. Opp. 38.   The third-party standing doctrine would cease to exist were that the case.   For that reason, Courts in this district have granted preliminary injunctions on the basis of the First Amendment rights of third parties, *see Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 114–18, 129 (D.D.C. 2012) (addressing irreparable "loss of First Amendment freedoms" after finding plaintiff corporation "ha[d] standing to assert its owners' free exercise rights"), and courts in this circuit regularly evaluate irreparable injury based on harms to parties not before the court, *see, e.g.*, *Nat'l Wildlife Fed'n v. Burford*, 676 F. Supp. 271, 278 (D.D.C. 1985) ("We have no problem in holding that defendants' actions in lifting protective land restrictions will irreparably injure plaintiff's members unless enjoined."), *aff'd*, 835 F.2d 305 (D.C. Cir. 1987).   Moreover, the other cases Defendants cite are not First Amendment cases, but merely cases in which the courts found that the facts before them did not justify the relief sought.[12]   And Defendants' resort to Article III standing cases can be rejected for "elid[ing] Article III's standing test and equity's irreparable harm analysis . . . [as] the concepts of an Article III cognizable injury and an irreparable harm are not coterminous."   *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 40 (D.D.C.

---

[12]   *See Arriva Med. LLC v. U.S. Dep't of Health & Human Servs.*, 239 F. Supp. 3d 266, 281 (D.D.C. 2017); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 212 (D.D.C. 2012).

2020).  Among other things, it is "settled" precedent both that only "one plaintiff" need meet "Article III's case-or-controversy requirement," and that the "irreparable harm" analysis looks to relevant third-party harms as well.  *See, e.g.*, *J.D. v. Azar*, 925 F.3d 1291, 1337–38 (D.C. Cir. 2019) (sustaining preliminary injunction based on analysis of irreparable harm to non-party class members); *Tyndale House*, 904 F. Supp. 2d at 129.  In any event, given the concrete and ongoing harms Plaintiffs are suffering due to Defendants' firewall violations, Powers Supp'l. Decl. ¶ 19–24, the proposed preliminary injunction will remedy Plaintiffs' first-party harms, too.  *See supra* at Section I.B.

Defendants' arguments on the balance of equities fail as well.  This is not a mere policy dispute, as Defendants suggest, Def. Opp. 40, but a case about unlawful and unconstitutional action.  Defendants' bald invocation of foreign policy does not help their cause.  As the bipartisan backlash to Defendants' actions makes clear, Compl. ¶¶ 43, 53, 74, 116–19, 137; Crain Supp'l. Exs. 3–6, the firewall *does* advance foreign policy in the manner chosen by Congress.  Defendants' breaches of the laws of the United States—not a preliminary injunction preventing them—are harmful to foreign policy.  And, in any event, whether the firewall is good policy or not is irrelevant, as it is required by law.  It is axiomatic that the government has no interest in violating the law or the First Amendment.  Pl. Br. 44–45.

## CONCLUSION

Plaintiffs respectfully request that this Court grant Plaintiffs' motion for a preliminary injunction and enter an order substantially similar to the order Plaintiffs have proposed as well as preliminarily enjoin the Repeal of the firewall regulation, 22 C.F.R. § 531.3, *et seq*.

Dated:  November 2, 2020

GIBSON, DUNN & CRUTCHER LLP

By:   _/s/ Theodore J. Boutrous, Jr._
Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Mylan L. Denerstein (admitted *pro hac vice*)
Zainab Ahmad (admitted *pro hac vice*)
Lee R. Crain (D.D.C. Bar No. NY0337)
Alexandra Grossbaum (admitted *pro hac vice*)
Lauren M. Kole (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166-0193
Tel:  212.351.4000
MDenerstein@gibsondunn.com
Zahmad@gibsondunn.com
LCrain@gibsondunn.com
AGrossbaum@gibsondunn.com
LKole@gibsondunn.com

Joshua S. Lipshutz (D.C. Bar No. 1033391)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
JLipshutz@gibsondunn.com

*Counsel for Plaintiffs*