# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GRANT TURNER, MARIE LENNON, SHAWN POWERS, MATTHEW WALSH, and HOANG OANH TRAN,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. AGENCY FOR GLOBAL MEDIA, MICHAEL PACK, SAMUEL E. DEWEY, DIANE CULLO, EMILY NEWMAN, MORVARED NAMDARKHAN (A/K/A MORA NAMDAR), and FRANK WUCO,<br><br>*Defendants.* | Case No. 20-cv-2885 |

## DECLARATION OF DR. NICHOLAS J. CULL IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Nicholas J. Cull, Ph.D. hereby declare under penalty of perjury that the following is true and correct:

1. I am a historian of public diplomacy and communication with over three decades of experience researching and writing on public diplomacy and the roles of advocacy, culture, exchange, broadcasting, and public opinion research in foreign policy. I am the first and only historian to write and publish a book on public diplomacy during the entirety of the Cold War, relying on declassified archives and more than 100 interviews with veterans of public diplomacy, including numerous surviving Cold War-era staff members of Voice of America. Similarly, I am the first and only historian to write and publish a book on post-Cold War public diplomacy from 1989 to 2001, relying on archives and interviews of government officials. My academic work

and research has provided me with deep and unique historical knowledge in particular on Voice of America and the history of international broadcasting efforts both in the United States and abroad.

## EDUCATIONAL & PROFESSIONAL BACKGROUND

2.  I am a historian and professor of communication and public diplomacy at the University of Southern California Annenberg School of Communication and Journalism, where I was the founding director of the Master's in Public Diplomacy program from 2005 to 2019. My research and teaching interests are broad and inter-disciplinary, though I have devoted a significant part of my career to conducting detailed historical studies of the institutions behind public diplomacy like Voice of America.

3.  I earned both my B.A. and Ph.D. at the University Leeds. I studied at Princeton University as a Harkness Fellow of the Commonwealth Fund of New York. From 1992 to 1997, I was a Lecturer in American History at the University of Birmingham, and from 1997 to 2005, Chair in American Studies and Director of the Centre for American Studies at the University of Leicester. While serving as professor and director of the Master's in Public Diplomacy program at the University of Southern California from 2005 to 2019, I also served as president of the International Association for Media and History, a scholarly organization dedicated to the research of the history of media.

4.  In addition to authoring the aforementioned books on Cold War and post-Cold War diplomacy—including "The Cold War and the United States Information Agency: American Propaganda and Public Diplomacy, 1945–1989" (Cambridge Uni. Press, 2008) and "The Decline and Fall of the United States Information Agency: American Public Diplomacy 1989-2001" (Palgrave, 2012), respectively—I have individually authored two additional books:

"Selling War: The British Propaganda Campaign Against American 'Neutrality' in World War II" (Oxford Uni. Press, 1995) and "Public Diplomacy: Foundations for Global Engagement in the Digital Age" (Polity, 2019).  I also co-authored "Projecting Empire: Imperialism and Popular Cinema" (I.B. Tauris, 2009) and "Projecting Tomorrow: Science Fiction and Popular Cinema" (I.B. Tauris, 2013).

5. I am the editor and co-editor of a number of books and collections including, most pertinently, "Propaganda and Mass Persuasion: A Historical Encyclopedia, 1500–present" (2003) and "Public Diplomacy in a Changing World" (2008).  My most recent edited works are "Routledge Handbook of Public Diplomacy" (Routledge, 2020) and "Canada's Public Diplomacy" (Palgrave, 2020).  I also drafted the entry on "Voice of America" in Wolfgang Donsbach (ed), *The International Encyclopedia of Communication*, Volume XI, Oxford UK and Malden, MA (Wiley-Blackwell 2008) at pp. 5327-5329.

6. From January 2012 to January 2019, I served as editor of the Journal of Place Branding and Public Diplomacy (published by Palgrave).  I presently serve on the board of the Public Diplomacy Council and I am a Fellow of the Royal Historical Society.  In addition to my work in academia, I also provide advice and training in public diplomacy to a number of foreign ministries and cultural agencies around the world including those of the U.S., U.K., Canada, Mexico, Switzerland, and the Netherlands.  Attached hereto as **Exhibit A** is my curriculum vitae.

