IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GRANT TURNER
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

MARIE LENNON
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

SHAWN POWERS
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

MATTHEW WALSH
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

HOANG OANH TRAN
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

KELU CHAO
c/o Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036;

*Plaintiffs*,

    v.

U.S. AGENCY FOR GLOBAL MEDIA
Wilbur J. Cohen Federal Building
330 Independence Avenue SW
Washington, DC 20407;

**Case No. 20-cv-2885**

**AMENDED COMPLAINT**

MICHAEL PACK
Wilbur J. Cohen Federal Building
330 Independence Avenue SW
Washington, DC 20407;

SAMUEL E. DEWEY,
Wilbur J. Cohen Federal Building
330 Independence Avenue SW
Washington, DC 20407;

DIANE CULLO
Wilbur J. Cohen Federal Building
330 Independence Avenue SW
Washington, DC 20407;

EMILY NEWMAN
Wilbur J. Cohen Federal Building
330 Independence Avenue SW
Washington, DC 20407;

MORVARED NAMDARKHAN (aka MORA
NAMDAR)
Wilbur J. Cohen Federal Building
330 Independence Avenue SW
Washington, DC 20407;

FRANK WUCO
Wilbur J. Cohen Federal Building
330 Independence Avenue SW
Washington, DC 20407;

*Defendants*.

## INTRODUCTION

1.      This case is about the insidious politicization of journalism that threatens not only

our nation's publicly funded, independent media but also our nation's reputation for modeling

and defending a free press around the world.  In the United States, publicly funded journalism is

protected from government interference by a firewall much like privately funded journalism is

protected from corporate interference by similar mechanisms.  As a former Director of Voice of

America recently explained to the House Foreign Affairs Committee, "a firewall of sorts . . . exists in virtually every news organization . . . to allow journalists to operate independently without reference to any kind of pressure."[1]  Unlike in the private sector, the firewall protecting publicly funded journalism is enshrined in law: it stands between government officials on one side, and reporters on the other, protecting against even the *perception* that iconic outlets like Voice of America, Radio Free Europe, and Radio Free Asia are mere mouthpieces for the U.S. government.  The firewall protects the credibility of these networks, which is crucial to completing their mission of spreading free speech and independent media to audiences living under oppressive regimes across the globe.

2. Defendants include the recently installed leaders of the United States Agency for Global Media ("USAGM"), which supports Voice of America, Radio Free Europe/Radio Liberty, Radio Free Asia and other independent news networks.  USAGM networks have a weekly audience of over 350 million people, many of whom live in countries like Iran and China, where the notion of a free press, and of credible, reliable journalism, is entirely foreign.

3. The USAGM networks export America's greatest products: free speech and freedom of the press.  The networks serve the vital national goal of combatting disinformation worldwide—fighting propaganda and deception with truth and shoe-leather journalism.  It was Radio Free Asia, for instance, that broke the story of how China had underreported COVID-19 deaths in Wuhan, simply by calling funeral parlors and adding up the numbers.  And it was Voice of America and Radio Free Europe/Radio Liberty that created a 24/7 Russian-language global digital network to counter Russian propaganda worldwide.

---

[1]  Oversight of the United States Agency for Global Media and U.S. International Broadcasting Efforts: Hearing Before the H. Comm. on Foreign Affairs, 116th Cong. (Sept. 24, 2020) (statement of Amanda Bennett).

4.      As Defendants seek to tear down the integrity and credibility of the USAGM networks, the vacuum will be filled by propagandists whose messages will monopolize global airwaves without Voice of America, Radio Free Europe/Radio Liberty, Radio Free Asia, Middle East Broadcasting Networks, and Radio y Television Martì as credible voices to the contrary.

5.      The USAGM networks' ability to maintain credibility amongst their worldwide audience depends significantly on their ability to demonstrate their independence from the U.S. government.  The firewall is so important to USAGM's model, in fact, that it has been codified into law: Section 6204(b) of Title 22 of the United States Code provides that the Chief Executive Officer of USAGM "shall respect the professional independence and integrity of" Voice of America and the other USAGM networks.  And Section 531.3(c) of Title 22 of the Code of Federal Regulations provides that the required "firewall" prohibits "any person within the Executive Branch or a Network, but outside the newsroom" from even "attempt[ing] to *direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks* . . . in the performance of their journalistic and broadcasting duties and activities."  (emphasis added).  The firewall signifies that even though the networks are state *funded*, they are affirmatively not state-*run*.  They are free, independent journalistic outlets designed to function like the most credible and reputable private news organizations in the world.  The primary currency of the USAGM networks is their credibility, which turns largely on their political independence as guaranteed by the firewall.  Indeed, the firewall that exists to separate USAGM-funded journalism from *any* political considerations is more robust even than those firewalls that exist within private news organizations.

6.      Federal law requires that the USAGM networks operate under ethical standards as credible and reputable news organizations.  Specifically, the International Broadcasting Act

provides that USAGM networks must "conduct" themselves "in accordance with the highest professional standards of broadcast journalism." 22 U.S.C. § 6202(a)(5). One such professional standard—a practice built into the fabric of every great media organization—requires a firewall between the newsroom and the publishers, codified in 22 U.S.C. §§ 6202, 6204(b), and 22 C.F.R. § 531, *et seq.* Simply put, the highest standards of professional journalism require journalism to be free of interference from an organization's business team. Journalists must be free to write, report, publish, and broadcast stories about their outlet's sponsors, advertisers, and even publishers because the credibility of a news organization *is* its business model. Without offering news people can trust, journalism cannot survive.

7.     Defendants have chosen to disregard that principle entirely. They include the newly installed CEO of USAGM, Michael Pack, his team of political appointees, and others—all of whom have engaged in a campaign of unconstitutional and unlawful conduct to try to accomplish exactly what the firewall prohibits: "attempt[ing] to *direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks . . .* in the performance of their journalistic and broadcasting duties and activities." 22 U.S.C. § 531.3(c) (emphasis added).

8.     First and foremost, Defendants' systematic dismantlement of the firewall began with the removal of those who sought to protect it. They removed, for instance, David Kligerman—the General Counsel of USAGM who *wrote* the agency-promulgated regulation articulating the contours of the firewall, codified at 22 C.F.R. § 531, *et seq.* (the "Firewall Regulation"), and knows the exact limit of USAGM's authority. They also removed Steve Springer, the Standards Editor of Voice of America—a journalist with over 40 years of experience in journalistic ethics and best practices—for the purpose of sidelining Voice of

America's strongest and best internal institutional knowledge of how the firewall works. Defendants have also fired journalists like Executive Editor of Radio Free Asia Bay Fang, attempted to reassign journalists like Voice of America's New York Bureau Chief, and refused to allow Voice of America to hire and retain foreign journalists critical to running its dozens and dozens of foreign language services—employment actions that breach the firewall and have had the cumulative effect of suppressing and chilling journalistic expression.  Pack also regularly and recklessly disparages network journalists, claiming that being a journalist at one of the networks is "a great cover for a spy,"[2] and that those same journalists are "not reporting the news . . . in an objective balanced manner."[3]

9.      Secondly, Defendants have engaged in an improper and aggressive course of investigatory conduct designed to effectuate control over and chill journalistic activity. Defendants have conducted investigations on behalf of USAGM into the conduct of network journalists on the other side of the statutory firewall.  The investigations appear to be driven primarily by the content and perceived viewpoint of the pieces at play.  And regardless of the merit of any particular investigation, the firewall clearly mandates that investigations into journalistic conduct should be done by the networks themselves to avoid unlawfully influencing content or pressuring journalists into a particular perspective in their coverage.

10.      The investigations Defendants have launched are transparently partisan.  For example, Defendants investigated a video posted on Voice of America's Urdu service on the

---

[2]  Tristan Justice, *NPR Manipulates Federalist Interview with VOA on Behalf of Government Opposing Reform*, The Federalist, (Sept. 3, 2020), https://thefederalist.com/2020/09/03/npr-manipulates-federalist-interview-with-voa-executive-on-behalf-of-government-employees-opposing-reform/.

[3]  *Sara Carter Show: Michael Pack reveals stunning foreign influence in federal media agencies*, Radio America (Sept. 10, 2020), https://podcasts.apple.com/us/podcast/the-ricochet-audio-network-superfeed/id960814054.

*(Cont'd on next page)*

basis that it appeared to favor former Vice President Joe Biden in the 2020 presidential election. Similarly, Defendants have interrogated numerous reporters and copy editors about a single line in a profile of First Lady Melania Trump that stated that President Trump "has disparaged immigrants and regularly attacks perceived adversaries on Twitter"[4]  Over the course of these illegal investigations, Defendants—who are not journalists and have no experience with journalistic ethics whatsoever—have ordered the termination of journalists, interrogated witnesses, inquired of reporters as to whether stories are "balanced" where stories appear to misalign with Defendants' political perspectives, and demanded that journalists name names to identify others to interrogate.

11.     Third, and perhaps most dramatically, Defendants have moved to repeal the firewall regulation and to cast aside the firewall altogether.  On Monday October 26, 2020, Defendants—just fifty minutes before they filed a brief opposing Plaintiffs' motion for a preliminary injunction in this very matter—purported to repeal the firewall regulation, asserting both that the firewall violated the very statute that conferred on the networks their editorial independence and that the firewall violated Article II of the United States Constitution. Defendants concluded that these statutes and Article II actually *required* them to take control of journalistic content.

12.     These actions, including the putative repeal of the firewall regulation, are unconstitutional and unlawful; they must cease immediately.  Defendants have retaliated against members of USAGM's senior leadership, including several of the Plaintiffs, as well as against Voice of America journalists who have engaged in protected expressive conduct, and have

---

[4]  *But see, e.g.*, Eugene Scott, *Trump's most insulting—and violent—language is often reserved for immigrants*, Wash. Post, (Oct. 2, 2019, 3:21 PM EDT), https://www.washingtonpost.com/politics/2019/10/02/trumps-most-insulting-violent-language-is-often-reserved-immigrants/; *Donald Trump's 10 Most Offensive Tweets*, Forbes, https://www.forbes.com/pictures/flji45elmm/donald-trumps-10-most-of/#45008b9570df.

engaged in discrimination based on perceived viewpoint—all in clear contravention of the First Amendment.  Defendants have also violated the statutory and regulatory firewall that exists to prohibit the very type of misguided political interference in which they engage.

13.     Defendants' misdeeds—which show no signs of abatement and have only worsened—have caused Plaintiffs and others unquestionable irreparable harm.  Several of the Plaintiffs are the former leaders of USAGM whom Defendants have purged from their positions. And another Plaintiff is one of the most senior editorial members of Voice of America.  Plaintiffs have collectively spent the majority of their professional careers helping to build USAGM and its networks into a credible media force with global audiences in the hundreds of millions.  They are dedicated public servants of the utmost integrity whom Defendants have maligned without basis as incompetent and, even worse, potential spies.  Defendants' conduct threatens the credibility of Plaintiffs, the USAGM networks, their journalism, and all who are employed there, harming the networks' ability to recruit and hire high-caliber journalists and to engage in uncensored journalistic and expressive activity.  Defendants must be stopped.

14.     If Voice of America and the other USAGM networks are to survive Defendants' insidious stewardship, this Court must act.  It must enforce the firewall in the way Congress wrote it and the agency's own regulation construes it, providing that the firewall is "violated when any person within the Executive Branch or a Network, but outside the newsroom, attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence . . . the performance of [the USAGM networks'] journalistic and broadcasting duties."  22 C.F.R. § 531.3(c).  Federal law plainly provides that: "The firewall is *critical* to ensuring that the editors, reporters, and other journalists of the USAGM network[s] make the decisions on what stories to cover and how they are covered, and that those decisions are ultimately governed by

the highest standards of professional journalism." *Id.* § 531.3(d) (emphasis added).  This Court must enforce the firewall and must ensure the First Amendment rights of USAGM journalists and those who support them are preserved, protected, and defended.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1).  A substantial part of the events giving rise to this claim occurred in this District, and Defendants are officers of the United States sued in their official capacities.

## PARTIES

17.     Plaintiff Grant Turner has been a public servant for nearly two decades.  An expert in federal budgeting and financial management, Turner has served the United States during both Democratic and Republican administrations in the Government Accountability Office, the Office of Management and Budget, the Centers for Disease Control and Prevention, and USAGM.  Turner served as the Chief Financial Officer of USAGM between 2017 and 2019, when he was named interim CEO and Director of USAGM.  When Defendant Pack was confirmed to his position as CEO, Turner reverted to his position as CFO of USAGM until August 12, 2020, when, after making protected disclosures relating to Defendants' misconduct, he was placed on administrative leave purportedly on the ground that his security clearance had been improperly adjudicated.  Turner remains an employee of USAGM, is vigorously contesting the charges levied against him relating to his security clearance, and fully expects to be restored to his position as CFO.

18.     Plaintiff Marie Lennon has served the United States for nearly half a century, *i.e.*, her entire professional life.  After serving in various capacities in the Department of Defense and the Environmental Protection Agency, Lennon joined Voice of America in 1982, during the

Reagan Administration.  In 2003, she became Chief of Staff to Voice of America Director David Jackson.  In 2015, Lennon became the Director of Management Services for USAGM's predecessor organization, a title she continued to hold at USAGM.  As the Director of Management Services, Lennon oversees human resources, contracts, security, civil rights, administration, and workforce support and development.  On August 12, 2020, after making a number of protected disclosures relating to Defendants' misconduct, Lennon was placed on administrative leave purportedly on the ground that her security clearance had been improperly adjudicated.  Lennon remains an employee of USAGM, is vigorously contesting the charges levied against her relating to her security clearance, and fully expects to be restored to her position as Director of Management Services at USAGM.

19.    Plaintiff Shawn Powers was a tenured professor of comparative media law and policy prior to entering public service.  Before joining USAGM, Powers served as the Executive Director of the U.S. Advisory Commission on Public Diplomacy, a body authorized by Congress to oversee and promote government activities designed to inform and influence foreign publics. In July 2018, Powers joined the Broadcasting Board of Governors ("Broadcasting Board"), serving as a Senior Advisor focused on strategic planning, innovation, research and evaluation, and policy coordination.  In November 2019, Powers was promoted to serve as USAGM's Chief Strategy Officer, leading the agency's interagency engagement, strategic planning, strategic initiatives, and partnerships with key international stakeholders.  In this capacity, Powers oversees the agency's Office of Policy and Research, Office of Internet Freedom, and its Office of Policy.  On August 12, 2020, after making a number of protected disclosures relating to Defendants' misconduct, Powers was placed on administrative leave purportedly on the ground that his security clearance had been improperly adjudicated.  Powers remains an employee of

USAGM, is vigorously contesting the charges levied against him relating to his security clearance, and fully expects to be restored to his position as Chief Strategy Officer.

20.     Plaintiff Matthew Walsh has served the United States for more than a decade as a career civil servant.  Walsh worked for almost nine years in the United States Department of State, under four different Secretaries of State, before joining USAGM as Chief of Staff to then-CEO and Director John Lansing in 2017.  In February 2019, Walsh became the Deputy Director for Operations, responsible for overseeing the international operations of USAGM, managing most of its employees including executives such as the Director of Management Services, the Chief Information Officer, the Director of Technology, Services and Innovation, the Chief Risk Officer, and approximately 250 other staff members.  On August 12, 2020, after making a number of protected disclosures relating to Defendants' misconduct, Walsh was placed on administrative leave purportedly on the ground that his security clearance had been improperly adjudicated.  Walsh remains an employee of USAGM, is vigorously contesting the charges levied against him relating to his security clearance, and fully expects to be restored to his position as Deputy Director for Operations.

21.     Plaintiff Hoang Oanh Tran has served the United States and worked at USAGM (and its predecessor agency) for nearly three decades.  She joined the agency in 1992 as a Human Resources Specialist and joined the staff of the Broadcasting Board in 1999.  Tran has been steadily promoted through the agency's ranks, serving as Special Projects Officer, Director of Board Operations and Managing Director; since 2019, she has been the Executive Director of USAGM.  Tran is responsible for personnel-related issues, including resource planning and performance management of the senior staff who report to the CEO.  She facilitates and supports agency decision-making, policy, and communications from the CEO, including by facilitating

the transition of USAGM's prior Board of Governors leadership model to the current presidentially-appointed, Senate-confirmed CEO structure.  On August 12, 2020, after making a number of protected disclosures relating to Defendants' misconduct, Tran was placed on administrative leave purportedly on the ground that her security clearance had been improperly adjudicated.  Tran remains an employee of USAGM, is vigorously contesting the charges levied against her relating to her security clearance, and fully expects to be restored to her position as Executive Director of USAGM.

22.     Plaintiff Kelu Chao has served the United States and has proudly served Voice of America and USAGM (and its predecessor agency) with distinction for nearly four decades. After starting her Voice of America career as an intern, Chao has risen steadily through the ranks under both Republican and Democratic presidential administrations, including in stints as a studio announcer, field reporter, editor, Hong Kong Bureau Chief, Mandarin Service Chief, and East Asia Director.  One of the most impactful experiences she had as a reporter was covering President George H.W. Bush's visit to China, where she saw firsthand Voice of America's impact on a Chinese audience looking for credible, objective coverage of this event.  Chao served as Voice of America's first Language Programming Director from 2001 to 2007, and led the Broadcasting Board of Governors' Office of Performance Review from 2008 to 2014, overseeing the broadcast networks' quality control program.

23.     In 2014, Chao was named Voice of America's Program Director, overseeing Voice of America's production and distribution of television, radio, online, and mobile content. In this role, she provides direction and management support to Voice of America's News Center and foreign-language services, which distribute Voice of America news in 47 languages.  From June 2015 to April 2016, Chao served as Voice of America's Acting Director, overseeing all of

Voice of America's operations, before returning to her prior position as Program Director.  In both positions, Voice of America audience and impact reached new highs.  Chao is passionate about the mission of USAGM's broadcast networks, including Voice of America, of bringing credible, trusted, objective news to foreign audiences around the globe, and believes the firewall is of paramount importance in protecting journalists' ability to carry out that mission.  However, since Defendant Pack's confirmation in June 2020, Chao has observed numerous firewall violations and is concerned about the suffocating effect Defendants' efforts to influence the broadcasting networks' coverage will have on their ability to cover the news credibly, objectively, and independently.  Chao remains an employee of Voice of America and has joined this lawsuit to contest Defendants' numerous and significant breaches of the firewall.

24.     Defendant the United States Agency for Global Media is an independent agency that supports federally funded broadcast networks, including Voice of America, the Office of Cuba Broadcasting, Radio Free Asia, Radio Free Europe/Radio Liberty, and the Middle East Broadcasting Networks.  USAGM networks broadcast in 62 languages and reach a cumulative weekly audience of 350 million people in more than 100 countries.  They produce more than 3,000 hours of original programming each week.  The agency's annual budget is over $800 million for the current fiscal year.