## HISTORY OF THE VOICE OF AMERICA & THE FIREWALL

7. The history of Voice of America ("VOA") and American international broadcasting efforts has long faced competing policy tensions.  Every administration understands the importance of VOA's broadcasting yet, until now, has also recognized—consistent with the journalists' long-held views—that editorial independence is critical to the success of

international broadcasting efforts and any ultimate foreign policy aims.  Simply put, without credible news, global audiences will not tune in, and the influence of an international broadcaster will diminish.

8.  The United States Information Agency ("USIA") was created in 1953 to coordinate international broadcasting and media operations.  VOA radio, which had been founded in 1942, become a central part of USIA's global operation.  In its first broadcast, VOA made a promise: "The news may be good or bad. We shall tell you the truth."  President Dwight D. Eisenhower signed the VOA Charter in 1960, setting VOA's mission of delivering impartial and balanced news to listeners worldwide.

9.  Since VOA was founded, separating the administration of VOA (by political appointees) and VOA's journalists has been essential to the organization's mission of providing impartial and credible reporting.  Even before Congress formally enacted the statutory firewall, separation between the political appointees/management and the journalists existed forcefully.  At times, this separation was referred to as a firewall, editorial independence, buffering, or insulation.  In short, keeping political influence out of its reporting has been part of VOA's ethos since the beginning.  Certainly, every presidential administration would prefer that VOA's coverage of the government's activities be positive, and journalists always endeavor to be as objective as possible in their reporting.  Yet, ultimately, past administrations have understood and respected the independence of journalists.  In fact, one could say that the history of VOA is the history of the tension I identified above, the internal discussions surrounding it, and Congress's ultimate resolution of that tension in law in favor of independence.

10.  I have studied moments in history where VOA's independence has come under attack.  Each of these moments share critical commonalities, including representing

4

governmental interference in grave times of national crisis.  But even in these moments—almost all of which came before the enactment of the International Broadcasting Act of 1994 ("IBA")—governmental officials took extreme care to protect as much as possible VOA's editorial independence.  For instance, in October 1962 during the Cuban Missile Crisis, a foreign service officer sat in the newsroom at VOA reading everything that was written pertaining to the crisis.  The administration justified this level of oversight by the extremity of the situation and the possibility that any wrong statements might cause nuclear war.  But the Kennedy administration did not censor news merely because President Kennedy did not like the presentation of information about his administration, his policies, or his personhood.

11. Similarly, during the final weeks of the Vietnam War in the Spring of 1975, VOA was unable to report on particular aspects of the war and its journalists were prevented from publishing certain stories.  Administration officials justified these decisions based on operational concerns.  The Ford administration did not disapprove of the presentation of news about the President or his image—rather, the administration believed it needed to step in momentarily to ensure that international broadcasting did not endanger personnel on the ground.

12. Notwithstanding the seriousness of the Vietnam War situation, VOA journalists were so unhappy with the administration's interference that they pushed for the codification of the VOA Charter into law in 1976 to ensure separation and prevent future interferences.  Over a decade later, Richard Carlson, then-director of VOA, infamously pushed back against the George H.W. Bush administration and then-USIA director Bruce Gelb when Gelb attempted to influence VOA's coverage of China during the Tiananmen Square protests in 1989.  Bush and his principle advisors wanted VOA to report on Tiananmen Square in a manner that was conciliatory to the Chinese government.  When Gelb directed VOA to remove a particular story from its news

lineup, the head of the news division, Diane Doherty, refused to comply.  Carlson supported Doherty's decision, viewing Gelb's interference as a challenge to the VOA charter and its tradition of journalistic independence.  When Gelb later directed Carlson to not carry an interview with a newly freed Chinese dissident, Carlson aired the interview anyway.

13. A few years later, the separation was further codified into law with the IBA, which memorialized that VOA and its fellow international broadcasting networks are required to adhere to the "highest standards of professional broadcasting journalism," 22 U.S.C. § 6202(a)(5), and created the Broadcasting Board (which ultimately became USAGM), who was instructed to "respect the professional independence" of the "broadcasting services."  IBA § 305(c).  This codification resolved the longstanding tension I mentioned above, and resolved it in favor of VOA's editorial independence.