25.     Defendant Michael Pack is the CEO of USAGM.  President Trump nominated Pack to serve as the USAGM CEO in 2018.  Pack's nomination languished in the Senate for two years, given bipartisan concerns about his competence, vision, and ethics, including questions raised by high-profile investigations into a non-profit organization he ran.  Nonetheless, on June

4, 2020, the Senate confirmed Pack in a 53-38 vote.  As CEO, Pack has explained that his "job really is to drain the swamp and to deal with [] issues of bias."[5]

26.     Defendant Samuel E. Dewey is an attorney and political appointee at USAGM hired by Pack.  Prior to joining USAGM earlier this year, Dewey worked as an attorney in the private sector and served as counsel in both Houses of Congress, where he conducted investigations for Republican members of Congress.  Dewey is active on Twitter, regularly tweeting politically controversial, pro-Trump, and anti-press sentiments.[6]  To Plaintiffs' knowledge, Dewey neither is nor has ever been a journalist or a news publisher.

27.     Defendant Emily Newman is the Chief of Staff to the CEO of USAGM, and was hired into that role by Defendant Pack.  Newman served as an advisor in the Department of Homeland Security in 2017 before transferring to the Department of Health and Human Services' ("HHS") Indian Health Service and later to a position in the White House as a liaison to HHS.  Previously, Newman worked as counsel for the Chairman of the U.S. Senate Committee on Indian Affairs, Senator John Barrasso, MD (R-WY) and practiced law in the private sector.  To Plaintiffs' knowledge, Newman neither is nor has ever been a journalist or a news publisher.

28.     Defendant Diane Cullo is Deputy Chief of Staff to the CEO of USAGM.  Cullo was appointed by Defendant Pack, after having served as Pack's White House-assigned "sherpa" during his lengthy nomination process.  It has been publicly reported that Senate aides had the impression that during the nomination Cullo had no knowledge of either how USAGM operated

---

[5]   Alex Ward, *Voice of America reporters: Trump-backed CEO "is failing" the US*, Vox, (Aug. 31, 2020, 1:30 PM EDT), https://www.vox.com/2020/8/31/21408467/voice-of-america-letter-michael-pack-trump.

[6]   *See, e.g.*, Samuel Dewey (@samueledewey), Twitter (Jul. 4, 2020) (retweeting "This is why the media is hated so much, and rightfully so.").

or its mission.  Prior to her current position, Cullo was an advisor at the Department of

Agriculture in the Office of Tribal Relations.  To Plaintiffs' knowledge, Cullo neither is nor has

ever been a journalist or a news publisher.

29.     Defendant Morvared Namdarkhan, professionally known as Mora Namdar, is an

attorney, and the Acting Vice President for Legal, Compliance, and Risk Management at

USAGM.  Prior to joining USAGM, Namdarkhan worked in governmental affairs for Occidental

Petroleum, and then served as a Special Assistant at the State Department for the Director of

Policy Planning, focusing on policy at Voice of America.  To Plaintiffs' knowledge,

Namdarkhan neither is nor has ever been a journalist or a news publisher.

30.     Defendant Frank Wuco is an advisor to Pack at USAGM.  Prior to joining

USAGM, Wuco was a senior advisor in the Bureau of Arms Control, Verification and

Compliance at the Department of State, and before that was a senior White House advisor to the

United States Department of Homeland Security.  To Plaintiffs' knowledge, Wuco neither is nor

has ever been a journalist or a news publisher.

## FACTUAL ALLEGATIONS

### *American Broadcasting Has Long Been Insulated From Political And Government Interference To Ensure Its Integrity And Journalistic Independence.*

31.     Government-funded journalism, reporting, and broadcasting have been a central

component of the United States' efforts to combat disinformation and propaganda abroad since

World War II.  Initially, U.S. government-funded international broadcasting provided news to

German audiences as a counterpoint to Nazi propaganda.  From there, coverage expanded to

Eastern Europe and the Soviet Union during the Cold War, and later to Cuba, Asia, and the

Middle East.  For the past eight decades, U.S. government-funded international broadcasting has

served millions of people around the world, especially in countries where governments prohibit

access to a free press and freedom of information.  Today, some of American broadcasting's biggest audiences are in Iran and China, where millions of people seek credible, impartial news uninfluenced by government agenda or politics.  American government-funded broadcasting services have played key roles in foreign policy by providing truthful information about local and world events where such information would otherwise be suppressed or censored.[7]  The global public's trust in the accuracy of reporting from these organizations is paramount to the success of their mission.

32.    America's government-funded journalism is housed under USAGM, an independent agency whose mission is "to inform, engage, and connect people around the world in support of freedom and democracy."[8]  USAGM oversees multiple broadcasting networks including Voice of America, the Office of Cuba Broadcasting, and four USAGM-funded organizations generally called the "grantees"—the Open Technology Fund, Radio Free Europe/Radio Liberty, Radio Free Asia, and the Middle East Broadcasting Networks.  The four grantees are private 501(c)(3) entities; their grant agreements are codified into law and the organizations are fully funded by government grants disbursed by USAGM.

---

[7]  As Chief Judge Howell explained recently,

> Notably, VOA Mandarin's service has extensive reach. Its "audience has continued to grow, particularly for its YouTube programs, which have reached roughly 100 million viewers. During the past year, VOA Mandarin reported on numerous topics that are sensitive to the [People's Republic of China ('PRC') ] government and generally banned, including Chinese dissident views, the mass detention of Uyghurs, political protests in Hong Kong, politics in Taiwan, and PRC 'misinformation' efforts. VOA also published articles in English and Chinese questioning China's COVID-19 numbers and timeline of events. VOA Mandarin's website received over 68 million visits from April 2019 to April 2020, including 4.5 million article views related to COVID-19 coverage." 2020 CRS Report at 2.

*Open Technology Fund v. Pack*, __ F. Supp. 3d ___, 2020 WL 3605935, at *3 n.3 (D.D.C. July 2, 2020).

[8]  U.S. Agency for Global Media, Who We Are, https://www.usagm.gov/who-we-are/, (last visited Oct. 2, 2020).

33.     Voice of America was the first of America's government-funded international broadcasters.  The network transmitted its first radio program to Europe in 1942, less than two months after the U.S. first entered World War II.  Its first broadcaster, writer and journalist, William Harlan Hale, inaugurated federally funded international broadcasting with the principle that has guided Voice of America—and Voice of America's sister networks—throughout its history: "We bring you voices from America.  Today, and daily from now on, we shall speak to you about America and the war.  *The news may be good for us.  The news may be bad.  But we shall tell you the truth*."

34.     Voice of America was founded to provide consistent and reliable news coverage to combat Nazi disinformation campaigns.  *See* Cong. Research Serv., RL. 435221, U.S. International Broadcasting: Background and Issues for Reform 1 (2016).  In 1948, President Harry S Truman signed the Smith-Mundt Act, authorizing Voice of America's post-war international broadcasting.  In 1976, President Ford signed into law the Voice of America Charter, setting forth three principles governing Voice of America broadcasting.  Pub. L. 94-350.  The Charter provided that Voice of America would: (1) "serve as a consistently reliable and authoritative source of news.  VOA news will be accurate, objective, and comprehensive"; (2) "will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions"; and (3) "present the policies of the United States clearly and effectively, and will also present responsible discussions and opinion on these policies."  *Id.*  The statute provided that Voice of America serves "[t]he long-range interests of the United States" and noted that "[t]o be effective, the Voice of America must win the *attention and respect of listeners*."  22 U.S.C. § 6202(c) (emphasis added).

35.     The federal government began to financially support other networks in the ensuing decades.  America launched Radio Free Europe and Radio Liberty in the early 1950s, which ultimately merged into one network in 1976.  Radio Free Europe began broadcasting to Central and Eastern Europe, and Radio Liberty to the Soviet Union, during the Cold War.  In 1973, Congress formalized its support of these broadcasting efforts, passing the International Broadcasting Act of 1973, which created the Board of International Broadcasting ("BIB").  The BIB was an independent government agency, led by a bipartisan board, which oversaw and funded Radio Free Europe and Radio Liberty from 1973 until 1994.

36.     In 1983, American broadcasting expanded into Cuba with the enactment of the Radio Broadcasting to Cuba Act.  That Act created a Cuba service within Voice of America. The Cuba service was moved to the Office of Cuba Broadcasting, an independent government agency.  The Office of Cuba Broadcasting had originally been created to oversee the operations of the federally funded Radio and TV Martí.  Radio and TV Martí—named after a renowned Cuban writer who fought Spain to gain Cuba's independence—provide news and entertainment programs to Cuba in Spanish.

37.     A decade later, Congress passed the International Broadcasting Act of 1994, (the "IBA"), Pub. L. 103-236, which repealed its 1973 predecessor and established the new Broadcasting Board, which later became USAGM.  The IBA articulated American policy as promoting "the right of freedom of opinion and expression, including the freedom 'to seek, receive, and impart information and ideas through any media and regardless of frontiers,' in accordance with Article 19 of the Universal Declaration of Human Rights."  IBA § 302(1).

38.     The IBA created the Broadcasting Board specifically to establish a firewall between the U.S. government and the government-funded broadcasting services that make

journalistic and editorial decisions.  The Broadcasting Board had nine bipartisan members who were statutorily required to enforce and protect the firewall that existed between the government and the journalists.  *See* IBA § 305(c) (articulating the existence of a firewall between anyone involved with any aspect of journalism (*e.g.*, the creation, editing, reporting, distributing, etc. of content) and everyone else in the government).  The firewall followed the tenor of regulations BIB had promulgated in 1985, "ensur[ing] that broadcasters would operate 'as independent broadcast media with professional independence.'"  *Open Technology Fund v. Pack*, __ F. Supp. 3d ___, 2020 WL 3605935, at *2 (D.D.C. July 2, 2020) (quoting 22 C.F.R. § 1300.1(b) (1985)).  As a Senate report explained, the statutory firewall was meant to "secure[] the professional independence and integrity of [the Agency's] broadcasting services" and serve as an "'asbestos firewall' between the Executive branch and the daily operation of the radios."  S. Rep. 103-107 (1993); *see also* H.R. Conf. Rep. 105-432 (to accompany H.R. 1757) at 127, March 10, 1998 ("The news gathering and reporting functions of the broadcasters must continue to be independent and objective.").  Over and over again, Congress recognized that "[a]lthough VOA correspondents are on the federal payroll, they are unique in that ***they are working journalists***.  Accordingly, their independent decisions on when and where to cover the news should not be governed by other considerations." H.R. Conference Report 107–671 (to accompany H.R. 1646), Sept 22, 2002 (emphasis added).  To support and reinforce the journalistic integrity and independence of United States international broadcasting, Section 303 of the IBA promulgated specific standards and principles that would govern that broadcasting.  Specifically, the act provided that the networks governed by the act must "conduct" themselves "in accordance with the highest professional standards of broadcast journalism."  IBA § 303(a); 22 U.S.C. § 6202(a)(5).  The statute also adopted the language of the Voice of America charter and applied

it to the other federally funded networks, providing that such broadcasting "shall include": (1) "news which is consistently reliable and authoritative, accurate, objective, and comprehensive"; (2) "a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society"; and (3) "clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies."  22 U.S.C. § 6202(b)(1)-(3); *see also id.* § 6202(c) (adopting near-identical language specific to Voice of America).

39.      In addition to codifying the firewall and establishing the core principles and standards of United States international broadcasting, the IBA also established Radio Free Asia. Radio Free Asia's statutory mission is to "provide accurate and timely information, news, and commentary about events in the respective countries of Asia and elsewhere" and "to be a forum for a variety of opinions and voices from within Asian nations whose people do not fully enjoy freedom of speech."  *See* IBA § 309(b); 22 U.S.C. § 6208(b).

40.      In 2017, the National Defense Authorization Act ("2017 NDAA") reorganized the structure of American international broadcasting once more, providing that at its helm would be a presidentially appointed and Senate-confirmed Chief Executive Officer.  The 2017 NDAA explicitly reaffirmed that the decades-old statutory firewall exists between the USAGM networks and applies to the CEO.  Specifically, the statute provided that "[t]he Secretary of State and the Chief Executive Officer, in carrying out their functions, ***shall respect the professional independence and integrity of the Board, its broadcasting services, and the grantees of the board.***"  22 U.S.C. § 6204(b); *accord Open Technology Fund*, 2020 WL 3605935, at *2.  In his signing statement, President Obama made clear that the statute "'retain[ed] the longstanding statutory firewall, protecting against interference with and maintaining the professional

independence of the agency's journalists and broadcasters and thus their credibility as sources of independent news and information.'" *Open Technology Fund*, 2020 WL 3605935, at *2 (quoting President Obama's Statement on Signing the National Defense Authorization Act for Fiscal Year 2017, 2016 DAILY COMP. PRES. Doc. 863, at 3 (Dec. 23, 2016)).

41.     On June 15, 2020, USAGM promulgated a regulation entitled *Firewall and Highest Standards of Professional Journalism*, also known as the Firewall Regulation.  The Firewall Regulation was passed unanimously by the Broadcasting Board and took effect on June 11, 2020.  *See* 85 Fed. Register 115,36151 (codified at 22 C.F.R. § 531).  As articulated in the Federal Register, the regulation would "codify a common-sense definition of the firewall, consistent with the law, the highest standards of professional journalism, and longstanding practice."  *Id.* at 36150-51.

42.     The Firewall Regulation makes clear that "USAGM networks *necessarily* enjoy full editorial independence in order to maintain their 'professional independence and integrity,' . . . insulating their editorial decisions from interference from those outside of the network, or from impermissible considerations, as set forth herein."  22 C.F.R. § 531.1(b).  The regulation also articulates that USAGM is permitted to "conduct[]" "oversight . . . in a manner consistent with that conducted by other media organizations which operate editorially independent news divisions that adhere to the highest standards of journalism."  *Id.*  And it provides that the "networks each enjoy *full editorial independence*."  *Id.* § 531.2(a) (emphasis added).

43.     The firewall "exists around USAGM-funded networks, their products, and staff in order to protect their professional independence and integrity."  22 C.F.R. § 531.3(a).  The firewall is like that applied "[w]ithin any credible news organization"—it separates "anybody

involved in *any* aspect of journalism (e.g., the creation, editing, reporting, distributing, etc., of content) and everyone else in the organization*." Id.* § 531.3(b).  "The firewall is *critical* to ensuring that the editors, reporters, and other journalists of the USAGM network[s] make the decisions on what stories to cover and how they are covered, and that those decisions are ultimately governed by the highest standards of professional journalism." *Id.* § 531.3(d) (emphasis added).

44.    The Firewall Regulation places strict limits on the interactions government officials—including those at USAGM—can have with members of the networks:

> This "firewall" is understood to be violated when ***any person*** within the Executive Branch or a Network, but ***outside the newsroom, attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks***, including their leadership, officers, employees, or staff, ***in the performance of their journalistic and broadcasting duties and activities***. It is also violated when someone inside the newsroom acts in furtherance of or pursuant to such impermissible influence. Such impermissible influence would undermine the journalistic and editorial independence, and thus the credibility, of that USAGM network, and their reporters, editors, or other journalists.

22 C.F.R. § 531.3(c).

### *President Trump Attacks the Agencies and Nominates Michael Pack, a Far-Right Documentarian With No Broadcast Journalism Leadership Experience, As USAGM CEO*

45.    In June 2018, the White House announced that President Trump intended to nominate Michael Pack as the CEO of USAGM.  The backlash was immediate.  Numerous media outlets expressed concern over the nomination.  The *Guardian* wrote that "[i]f Pack does become head of the [the Agency], critics fear that he will turn Voice of America and the other

[Agency] networks into a megaphone for Trump."[9]  There was broad concern that Pack's mission would be to subvert the credibility of the journalism thousands of people had spent decades building, and convert USAGM networks into "Trump TV" or another form of state-run propaganda.

46.     Pack's confirmation process quickly became bogged down.  Numerous Senators—from both major political parties—had concerns that Pack's experience as a documentary filmmaker would not provide the skill set necessary to lead an organization dedicated to broadcast journalism.  USAGM is an agency with a current annual budget of over $800 million, overseeing more than 3,000 employees.  On information and belief, Pack has never managed a budget or staff of that size.[10]

47.     As Pack's nomination languished, President Trump and the White House began pressuring the Senate to confirm Pack.  In April 2020, the President called Voice of America "the Voice of the Soviet Union"[11] and claimed that Voice of America was saying "disgusting [things] toward our country,"[12] and was "parroting Chinese talking points during its coronavirus

---

[9]   Arwa Mahdawi, *Michael Pack: the Bannon ally critics fear will become Trump's global propagandist*, The Guardian (June 6, 2018), https://www.theguardian.com/media/2018/jun/06/michael-pack-steve-bannon-ally-broadcasting-board-of-governors.

[10]  *See* Senate Committee on Foreign Relations, Testimony of Michael Pack, Sept. 19, 2019, https://www.foreign.senate.gov/imo/media/doc/091919_Pack_Testimony.pdf (describing past experience as running a "small business" "with 50 to 75 associates" at Manifold Productions, as well as running the Claremont Institute).  The Claremont Institute currently has a staff of 28. Claremont Institute, Leadership, https://www.claremont.org/leadership/ (last visited Oct. 2, 2020).

[11]  Alex Ward, *Trump and Steve Bannon want to turn a US-funded global media network into Breitbart 2.0*, Vox, (June 18, 2020, 6:00 PM EDT) https://www.vox.com/2020/6/18/21295549/trump-bannon-pack-global-media-china-wednesday-massacre.

[12]  Sarah Ellison, *How Trump's Obsessions with Media and Loyalty Coalesced in a Battle for Voice of America*, Wash. Post (June 19, 2020, 4:52 PM EDT), https://www.washingtonpost.com/lifestyle/media/how-trumps-obsessions-with-media-and-loyalty-coalesced-in-a-battle-for-voice-of-america/2020/06/19/f57dcfe0-b1b1-11ea-8758-bfd1d045525a_story.html.

*(Cont'd on next page)*

coverage."[13]  The White House later issued a statement that "VOA too often speaks for America's adversaries—not its citizens . . . . Journalists should report the facts, but VOA has instead amplified Beijing's propaganda."[14]  The President accused Voice of America of "spend[ing America's] money to promote foreign propaganda" "amid a pandemic."[15]  He called the broadcaster a "DISGRACE" and accused it of peddling Chinese and Iranian "propaganda."[16]

48.  Pack was confirmed on June 4, 2020 and sworn in as CEO of the agency four days later.  The President tweeted:



He specifically referenced a "big battle in Congress" that had been ongoing for 25 years.  The IBA was signed into law approximately 25 years before Pack's confirmation; that statute codified the statutory firewall as it exists today.