14. Weeks after the 9/11 attacks, the George W. Bush administration tried to prevent VOA's Pashto service from airing of an exclusive interview with Taliban leader, Mullah Omar, who was sheltering Osama bin Laden.  The State Department attempted to stop then-acting VOA director, Myrna Whitworth, from proceeding with the broadcast, calling Whitworth and members of the VOA board to express the administration's views.  The Bush administration was concerned that allowing Omar to speak directly to listeners was a dangerous move in the face of war.  VOA leadership considered the administration's views and ultimately decided to air segments from the Mullah Omar interview in a larger piece based on President Bush's statement to a joint session of Congress.  VOA also released a statement defending the coverage decisions to its critics, emphasizing that censorship of VOA's coverage damages its credibility with a worldwide audience.

15. These historical moments illustrate that the separation between the administration of VOA and its journalists has remained an integral part of VOA's ethos for over sixty years—so integral, that the separation was ultimately codified into statute as the "firewall." There have been only a handful of times when the government influenced VOA's news coverage—critically, such interference was during moments of extreme crisis such as war, and the interference was never taken lightly by either the administration or VOA. Nor has any successful interference of which I am aware occurred after the enactment of the IBA. The firewall continues to allow VOA journalists to provide audiences with balanced coverage of the news, uninfluenced by U.S. national and foreign policy interests.

## THE IMPACT OF FIREWALL VIOLATIONS

16. I have reviewed closely the regulation adopted at 22 C.F.R. § 531.1, *et seq.*, which clarified and codified into federal regulation the independence required by the IBA and the longstanding historical independence of VOA. I understand, however, that the current CEO of USAGM, Michael Pack, has moved to repeal this regulation. I have reviewed Mr. Pack's repeal, *see* Knapp Ex. 2, and the purported rationales for revoking the regulation and, incredibly, for Mr. Pack's broad invocation of authority to control editorial content, *see id.* at 19. My view is that Mr. Pack's arguments are specious, belied by historical practices, contrary to fact, and pose a grave threat to the international broadcasting of the United States.

17. Mr. Pack does not explain or excuse his editorial interferences with VOA on the basis of an existential crisis. Mr. Pack's actions are making a statement about the very principle of presidential oversight and the administration's desire to control the coverage and output of VOA—trying to resolve the tension between administrative control and independence in a way that plainly conflicts with the law as I understand it and historical practice. These are not the

final days of war. We do not sit on the precipice of a nuclear holocaust. Mr. Pack has no plausible historical justification for invading VOA's required editorial independence except for his view that VOA should fundamentally change.

18.   Mr. Pack has said that the firewall is harmful to the agency's and national interests. This is wrong as a matter of policy, history, and sound logic. A firewall is essential for international broadcasters to be credible in a world market. VOA operates in a highly competitive global media environment. VOA is not comparable to outlets like Radio Moscow or Radio Pyongyang—state-run "news" outlets—but if Mr. Pack's actions are allowed to continue unabated, those propaganda outlets may well become adequate comparators. Instead, VOA has long prided itself on adhering to models like that of the BBC. The BBC and organizations like it have a strong firewall between governmental and political actors and journalists and broadcasters. Taking away this kind of firewall, in practice, or in regulation, is not a step toward the BBC—one of the most successful news outlets (and therefore, one of the most influential mechanisms to advance foreign policy) in the world. Instead, obliterating the firewall as Mr. Pack appears to want to do is a step away from the BBC model and towards Radio Pyongyang. It is a step away from credibility, and no international broadcaster should take a step away from credibility.

19.   The Administration has countless tools at its disposal to control its public image and messaging—the Administration hosts press conferences, manages its own twitter feeds, and has control over press mechanisms of embassies around the world. Administrations further control their cultural messaging internationally through other media, such as exhibitions, documentary films, and exchanges. VOA and the global media is something different. VOA is not a propaganda outlet or a mouthpiece for government speech.

20. VOA has long been a form of cultural diplomacy. Not only does it deliver impartial new coverage, but it also demonstrates the best of journalistic practices and integrity to the rest of the world. By its nature, this means that VOA's reporting *must* be unbiased and *must* report the good and the bad because that is the only way to deliver truthful news coverage. This will always create tension between the reporter and government leadership. But Mr. Pack's invocation of absolute power to control *his* VOA is strange, dramatic, and unprecedented. He does not respect the tension (and Congress's attempts to resolve it). No good can come from his actions.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 1st day of November, 2020, in Los Angeles, California.

_____
Nicholas J. Cull, Ph.D.