---

[13]  Ward, *supra* note 11.

[14]  David Folkenflik, *White House Attacks Voice of America Over China Coronavirus Coverage*, NPR, (Aug. 10, 2020, 6:14 PM ET), https://www.npr.org/2020/04/10/831988148/white-house-attacks-voice-of-america-over-china-coronavirus-coverage.

[15]  The White House, Amid a Pandemic, Voice of America Spends Your Money to Promote Foreign Propaganda, (Apr. 10, 2020), https://www.whitehouse.gov/articles/amid-a-pandemic-voice-of-america-spends-your-money-to-promote-foreign-propaganda/.

[16]  Paul Farhi, *With their visas in limbo, journalists at Voice of America worry that they'll be thrown out of America*, Wash. Post, (Aug. 2, 2020, 2:57 PM EDT), https://www.washingtonpost.com/lifestyle/media/with-their-visas-in-limbo-journalists-at-voice-of-america-worry-that-theyll-be-thrown-out-of-america/2020/08/02/e9882c8a-d33f-11ea-8d32-1ebf4e9d8e0d_story.html.

49.     On or about June 17, 2020 Pack held his first meeting with the senior staff of

USAGM, including Plaintiffs Shawn Powers, Hoang Oanh Tran, Marie Lennon, Grant Turner

and Matthew Walsh.  On information and belief, Pack had planned to fire these Plaintiffs at that

meeting.  The night before, however, Representative Eliot Engel, Chairman of the House Foreign

Relations Committee, issued a public statement warning against this course of action:

> I have learned that Michael Pack, the new CEO of the U.S. Agency
> for Global Media, intends to force out a number of the agency's
> career senior leadership tomorrow morning. My fear is that
> USAGM's role as an unbiased news organization is in jeopardy
> under his leadership. USAGM's mission is 'to inform, engage, and
> connect people around the world in support of freedom and
> democracy'—not to be a mouthpiece for the President in the run
> up to an election.
>
> . . .
>
> Mr. Pack should immediately reverse course and allow the
> nonpartisan public servants who run USAGM to keep doing their
> jobs. And Mr. Pack needs to understand that USAGM is not the
> Ministry of Information. The law requires that our international
> broadcasting be independent, unbiased, and targeted toward
> audiences around the world. USAGM broadcasters are credible
> only if audiences believe what they're seeing and hearing is the
> straight, unvarnished truth. I will use every tool at the Foreign
> Affairs Committee's disposal to make sure career employees are
> protected, the law is followed, and USAGM's credibility remains
> intact."[17]

On information and belief, prior to the meeting, Pack was informed that he lacked legal authority

to fire these Plaintiffs—career civil servants with unblemished employment histories—absent

valid rationales.

---

[17]   Press Release, Rep. Eliot L. Engel, Chairman, House Committee on Foreign Affairs, Engel Raises the Alarm on
Impending Firing Spree at USAGM (Jun. 16, 2020), https://foreignaffairs.house.gov/2020/6/engel-raises-the-
alarm-on-impending-firing-spree-at-usagm.

50.     Pack's planned purge of USAGM senior staff would thus have to wait.  The meeting lasted approximately 10 minutes.  Pack read from a script which thanked everyone for their service and then laid out his immediate plans.

51.     Pack implemented an immediate freeze of many of USAGM's core activities: (1) personnel actions (other than retirement); (2) contracting actions; and (3) technical migrations (IT projects).  After the meeting, Pack's Chief of Staff, Defendant Emily Newman, told the staff in an email that they were prohibited from communicating with external parties, severely hampering many of the USAGM Plaintiffs' ability to do their jobs and keep the agency running.  The freezes also precluded certain Plaintiffs from approving any administrative action and barred them from spending any funds, including previously approved expenditures.  Each of these limitations prohibited the USAGM Plaintiffs from undertaking actions that were essential to the functioning of the agency.

52.     Shortly after the meeting, Defendant Newman sent an email to all senior staff officially revoking all delegated authorities.  This included, for example, the delegated authorities which allowed senior staff to spend funds, hire staff, and approve contracts.

53.     These actions had immediate effect on USAGM and its thousands of employees.  Basic tasks like ordering toilet paper and contracting for cleaning services—essential during a pandemic—languished.  Numerous essential contracts lapsed.  At least two of the agency's news organizations—Radio Free Asia and Radio Free Europe/Radio Liberty—were brought to the brink of not being able to pay their employees.  On information and belief, the goal of Defendant Pack's actions was to strangle the news networks and remind them who was in control, thus ensuring that all the networks would take direction from USAGM without question in the future—*i.e.*, to have a chilling effect on the networks' freedoms of speech and press.

54.     On June 17, 2020, Pack unilaterally removed the Boards of each of the grantee networks and replaced them with largely unqualified members of the administration as well as an employee of Liberty Counsel Action, a conservative advocacy organization.[18]  Pack also removed the Presidents of each of the grantee networks, leaving their leadership teams weakened and diminishing their capacity to effectively manage themselves.

55.     The organizational heads dismissed the night of Wednesday, June 17, 2020 included Bay Fang, then President of Radio Free Asia.  Fang returned to her prior position as Executive Editor at Radio Free Asia—a journalistic position within the statutory and regulatory firewall.  Although the head of Voice of America, former Director Amanda Bennett, had resigned prior to Pack's purge of the network leaders, Voice of America was not spared.  The same day, Pack directed that Voice of America's Standards Editor, Steve Springer, be reassigned from that position.

56.     Pack's purge was quickly labeled the "Wednesday night massacre."  A bipartisan group of Senators condemned the purge immediately and pledged to review the agency's funding as a consequence:

> As the United States faces global challenges in the information space, it cannot afford to invest in an enterprise that denigrates its own journalists and staff to the satisfaction of dictators and despots, nor can it be one that fails to live up to its promise of providing access to a free and independent press.  Congress set up these networks, and its governance structure at USAGM, to preserve the grantees' independence so they can act as a bulwark against disinformation through credible journalism.[19]

---

[18]  *See Open Technology Fund*, 2020 WL 3605935, at *3–4.

[19]  Press Release, Sen. Marco Rubio, Rubio and Colleagues Send Letter to USAGM CEO Expressing Concern Following Recent Termination of Employees (July 1, 2020), https://www.rubio.senate.gov/public/index.cfm/2020/7/rubio-and-colleagues-send-letter-to-usagm-ceo-expressing-concern-following-recent-termination-of-employees.

### *Defendants Breach The Firewall Over And Over Again*

57.      In the ensuing weeks, Defendants started to aggressively change things at USAGM.  Their goal was to fundamentally remake USAGM into state-sponsored media.  To accomplish this, they needed to aggressively breach the statutory and regulatory firewall, cow the journalists into submission, and chill any expressive conduct that they deemed out of lockstep with the administration.

58.      ***Sidelining The Guardians Of The Firewall.***  A wall is only as good as the guardians who protect it.  Guardians of the USAGM firewall included agency stalwarts like David Kligerman, who wrote the very regulation that articulated the firewall's requirements. Kligerman spent much of his career advising government officials about the firewall, what it required, and what it prohibited.  He, along with Plaintiffs Turner, Lennon, Powers, Walsh, and Tran, were an essential bulwark against political interference with the agency's journalistic mission: they ensured that the firewall between USAGM and the newsrooms of the agency's news networks was maintained.  Thus, Defendants have drummed up sham justifications to remove these USAGM employees—public servants who took the firewall seriously and who would have served as impediments to Pack's unlawful mission to take control over the agency networks' journalistic content.  Other guardians of the firewall had been sidelined and purged by Defendants as well, including Steve Springer, the former Standards Editor of Voice of America, and Bay Fang, the former Executive Editor of Radio Free Asia.

59.      One of the central means by which Defendants have been able to exert undue and unlawful political influence over Voice of America's newsroom was by removing Steve Springer, Voice of America's longtime Standards Editor, from his role and forbidding Voice of America from bringing him back in that role.  The position of Standards Editor is a journalistic function ensuring the independence, integrity, and credibility of top-flight journalism.  Standards

Editors are essential to the functioning of a newsroom.  They are the guardians of journalistic best practices and ethics—what they say in that regard goes.  Their judgment and experience ensures that a news organization's reporting remains at the highest quality of journalistic independence.

60.     Steve Springer joined Voice of America after a storied career in journalism at CNN and other organizations.  Springer served as the editor to whom all Voice of America journalists could go to for firewall and other journalistic best practices and ethics questions. Springer trained all new employees throughout USAGM and the networks on the obligations imposed by the firewall to ensure that everyone understood and respected it.

61.     Springer was removed from his position on Pack's first day in office, hours before the famed Wednesday night massacre.  Springer was detailed to the role of a special assistant to Andre Mendes, CEO Pack's Chief Operating Officer, but was given no duties whatsoever; he had literally nothing to do for nearly five months.  Voice of America leadership, including Plaintiff Chao, communicated multiple times to USAGM officials that Voice of America wanted Springer to return and that his position was critical to Voice of America's mission of pursuing the highest professional standards of journalism.

62.     The removal of Steve Springer as the Standards Editor of Voice of America was done by or directed by Defendants in direct breach of the firewall.  No CEO of any reputable private news organization would have interfered with the Standards Editor position—or any position in the newsroom—or removed a Standards Editor, let alone one as experienced, professional, and capable as Steve Springer.  *Cf. See Open Technology Fund*, 2020 WL 3605935, at *11 n.19 (noting the "'equivalen[cy]' standard" that governs the minimal "direction and oversight" in which the CEO can engage).  The sidelining of Steve Springer was meant to

coerce, threaten, interfere with, or otherwise impermissibly influence Voice of America

personnel in the performance of their journalistic and broadcasting duties and activities, and

indeed has had those effects on the network and its journalists.

63.     Springer's removal has had an immediate and deleterious effect on Voice of

America, its journalists, and its content.  A senior editor writing to Voice of America leadership

in mid-August 2020 perhaps put it best: "[T]hat we still have no agency-wide standards editor

[for this] sustained period—but especially during peak US election time—*is frankly journalistic*

*malpractice*."  The editor further explained, "[t]he standards editor during US election season

plays an even more influential role, helping communicate the agency's editorial practices so that

all journalists can apply a consistent standard in all languages.  Leaving this position empty

*damages our journalism*.  It's as simple as that.  *The longer the position remains empty, the*

*more likely we will make errors that undermine our credibility.*"

64.     Pack's efforts to remove the firewall's guardians did not stop with Springer.  On

August 12, 2020, Pack wrote to and placed Kligerman and Plaintiffs Powers, Tran, Lennon,

Turner and Walsh, who collectively possess over a century of experience—including experience

understanding and protecting the firewall—on administrative leave, under the pretext that the

USAGM's Office of Security lacked the proper authority to investigate background checks, an

allegation that if true would apply to over 1,500 agency employees.  In this written

correspondence, Pack reminded them that despite being placed on leave, they were still required

to comply with all USAGM laws, regulations, and policies, and faced disciplinary action if they

violated these policies.  These policies included the Broadcasting Administrative Manual,

USAGM's employee policy handbook, which provides on page 159 that USAGM employees are

required to preserve, protect, and defend the firewall, a policy the Defendants have continued to

repeatedly violate.  The Plaintiffs placed on administrative leave are vigorously challenging these meritless charges in administrative proceedings.  Because potentially *every* USAGM employee is subject to a similar charge relating to their security clearances, Defendants' selective enforcement against these Plaintiffs is clear indication of Defendants' desire to breach and interfere with the functioning of the statutory firewall by sidelining these Plaintiffs from their leadership roles at USAGM.

65.     ***Terminating Radio Free Asia's Executive Editor.***  Defendants have blatantly interfered with personnel decisions in violation of the firewall.  Simply put, which reporters to hire, fire, where to place them, and other such decisions are day-to-day newsroom decisions with which the firewall prohibits USAGM from interfering.  But Defendants have actively meddled in these processes, attempting to control these essential journalistic functions.  The ultimate goal of this meddling is to limit and change journalistic coverage and to fundamentally remake the USAGM networks.

66.     Following the improper removals of the USAGM Plaintiffs and Steve Springer, Defendants' next improper personnel decision was terminating Bay Fang as Executive Editor of Radio Free Asia.  At the time Pack assumed his position, Fang was serving as the President of Radio Free Asia, but when Pack took power he immediately terminated all the heads of the grantee networks, including Fang.  Pursuant to the terms of her contract, Fang returned to serve in her prior role of Executive Editor.  Subsequent to her demotion, during the week of June 22, USAGM staff—including Pack—had asked why Fang, even though terminated as President, was "still there."  A couple of weeks later, Pack demanded that the acting President of Radio Free Asia fire Fang, and he did so.

67.     An Executive Editor has a core journalistic function—she oversees editorial content of a publication, including by directing coverage decisions.  The Executive Editor was a firewall-protected position, reporting to the President of Radio Free Asia and to no one else.  Forcing Fang's termination was a clear-cut violation of the firewall, just as demanding the termination of any journalist is a blatant violation of the firewall.  No CEO of any reputable private news organization would have personally directed the firing of an Executive Editor, particularly not one so experienced, professional, and capable as Bay Fang.  The termination of Fang was meant to coerce, threaten, interfere with, or otherwise impermissibly influence network personnel in the performance of their journalistic and broadcasting duties and activities.

68.     ***Attempting to Reassign the New York Bureau Chief.***  Several months ago, Voice of America hired a new Bureau Chief for New York.  A Bureau Chief is an essential journalistic function.  Bureau Chiefs manage the bureau and are responsible for coverage decisions, management of bureau personnel and editorial oversight.  Originally, when that job was listed, no New York Bureau employees applied for the position.  Consequently, Voice of America hired a qualified member of its Russian service for the role.

69.     Before that person could relocate for their new position, but after they had started in the job remotely, Defendant Cullo called Plaintiff Lennon and demanded a reassignment of the person who had been selected.  Though the job had been advertised months ago, the position filled, and the individual actively doing the job without issue, Cullo demanded that the position be re-advertised and that Lennon work on reassigning the person who had been hired as Bureau Chief.  Cullo asked Lennon to "give me some ideas" about where they could "park" the would-be Bureau Chief.  Cullo did not provide Lennon with any legitimate reason for the reassignment.  Her stated rationales were that Voice of America had not advertised the position, that Voice of

America should have promoted someone from within the New York Bureau, and that she did not think they should pay relocation fees when there were qualified applicants already located in New York.  Those rationales were false.  *First*, the position had been advertised and filled prior to Cullo's joining the agency.  *Second*, no one within the New York Bureau had applied to be Chief.  *Third*, the hired Bureau Chief had not sought relocation reimbursement.

70.     Cullo's interference with journalistic hiring was a blatant breach of the firewall.  The decision plainly interfered with or at least attempted to interfere with Voice of America's exercise of its journalistic duties.  *See* 22 C.F.R. § 531.3(c).  The originally hired New York Bureau Chief remains in his position only because senior managers at Voice of America and others refused to comply with Cullo's orders in adherence to the firewall.

71.     ***Constructive Discharge of Foreign Journalists.***  Many of Voice of America's journalists are not American citizens.  They are extremely experienced, high-ranking journalists in foreign countries that Voice of America expends significant effort and resources to recruit because those individuals are often the only people qualified to serve as journalists on one of the dozens of foreign language services Voice of America operates.  Many of these foreign journalists take great personal risks in working for Voice of America.  They often hail from countries where practicing independent journalism itself is risky and working for an American outlet even riskier.  Particularly because of the need to have credible, professional journalists with language skills, several of Voice of America's foreign journalists are the *only* journalists who are working for certain Voice of America language services.  Without these foreign journalists, those journalistic outlets would have to close wholesale.

72.     USAGM is not an immigration authority but rather, like any employer, can sponsor its employees for certain types of visas.  One such visa is the J-1 visa, a non-immigrant

cultural exchange visa.  Applications for J-1 visas undergo an extensive vetting process by the

State Department and the Department of Homeland Security.  That visa can only be provided for

aliens with *actual* positions—*i.e.*, if a position ceases to exist or is defunded, the alien can no

longer work or live in the United States.  Although Voice of America always looks to hire

American citizens, when qualified citizens are unavailable, Voice of America recruits the best

foreign journalists through vigorous vetting and recruitment.

73.     When Voice of America decides to hire a foreign journalist, it prepares the

requisite sponsorship papers, and the CEO of USAGM engages in the ministerial act of signing

those sponsorship papers.  Neither of USAGM's two prior CEOs—John Lansing and Plaintiff

Turner—ever hesitated or refused to sign the requisite sponsorship papers.  They knew that their

failure to do so would be a gross breach of the firewall because it would constitute an

interference with journalistic operations and personnel decisions.  Even, for instance, the

perception that the CEO was evaluating a visa applicant's journalistic content and experience

before signing sponsorship papers would result in a firewall breach by suggesting that the CEO

was using the ministerial visa sponsorship process to interfere with journalistic content.  No

reputable news organization would let its business-side leadership control hiring of line reporters

in this manner.

74.     Since taking office, Pack has refused to adhere to this model: he has stated that he

will *personally* review and decide whether to renew J-1 visa applications on a case-by-case basis.

Pack has further refused to fund the contracts of multiple foreign journalists who already have J-

1 visas.  Pack has articulated no standard that he will use to evaluate visa requests.  Pack's

decision to arbitrarily subject J-1 visa holders to increased scrutiny is part of his larger objective

to reduce the independence and effectiveness of Voice of America's journalistic reporting by

exerting greater control over foreign journalists.  He is effectively controlling the hiring and firing of foreign journalists, in violation of the firewall, under the pretense of reviewing visa determinations.

75.     Pack's refusal to complete his ministerial function of signing J-1 sponsorship papers is having a crippling effect on the journalistic operations of Voice of America and on its long-term reputation.  Multiple Voice of America foreign-language news services are struggling to produce the volume and quality of content both Congress and their audiences expect; numerous services are so understaffed that they have been forced to abandon 24/7 monitoring of the news, and have *significantly* reduced the amount of new content being produced and broadcast.  These problems will only worsen if Pack does not change course.  At least five journalists thus far have been forced to leave the U.S. because their visas expired in light of Defendant Pack's refusal to sign the requested renewals.[20]

76.     Voice of America's mission to combat disinformation requires the work of these dedicated foreign-language trained journalists to make the news accessible for its global audience.  And the effort Voice of America has made to demonstrate to foreign journalists it seeks to recruit—many of whom face great peril in choosing to work for an American-government funded news organization—that it is a credible place to work for professional journalists (rather than a prop of the U.S. government) are being squandered.  Highly skilled and sought-after journalists, who might ordinarily seek employment or be recruited by Voice of America, are unlikely to join Voice of America upon learning the truth about its disturbing pattern of promising journalistic employment, asking journalists to uproot their lives to come

---

[20]   Jessica Jerreat, *Members of Congress Call on USAGM to Explain J-1 Visa Denials*, Voice of America (Sept. 16, 2020), https://www.voanews.com/usa/members-congress-call-usagm-explain-j-1-visa-denials.

here and help export American free media, and subsequently reneging on every promise made. A Chinese government editorial put it best: *"*Those who still have the illusion that the U.S. government will protect them if they sell out their country and work for the U.S. will only be repeatedly humiliated by (President Donald) Trump."[21]

77.     Pack's refusals to sponsor or renew these J-1 visas or to fund foreign-language journalist positions that had already been filled exerts a chilling effect on all journalists who hold visas, because their ability to stay employed in the United States becomes inextricably intertwined with Pack's standardless, arbitrary and capricious discretion.  Pack's statement that he would only renew J-1 visas on a case-by-case basis effectively tells these foreign journalists to tailor the content of their reporting in a manner that will keep Pack satisfied, lest he decline to renew their visa and send them back to their home countries.  A group of House and Senate members wrote in a letter to Pack on September 14, 2020, by "fail[ing] to expeditiously extend these visas . . . [Pack is] potentially putting the lives of these journalists in danger by forcing them to return to countries where political leaders may target them for their work on behalf of an American media outlet[.]"[22]  "Failing to renew these visas constitutes more than callous treatment of a class of employees and contractors who have put their unique skills and insights to use in service of the USAGM's mission."[23]  Indeed, it is reckless disregard for the safety of journalists.

---

[21]   Jessica Jerreat, *VOA Journalists Fly Home After USAGM Fails to Renew J-1 Visas*, Voice of America (Aug. 25, 2020), https://www.voanews.com/usa/voa-journalists-fly-home-after-usagm-fails-renew-j-1-visas.

[22]   Letter from Sen. Robert Menendez, United States Senator, et al., to Michael Pack, Chief Executive Officer of USAGM (Sept. 14, 2020), https://www.foreign.senate.gov/imo/media/doc/09-14-20%20Letter%20to%20Pack%20on%20Visa%20ExtensionsFINAL1.pdf.

[23]   *Id.*

78.     No leader of a reputable news organization in Pack's position would exert authority in such a callous and indifferent manner.  Indeed, no private-sector CEO would interfere in journalistic hiring and firing in the way Pack's J-1 visa practices have, and particularly not when such an arbitrary practice clearly seeks to control the journalistic content produced and so cripples the very organization and reputation he runs.  The refusal to exercise the ministerial, pro forma duty of signing J-1 visa sponsorship papers like any other private sector employer does is a blatant violation of the firewall and must be remedied.

79.     ***Illegal Interference with Journalistic Content.***  At Defendant Pack's direction and with his encouragement, USAGM lawyer Defendant Sam Dewey has undertaken a course of unlawful interference with a host of journalistic processes, particularly at Voice of America. USAGM is prohibited from taking action to "coerce, threaten, interfere with, or otherwise impermissibly influence . . . the performance of [] journalistic and broadcasting duties and activities."  22 C.F.R. § 531.3(c).  Dewey's actions are thus illegal.

80.     Dewey has aggressively worked to insert himself into the newsroom, in direct violation of the firewall.  Dewey has asked to participate in news coverage meetings regarding election reporting and raised concerns about the political content and perceived viewpoint of Voice of America stories.  He has also ignored the journalistic chain of command—reaching far within the newsroom to speak directly with journalists, bypassing Voice of America's Director and even its senior journalistic leaders to raise concerns about content and seek action from lower-level journalistic employees.  No credible news organization would ever permit a manager outside the firewall to attend such meetings or voice such concerns to journalists within the firewall.  Merely requesting to attend news coverage meetings sends a striking message that USAGM is watching and that coverage must toe the party line.  That Dewey is a sophisticated

attorney capable of parsing statutes and regulations suggests that his breaches of the firewall were knowing and intentionally designed to intimidate and influence coverage of the election.

81.     ***Interference through Threats, Coercion, and Investigations.***  At the direction of Defendant Pack, Defendant Sam Dewey and other USAGM officials, have and are continuing to investigate and scrutinize journalistic activity in an unlawful attempt to "coerce, threaten . . . [and] impermissibly influence . . . the performance of [] journalistic and broadcasting duties[.]" 22 C.F.R. § 531.3(c).  Whether a story should be published, was improperly published, or should be taken down is a day-to-day journalistic decision.  Where lapses of journalistic practices occur, journalistic practice and USAGM policy dictates that the investigation of any alleged issues be undertaken by *other journalists* at the networks—not by politically motivated actors on the other side of the firewall.

82.     In fact, throughout USAGM's recent history, Voice of America leadership itself has been the one to investigate apparent issues with journalistic best practices within Voice of America.  In cases where the lapse is potentially significant, Voice of America leadership has brought in outside auditors, including professors of journalistic ethics, to opine on the nature of the alleged error and any potential penalty.  For example, in 2017 concerns were raised within the Voice of America about the way the Mandarin Service handled a live broadcast of an interview with a Chinese exile.  Both an outside law firm as well as an expert in broadcast journalism were retained to conduct an investigation—this structure was purposely designed to avoid any appearance of political partiality.

83.     To the contrary, Defendants have launched a series of USAGM-led investigations into alleged journalistic lapses within the news networks on the other side of the firewall.  In recent weeks, two incidents occurred in two of Voice of America's language services—its Urdu

service and one of its Spanish services, VOA Noticias.  The contrast between how USAGM

handled each potential lapse in journalistic standards is instructive on USAGM's political

motives and its own conflicts of interest.

84.     Specifically, VOA Noticias posted a video from a Trump campaign official

advising Latinos to vote against Joe Biden.  The story provided no context or response from the

Biden campaign—it was effectively raw campaign footage.  Once Voice of America leadership

became aware of the story—which did not meet the Voice of America requirements for balance

and objectivity under its charter, *see* 22 U.S.C. § 6202(c)(2)—it removed it from VOA Noticias's

Twitter feed and investigated the incident.  USAGM, while aware of the incident, did not take

any action with respect to this apparent journalistic lapse.

85.     But when a video appeared on Voice of America's Urdu service relating to

Democratic presidential nominee Joe Biden, USAGM itself conducted a detailed journalistic

standards investigation within Voice of America, in clear violation of the firewall.  That video

featured clips of Biden speaking at an event organized by an American-Muslim nonprofit

organization; it included a two-minute clip of Biden speaking and provided no context or

response from the Trump campaign.

86.     Shortly after learning about the Biden video, Voice of America leadership started

to investigate but was immediately rebuffed by USAGM and Defendants—in stark contrast to

how the VOA Noticias incident was handled.  Voice of America leadership was advised by

USAGM leadership that only Defendant Dewey—a political appointee at USAGM—would be

conducting the investigation into whether the Urdu service journalists abided by journalistic

standards.  Defendant Pack himself personally assigned Dewey to conduct this investigation,

bypassing journalistic leadership.  In conducting the investigation, Dewey interviewed the reporters about an editorial decision in the newsroom—a blatant violation of the firewall.

87.     Defendants Dewey, Cullo, and Newman participated in this investigation.  On July 28, 2020, for instance, Defendants Newman and Cullo asked the Voice of America Acting Director for lists of "all people" involved "directly or indirectly, or who should have been involved" in producing and airing the Biden video.  She further requested that Voice of America send her all of their contracts.  Defendant Dewey inquired further on July 29, 2020, seeking additional documents, access to any "materials gathered as part of [Voice of America's] review" into the video, and for an assessment of what employees at Voice of America "*should* have been involved in the process"—an assessment that he believed "can be resolved independent of any analysis of the actual situation at hand."  Mr. Dewey sought information relating to the journalistic "policy and procedure" relating to the Biden video.

88.     Once Defendant Dewey's investigation concluded, the punishment was swift: the Urdu service's digital managing editor was placed on administrative leave, and four contractors who had worked on the Joe Biden video were terminated.  This punishment was historically unprecedented and wholly disproportionate to the journalistic "crime."  The message sent to Voice of America's journalists was clear: the USAGM CEO—not Voice of America—would play judge and jury to those whose reporting is considered unfavorable to the President and the punishments will be severe.  To Plaintiffs' knowledge, no similar USAGM investigation or discipline has occurred relating to the VOA Noticias video that advised Latinos to vote in favor of President Trump.  The clear inference journalists can draw: journalists are safe where they favor the administration but not where they don't.  That is textbook political interference with journalistic coverage.

89.     The message Pack and Dewey sent—we are watching, and any failure to toe the party line will be dealt with swiftly—was heard loud and clear.  Days after the investigation, a Voice of America Urdu service journalist—presumably worried about his job after observing the actions Defendants Pack and Dewey took with regard to his colleagues—removed certain videos from the service's website.  Removed videos included coverage of the protests that followed the killing of George Floyd.  These videos covered important events of public and even historical significance; they were not only appropriate incidents to cover but even essential news.  But because the journalist feared Defendants might view these stories through a particular lens and subject those associated with the stories to punishment, this journalist removed these stories from the Urdu service's website.  On information and belief, these videos have been permanently deleted.

90.     Defendant Dewey got wind of the removals and immediately sprung to action. Bypassing the normal journalistic chain of command, he wrote directly to the chief of the Urdu service asking him for more information about the now-deleted videos.  Specifically, he stated "*Please identify content put out during same time period as these videos that presents the other side of these issues, namely that regardless of the merit of the BLM or other causes, mass rioting is not acceptable.*  For example, are there videos that contain some of the statements by Attorney General Barr on these issues or stories about those who lived in underserved communities and had their property damaged?"  Dewey's note further stated: "*Please immediately instruct the entire service that they are ordered and directed by the office of the CEO to search for and preserve any copies of the stories removed.*"  These directives illustrate unabashed breaches of the firewall and blatant attempts to exert control over the Voice of America's content.  The

message was loud and clear: with every George Floyd protest story, there should be content that favors Dewey's perspective, as illustrated in his Twitter feed:



Dewey's pressure, coercion, intimidation, and interference flies in the face of the firewall.

91.     Dewey's investigative onslaught has continued.  In recent weeks, Dewey asked Voice of America leadership to report to him *which Voice of America journalists* were working on *every story* being developed at the network—something he called a chain of custody.  As a member of USAGM CEO's team, and pursuant to the firewall, Dewey has no place knowing what stories are being prepared by the network for publication, let alone *who* is working on those stories.  Dewey's message again was clear: we are here, we are watching, and the failure to conform will be addressed forcefully.  Attempting to ascertain which journalists are responsible for what stories exerts a chilling effect on journalists—it tells journalists not only that the CEO is monitoring what content they produce but also what the CEO wants them to take a particular journalistic approach towards.  The firewall expressly disallows this very type of coercion, interference, and pressure from occurring.

92.     ***Investigations into Profiles of Jill Biden and Melania Trump.***  Improper journalistic investigations have proliferated beyond Defendant Dewey as well.  In fact, Defendant Dewey, as well as other USAGM employees working at his behest, have undertaken a

large-scale investigation of the production and editorial process of two specific Voice of America pieces: two audiovisual profiles of former Second Lady Dr. Jill Biden and First Lady Melania Trump.  USAGM's purported investigation into these two pieces involved interviews of many journalists and/or editors in Voice of America's newsroom and language services.

93.     The audiovisual profiles of Mrs. Trump and Dr. Biden went live on the Voice of America website on July 29, 2020.[24]  The profiles provide details about the First and former-Second Ladies' personal histories and involvement in various causes, showing clips of them speaking at public events including political rallies on behalf of their husbands.  In both profiles, a voiceover describes how each woman met her husband, had children with them, and took up public causes like child welfare (Mrs. Trump) and education (Dr. Biden).  The pieces are similar in tone and duration, each video piece spanning just over three minutes composed of spliced footage of the subjects, their husbands, and other third-party commentators.  The tone is matter-of-fact, and the coverage provides factual backgrounds on both women.

94.     The pieces are accompanied by the following captions.

*Melania Trump, the first lady of the United States, was a model before she married businessman Donald Trump 15 years ago. A Slovenian immigrant, the first lady shies away from the public eye except for occasional appearances on behalf of her causes, which focus on children. VOA's Carolyn Presutti shares with us things you might not know about the president's wife.*

---

[24] Carolyn Presutti, *America's First Lady - From Immigrant Model to The White House*, Voice of America (July 29, 2020, 6:40 AM), https://www.voanews.com/episode/americas-first-lady-immigrant-model-white-house-4370301; Carolyn Presutti, *Former Second Lady Vying to Be America's First Lady*, Voice of America (July 29, 2020, 6:39 AM), https://www.voanews.com/episode/former-second-lady-vying-be-americas-first-lady-4370306. Plaintiffs incorporate these stories by reference.



*Jill Biden, the wife of presumptive Democratic presidential nominee Joe Biden, is on leave from her teaching job to assist with her husband's campaign. Mrs. Biden is very familiar with life in Washington, since her husband spent 36 years in the U.S. Senate and eight years as vice president under Barack Obama. VOA's Carolyn Presutti brings us more interesting facts about Jill Biden in this profile.*



The captions, like the pieces themselves, provide similar information about the two women, and are structured as near-mirror images.

95.     Multiple Voice of America reporters and editors were contacted by members of the USAGM Human Resources department about an administrative investigation regarding the profiles of Mrs. Trump and Dr. Biden published by Voice of America.  These reporters and editors were questioned by USAGM officials about their involvement with the pieces and particularly about who wrote particular words about the President, characterizing him as having "disparaged immigrants" and "attack[ed] perceived adversaries on Twitter."

96.     The very existence of this investigation was a blatant violation of the statutory and regulatory firewall—an attack on journalistic independence and integrity designed to chill journalists into conforming to a prescribed party line.  Questioning journalists and editors about the Voice of America editorial process, the balance of the Biden/Trump pieces, or the ethical

standards Voice of America employ in publishing its pieces about Mrs. Trump and Dr. Biden are clear violations of the statutory firewall, and of these journalists' and editors' rights under the First Amendment.  The First Amendment and federal statute and regulation do not permit government officials to interrogate journalists about the process and editorial judgments of their stories.  These investigations are having and will have a chilling effect on news coverage.  They must be stopped.

97.     The investigation was also plainly content- and perceived viewpoint-based. Reporters and editors have been repeatedly questioned about who wrote particular words about the President, characterizing him as having "disparaged immigrants" and "attacks perceived adversaries on Twitter"—facts, regardless of whom at Voice of America wrote them, that are objectively true.[25]  The investigation, undertaken by, and at the direction of, political appointees, took place because the piece involved politics, and because the words in question were perceived to be unfavorable to the President.  USAGM's attempt to root out the writer and editor responsible for these words is a reprehensible attempt to retaliate against reporters engaging in expressive content and to penalize them for taking what they perceive to be an anti-Trump viewpoint, despite the clear balance of the profile.  Voice of America's pieces and journalists *are* balanced.  The journalists *have* integrity.  And they *do* uphold the highest standards of professional journalism.  Those questioned in this investigation are all seasoned journalists.  That Defendants seek to punish speech and journalistic activity says far more about them than the veteran journalists at Voice of America attempting to do their vital job.

---

[25]   *See, e.g.*, @realdonaldtrump, Twitter (Nov. 3, 2019, 7:48 PM) ("[Adam Schiff] is a proven liar, leaker & freak who is really the one who should be impeached!"), https://twitter.com/realDonaldTrump/status/1191155326743195648; @realdonaldtrump, Twitter (Feb. 11, 2017, 7:12 AM) ("Our legal system is broken! '77% of refugees allowed into U.S. since travel reprieve hail from seven suspect countries.' (WT)  SO DANGEROUS!"), https://twitter.com/realDonaldTrump/status/830389130311921667.

98.     USAGM has procedures for editorial lapses, but none of them were followed in any of these investigations.  Specifically, the procedures set four tiers of investigation for USAGM entities.  *First*, for minor corrections, the network handles the entire investigation internally.  *Second*, if there is a problem with a single story or series, network leadership again handles the investigation, but keeps USAGM apprised of progress and results.  *Third*, if there is an individual journalist with a pattern of lapses, the network again responds to the issue and is asked to coordinate with USAGM as well as external journalism experts.  *Fourth*, if there is a widespread and longstanding pattern of ethics violations, USAGM investigates not any individual incident or journalist but rather reviews a random sample of programming and consults with the network to assist with the review of such a big-picture review.

99.     In none of these tiers is USAGM empowered to embark on an investigation into specific editorial concerns or empowered to impose punishment.  And critically, the policy prohibits USAGM from acting unilaterally without the consultation of the network in question— let alone where the network opposes such action.  These procedures exist for good reason.  As a former Director of Voice of America explained to the House Foreign Affairs Committee: "[I]t's different when [an investigation] is done by a journalist who has no actual association with either side of the argument, than when it is done by people who have some kind of connection with that."[26]  Defendants have deliberately deviated from these procedures, investigating journalism in a clear attempt to coerce, influence, curb, and chill speech.

100.     No reputable news organization allows members of its organization who are outside of the firewall to investigate alleged journalistic errors or penalize those errors.  These

---

[26] Oversight of the United States Agency for Global Media and U.S. International Broadcasting Efforts: Hearing Before the H. Comm. on Foreign Affairs, 116th Cong. (Sept. 24, 2020) (statement of Amanda Bennett).

investigations and punishments are having a serious and immediate effect.  In fact, as a senior newsroom manager wrote to Voice of America's leadership, "We have reached a point where we, in the News Center, are at least as worried about self-censorship as we are about bias and think we need to be equally vigilant against both."  Defendants' actions breach the firewall and invite improper interference, coercion, and pressure on reporting.  22 C.F.R. § 531.3(c).

101.  ***Commandeering Voice of America's Website.***  At Pack's direction, on June 24, 2020, USAGM issued a press release explaining that Voice of America would now be linking to editorials on its homepage.  These editorials are written by the U.S. government and represent its views.  This change had never been discussed with Voice of America's leadership, nor were they given any advance notice about it.[27]  Making this change, without consulting Voice of America's leadership, in an attempt to influence the appearance of Voice of America's content to its audience, is an attempt to impermissibly influence content in violation of the firewall.  *See* 22 C.F.R. § 531.3(c).  Directing that a link to Voice of America's editorials be displayed on the Voice of America webpage reflects an effort to exert influence over Voice of America's content, and to disguise U.S. government views as Voice of America news.  Voice of America's web presentation is a journalistic decision, and Pack's involvement in making this change, and USAGM's requiring of it, is a clear breach of the firewall.[28]

---

[27]  The IBA requires United States broadcasting to "include . . . clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies, including editorials, broadcast by the Voice of America, which present the views of the United States Government."  22 U.S.C. § 6202(b)(3).  The statute does *not*, however, require any USAGM network to publish content written by the government, nor does it give any government official the authority to dictate how opinion pieces are presented and where.

[28]  Defendants' actions with respect to the editorials has already caused substantial confusion in the public as to whose views those editorials represent, thereby jeopardizing Voice of America's credibility as an independent media organization.  *See* Zack Budryk, *Biden Would Fire Trump Appointee Leading US Media Agency For "Hijacking" Outlet*, The Hill (June 25, 2020), https://thehill.com/homenews/administration/504534-biden-would-fire-trump-appointee-leading-us-media-agency-for (noting that Mr. Pack "has also announced that Voice of America's editorials will be more closely aligned with President Trump's views"); Alex Ward, *The Head of*
*(Cont'd on next page)*

**Voice of America Website at 12:23 pm on June 3, 2020**



**Voice of America Website at 8:11 pm on August 27, 2020**



102.  ***New "Conflict of Interest" Policy and Pretextual Investigation of White House Bureau Chief in Retaliation for Reporting Firewall Violations to Management.***  On August 31, 2020, a coalition of Voice of America's journalists sent a letter to USAGM leadership.  In that

---

*US Broadcasting Is Leaning Toward Pro-Trump Propaganda.  Biden Would Fire Him.*, Vox (June 25, 2020), https://www.vox.com/2020/6/25/21302625/joe-biden-president-voice-america-fire-michael-pack (noting the "concern . . . about Pack's vision for Voice of America's editorials"); Arthur Bloom, *Michael Pack Is Right To Rein In State-Funded Broadcasters*, The American Conservative (June 23, 2020), https://www.theamericanconservative.com/articles/michael-pack-is-right-to-rein-in-state-funded-broadcasters/ ("VOA's editorials are cleared by the State Department").

*(Cont'd on next page)*

letter, the journalists felt "compelled to express [their] profound disappointment with the actions and comments of the chief executive officer of the U.S. Agency for Global Media, which endanger the personal security of Voice of America reporters at home and abroad, as well as threatening to harm U.S. national security objectives."[29]  By "Pack recklessly expressing that being a journalist is 'a great cover for a spy,'" the letter said, lives may be in "jeopardy."  They compared Pack's actions to those taken during the "Red Scare" led by former Senator Joseph McCarthy in the 1950s.

103.    In their letter, the Voice of America journalists—including two editors, two foreign correspondents, the White House Bureau Chief, the White House senior correspondent, and the national affairs correspondent—stated that they "watched in dismay as USAGM executives ha[d] been dismissed for . . . attempting to educate [Pack] on avoiding legal violations, as well as guiding him on the firewall that protects VOA's legally mandated editorial independence."  They expressed that "Pack's actions risk crippling [Voice of America] programs," believing that "competent and professional overnight" were necessary to protect "not only the news organizations of USAGM (one of the world's largest broadcasting entities) and our audiences, but also our stakeholders, including the American public."[30]  Although the letter was meant to be a private, internal communication, it was ultimately leaked to the press and was reported on by NPR and other news outlets.  Since the letter was published, multiple Voice of America journalists have added their names to it.

---

[29]  Letter from Aline Barros et al., Journalists, Voice of America, to Elez Biberaj, Acting Director, Voice of America (Aug. 31, 2020), https://assets.documentcloud.org/documents/7048656/LettertoVOAdirector.pdf.

[30]  *Id.*

104.    USAGM did not respond to the journalists' criticism favorably, answering the

letter in a series of Tweets posted on @USAGMPox on September 1.  The ominously

threatening Tweets stated:

> The course of action undertaken by various U.S. federal employees
> of the Voice of America (VOA), when they submitted an untitled
> letter dated August 31, 2020 to their Acting Director and the press,
> was improper and failed to follow procedure.
>
> All federal employees of the U.S. Agency for Global Media
> (USAGM), its broadcast agencies, and grantees are well aware that
> the U.S. Government provides numerous avenues of recourse to
> federal employees with genuine complaints.
>
> The untitled letter followed none of the prescribed protocols found
> in standing U.S. Government personnel directives, including those
> that direct USAGM and VOA federal employees, specifically.
>
> Thus, a direct response to this unconventional and unauthorized
> approach would be inappropriate and unwarranted.  USAGM and
> VOA leadership are handling the choice of complaint transmission
> as an administrative issue.[31]

The ominous tweets foreshadowed what was to come.

105.    On Sunday, October 4, 2020, Pack sent a policy memo to all staff of Voice of

America, the Office of Cuba Broadcasting, Radio Free Europe/Radio Liberty, Radio Free Asia,

and the Middle East Broadcasting Networks, with the subject "Guidance on Conflicts of

Interest."  Sending such a memorandum on a Sunday is completely out of the ordinary—and,

notably, the memorandum was backdated to October 2, 2020.  In the memo, Pack claimed to

"clarify policies and provide guidance on" the "[m]anagement of conflicts of interest" which is

"a key component of maintaining fairness, objectivity and balance."  Pack did *not* merely clarify

policies, but also pronounced new ones, broadening conflicts of interest to include "reporting on

---

[31]   USAGM (@USAGMspox), Twitter (Sept. 1, 2020),
        https://twitter.com/USAGMspox/status/1300805832427401216.

an issue: (1) in which they have a personal interest or (2) have publicly personally expressed a

political opinion."

106.     Pack provides three examples of conduct which paint a distressing picture of what

will give rise to conflicts of interest demanding recusal under this new policy.  *First*:

> If a Voice of America ("VOA") journalist is personally affected by
> a potential governmental action, then they may not cover that issue.
> For example, a journalist who is working in the United States on a
> J-1 visa must follow normal procedures and recuse themselves from
> any story involving J-1 visas.

*Second*, a journalist who:

> [P]ublicly takes a personal position on an active political issue has a
> conflict of interest—doubly so if that issue directly affects that
> individual.  For example, a journalist who, *in their private capacity*,
> publicly criticizes the U.S. Department of Justice's leadership for,
> among other things, implementing the policies and protecting the
> prerogatives of the Administration must recuse themselves from
> reporting on the Department and the part of the administration
> implicated by the criticism.

*Third*, a journalist who:

> [E]xpresses personal views on political topics *in their personal
> social media* creates the potential for a conflict of interest . . . [f]or
> example, a journalist who on Facebook 'likes' a comment or
> political cartoon that aggressively attacks or disparages the
> President must recuse themselves from covering the President.

107.     These purported policies are plainly overbroad and vague, and confer

unconstitutionally unfettered discretion on USAGM to suppress speech at will.  As to

overbreadth, *every* journalist is arguably "affected" by government policy on COVID-19, yet it

cannot possibly be consistent with the highest standards of professional journalism that *no*

journalist at Voice of America can cover any story about the pandemic.  As to vagueness and

unfettered discretion, the policy sets as its prototypical conflict of interest anyone who

"*aggressively* attacks or disparages the President must recuse themselves from covering the

President."  That vague standard makes clear USAGM's perspective that criticism of the administration should be suppressed but fails to articulate what makes "attacks" or "disparagement" sufficiently "aggressive" to justify suppressing speech.  For that reason, too, the policy confers unfettered discretion to suppress speech—providing Defendants with the opportunity to institute the very type of *post hoc* justifications for suppressing speech that the Supreme Court has long disallowed.

108.    USAGM's decision to impose this policy violates the First Amendment and breaches the firewall.  This conflict of interest policy—on information and belief drafted by those who have little or no experience in journalistic ethics—is a mechanism of controlling and influencing journalistic content, signaling that "attacks" on (i.e., critical coverage of) the President are plainly out-of-bounds.  The new "policy" also not only seeks to control journalists but their supervisors as well.  The policy memorandum asserted that "[t]he obligation to recuse or mitigate conflicts of interest rests with both the individual journalist *and their supervisor*.  If a journalist fails to recuse themselves, it is the obligation of the supervisor to *order recusal*."  Promulgating this conflict of interest policy reflects a flagrant attempt to control journalists, their supervisors, and the journalistic content they produce.  Promulgating this policy is beyond USAGM's authority.  *See* 22 C.F.R. § 531.3(c).

109.    The vague, overbroad conflict policy also portended yet another firewall breach.  Just hours after Pack sent his memo, NPR broke the news that USAGM had been investigating Voice of America's White House Bureau Chief, Steve Herman for purported bias and conflicts of interest.[32]  Herman, a veteran journalist and longtime Voice of America correspondent, led and

---

[32]  David Folkenflik, *Political Aides Investigate VOA White House Reporter For Anti-Trump Bias*, NPR (Oct. 4, 2020), https://www.npr.org/2020/10/04/919266194/political-aides-investigate-voa-white-house-reporter-for-anti-trump-bias.

organized the journalists who wrote the August 31 letter.  As NPR described, Defendants Dewey and Wuco – at Pack's apparent direction – launched a retaliatory investigation into Herman and his storied work as a journalist.  Dewey and Wuco have placed Herman's reporting under a magnifying glass since the letter, and have been watching Herman's private social media activity for any hint of bias.

110.   As part of this retaliatory investigation, Pack and his team prepared a 30-page dossier of materials to build an erroneous case that Herman violated Voice of America's Best Practices Guide or Social-Media Policies.  Defendant Wuco has transmitted a copy of this dossier to Voice of America's Acting Director, Elez Biberaj, asking Biberaj to do something about Herman, in a clear effort to pressure the Acting Director to take action against Herman.  Within that dossier are multiple allegations that Herman's stories were a "conflict of interest."  In particular, Pack and his team explicitly determined that Herman's September 8, 2020 story, *Trump Defies North Carolina COVID Guidelines With Large Outdoor Rally*,[33] and his September 10, 2020 story, *I Didn't Lie,' Trump Asserts About Seriousness of Coronavirus*,[34] were conflicts of interest by USAGM.  Neither story appears biased on its face.  And as NPR explained, "Both stories closely resembled accounts from other news outlets on the events."[35]

111.   Should Biberaj ultimately be forced to give in to Pack's pressure and take action against Herman—*i.e.*, forcing him to recuse or worse—that would both disrupt and chill journalistic coverage by removing Voice of America's White House bureau chief from action

---

[33]  Steve Herman, *Trump Defies North Carolina COVID Guidelines With Large Outdoor Rally*, Voice of America (Sept. 8, 2020), https://www.voanews.com/2020-usa-votes/trump-defies-north-carolina-covid-guidelines-large-outdoor-rally.

[34]  Steve Herman, *I Didn't Lie,' Trump Asserts About Seriousness of Coronavirus*, Voice of America (Sept. 10, 2020), https://www.voanews.com/2020-usa-votes/i-didnt-lie-trump-asserts-about-seriousness-coronavirus.

[35]  *Id.*

mere weeks away from a presidential election and in the midst of a public health crisis.  Even if Herman is permitted to retain his position, Defendants' policy, and their unlawful investigation of Herman and the resulting pressure on Biberaj, are plain attempts to intimidate Herman and undermine his coverage of the Administration in violation of the First Amendment and the firewall.

112.    In sum, Defendants' actions here present three-fold violations of the firewall. *First*, the retaliatory and plainly pretextual investigation into Steve Herman violates the firewall. USAGM had no basis to reach out and investigate Herman's journalistic practices.  As Representative Michael McCaul, the Ranking Member of the House Foreign Affairs Committee, explained, if the allegations regarding the Herman investigation are "true, this is very troubling and potentially illegal."[36]  *Second*, Defendants' attempts to pressure Biberaj to take action against Herman for allegedly violating journalistic standards clearly violates the firewall.  *Third*, Defendants' promulgation of a policy about journalistic ethics, both on its own and as part of the effort to intimidate both Herman and Voice of America leadership, violates the firewall. Defendants again have "attempt[ed] to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks, including their leadership, officers, employees, or staff, in the performance of their journalistic and broadcasting duties and activities."  22 C.F.R. § 531.3(c).  That simply is not allowed.

### *Defendants Engage In A Pattern Of Arbitrary And Insidious Gross Mismanagement, In Violation Of The Firewall And The CEO's Fiduciary Duties And Take Care Obligations*

113.    Since Defendants took power in June, they have engaged in a pattern of gross mismanagement—making arbitrary and insidious decisions designed to choke the USAGM

---

[36]  Jessica Jerreat, *USAGM Officials Breached Firewall, Committee Chair Says*, VOA (Oct. 6, 2020), https://www.voanews.com/usa/usagm-officials-breached-firewall-committee-chair-says.

networks, send a message about their ability to control the networks, and—ultimately—to coerce, intimidate, threaten, and pressure these organizations into agreeing to Defendants' journalistic control. Since taking power, Defendants have frozen contracts and budgets. They have imposed hiring freezes that have lasted months longer than ordinary-course freezes imposed during leadership transitions. And they have frozen all technical migrations. Even routine contracts that permit the networks to run their day-to-day operations, such as contracts for toilet paper or cleaning (in the middle of a pandemic) have been frozen. Other routine contracts, such as agreements with distributors to carry Voice of America content, are likewise frozen. The failure to maintain these contracts will result in fewer broadcasters carrying Voice of America stories, fewer individuals being able to access these materials, and an inability to track even the most basic digital metrics for assessing performance.

114. Defendants have also moved money unlawfully—a failure exposing the agency to violations of the Antideficiency Act, 96 Stat. 877, which prohibits federal agencies from making obligations or expenditures in a manner inconsistent with congressional appropriations. Federal employees who violate the Antideficiency Act may be subject to administrative and penal sanctions. Defendants opened up themselves and the agency to such sanctions, by failing to disburse funds that have been allocated through valid appropriations bills that were then signed into law by President Trump—a failure that also exposes the agency to violations of the Congressional Budget and Impoundment Control Act of 1974. The failure to fund grantees is a breach of Defendants' fiduciary duty and take care obligations and creates a significant legal risk for USAGM. USAGM is the overwhelming source of funding to the grantees, if not their entire source of funding. Yet numerous funds needed to operate the grantees have not been disbursed and no reason has been given for withholding them. Defendants have also moved funds

internally without appropriate and legally required authorization.[37]  Specifically, Defendants

moved approximately $3.5 million of Internet Freedom funds from USAGM's grantee

organizations, back to USAGM's corporate accounts, without notifying appropriators or getting

the funds reapportioned by the Office of Management and Budget.  Defendants have also moved

$1.8 million from the Office of Policy Research without Congressional authorization.

115.    Defendants have engaged in other types of gross mismanagement as well.  They

have installed as board members of grantee organization loyalists who are woefully unqualified

to oversee leading media organizations and are not going to exercise independent judgment if

there is an attempted breach of the firewall.  They have ignored requests for decisions on key

personnel matters, despite receiving numerous email requests about open positions and positions

needing approval.  They have ignored these requests almost entirely—effectively denying them

without basis and severely hamstringing the agency's ability to fulfill its mandate.

116.    Defendants have also actively put USAGM employees in harms' way in the

context of the ongoing COVID-19 pandemic.  During in-person meetings, Defendants refuse to

wear masks, and do not social distance.  Plaintiff Walsh chaired the Agency's Emergency Action

Committee, which set COVID-19 policies, and Plaintiff Lennon was a member of the committee.

The body established extensive policies to protect the health of USAGM employees, but in many

instances Defendants have utterly ignored those policies, without replacing them with any

effective alternatives.

117.    Defendants have also refused to approve policies or practices that would protect

agency employees from COVID-19.  For instance, Plaintiff Walsh asked for permission from the

CEO Office to send a reminder email to all agency employees to wear masks at the office—a

---

[37]  *See* Consolidated Appropriations Act, Pub. L. No. 116-93 (2019).

request ignored for *weeks*.  When Walsh finally asked then-Chief Operating Officer Andre Mendes why Defendants would not approve of the simple reminder, Mendes advised that the new CEO's team did not want to approve a reminder email about the mask policy because no one in the CEO's office ever wears a mask and they do not want any attention paid to that fact or to possible disciplinary repercussions of employees failing to follow the policy.  The policy is not only a USAGM policy; the D.C. Mayor's office has ordered that masks be worn in office buildings, and that those in office buildings exclude or eject those who do not wear masks indoors.[38]  Similarly, Defendants have refused to institute even a simple temperature-screening process for individuals entering the building.  While a number of employees worked to set up such a program, Defendants have told them that they will not be implementing it.  Instead, Pack has joked about instituting policies that will actually *cause* his employees to get COVID-19.[39]

118.     Aside from violating Defendants' duties to the networks and their take care obligations, these actions all violate the firewall.  They are designed to turn the proverbial screws on the networks, establish authority, and stifle perceived dissent.  At best, Defendants are engaged in gross mismanagement.  At worst, a transparent conspiracy to violate the law.  Either way, these misdeeds must be stopped.

### Defendants' Misconduct Leads To Continued Bipartisan Intervention And Media Outrage Including Interviews Where Pack Concedes His Unlawful Acts

119.     Defendants' conduct has sparked bipartisan outrage.  Representative Eliot Engel initially led the way, noting early on that he believed "USAGM's role as an unbiased news organization [wa]s in jeopardy under [Pack's] leadership."  Less than a month into Pack's tenure

---

[38]  D.C. Mayor's Order 2020-080: Wearing of Masks in the District of Columbia To Prevent the Spread of COVID-19 (July 22, 2020), https://coronavirus.dc.gov/maskorder.

[39]  The Federalist, *How Michael Pack is Draining The Swamp and Rooting Out Bias in Taxpayer Journalism*, (Aug. 27, 2020), https://thefederalist.com/2020/08/27/why-public-broadcasting-drifted-left-and-what-can-be-done-to-fix-it/.

as CEO, a bipartisan coalition of seven Senators—including Republicans Marco Rubio, Lindsey Graham, and Susan Collins—sent a letter to Pack expressing their "deep concern" about his unilateral actions to terminate the heads of some of the USAGM networks and "remov[e] of [the networks'] boards" for "no specific reason."  The Senators believed Pack's actions to be so egregious that they vowed to conduct "a thorough review of USAGM's funding to ensure that United States international broadcasting is not politicized and the agency is able to fully and effectively carry out its core mission." [40]

120.    The Senators concluded that Pack's actions "raise[] questions about the preservation of these entities and their ability to implement their statutory mission now and in the future."  Even though clear federal statute and regulation require Defendants to uphold the highest standards of journalism and abide by the firewall, the Senators "urge[d] [Pack] to respect the unique independence that enables USAGM's agencies and grantees" and felt the need to remind Pack of the obvious, that:

> ***the credibility and independence of these networks [is] required by law***, [and] is critical for audiences overseas living under repressive regimes, the network's brave journalists who often come under threat for their work, and the future of U.S. broadcasting.
>
> [T]he United States . . . cannot afford to invest in an enterprise that denigrates its own journalists and staff to the satisfaction of dictators and despots, nor can it be one that fails to live up to its promise of providing access to a free and independent press. ***Congress set up these networks, and its governance structure at USAGM, to preserve the grantees' independence so they can act as a bulwark against disinformation through credible journalism.***[41]

---

[40]  Letter from Marco Rubio et al., U.S. Senators, to Michael Pack, CEO, USAGM (July 1, 2020), https://www.rubio.senate.gov/public/_cache/files/20db345a-a326-4a8e-91e7-be7a7f420137/EC533D38ED5702A49F6070DF40808FB3.20.07.01-letter-to-michael-pack-re-usagm.pdf.

[41]  *Id.*

121.    Days later, on July 3, 2020, members of the House of Representatives issued a press release after sending a letter to Chairwoman Nita Lowey and Ranking Member Hal Rodgers of the House Committee on Appropriations, Subcommittee on State, Foreign Operations, and Related Programs, in advance of the Subcommittee's FY 2021 Markup Meeting "urg[ing] the subcommittee to consider legislative actions that would bolster congressional oversight of the [USAGM], ensure its journalistic independence, and safeguard its mission."  The letter carefully articulated all of the "alarming developments" within USAGM, including the firing of the officers and presidents of USAGM's networks, removing the independent members of the grantees' boards and "replac[ing] them with Pack and political loyalists," as well as freezing funding for various programs and personnel.  As the letter stated:

> *The management [Pack] removed were highly respected, experienced, and dedicated to maintaining the independence of USAGM and ensuring that its programming was free from political interference*. We are concerned that it is precisely that resistance to politicization of programming and reporting that led to their abrupt dismissal.
>
> We are deeply concerned. . . .  Deviating from [best practice] standards will impair the trust built over years in the independence and safety of the tools supported through USAGM.  As the United States confronts a rising authoritarian tide around the world, and an aggressive effort by Russia, China, and other powers to undermine the tenets of liberal democracy, USAGM has never been more vital. *The strength of USAGM comes directly from providing truth-based reporting and programming that adheres to the standards of professional journalism, precisely the information that autocratic regimes block in favor of propaganda.  If the firewall that protects USAGM's editorial independence is eroded, it will make USAGM ineffective.*  Rather than providing a counterpoint to autocratic regimes, it would call into question the U.S.'s commitment to democratic values, and risk reinforcing misperceptions that USAGM media outlets are simply state

> propaganda, no different from Russia Today or others around the
> world.[42]

Pack did nothing to allay Congress's concerns.  Instead, he and the other Defendants consistently and purposefully breached the firewall to politicize the programming of USAGM and its networks—the exact fear Congress had articulated.

122.    Pack's blatant breaches of the firewall led Representative Eliot Engel, Chairman of the House Committee on Foreign Affairs, to make yet *another* statement in August, the same day Pack placed Turner, Powers, Lennon, Walsh, Tran, and Kligerman on administrative leave. Representative Engel admonished Pack for "once again attempting to purge USAGM of the apolitical, career officials who have helped ensure that the agency fulfills its mission to provide unbiased news and information around the world."  Representative Engel continued, stating that

> [Pack] is destroying the decades-old legacy of America's
> international broadcasting efforts in a clear attempt to transform
> the agency into an ideological mouthpiece to promote Donald
> Trump in advance of the election.  And, despicably, he or someone
> in his inner circle leaked the names of career individuals to
> the *New York Post* as he was in the process of sidelining them.[43]

Representative Engel concluded by reminding the American public that "[t]he United States is not a dictatorship, and [Engel] will not stand by as Donald Trump tries to create a Soviet Tass or Chinese Xinhua government mouthpiece through his henchman, Michael Pack."[44]

123.    In response, Pack doubled down.  In an interview with Chris Bedford on *Federalist Radio Hour*, Pack effectively conceded he violated the law by breaching the firewall,

---

[42]  Press Release, Reps. Adam Schiff et al., U.S. Representatives, Schiff, Raskin, Engel, Colleagues Send Letter to Appropriations Subcommittee to Bolster Oversight of U.S. Agency for Global Media (July 3, 2020), https://schiff.house.gov/news/press-releases/schiff-raskin-engel-colleagues-send-letter-to-appropriations-subcommittee-to-bolster-oversight-of-us-agency-for-global-media.

[43]  Press Release, Rep. Eliot L. Engel, Chairman, House Committee on Foreign Affairs, Engel Statement on Purge of USAGM Officials (Aug. 12, 2020), https://foreignaffairs.house.gov/2020/8/engel-statement-on-purge-of-usagm-officials.

[44]  *Id.*

comparing his mission as USAGM CEO to his role as head of the Claremont Institute, an entity dedicated to far-right thinking.  This is the type of entity Pack intends to lead Voice of America to become.

124.    In continuing to talk about the mission of Voice of America, Pack made clear during his interview that he believed that Voice of America "is supposed to represent ***the Administration's point of view*** along with legitimate criticism but in a full and forthright manner."[45]  That is false, and contradicted by statute.  Voice of America is chartered to "serve as a consistently ***reliable and authoritative*** source of news" and to "***represent America, not any single segment of American society***," and certainly not one Administration's view.  This is a clear violation of the firewall: USAGM officials are forbidden from even "attempt[ing] to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks, including their leadership, officers, employees, or staff, in the performance of their journalistic and broadcasting duties and activities."  22 C.F.R. § 531.3(c).

125.    When asked about the firewall, Pack said he only "***sort of agree[d]*** with [the] premise . . . that there needs to be separation between us the political appointees and what journalists are reporting."[46]  Pack openly mocked the firewall's protections when he talked about withholding journalist's J-1 visas because he is worried that since "be[ing] a journalist is a great cover for a spy"—that some of the J-1 visa holders might try and "penetrate[]" USAGM and he needs "to make sure that doesn't happen," a suggestion which the *Federalist* later argued was "reasonable."[47]

---

[45]  Interview by Chris Bedford, Senior Editor, Federalist, with Michael Pack, CEO, USAGM (Aug. 27, 2020), https://thefederalist.com/2020/09/03/npr-manipulates-federalist-interview-with-voa-executive-on-behalf-of-government-employees-opposing-reform/ ("Pack Federalist Interview").

[46]  *Id.*

[47]  *Id.*

126.    As Jason Rezaian, a writer for *The Washington Post* who was imprisoned for 544 days in Iran on false accusations of espionage explained to Voice of America, Pack's comments are "irresponsible and fly in the face of the mandate of this illustrious and long-standing institution . . . . [These] public statements made by Western officials are used against people who are already really vulnerable, who are already being held . . . [T]his could mushroom into another one of those situations where suddenly many honorable hardworking journalists . . . are going to face greater danger."[48]

127.    Both NPR and *The Washington Post* also reported on Pack's interview on the "pro-Trump website The Federalist."  NPR commented that despite Pack's stance that his job was "to drain the swamp, to root out corruption and to deal with these issues of bias, not to tell journalists what to report," that "it appears that Pack is, in fact, interested in influencing which stories get told, and how," citing to multiple instances of the firewall being "explicitly violated by Pack and the team he has brought in."[49]  This includes the firing of the Standards Editor, stories being improperly removed from Voice of America's websites, and the involvement of a political appointee in the Urdu investigation as described above.

128.    *The Washington Post* also reported that "Pack has presented no evidence that anyone at Voice of America is a foreign intelligence agent.  Nor has he explained why Voice of America and sister agencies such as Radio Free Europe and Radio Free Asia—media

---

[48]  Jessica Jerreat, *Members of Congress Call on USAGM to Explain J-1 Visa Denials*, Voice of America (Sept. 16, 2020), https://www.voanews.com/usa/members-congress-call-usagm-explain-j-1-visa-denials.

[49]  David Folkenflik, *At Voice of America, Trump Appointee Sought Political Influence Over Coverage*, NPR (Sept. 2, 2020), https://www.npr.org/2020/09/02/907984631/at-voice-of-america-trump-appointee-sought-political-influence-over-coverage.

*(Cont'd on next page)*

organizations that don't control sensitive government information—would be an appealing target for penetration by a hostile power."[50]

129.    Rather than addressing these criticisms, Pack continues to propound the same dangerous rhetoric to anyone who will listen.  On September 10, 2020, in an interview on the *Sara Carter Podcast*, Pack once again claimed that Voice of America and the other USAGM networks are "a natural place for foreign intelligence to be . . . [I]t's a good place to put a spy if you are Chinese or Iranian or Pakistani intelligence.  You can have access to the State Department, you have access to lots of material, you could influence broadcasts back to your home country and *there have been high-profile examples of that over our history*."[51]  He agreed with Carter when she said "there are people and there are . . . intelligence agencies, the Chinese, the Pakistani's, Afghanistan, . . . I would even say the British.  Anybody who could spy, or anybody who could get into the government, could utilize these agencies."  "That's right," Pack replied.  "We don't know whether over these 10 years, foreign intelligence agencies have penetrated the Voice of America or the other organizations, and they've been a target for foreign intelligence from the very beginning."

130.    But Pack again provided no evidence of *any* counterintelligence activity within USAGM—because there is none.  Nor did he offer any argument as to why his theory was rational.  It is not.  Contrary to Pack's assertion, USAGM network journalists do not have a generalized "access" to the State Department or to any materials beyond what private media

---

[50]  Sarah Ellison & Paul Farhi, *New Voice of America overseer called foreign journalists a security risk.  Now the staff is revolting.*, Wash. Post (Sept. 2, 2020), https://www.washingtonpost.com/lifestyle/style/new-voice-of-america-overseer-called-foreign-journalists-a-security-risk-now-the-staff-is-revolting/2020/09/01/da7fa0a8-eba2-11ea-ab4e-581edb849379_story.html.

[51]  *Sara Carter Show*, *supra* note 3.

journalists have.  Voice of America reporters do not have access to State Department files or computer systems.

131.    In fact, Voice of America reporters' relationship with the State Department is no different from that of private reporters.  Voice of America journalists undergo the same vetting as all other media to obtain credentials (called "hard passes") issued by the State Department, the White House, and the Department of Defense.  Serving Voice of America does not provide reporters with any increased access compared to what a reporter from the AP, Reuters, NPR, or CNN would have.  Nor do Voice of America reporters generally come into contact with classified materials; again, Voice of America reporters only access those classified materials that they obtain through investigative reporting, in the same manner as NBC, *The New York Times*, or the *Washington Times*.  Contrary to Pack's statements, then, there simply is no incentive for foreign intelligence agencies to "infiltrate" these independent news media organizations.

132.    Pack's claim that a foreign spy could "influence broadcasts back to [their] home country" is equally specious.  It is effectively impossible for a Voice of America journalist to purposefully yet surreptitiously manipulate reporting so as to benefit a hostile power.  Voice of America's journalists operate as a team, and no broadcast is done in a vacuum.  Radio and television segments are reviewed by multiple copy and video editors.  The language services are directly monitored by professional journalists employed in the central newsroom, and more importantly, the news services are *public* broadcasts.  Even if a Chinese agent, for instance, sought to publish pro-Chinese news through Radio Free Asia, the stories are printed and

publicized around the world.  Any influence by foreign spies would be readily apparent both inside and outside of the newsroom.[52]

133.    Also in that same interview, Pack again admitted not only that he breached USAGM's statutory and regulatory firewall but that he actively intended to do so.  He said of the networks that "in some cases they're not reporting the news even, in an objective, balanced manner . . . [T]he things that are unfair need to be purged" and that they "need[] controls to make sure that [the news] is even handed."[53]  He claimed that prior to his appointment, the networks were "essentially not managed for 20 years," ignoring the storied bipartisan board and prior CEOs that managed Voice of America and the thousands of dedicated journalists who have served their country at the USAGM networks.  Contrary to that assertion, as the Office of the Inspector General found in its 2019 inspections of the Agency, USAGM was able to meet its oversight, reporting, and language review requirements, all while "improv[ing] strategic direction at the executive level" and "respect[ing] the broadcasting entities' editorial independence."[54]

134.    The implication of Pack's remarks is clear: Pack disagrees with the content of Voice of America's reporting and editorial choices, and intends to manage those choices and to

---

[52] And indeed, Voice of America and Radio Free Asia have published critical stories of China *numerous* times. *See, e.g.*, Press Release, Voice of America, A Statement from VOA Director Amanda Bennett (Apr. 10, 2020), https://www.insidevoa.com/a/a-statement-from-voa-director-amanda-bennett-/5367327.html.  And Radio Free Asia has published groundbreaking stories unfavorable to China, including its extensive coverage mass detention of Uyghurs in Western China and China's undercount of COVID-19 deaths in Wuhan.  *See, e.g.*, Radio Free Asia, *Estimates Show Wuhan Death Toll Far Higher than Official Figure*, Voice of America (Mar. 27, 2020), https://www.voanews.com/science-health/coronavirus-outbreak/estimates-show-wuhan-death-toll-far-higher-official-figure.  As William Harlan Hale explained, for Voice of America (and its sister networks), "[t]he news may be good. . . .  The news may be bad.  But we shall tell you the truth."

[53] *Sara Carter Show*, *supra*, note 3.

[54] Office of Inspector Gen., U.S. Dep't of State, Targeted Inspection of the Governance of the United States Agency for Global Media 5, 7 (Apr. 2019),  https://www.oversight.gov/sites/default/files/oig-reports/ISP-IB-19-22.pdf.

ensure people at Voice of America "suffer the consequences" for what he perceives as a "left-wing, leftward bias" inherent to media.  As to purportedly biased coverage, Pack has said he was "shocked" at the bias he encountered, and rebuked previous Agency leadership for their treatment of bias, which he equated to "at the most, a slap on the wrist."  He expressly admitted that "we [at USAGM] are continuing to look into it" and that USAGM has worked "to hold people accountable and do a complete investigation" of alleged breaches of journalistic practices—a clear firewall violation.  Pack further conceded that USAGM had personal involvement in the resulting disciplinary actions for this "biased" coverage: "[P]eople all the way up the chain have had varying degrees of disciplinary action."

135.    Pack's own bias against his own agency staff was palpable in the Carter interview.  He accused prior public servants at the agency of "covering up things" during his confirmation process.  He claimed that his confirmation was held up because "things happened that they were afraid that we were going to expose."  He has offered no evidence of these claims. In fact, the alleged subject of the purported cover up—flaws in the security clearance process at USAGM—was an acknowledged problem on which USAGM had worked extensively to take corrective action long before Pack arrived.  Pack and his confirmation "sherpa," Defendant Cullo, refused numerous offers for briefings from career Agency senior staff, including several of the Plaintiffs, related to all Agency and network operations, strategic plans, and initiatives. Just because Pack had no knowledge of how USAGM functioned prior to his ascension does not mean the dedicated civil servants were working to cover things up.

136.    Pack's rhetoric puts tens if not hundreds of bona fide reporters at risk of serious harm: The CEO of their own agency has branded Voice of America reporters as possible spies, many of whom work around the world, often in countries hostile to the free press.  If anything,

Pack's irresponsible statements are a gift to the world's autocrats, advancing their interests in delegitimizing the very free press meant to counter autocratic disinformation and propaganda. Although it is true that government auditors deemed USAGM's background check procedures insufficient in certain areas, that fact alone does not render USAGM's networks a hotbed of espionage.  Pack's view otherwise is contrary to all reason—so divorced from reality that it evidences that his reason for "purging" journalists and employees is at best mere pretext to justify an unlawful inquisition into journalistic practices designed to convert unlawfully the USAGM networks into governmental propaganda and to root out his imagined "deep state" conspiracy.  As one congressman put it during a hearing before the House Foreign Affairs Committee:

> Mr. Pack, without evidence, has made libelous claims, really, that, were these journalists to go get a job somewhere else in another country, could threaten not only their livelihoods, but their safety. When somebody from the United States government has labeled a journalist, a spy, who is going to go trust them in another country? Who is going to go hire them somewhere else?[55]

137.    Pack, during the Carter interview, explained what he believed his mission to be: "Our ideas are under attack, and they are, our enemies are ramping up their information *and disinformation* campaigns, and we really need to ramp *ours* up, and defend American ideas and principles."[56]  Despite the decades of work to establish Voice of America and its sister networks as exporters of America's great tradition of freedom of the press, Pack equated the USAGM networks with raw propaganda and disinformation.  He then repeated his position that the

---

[55]   Oversight of the United States Agency for Global Media and U.S. International Broadcasting Efforts: Hearing Before the H. Comm. on Foreign Affairs, 116th Cong. (Sept. 24, 2020) (statement of Rep. Joaquin Castro).

[56]   *Sara Carter Show*, *supra*, note 3.

networks need to publish "the administration's view," and said that "if [the Agency] doesn't fulfill its mission, it will not survive."

138.    Pack fundamentally misunderstands the mission and virtues of the agency he leads.  The networks are not propaganda.  They are not messaging devices for the Administration's views.  To the contrary, the very independent media he seeks to destroy is the *best* exemplar of America's ideals and values that this country can share with the world and the best way to combat national security threats from disinformation.  To equate USAGM journalists with the disinformation campaigns they were created to combat is a threat to U.S.-funded journalism and to the entire nation.

139.    Recognizing these threats, Congress is taking Pack's unlawful actions seriously. Pack was subpoenaed to testify before the House Foreign Affairs Committee on September 24, 2020, to explain the "outrageous actions since he took control of USAGM."  Pack "br[oke] his commitment" and failed to appear "in defiance of [that] subpoena."[57]

140.    Shortly after the conflicts of interest policy was released, Representative Engel yet again publicly rebuked Pack's actions over the last couple of months, calling his tenure a "disaster" and urging Voice of America's acting director to "ignore any attempt by USAGM management to improperly interfere in the service's work":

> One of Michael Pack's first actions as USAGM's CEO was to remove Voice of America's standards editor, a breach of the firewall meant to protect VOA and our other broadcasters from interference by any administration. Hobbling VOA's ability to police itself, Mr. Pack is now sending his right-wing political appointees after a respected and experienced journalist who recently authored stories providing unbiased reporting on President Trump's handling of the coronavirus. Mr. Pack's attempt to tell the broadcast services more broadly how to deal with

---

[57]  Oversight of the United States Agency for Global Media and U.S. International Broadcasting Efforts: Hearing Before the H. Comm. on Foreign Affairs, 116th Cong. (Sept. 24, 2020) (statement of Chairman Rep. Eliot Engel).

*(Cont'd on next page)*

perceived conflicts of interest likewise breaches the independence of those services and their journalists. . . .[58]

### Pack's Abrupt "Repeal" of the USAGM Firewall Regulation Purports to Eviscerate Protections of USAGM Networks' Journalism from Political Interference

141.    At approximately 10:18 p.m. on October 26, 2020, less than one hour before Defendants filed their Opposition to Plaintiffs' Motion for Preliminary Injunction, USAGM abruptly issued a "final rule" purporting to immediately repeal the Firewall Regulation, in a transparent effort to undercut Plaintiffs' regulatory firewall claims.[59]  This so-called "final rule" was accompanied by a brief statement by Pack explaining that the decision to repeal this regulation was based on purported "extensive legal analysis" by "external" legal counsel.

142.    According to Defendants, the Firewall Regulation needed to be rescinded because it was in somehow in tension with USAGM's mandate to "support the foreign policy of the United States."[60]  Pack also claimed that it frustrated his ability as CEO to "direct and supervise all broadcasting activities" of the USAGM networks and made it difficult for USAGM's leadership to effectively manage USAGM personnel, including, for example, preventing "biased reporting," or issuing "policies and procedures that require journalists not to advocate political positions."[61]  Pack's statement regarding the rescission of the Firewall Regulation goes so far as to claim that the existence of the Firewall Regulation "threatened constitutional values" by inhibiting him, as an appointee of the President, from pursuing the President's foreign-policy

---

[58]  Press Release, Rep. Eliot L. Engel, Chairman, House Committee on Foreign Affairs, Engel Statement on USAGM Officials Breaching the "Firewall" and Targeting VOA Journalist (Oct. 5 2020), https://foreignaffairs.house.gov/2020/10/engel-statement-on-usagm-officials-breaching-the-firewall-and-targeting-voa-journalist.

[59]  USAGM Final Rule, October 26, 2020, https://www.usagm.gov/wp-content/uploads/2020/10/Firewall-Repeal-Notice.pdf.

[60]  *Id.*

[61]  *Id.*

*(Cont'd on next page)*

objectives, which threatened to render USAGM "effectively unaccountable to Congress and the President."[62]  Critically, the repeal states that Defendants believe that "USAGM's statutory mandate"—namely, the IBA—"and Article II *necessarily require USAGM—at times—to control content*."

143.    The sudden rescission of the Firewall Regulation was viewed with alarm by members of both parties in Congress, who correctly understood the move to be the latest and most blatant effort by Defendants to eliminate the protections established to preserve the broadcast networks' journalistic independence and integrity and to convert the broadcast networks into a megaphone for the political agenda of the U.S. government.

144.    Representative Engel "renew[ed] his call for Mr. Pack to resign or be fired" but "worr[ies] about what additional damage he can do in the meantime."  He said that with this move, Pack had:

> [T]aken his rampage on America's international broadcasting to another level. He's trying to tear down the legally mandated firewall that protects USAGM broadcasters from outside interference*. But Congress created that firewall by law and although Mr. Pack can huff and puff, he can't blow that wall down*. The rule he rescinded yesterday clarified the legal protections. The firewall remains.
>
> This may come as small comfort to journalists at USAGM broadcasters, as Mr. Pack has shown again and again that he doesn't feel constrained by laws. Legal action against him is piling up and he remains in defiance of a duly authorized subpoena to appear before the Committee on Foreign Affairs. However, *I encourage USAGM journalists to continue carrying out their important work and to ignore illegal interference from Mr. Pack*

---

[62]  *Id.*

*and other administration officials. The law remains on your side*.[63]

145.   Representative Engel's Republican counterpart on the House Foreign Affairs Committee, the Ranking Member, Representative Michael McCaul, said that:

> It is unclear why CEO Pack is opposed to journalistic objectivity at USAGM and its networks.  Without it, the mission and effectiveness of the agency is undermined.  Fortunately, the requirement that USAGM's broadcasts be objective and conform with the highest professional standards in broadcast journalism is mandated in statute.  Mr. Pack may be able to repeal a regulation, but he cannot repeal the law.[64]

146.   Senator Robert Menendez, the Ranking Member of the Senate Foreign Relations Committee, called for his colleagues in Congress to help "stop [Pack's] nonsense and ensure that the reporters, editors, and producers at all of USAGM's grantees can continue their critical work without political influence from this White House or anyone else."  Senator Menendez said that USAGM's:

> Editorial independence and integrity is a statutorily-mandated component of USAGM's work. This principle sets the networks and grantees apart from state-run propagandistic media in the countries in which they operate.  Arbitrarily rescinding the regulatory firewall is not only an attack on USAGM's independence, it is an affront to the hundreds of thousands of

---

[63]   Press Release, Rep. Eliot L. Engel, Chairman, House Committee on Foreign Affairs, Engel Statement on Michael Pack's Attack on the Statutory Firewall (Oct. 27, 2020), https://foreignaffairs.house.gov/press-releases?ID=C48C338F-6F23-4E20-979E-FA4F4F7EAB0C.

[64]   Jessica Jerreat, *USAGM CEO Criticized Over Move to Rescind Firewall Regulation*, Voice of America (Oct. 27, 2020), https://www.voanews.com/usa/usagm-ceo-criticized-over-move-rescind-firewall-regulation.

*(Cont'd on next page)*

people around the world that have come to rely on these critical
services.[65]

147.     Senator Chris Murphy of the Senate Foreign Relations Committee, who recently

proposed legislation to strengthen the protection of USAGM's journalists from political

interference, said that:

> Whether Michael Pack wants it there or not, Congress cemented
> the firewall at USAGM in legal statute to protect broadcasters from
> the very outside political interference we're seeing right before our
> eyes. America is a democracy, and the firewall that was codified as
> part of the International Broadcasting Act is what distinguishes
> USAGM-funded networks from state-sponsored propaganda we
> see in places like Russia and China. We cannot allow the
> president's political appointees to influence journalistic content
> and we must ensure the law remains on the side of the
> journalists—not Trump's political hacks."[66]

### *Plaintiffs Have Suffered, And Continue To Suffer, Irreparable Harm Due To Defendants' Repeated Breaches Of The Firewall And Each Plaintiff Has Standing To Bring This Action.*

148.     Each of the Plaintiffs has suffered and continue to suffer irreparable harm as a

result of Defendants' ongoing efforts not only to breach but also to demolish the firewall.  Their

careers have been affected and their reputations attacked and maligned.  Each of the Plaintiffs

has worked—some of them literally for decades—to support and build the journalistic efforts at

Voice of America and the other USAGM entities, but Defendants are destroying the agency

---

[65]  Press Release, Sen. Robert Menendez, Menendez Statement on Michael Pack's Latest Attack on USAGM (Oct.
27, 2020), https://www.foreign.senate.gov/press/ranking/release/menendez-statement-on-michael-packs-latest-
attack-on-usagm.

[66]  Press Release, Sen. Chris Murphy, Murphy Statement on USAGM's Repeal of Firewall Regulation (Oct. 27,
2020), https://www.murphy.senate.gov/newsroom/press-releases/-murphy-statement-on-usagms-repeal-of-
firewall-regulation.

entirely.  Plaintiffs' jobs—current and, for those placed on leave and planning to return, future—
are harmed every day .

149.    With Voice of America's independence at risk, its credibility is necessarily at risk
as well.  Hiring qualified journalists will be more difficult.  Reporting will be more difficult.
Managing and supervising journalists will be more difficult.  Indeed, many of the Agency's most
qualified and dedicated civil servants have left voluntarily, due to the conditions to which they
have been subjected.  When Pack took office, the Agency had 12 career Senior Executive
Service (SES) employees; now there are four.  The Acting Director of Congressional Affairs left
the Agency to move to the Department of Defense, while the chief litigator within the General
Counsel's office left to join the Department of State.  The Deputy Chief Financial Officer
departed as well.  Foreign governments are already pointing to Pack's encroachments on Voice
of America as an "embarrassing situation" and that its content will be met "with suspicion in
targeted countries."[67]  Agency personnel fulfilling their duties as public servants to tell America's
story and to export one of America's greatest products—free speech—will be fundamentally
harmed.

150.    Defendants' actions have severely damaged the reputation of USAGM, its
broadcast networks, and its employees, and have caused USAGM's peer agencies abroad to
question USAGM's commitment to the core principles of fair, objective reporting and
independence from political influence.  USAGM is a member of the "Directors General 7,"
("DG7") a group of leading publicly-funded international broadcasters (also including the BBC
(United Kingdom), Deutsche Welle (Germany), Canadian Broadcasting Company (Canada),

---

[67]  Li Qinqing, *Ironic for US propaganda machine to expel foreign journalists*, China's Global Times (Aug. 24,
2020, 11:08 PM), https://www.globaltimes.cn/content/1198736.shtml.

Australian Broadcasting Corporation (Australia), NHK World (Japan), and France Media Monde (France)) with a shared commitment to the values of journalistic independence and the promotion of free expression abroad.  For several years, Plaintiff Powers has served as USAGM's representative to the DG7 and has regularly participated in the group's quarterly meetings, annual conferences, and other committees.  However, the other members of the DG7 expressed growing concern about USAGM's leadership, direction, and continued commitment to journalistic independence, and have stated that Powers will be excluded from this year's annual DG7 meeting.  The other DG7 members have also stated that if Pack and other members of USAGM's leadership continue to attack the broadcast networks' journalistic independence from the Trump Administration's agenda, that neither Powers nor any other USAGM employee would be welcome to participate in the DG7 going forward.  The destruction of the firewall has directly damaged Powers' reputation in the community of international broadcasters—a community essential to his academic work and expertise.

151.    Plaintiff Powers also serves as a member of the Executive Committee for the Association of International Broadcasters ("AIB"), a non-profit trade association that represents and supports global media organizations.  However, due to Pack's ongoing efforts to interfere with the integrity and independence of the USAGM networks' reporting, AIB leadership will not be including Powers in their quarterly Executive Committee business meeting and will not allow Powers to exercise any related voting rights or responsibilities due to their concerns that USAGM was no longer committed to the shared values of press freedom and journalistic independence from political influence.  In this way, the Defendants' ongoing firewall breaches and efforts to influence the USAGM networks' coverage have diminished the standing of USAGM and have significantly impaired the ability of its senior leaders to participate in policy

discussions and information exchanges with other international broadcasters.  Powers understands that his exclusion from both DG7 and AIB are the direct result of his association with a broadcast agency that no longer shares those groups' commitment to editorial independence.

152.    The actions of Defendants are also directly stifling and chilling protected activity and speech.  In an editorial meeting in September 2020, in fact, newsroom managers at Voice of America killed multiple stories on political issues specifically because of the increased scrutiny, the investigations, and the risks of retaliation by Defendants.  Voice of America added a third copy editor to all political stories, to avoid accusations of bias—by way of comparison, other outlets have at most *one* copy editors per story.  Requiring more copy editors to review every political piece slows the editorial process, hampering coverage and prohibiting Voice of America from covering the "new" in "news."  At the same time, reporting has been watered down to the point of self-censorship, so as to not give Defendants *any* argument—even an unreasonable one—that a published story could be interpreted as pro-Biden.  Voice of America employees throughout have recognized an increase in self-censorship that grows with each additional breach of the firewall.

153.    In addition, USAGM political appointees are beginning to take direct steps towards silencing and censoring Voice of America journalists in their speech activities outside of the newsroom.  On information and belief, Defendant Wuco, an adviser hired by Pack to assist him in the front office of USAGM, has put pressure on the Acting Director of Voice of America to take disciplinary action against Voice of America journalists for social media activity Wuco has deemed to be biased and inconsistent with journalistic ethics.  To Plaintiffs' knowledge, Wuco has never been a journalist.

154.    As a result of Defendants' actions, Voice of America's journalism has been
severely hampered.  As of October 2, 2020, for instance, nearly 200 positions were open at Voice
of America that Defendants prohibited the network from filling.  According to an internal Voice
of America assessment:

> The Agency's hiring freeze and non-renewal of J-1 work
> authorizations and [personal service contracts] will have long-term
> consequences by crushing morale and diminishing VOA's brand
> and reputation, handicapping our ability to recruit top professionals
> and journalists in the future.  Current work loads are not
> sustainable, and staff burnout and rising overtime costs are a
> concern.

The internal assessment further indicated that numerous programs and even several smaller
language services might have to close.  As a result of Defendants' activities, the assessment
made clear that "VOA will lose affiliates, credibility, audience, and standing in many countries,
allowing competitors from hostile competitors to fill the void," including, but not limited to,
organizations like China's China Central Television (CCTV).[68]

155.    Defendants' actions are also having a severe effect on Voice of America's
language services.  Voice of America has had to cancel all Hausa language television partner
stations, which have a target audience of 220 million people, and has had to cancel Hausa radio
and Twitter content that targets young people who are most vulnerable to extremism.
Defendants have also caused a severe shortage of editors for the Mandarin service, limiting news
coverage and analysis and cancelling a popular program called "China on Twitter."  Voice of

---

[68]  Further harming Voice of America's global credibility, Pack has publicly maligned the USAGM networks'
journalism as "substandard," *USAGM Denounces Substandard Journalism Within Federal News Networks;
Agency Publishes Clarification of Federal Reporting Expectations*, USAGM Press Release (Oct. 6, 2020),
https://www.usagm.gov/2020/10/06/usagm-denounces-substandard-journalism-within-federal-news-networks-
agency-publishes-clarification-of-federal-reporting-expectations/, even as Voice of America recently won an
award for its content, prevailing over Frontline and NBC News in awards for longform digital video
storytelling.  *See Shoura*, Online Journalism Awards, https://awards.journalists.org/entries/shoura/.

America has similarly had to reduce or cancel Russian-language, Iranian, and Korean programming, and has been forced to halt development of new programs specific to issues in Venezuela.  Critically, too, Defendants' personnel interference has affected quality control and editorial oversight, including, as the Voice of America internal assessment described, "[u]nacceptable adverse impact[s] on editorial oversight" as a result of insufficient personnel.

156.    Defendants' repeated actions in violation of the firewall have directly impaired the ability of the broadcast networks' journalistic and editorial staff, including Plaintiff Chao, to produce and publish reliable, accurate, and balanced journalism.  These firewall violations, culminating in the rescission of the regulatory firewall, have signaled Defendants' belief that they have the authority to control the journalistic content published by Voice of America and the other broadcasting networks, which poses an existential threat to the networks' credibility and reputation in a competitive media marketplace, and threatens to undo the decades of time and effort Chao and her journalistic colleagues have invested in earning the trust and respect of their audiences by consistently producing fair, objective reporting that is not driven by the political agenda or current policy positions of the United States government.  Defendants' conduct has also actively chilled the journalistic content that Chao is charged with managing, and the journalists she is responsible for supervising and supporting.

157.    Voice of America cannot continue to function as required by law when placed under these types of pressures.  And its reporters, facing serious and personal risks to their future—and for some foreign correspondents, their safety—have been and unquestionably will be chilled in their news coverage.  This is the very type of irreparable harm that the First Amendment and the firewall are meant to protect against.

158.    Many journalists, both within Voice of America and the related entities, would be plaintiffs in this action were it not for Defendants' persistent and ongoing breaches of the firewall and their retaliation.  These journalists have been hindered in joining this action as a result of Defendants' misdeeds.  Specifically, journalists reasonably fear the type of retaliatory action suffered by Steve Herman, the USAGM Plaintiffs, and others.  Defendants have shown themselves ready to retaliate against anyone who would stand in the way of their campaign to control the broadcasting networks and influence their content.  Journalists also are unable to pursue their claims for fear that, if they publicly advance these claims, the new Conflicts of Interest policy will take them off their beat and leave their already-stretched-thin colleagues without sufficient journalistic support to fulfill Voice of America's mission.  They also fear being unfairly castigated as biased.  Journalists' careers and their ability to engage in expressive activity rise and fall with the public's perception of their credibility, objectivity, honesty, and balance in their reporting, editing, and management of a news organization.  Any attack upon a journalist's credibility imperils her career and threatens her ability to engage in protected First Amendment activity.  Journalists cannot participate in this action without risking not only their position at Voice of America in the face of Defendants' pattern of retaliation and unlawful activity but also their reputation for balance and impartiality.

## FIRST CAUSE OF ACTION

### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2): Defendants' Actions Are Arbitrary, Capricious, Unconstitutional, Or Otherwise Not In Accordance With Law

159.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

160.    Individually and collectively, Defendants' numerous firewall violations constitute "final agency action[s] for which there is no other adequate remedy."  5 U.S.C. § 704.

161.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusions found to be": (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "contrary to constitutional right, power, privilege, or immunity"; (3) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or (4) "without observance of procedure required by law." 5 U.S.C. § 706(2).

162.    Defendants' firewall breaches are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Defendants' conduct infringes upon the First Amendment right to freedom of the press and the right to engage in protected First Amendment activity, and is unconstitutional retaliation and unconstitutional discrimination based on perceived viewpoint. Defendants' actions—including their perceived-viewpoint discrimination—are presumptively unconstitutional, and because Defendants have no legal or rational justification for their misconduct, that conduct is unconstitutional. In fact, the *only* reasonable inference to draw from Defendants' conduct is that Defendants intended to penalize those who have a perceived viewpoint that differs from Defendants' political perspective. Defendants' numerous breaches of the firewall therefore also constitute unconstitutional retaliation—actions undertaken to penalize several of the Plaintiffs and others for engaging in First Amendment protected activity.

163.    Defendants' conduct is also "not in accordance with law," and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (2)(C). Defendants' misconduct violates the statutory and regulatory firewalls, which exist to protect the USAGM journalists' professional independence and integrity and to enable them to operate within the highest professional standards of broadcast journalism. *See* 22 U.S.C.

§§ 6202, 6204(b); 22 C.F.R. § 531.3.  Defendants are forbidden from even "attempt[ing] to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks, including their leadership, officers, employees, or staff, in the performance of their journalistic and broadcasting duties and activities."  22 C.F.R. § 531.3(c).  Yet that is precisely what they have done, over and over again—attempting to coerce, intimidate, threaten, pressure, and interfere with the journalism of the USAGM networks.  Defendants' gross corporate mismanagement also violates the firewall in that it seeks to strangle the networks and coerce them into submission and because it violates the statutory take care clause, which requires that Defendants "respect the professional independence and integrity of the Board, its broadcasting services, and the grantees of the Board."  22 U.S.C. § 6204(b).

164.     Defendants' firewall breaches are also "arbitrary and capricious."  5 U.S.C. § 706(2)(A).  Defendants' conduct has no legitimate rationale and directly conflicts with the law, regulation, and the interests and mission of USAGM, the networks, and their employees.  To date, Defendants' expressed rationales for their misdeeds are their efforts to "drain the swamp," root out the "deep state," and attempt to prohibit "spies" from infiltrating the networks.  These rationales are the height of irrationality—the product of baseless conspiracy theories devoid of any evidence in support.

165.     Defendants' misconduct has harmed and continues to harm the reputation and credibility of Plaintiffs and all USAGM networks, harming journalists and Plaintiffs as employees of USAGM and the networks, chilling protected journalistic activity, and limiting all USAGM stakeholders' and journalists' futures.  Defendants' conduct has resulted in the killing of important news stories and changed editorial decisions—Defendants have also directly risked Plaintiffs' livelihoods and future careers, smearing them as incompetent or, worse, as spies.

166.     As a result of Defendants' actions, therefore, Plaintiffs have suffered and continue to suffer irreparable harm.

**SECOND CAUSE OF ACTION**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2):**
**Defendants' Rescission of the Firewall Regulation Is Contrary to Established Law,**
**Unconstitutional, and Arbitrary and Capricious**

167.     Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

168.     Defendants' abrupt attempt to rescind the Firewall Regulation on October 26, 2020 constitutes a "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

169.     Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusions found to be": (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "contrary to constitutional right, power, privilege, or immunity"; (3) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or (4) "without observance of procedure required by law." 5 U.S.C. § 706(2).

170.     Defendant's purported "repeal" of the Firewall Regulation is "not in accordance with law," and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (2)(C). For decades, the statutes governing USAGM and its predecessor agencies have emphasized the need to uphold the credibility, objectivity, and journalistic independence of the broadcast networks. The current iteration of the IBA, passed in 1994, required USAGM's predecessor agency, the Broadcasting Board, to "respect the professional independence and integrity of" the broadcast networks and grantees, IBA § 305(b), in order to ensure that they can operate "highest professional standards of broadcast journalism."

IBA § 303(5).  Although Defendants' decision to rescind the regulatory firewall relies on the

2017 NDAA's creation of the unitary CEO position in order to expedite the agency's decision-

making, he omits that the 2017 NDAA reinforced the statutory firewall by requiring the USAGM

CEO to "respect the professional independence and integrity of the Board, its broadcasting

services, and the grantees of the board."  22 U.S.C. § 6204(b).  As such, Defendants

mischaracterize the Firewall Regulation as an unlawful extension of the statutory firewall rather

than a codification of existing law.  On this basis, USAGM's justifications in repealing the

Firewall Regulation plainly misinterpret and contradict the statutes governing USAGM, and the

repeal is therefore "not in accordance with law."

171.    The Defendants' purported repeal of the Firewall Regulation likewise violates the

First Amendment by attempting to control the reporting activities of journalists exercising their

First Amendment rights and serving as a shining example for foreign audiences of the freedom

of the press enshrined in the U.S. Constitution.  By repealing the firewall regulation and invoking

a purported right to control editorial content, the Defendants attempt to curtail that freedom of

speech by eliminating a core protection insulating these journalists' work from political

interference, and threaten a chilling effect on the objectivity and credibility of the USAGM

networks' reporting by raising the specter that said reporting will be scrutinized based on its

adherence to the U.S. government's political agenda.

172.    Defendants' firewall breaches are also "arbitrary and capricious."  5 U.S.C.

§ 706(2)(A).  Defendants' stated rationale for this action focuses on their contention that the

Firewall Regulation inhibits Pack's ability to directly supervise and manage the work of its

journalists, but fails to meaningfully consider the paramount importance of the firewall to

ensuring the continued credibility and effectiveness of the USAGM networks' journalism and to

the agency's founding mission.  USAGM's "final rule" in support of rescinding the Firewall

Regulation does not consider other key issues, such as the reliance of USAGM's employees on

the expectation that they would be able to report independent, objective news free of political

interference, or the determination in the Firewall Regulation that USAGM should oversee the

broadcast networks' journalism "in a manner consistent with that conducted by other media

organizations which operate editorially independent news divisions," rather than the top-down

model followed by state-run media organizations in other countries such as Russia, China, and

Iran.  The repeal is furthermore arbitrary and capricious in that its rationales are pretext for the

true reason for the repeal: to gain an advantage in litigation, as evidenced by the fact that the

repeal was effectuated fifty minutes before Defendants filed their opposition to Plaintiffs

preliminary injunction motion.  Given USAGM's failure to consider these and other significant

issues in promulgating this "final rule," the rule is arbitrary and capricious in violation of 5

U.S.C. § 706(2).

### THIRD CAUSE OF ACTION
### Injunctive Relief Under The First Amendment

173.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above

as though fully set forth herein.

174.    Defendants' firewall breaches violate the First Amendment by, including but not

limited to: (A) unconstitutionally restraining rights under the First Amendment's guarantees of

free speech and freedom of the press; (B) unconstitutionally retaliating for activity protected

under the First Amendment; (C) unconstitutionally discriminating based on perceived viewpoint;

and (D) unconstitutionally imposing a vague and overbroad conflict of interest policy that

confers on them unconstitutionally unfettered discretion to suppress speech.

175.     Plaintiffs are civil servants engaged in the work of supporting journalists, and these journalistic activities are entitled to First Amendment protection under the freedom of the press clause and the free speech clause of the First Amendment.  Defendants have deprived USAGM journalists of their First Amendment rights to freedom of speech and freedom of the press by interfering with the manner in which Voice of America covers editorials, demanding that reporters at Voice of America justify individual decisions concerning coverage, attempting to infiltrate internal journalistic discussions concerning coverage of the 2020 presidential election, and investigating editorial decisions, among other misdeeds.  Defendants have chilled news coverage, caused the killing of valuable news stories, interfered in journalistic personnel decisions, removed the guardians of the firewall that exists to protect the journalism at the USAGM networks, and engaged in a pattern and practice of investigative harassment and intimidation.  Defendants have also imposed an overbroad and unconstitutionally vague conflict of interest policy that confers on them unfettered discretion to suppress speech.  Defendants' actions have impacted the content of news coverage, violating the integrity of the journalistic process that is key to the mission of the USAGM and the promise of the First Amendment.  Defendants' actions have actually chilled coverage, which has resulted in critical news stories being killed for fear that they will lead to retaliation.

176.     By interfering with the content of coverage and personnel, Defendants have prevented the USAGM networks and journalists from making independent decisions about what news to cover and how to cover it, in violation of the First Amendment.  To date, Defendants' expressed rationales for their misdeeds are their efforts to "drain the swamp," root out the "deep state," and attempt to prohibit "spies" from infiltrating the networks.  These rationales do not satisfy any tier of First Amendment scrutiny.

177.     Defendants have retaliated against journalists and supporting personnel for engaging in expressive conduct and because Defendants perceive that certain people's viewpoints differ from their own.  Defendants perceive that USAGM journalists and Plaintiffs are liberal, anti-Trump and members of the "deep state."  Defendants' efforts to interfere with the content of Plaintiffs' news coverage and to undermine the efficiency of their organizations were undertaken to retaliate against and limit speech and journalistic activities.  Defendants have made clear that coverage of the Trump Administration's politics and policies that is found to be insufficiently complimentary will be met with reprisal, chilling the exercise of First Amendment rights.  This is textbook unconstitutional retaliation and discrimination based on perceived-viewpoint.  Defendants' conduct is presumptively unconstitutional, and Defendants can offer no compelling rationale to justify it.

178.     Defendants' misconduct risks the reputation and credibility of Plaintiffs and all USAGM networks, harming journalists and Plaintiffs as employees of USAGM and the networks, chilling protected journalistic activity, and limiting all stakeholders' and journalists' futures.  Defendants' conduct has resulted in the killing of important news stories and changed editorial decisions—Defendants have also directly risked Plaintiffs' livelihoods and future careers, smearing them as incompetent or, worse, as spies.

179.     As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

## FOURTH CAUSE OF ACTION
### Injunctive Relief for Violation of the Statutory Firewall, 22 U.S.C. §§ 6202, 6204

180.     Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

181.     In creating USAGM (and its predecessors) and its networks, Congress created a statutory firewall to protect the independence and integrity of its journalists and their reporting. Federal law provides that "United States international broadcasting shall . . . be conducted in accordance with the highest professional standards of broadcast journalism" and shall "be based on reliable information about its potential audience."  22 U.S.C. § 6202(a)(5)–(6).  In addition, "United States international broadcasting shall include . .  news which is consistently reliable and authoritative, accurate, objective, and comprehensive" and which is "a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society."  22 U.S.C. § 6202(b)(1)–(2).

182.     Congress recognized that, to be effective, "the Voice of America must win the attention and respect of [the] listener[]."  22 U.S.C. § 6202(c).  To meet that goal, Congress stated that Voice of America will "serve as a consistently reliable and authoritative source of news," and that its news "will be accurate, objective, and comprehensive."  22 U.S.C. § 6202(c)(1).  Voice of America "will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions."  22 U.S.C. § 6202(c)(2).  And when Congress created the office of the CEO, it required the CEO to "respect the professional independence and integrity" of its broadcasting services and grantees.  22 U.S.C. § 6204(b).

183.     As officers of USAGM and its associated entities, Defendants are bound by the statutory firewall.

184.     Defendants have egregiously, aggressively, and unabashedly violated the firewall by interfering with the manner in which Voice of America covers editorials, demanding that reporters at Voice of America justify individual decisions concerning coverage, attempting to

infiltrate internal journalistic discussions concerning coverage of the 2020 presidential election, and investigating editorial decisions, among other misdeeds.  Defendants have chilled news coverage, caused the killing of valuable news stories, interfered in journalistic personnel decisions, removed the guardians of the firewall that exists to protect the journalism at the USAGM networks, and engaged in a pattern and practice of investigative harassment and intimidation.  Defendants' actions have impacted the content of Plaintiffs' coverage, violating the integrity of the journalistic process that is key to the mission of the USAGM and the promise of the statutory firewall.  Defendants' actions have actually chilled coverage, which has resulted in critical news stories being killed for fear that they will lead to retaliation, which in turn impacts and influences news coverage.  Defendants' conduct breaches the statutory firewall, ignoring the journalists' professional independence and integrity and preventing the USAGM networks from operating within the highest professional standards of broadcast journalism.

185.    Defendants' misconduct risks the reputation and credibility of Plaintiffs and all USAGM networks, harming journalists and Plaintiffs as employees of USAGM and the networks, chilling protected journalistic activity, and limiting all stakeholders' futures. Defendants' conduct has resulted in the killing of important news stories and changed editorial decisions—Defendants have also directly risked Plaintiffs' livelihoods and future careers, smearing them as incompetent or, worse, as spies.

186.    As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

**FIFTH CAUSE OF ACTION**
**Injunctive Relief for Violation of the Regulatory Firewall, 22 C.F.R. § 531.3**

187.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

188.     The Broadcasting Board unanimously adopted the Firewall Regulation to protect the professional independence and integrity of its journalists and their reporting.  *See* 22 C.F.R. § 531.3(a).  This regulatory firewall remains in place today.  The regulatory firewall exists between the news divisions of USAGM networks, everyone else in the organization, and the Executive Branch of the U.S. Government.  22 C.F.R. § 531.3(b).  "The firewall is critical to ensuring that the editors, reporters, and other journalists of the USAGM network make the decisions on what stories to cover and how they are covered, and that those decisions are ultimately governed by the highest standards of professional journalism."  22 C.F.R. § 531.3(d).

189.     The Firewall Regulation is violated when any person within the Executive Branch or within USAGM but outside of its news divisions "attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks including their leadership, officers, employees, or staff, in the performance of their journalistic and broadcasting duties and activities.  It is also violated when someone inside the newsroom acts in furtherance of or pursuant to such impermissible influence."  22 C.F.R. § 531.3(c).  The firewall also limits Defendants' "direction and oversight" to those activities "that those in equivalent leadership positions in an organization overseeing other reputable news organizations may provide, in a manner consistent with the highest standards of professional journalism."  22 C.F.R. § 531.3(e)(3).

190.     Defendants have egregiously, aggressively, and unabashedly violated the firewall by interfering with the manner in which Voice of America covers editorials, demanding that reporters at Voice of America justify individual decisions concerning coverage, attempting to infiltrate internal journalistic discussions concerning coverage of the 2020 presidential election, and investigating editorial decisions, among other misdeeds.  Defendants have chilled news

coverage, caused the killing of valuable news stories, interfered in journalistic personnel decisions, removed the guardians of the firewall that exists to protect the journalism at the USAGM networks, and engaged in a pattern and practice of investigative harassment and intimidation. Defendants' actions have impacted the content of Plaintiffs' coverage, violating the integrity of the journalistic process that is key to the mission of the USAGM and the promise of the statutory firewall. Defendants' actions have actually chilled coverage, which has resulted in critical news stories being killed for fear that they will lead to retaliation, which in turn impacts and influences news coverage. Defendants' conduct includes actions that *no one* "in equivalent leadership positions in an organization overseeing other reputable news organizations" would take. Defendants' conduct breaches the regulatory firewall, ignoring Plaintiffs' professional independence and integrity and preventing Plaintiffs from operating within the highest professional standards of broadcast journalism.

191. Defendants' misconduct risks the reputation and credibility of Plaintiffs and all USAGM networks, harming journalists and Plaintiffs as employees of USAGM and the networks, chilling protected journalistic activity, and limiting all stakeholders' futures. Defendants' conduct has resulted in the killing of important news stories and changed editorial decisions—Defendants have also directly risked Plaintiffs' livelihoods and future careers, smearing them as incompetent or, worse, as spies.

192. As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

## SIXTH CAUSE OF ACTION
### *Ultra Vires* Actions in Excess of Statutory Authority

193. Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

194.     As described above, numerous instances of Defendants' conduct have constituted violations of the statutory firewall governing USAGM's management of the USAGM broadcasting services as set forth at 22 U.S.C. § 6202 and § 6204(b).

195.     Executive branch agencies and officials such as Defendants may only exercise power granted by Congress or delegated by the President.

196.     Defendants' firewall violations constitute *ultra vires* actions in excess of their delegated authority, and Defendant Pack's actions violate the statutory command that he "respect the professional independence and integrity" of USAGM and its broadcasting services and grantees.

197.     As a result of Defendants' *ultra vires* actions, Plaintiffs have suffered and continue to suffer irreparable harm.

## SEVENTH CAUSE OF ACTION
### Breach of Fiduciary Duties and Statutory Take Care Clause, 22 U.S.C. § 6204(b)
### (Against Chief Executive Officer Michael Pack)

198.     Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

199.     As Chief Executive Officer of USAGM, Michael Pack owes a fiduciary duty to USAGM and its associated entities.  To that end, Congress included a take care clause in the statute establishing the office of Chief Executive Officer, which requires that the Chief Executive Officer "respect the professional independence and integrity of the Board, its broadcasting services, and the grantees of the Board."  22 U.S.C. § 6204(b).

200.     Michael Pack has breached his fiduciary duties and violated the statutory take care clause through his gross mismanagement of USAGM and its networks.  Pack's actions, including strangling the entities of funds, failing to complete even ministerial duties, ignoring essential contracting needs, and other misdeeds, have prevented USAGM from accomplishing its

objective of providing consistently reliable and authoritative, accurate, objective, and comprehensive news and information.  Defendants have also actively breached their fiduciary duties and the take care clause by engaging in unsafe COVID-19 practices, requiring even those with serious health conditions to come into the office, and failing to take preventative actions like wearing protective masks and engaging in social distancing.

201.    As a result of Defendants' actions, Plaintiffs, as employees of and stakeholders in USAGM and its networks, have suffered and continue to suffer irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter each of the following forms of relief:

a.  A preliminary and permanent injunction, that:

    i.    Enjoins Defendants from violating the First Amendment, and the statutory and regulatory firewall;

    ii.   Enjoining the putative "repeal" of the Firewall Regulation from taking effect;

    iii.  Enjoins Defendants from retaliating against Plaintiffs and any journalists or employees of USAGM, Voice of America, Radio Free Asia, Radio Free Europe/Radio Liberty, the Office of Cuba Broadcasting, or the Middle East Broadcasting Company for attempting to protect the firewall, for participating in this action, or for otherwise attempting to exercise their First Amendment rights;

    iv.   Prohibits Defendants from discriminating against Plaintiffs and any journalists or employees of USAGM, Voice of America, Radio Free Asia, Radio Free

Europe/Radio Liberty, the Office of Cuba Broadcasting, or the Middle East Broadcasting Networks on the basis of their perceived viewpoint;

v. Requires Defendants to reinstate Steve Springer as Standards Editor of Voice of America or to permit Voice of America to hire the Standards Editor of the Voice of America leadership's choice;

vi. Enjoins Defendants from hiring, firing, or otherwise interfering with journalistic personnel decisions at Voice of America, Radio Free Asia, Radio Free Europe/Radio Liberty, the Office of Cuba Broadcasting, or the Middle East Broadcasting Networks, Inc.;

vii. Enjoins Defendants from conducting any and all investigations into potential lapses of journalistic standards and ethics at Voice of America, Radio Free Asia, Radio Free Europe/Radio Liberty, the Office of Cuba Broadcasting, or the Middle East Broadcasting Networks, or from directing, pressuring, coercing, threatening, interfering with, or otherwise impermissibly interfering with such investigations, except pursuant to the Procedures for Editorial Lapse;

viii. Enjoins Defendants from attending or seeking to attend newsroom meetings, from speaking to journalists or leadership (except the appointed Directors or Presidents) of Voice of America, Radio Free Asia, Radio Free Europe/Radio Liberty, the Office of Cuba Broadcasting, or the Middle East Broadcasting Networks about editorial decisions, journalistic standards, or coverage decisions;

     ix.    Enjoins any enforcement of USAGM's conflict of interest policy, imposed on October 4, 2020, which is overbroad and vague, and confers upon USAGM unfettered discretion to suppress speech;

     x.    Requires Michael Pack to fulfill his ministerial duty of signing J-1 visa sponsorship requests, allowing Voice of America to hire or retain needed journalists or in the alternative requiring Pack immediately to publish meaningful, written standards that govern his review of any purported discretion used to determine whether to sign J-1 visa forms;

     xi.    Establishes an independent monitor to ensure Defendants' compliance with this Court's order, the First Amendment, and the statutory and regulatory firewall;

b.  A declaration that Defendants' conduct as alleged herein violated the First Amendment;

c.  A declaration that Defendants' conduct as alleged herein violates the statutory and regulatory firewalls that surround USAGM networks; and

d.  An order granting Plaintiffs costs, fees, and disbursements incurred in connection with these proceedings and such further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial as to all matter properly triable by jury.

Dated:    November 4, 2020          Respectfully submitted,

                                        GIBSON, DUNN & CRUTCHER LLP

                                        /s/ *Theodore J. Boutrous, Jr.* _____

                                        Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
                                        333 South Grand Avenue

Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Mylan L. Denerstein (admitted *pro hac vice*)
Zainab Ahmad (D.D.C. Bar No. NY0345)
Lee R. Crain (D.D.C. Bar No. NY0337)
Alexandra Grossbaum (admitted *pro hac vice*)
Lauren Kole (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166-0193
Tel: 212.351.4000
MDenerstein@gibsondunn.com
Zahmad@gibsondunn.com
LCrain@gibsondunn.com
AGrossbaum@gibsondunn.com
LKole@gibsondunn.com

Joshua S. Lipshutz (D.C. Bar No. 1033391)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
JLipshutz@gibsondunn.com

*Counsel for Plaintiffs*