**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
GRANT TURNER, *et al.*,                )
                                                    )
                    *Plaintiffs*,              )
                                                    )
v.                                                  )          Case No. 1:20-cv-02885-BAH
                                                    )
U.S. AGENCY FOR GLOBAL MEDIA        )
MEDIA, *et al.*,                               )
                                                    )
                    *Defendants.*           )
_____)


**DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.     No Plaintiff has adequately demonstrated a reputational injury fairly traceable to Defendants' conduct and redressable by this Court........................................................... 1

    A.    Plaintiffs' novel theory of imputed reputational harm contravenes standing doctrine. ...................................................................................................... 1

    B.    Even accepting Plaintiffs' novel theory, Plaintiffs have failed to make a clear showing of reputational injury fairly traceable to the challenged conduct. ..................................................................................................... 7

II.    The addition of Plaintiff Chao does nothing to clear the jurisdictional obstacles posed by standing and the CSRA ............................................................................ 8

    A.    Ms. Chao must administratively exhaust her claims before filing suit. ................. 9

    B.    Ms. Chao has not suffered injury-in-fact. ............................................. 11

III.    Plaintiffs' challenge to the rule rescission is without merit. ............................... 12

    A.    Plaintiffs lack standing to challenge the rescission, just as they lack standing to assert their other claims. .................................................... 13

    B.    The rescission is valid and lawful. .................................................... 13

        1.    The rescission is consistent with the IBA. ................................. 13

        2.    The rescission is constitutional. ........................................... 18

        3.    The rescission is not arbitrary and capricious. ........................... 19

    C.    Plaintiffs have not shown that enjoining the rescission is necessary to avert irreparable harm or that doing so is in the public interest. ..................................... 22

IV.    CEO Pack did not say he would turn off the air conditioning and ban masks. ............... 23

# TABLE OF AUTHORITIES

## CASES

*Am. Trucking Ass'ns, Inc. v. United States*,
   627 F.2d 1313 (D.C. Cir. 1980) ...................................................................... 20, 22

*Andrade v. Lauer*,
   729 F.2d 1475 (D.C. Cir. 1984) ............................................................................ 10

*Baker v. Carr*,
   369 U.S. 186 (1962) ............................................................................................... 11

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................. 6

*Bldg. & Const. Trades Dep't, AFL-CIO v. Brock*,
   838 F.2d 1258 (D.C. Cir. 1988) ............................................................................ 22

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ............................................................................................... 14

*Cierco v. Mnuchin*,
   857 F.3d 407 (D.C. Cir. 2017) ................................................................................ 4

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................................... 12

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) .......................................................................................... 22

*DHS v. Regents*,
   140 S. Ct. 1891 (2020) .......................................................................................... 21

*Doe v. Nat'l Board of Medical Examiners*,
   199 F.3d 146 (3d Cir. 1999) ...................................................................... 2, 3, 4, 7

*EarthLink, Inc. v. FCC*,
   462 F.3d 1 (D.C. Cir. 2006) .................................................................................. 20

*FCC v. WNCN Listeners Guild*,
   450 U.S. 582 (1981) ............................................................................................... 20

*Foretich v. United States*,
   351 F.3d 1198 (D.C. Cir. 2003) ................................................................... 1, 2, 3

*Forsham v. Harris,*
  445 U.S. 169 (1980)......................................................................................... 16

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
  460 F.3d 13 (D.C. Cir. 2006)............................................................................ 6

*Gully v. Nat'l Credit Union Admin. Bd.,*
  341 F.3d 155 (2d Cir. 2003).............................................................................. 2

*In re Core Commc'ns, Inc.,*
  455 F.3d 267 (D.C. Cir. 2006).......................................................................... 20

*Indep. Equip. Dealers Ass'n v. EPA,*
  372 F.3d 420 (D.C.Cir.2004)............................................................................ 7

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
  341 U.S. 123 (1951).......................................................................................... 2

*Laird v. Tatum,*
  408 U.S. 1 (1972)............................................................................. 7, 11, 12, 23

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)...................................................................................... 4, 7

*Mahoney v. Donovan,*
  721 F.3d 633 (D.C. Cir. 2013).......................................................................... 10

*McBryde v. Committee to Review Circuit Council Conduct,*
  264 F.3d 52 (D.C. Cir. 2001).......................................................................... 1, 4

*Meese v. Keene,*
  481 U.S. 465 (1987)................................................................................... 2, 4, 7

*Moose Lodge No. 107 v. Irvis,*
  407 U.S. 163 (1972).......................................................................................... 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)............................................................................................ 21

*N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.,*
  878 F.3d 271 (D.C. Cir. 2017).......................................................................... 21

*NCAA v. Governor of N.J.,*
  730 F.3d 208 (3d Cir. 2013)............................................................................... 2

iii

*Parsons v. U.S. Dep't of Justice*,
   801 F.3d 701 (6th Cir. 2015) ................................................................... 2

*Ralis v. RFE/RL, Inc.*,
   770 F.2d 1121 (D.C. Cir. 1985) ...................................................... 15, 16

*Shukh v. Seagate Tech., LLC*,
   803 F.3d 659 (Fed. Cir. 2015) ............................................................... 2

*Steadman v. Governor, U.S. Soldiers' & Airmen's Home*,
   918 F.2d 963 (D.C. Cir. 1990) ............................................................ 10

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009) ............................................................................ 13

*Tripp v. Dep't of Def.*,
   284 F. Supp. 2d 50 (D.D.C. 2003) ...................................................... 18

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................ 23

*Weaver v. U.S. Info. Agency*,
   87 F.3d 1429 (D.C. Cir. 1996) .................................................. 9, 10, 11

**STATUTES**

5 U.S.C. § 1214 ......................................................................................... 9

5 U.S.C. § 2301 ......................................................................................... 9

5 U.S.C. § 2302 .................................................................................... 9, 10

15 U.S.C. § 78u-3 ................................................................................... 16

22 U.S.C. § 1461 ..................................................................................... 18

22 U.S.C. § 1461-1 .................................................................................. 18

22 U.S.C. § 6202 ................................................................ 14, 17, 19, 20

22 U.S.C. § 6204 .................................................................... 14, 16, 17, 19

22 U.S.C. § 6211 ..................................................................................... 18

22 U.S.C. § 6541 ..................................................................................... 15

29 U.S.C. § 662 ........................................................................................................... 16

Board for International Broadcasting Act of 1973,
   Pub. L. No. 93-129, 87 Stat. 456 ..................................................................... 15, 16

**REGULATIONS**

22 C.F.R. § 531.3 ....................................................................................................... 22

**OTHER AUTHORITIES**

*How Tax Collectors Like the IRS Cleverly Rob You of Your Money*, Financial Samurai,
   (revised Dec. 20, 2019),
   https://www.financialsamurai.com/how-tax-collectors-like-the-irs-cleverly-rob-you-of-
   your-money/ ................................................................................................................ 3

Josh Rogin, *Iranian Jamming Jams up the BBG*, *Foreign Policy* (Feb. 17, 2010),
   https://foreignpolicy.com/2010/02/17/iranian-jamming-jams-up-the-bbg ............................. 17

P.J. Huffstutter & Mark Weinraub, *Penny for your corn? Stingy trade-war aid irks U.S.
   farmers*, Reuters (Nov. 28, 2018),
   https://www.reuters.com/article/us-usa-trade-china-aid/penny-for-your-corn-stingy-trade-
   war-aid-irks-u-s-farmers-idUSKCN1NX1D7 ............................................................. 3

The Court ordered supplemental briefing on four issues: (1) the scope of cognizable reputational injury; (2) how the addition as Plaintiff of Kelu Chao affects the Court's jurisdiction; (3) the validity of the October 26, 2020 Final Rule rescinding the June 11, 2020 Final Rule; and (4) the factual background for statements allegedly made by CEO Pack.

I.   **No Plaintiff has adequately demonstrated a reputational injury fairly traceable to Defendants' conduct and redressable by this Court.**

   *A.   Plaintiffs' novel theory of imputed reputational harm contravenes standing doctrine.*

   Plaintiffs contend that they have standing on the theory that the agency's actions tarnish the agency's reputation and, by extension, their own.  This novel theory—which would put agencies in the impossible position of being subject to litigation any time one of their employees disagreed with their actions—is inconsistent with the law governing reputational harm.  This doctrine requires that the defendant has injured the plaintiff in a manner "personal to" the plaintiff, by labeling the plaintiff or imputing to the plaintiff some trait that makes the plaintiff unfit for his or her profession.  Absent such a label, any harm Plaintiffs have suffered is a result of the unfettered choices of third parties; it is not an injury fairly traceable to the Defendants' conduct or redressable by a court order.

   To cause a cognizable reputational injury, the defendant must apply a label to the plaintiff, whether through words or actions.  Thus in *Foretich v. United States*, the plaintiff adequately demonstrated a reputational injury was caused by a statute that, in the D.C. Circuit's words, "embodi[ed] a congressional determination that [the plaintiff] is a child abuser" and "brand[ed]" him as such.  351 F.3d 1198, 1213, 1214 (D.C. Cir. 2003).  Similarly, in *McBryde v. Committee to Review Circuit Council Conduct*, the D.C. Circuit considered the defendant's "official characterization" of the plaintiff as having "'engaged for a number of years in a pattern of abusive behavior.'"  264 F.3d 52, 57 (D.C. Cir. 2001) (quoting the "Committee Report" issued by the defendant).  And in *Meese v. Keene*, the Supreme Court considered the "statutory

characterization of" films the plaintiff wished to show as "political propaganda."  481 U.S. 465, 473 (1987); *see id.* (referring to the "appellation" and the "identification" of the films); *id.* at 474 (films that "have been classified as 'political propaganda'"); *see also Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 139 (1951) (addressing reputational harm from Attorney General's official "designations of the complaining organizations as 'Communist'").

Here, the situation is quite different.  As these and other cases cited by Plaintiffs show, harm to "professional reputation" means harm to "how people who can affect [a plaintiff's] future and his livelihood, *and whose judgment may be informed by the information*, will perceive him."  *Doe v. Nat'l Board of Medical Examiners*, 199 F.3d 146, 153 (3d Cir. 1999) (concerning the defendant examiners board placing a "flag on [plaintiff's] test scores [that] identifies him as a disabled person") (emphasis added).[1]  No such harm exists here.  Defendants did not communicate "information" about Plaintiffs to third parties that informed their perception.

Nor did Defendants apply a label to Plaintiffs through action.  As the D.C. Circuit has explained, the label need not always be express.  In *Foretich*, for example, the statute itself did not, on its face, label the plaintiff.  But the fact of its passage did: "The statute represents the culmination of that process, and it memorializes judgments about Dr. Foretich that Congress formed during the course of that process."  351 F.3d at 1258.  And in *Doe*, the test score flag merely indicated that he had received some accommodation; third parties viewing the flag had to

---

[1] Plaintiffs also cited cases from other jurisdictions, but all are in accord.  *See, e.g.*, *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 707 (6th Cir. 2015) (reputational harm from publication of a report that "classified" a group including plaintiffs as "a 'loosely-organized hybrid gang'"); *NCAA v. Governor of N.J.*, 730 F.3d 208, 219 (3d Cir. 2013) (reputational injury from statute "directed at the [plaintiff's] events" and that associated those events with gambling); *Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 162 (2d Cir. 2003) (reputational injury from regulatory board's finding, in an order, of "misconduct and unfitness"); *Shukh v. Seagate Tech., LLC*, 803 F.3d 659, 665 (Fed. Cir. 2015) (reputational injury from failing to credit plaintiff in specified patents and patent applications).  *Shukh* is unusual, but in accord, in that issue was failing to communicate a positive trait.  803 F.3d at 665.

make the logical leap, knowing that accommodations are offered only to those with disabilities. *See* 199 F.3d at 150–51.  But the injury recognized is one "personal to" the plaintiff—the challenged action embodies and communicates to the public an official view that the plaintiff possesses some negative trait. *Id.* at 153.

Plaintiffs here assert no such injury resulting from a label imposed by Defendants on them personally.  Instead, they claim that they are injured by the transitive property if third parties think less of the agency because of its policies and therefore think less of those who work there.  So far as Defendants are aware, no court has recognized such a tenuous argument.  The scope of claims that would be created by this novel theory proves its unsoundness.  A DOJ attorney has not suffered cognizable reputational injury when some third party thinks DOJ attorneys lack credibility because of positions the Department takes in litigation.  An employee that works at the Department of Agriculture has not suffered cognizable reputational injury when some third party thinks employees at the Department are miserly because the Department isn't doing enough for farmers.[2]  An employee at the IRS has not suffered cognizable injury when some third party thinks, because of IRS policies, that IRS employees are crooks.[3]  It is only "reputational injury that derives *directly* from government action" that will support Article III standing.  *Foretich*, 351 F.3d at 1214 (emphasis added).

In terms of standing doctrine, Plaintiffs' theory also fails on causation and redressability. When the defendant has applied a label to the plaintiff, it is the label that affects the plaintiff's reputation and the obvious remedy is removal of that official label.  Thus in *Foretich*, the proposed remedy was invalidation of the law that "branded" the plaintiff.  *Id.*  In *McBryde*, the

---

[2] *Cf.* P.J. Huffstutter & Mark Weinraub, *Penny for your corn? Stingy trade-war aid irks U.S. farmers*, Reuters (Nov. 28, 2018), https://www.reuters.com/article/us-usa-trade-china-aid/penny-for-your-corn-stingy-trade-war-aid-irks-u-s-farmers-idUSKCN1NX1D7.
[3] *Cf. How Tax Collectors Like the IRS Cleverly Rob You of Your Money*, Financial Samurai, (revised Dec. 20, 2019), https://www.financialsamurai.com/how-tax-collectors-like-the-irs-cleverly-rob-you-of-your-money/.

proposed remedy was a declaration that the offending report was issued without legal authority. 264 F.3d at 57.  In *Doe,* the remedy was the removal of the flag on the test scores.  199 F.3d at 148.  In *Meese* the proposed remedy was to enjoin "the application of the words 'political propaganda' to the films" the plaintiff wished to show.  481 U.S. at 476.  Of course, in some cases a court may also order additional remedies, such as a name-clearing hearing that permits the plaintiff to set the record straight.  But causation and redressability in all these cases are conceptually straightforward: the defendant's label is causing the harm, and so the label must be effectively removed.

By contrast, how third parties might assess an agency's policy, and the extent to which they transfer their views of that policy onto the agency's employees, are of course consequences of those third parties' "unfettered choices"; they are not fairly traceable to the defendant.  *Cierco v. Mnuchin*, 857 F.3d 407, 418 (D.C. Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).  Even at the outer-bounds, the causal link between a defendant's actions and the harm to the third party must be more concrete.  To accept Plaintiffs' contrary arguments, this Court would have to jettison governing legal principles.

In this case, the link between particular actions of the Defendants and third parties' reactions is exceedingly tenuous.  Plaintiffs suggest that third parties view the sum of USAGM policy changes, that these third parties conclude that these changes undermine the USAGM networks' professional credibility, and that these third parties then conclude that all USAGM employees lack credibility.  Even if Plaintiffs could establish that the third parties' decision to blame all agency employees for those third parties' disagreements with agency policy satisfied the causation requirement, the Court cannot redress the injury because it cannot enter programmatic relief.  Although Defendants do not understand Plaintiffs' claims to rest on Mr. Pack's statements, to the extent that third parties object to CEO Pack's characterizations of the agency he leads, *see* PI Hr'g Tr. at 45:7–19, those third parties may still object so long as CEO

Pack is CEO and maintains his views.  Plaintiffs do not seek, and the Court cannot enter, an order that removes CEO Pack or restrains his freedom to state his opinions.  Yet Plaintiffs' purported injury may well persist unless the Court does so.  *See* Second Decl. of Shawn Powers ¶ 21, ECF No. 30-11 (indicating third party acted because he objected to "Mr. Pack's attacks on the independence of the networks").

Moreover, policies that some third parties find objectionable, others might celebrate.  The agency would be caught in a whipsaw, thrown from embracing one policy to another and back again as different groups who objected to each policy tarred agency employees for supporting it.  Indeed, under Plaintiffs' theory, virtually any agency action on a controversial topic would give rise to a cause of action by its employees for their alleged personal reputational harm.  That is sufficient to prove the theory's unworkability.  And any conceivable remedy in these scenarios would also be far reaching and unmanageable.  A judicial order to "improve the agency's reputation" would of course be meaningless.  An order, as Plaintiffs in this case request, that seeks wide-ranging programmatic relief to restore the agency's image is essentially the same and utterly improper.  And because different third parties might object to the court-ordered policy, the agency may end up subject to conflicting court orders.  Here, for example, one set of employees might get an order seeking to restore their view of network independence and thus the network's credibility.  A new set of plaintiffs might then ask for an order seeking a policy that better polices perceived bias, and thus, in their view, restores the network's credibility.  Agency policy cannot be beholden to the competing public views of which policy best advances conflicting notions of credibility.

Plaintiffs have pointed to no case that embraces such a broad theory of reputational harm, and Defendants are not aware of one.  No agency employee can challenge his agency's actions on the theory that those actions tarnish the agency's reputation and by the transitive property also tarnish the employee's reputation.

On the specifics of this case, and on a correct understanding of the law, Plaintiffs have not made a "clear showing," or any showing, of cognizable reputational injury fairly traceable to the challenged conduct.  None of Defendants' actions challenged in these proceedings applies a label to any Plaintiff.  Reassigning former VOA standards editor Steve Springer to USAGM headquarters does not impute any trait to Plaintiffs.  Asking to attend news coverage meetings does not impute any trait to Plaintiffs.  Violating a statute or regulation, even if proven, does not impute any trait to Plaintiffs.  Not endorsing visa applications does not impute any trait to Plaintiffs.  And speaking to agency employees about their work does not impute any trait to Plaintiffs.

Indeed, Plaintiffs' theory underscores that they do not challenge specific instances of allegedly illegal conduct at all.  As Plaintiffs correctly note, Defendants did not specifically brief the issue of final agency action under the APA.  *See* Reply Mem. of P.&A. in Supp. of Pls.' Mot. for a Prelim. Inj., at 11, ECF No. 30 (Pls.' Reply).  That is because Plaintiffs do not challenge any specific agency action *at all*.  Instead, they broadly challenge the agency's management all together.  If Plaintiffs were to amend their complaint to challenge specific instances of allegedly illegal conduct, it is apparent that most challenged actions are "not 'agency action' within the meaning of [the APA], much less 'final agency action.'"  *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006).  Asking to attend meetings, speaking to employees, initiating investigations—none of these actions are the "consummation" of agency decisionmaking, nor do they determine legal "rights or obligations."  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (discussing "final" agency action); *see also Fund for Animals*, 460 F.3d at 19 ("[W]e have long recognized that the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency.'  Much of what an agency does is in anticipation of agency action.  Agencies prepare proposals, conduct studies, meet with members of Congress and interested groups, and engage in a wide

variety of activities that comprise the common business of managing government programs." (quoting *Indep. Equip. Dealers Ass'n v. EPA,* 372 F.3d 420, 427 (D.C.Cir.2004)).

Plaintiffs bring a programmatic challenge to nearly every aspect of how Defendants are managing the agency they lead.  Challenges of this nature may be appropriate before Congress, before the agency itself, or before the public, but they are not appropriate before a court.  *Lujan*, 504 U.S. at 568; *see also Laird v. Tatum*, 408 U.S. 1, 15 (1972) ("[T]his approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the 'power of the purse.'").

### B. Even accepting Plaintiffs' novel theory, Plaintiffs have failed to make a clear showing of reputational injury fairly traceable to the challenged conduct.

Even if Plaintiffs' theory were sound, they would still have failed to meet their burden to make a "clear showing" on this point.  A plaintiff's claim of reputational injury must be established by some degree of proof, not by an abstract claim that, in their own view, their reputation has been damaged.  The necessary degree of proof will naturally vary with circumstances.  In *Doe*, for example, the Court readily concluded that being labeled "disabled" would affect the plaintiff's reputation. 199 F.3d at 153.  But in *Meese*, where the harm that arose from displaying films labeled as "propaganda" was less obvious, the Court looked to extensive evidence that supported the plaintiff's contention it would harm his reputation.  481 U.S. at 473–75.  In the circumstances of this case, it is far from obvious whether and how Defendants' actions that allegedly indirectly affect the agency's reputation also impose some negative consequence for Plaintiffs' reputations.

Plaintiffs have presented no evidence that their individual reputations have been harmed. Plaintiffs' initial declarations offer nothing more than conclusory statements asserting such harm. *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.*, at 8 n.2, ECF No. 27 (Defs.' Opp'n)

(summarizing Plaintiffs' declarations).  In an apparent concession to this failing, Plaintiffs filed a supplemental declaration from Plaintiff Shawn Powers in an attempt to substantiate the claimed harm to his reputation.[4]  But all that declaration shows is that one Plaintiff has been disinvited from two professional meetings which he previously participated in as a representative of USAGM.  *See* Powers Suppl. Decl. ¶¶ 19–22.  What is tellingly missing is any indication that Mr. Powers was disinvited because the third parties think Mr. Powers *himself* is no longer credible or possesses some other trait that makes him unsuitable for his profession.  In his own accounting, it is not some trait—some aspect of Mr. Powers' reputation—that got him disinvited, but rather the fact that he "worked for an organization that no longer operated in accordance with the foundational principles of the DG7."  *Id.* ¶ 21; *see also id.* ¶ 22.  Indeed, the third parties evidently think highly of Mr. Powers and stand ready to "welcome [him] back" as soon as CEO Pack changes his policies.  *Id.* ¶ 22.

Plaintiffs bear the burden of making a "clear showing" on each factor required to obtain injunctive relief.  They have failed to present sufficient evidence—any evidence—of injury-in-fact, and have therefore not shown a likelihood of success on the merits.

## II.    The addition of Plaintiff Chao does nothing to clear the jurisdictional obstacles posed by standing and the CSRA.

The addition of VOA senior manager Kelu Chao as a Plaintiff does nothing to clear the jurisdictional obstacles.  First, Ms. Chao's claims are jurisdictionally precluded until administratively exhausted under the CSRA.  Second, Plaintiffs have not demonstrated that Ms. Chao has suffered an injury-in-fact.

---

[4] No specific evidence was offered as to any other Plaintiff.

A. *Ms. Chao must administratively exhaust her claims before filing suit.*

Ms. Chao is a senior manager at Voice of America.[5]  Her basic contention is that the policy changes CEO Pack has implemented and other actions of the Defendants have affected her ability to do her job because she worries that she "could be interrogated by Mr. Pack's team, in violation of the firewall, for accurate and balanced reporting on a story that they do not approve of," and that she could be "placed on leave or even terminated for overseeing coverage of a story that [Defendants] do not agree with."  Roe Decl. ¶ 25.  She has not been the subject of any adverse personnel action, such as termination, but she alleges that the policy changes have affected, or might affect, the conditions of her employment and the way she does her job.

Her claim falls squarely within the CSRA's structure.  Ms. Chao contends that the challenged actions impose a significant change in her working conditions by supposedly unlawfully restricting her speech.  Under the CSRA, any such "change in . . . working conditions" constitutes a "personnel action."  5 U.S.C. § 2302(a)(2)(A)(xii).  And her contention that this change in working conditions violates the First Amendment represents an allegation of a statutorily defined "prohibited personnel practice."  *Id.* §§ 2301(b)(2), 2302(b)(12); *see Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1432–33 (D.C. Cir. 1996) (explaining that CSRA covers statutorily defined personnel actions that allegedly violate constitutional rights).

The CSRA requires that Ms. Chao first bring her claim to the Office of Special Counsel (OSC).  *See* 5 U.S.C. § 1214(a).  Because the OSC has discretion to decide whether to bring such a complaint before the MSPB, there is no guarantee of judicial review in a court of appeals.  For that reason, a plaintiff alleging an unconstitutional change in working conditions may seek relief in federal district court if she is unable to obtain judicial review otherwise.  "But first the plaintiff must exhaust available administrative remedies."  *Weaver*, 87 F.3d at 1433 (citing *Steadman v.*

---

[5] Ms. Chao formerly filed a declaration under the pseudonym John Roe.  *See* Decl. of John Roe, ECF No. 12-64; Joinder Mot., ECF No. 37.

*Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990)).   As the D.C.

Circuit explained in *Steadman*, it is only "in the unusual case" that a plaintiff can skip straight to

district court: when "the constitutional claim raises issues totally unrelated to the CSRA

procedures."   918 F.2d at 967; *see also Andrade v. Lauer*, 729 F.2d 1475, 1492 (D.C. Cir. 1984)

(exhaustion not required when there is a "complete divergence" between constitutional claim and

CSRA claim).   That is not the case here.

To be sure, in *Weaver* the D.C. Circuit concluded that a plaintiff need not exhaust CSRA

claims to challenge a prepublication review requirement.   87 F.3d at 1434.   But that claim

pertained to the employee's activities outside of work: the plaintiff had published an article in a

professional journal on her own time, *id.* at 1432, and sought prospective relief from "a

regulation restricting employee speech" in that personal capacity, *id.* at 1434.   Because that claim

was independent of any personnel action, and indeed independent of any conditions affecting the

plaintiff's job, it could proceed outside the CSRA.   As the *Weaver* court explained, the

constitutional challenge "stands independently of," and could be "isolated from" the relevant

personnel practice.   *Id.* at 1434.   In short, as regards the prepublication review requirement, the

plaintiff in *Weaver* was not challenging a "personnel action" at all.

The same cannot be said for Ms. Chao here.   Rather, Ms. Chao's entire claim is that the

challenged conduct has affected the way she performs her job.   Such a claim is at the core of the

CSRA's reticulated review scheme, as it pertains directly to the employment relationship and the

performance of the employee's work.   The D.C. Circuit has taken an expansive view of the type

of action that "affect[s] working conditions" and thus falls within the CSRA's administrative

provisions.   *See Mahoney v. Donovan*, 721 F.3d 633, 636–37 (D.C. Cir. 2013).   Thus, changes to

the amount or type of work falls within the CSRA, as do actions that "affect the ability" of

employees "to do their jobs efficiently and effectively."   *Id.* at 636.   Perhaps most analogous, so

too do actions that "interfere[] with [an employee's] decisional independence."   *Id.*   Because Ms.

Chao's claim is that the challenged conduct "interferes with" her journalistic "independence," hers is a claim that Defendants' actions have affected her "working conditions," which meets the CSRA's definition of a covered personnel action.  *See* 5 U.S.C. § 2302(a)(2)(A)(xii).  She must therefore administratively exhaust this claim through the CSRA structure before she can proceed in federal district court.  *Weaver*, 87 F.3d at 1433.

> B. *Ms. Chao has not suffered injury-in-fact.*

Nowhere in her declaration does Ms. Chao even suggest that her reputation has been tarnished in some way.  Ms. Chao is a federal employee of a federal entity—VOA—that is a subsidiary of USAGM itself.  Any injury to her reputation is, like the original Plaintiffs', wholly derivative of the alleged harm to the agency.  It therefore fails for the same reasons.

Plaintiffs may claim that Ms. Chao has suffered a First Amendment injury.  But that gets her nowhere for several reasons.  First, Ms. Chao's speech in the course of her employment at VOA is not entitled to First Amendment protections.  *See infra* at 18–19; Defs.' Opp'n at 27–35, ECF No. 27.  And, second, Ms. Chao does not allege that she has actually been prevented from engaging in any speech she wishes to engage in.  *See* Roe Decl. ¶¶ 25–26.  Nor does she identify any concrete or imminent threat that Defendants will act to control her speech.  She claims that she "worries" she will be face retaliation for her speech, but she does not allege that that she has acted or will act on that fear.  She thus has not suffered any First Amendment harm at all, because if Plaintiffs "themselves are not chilled, but seek only to represent [others] whom they believe are so chilled," they "clearly lack that 'personal stake in the outcome of the controversy' essential to standing."  *Laird*, 408 U.S. at 13 n.7 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)); *see id.* (noting the plaintiffs' concession that they themselves are "not people, obviously, who are cowed or chilled" by the challenged conduct).

But even had Ms. Chao acted on her worry, such a claim, on its own, is insufficient to support standing.  *Id.* at 13.  Ms. Chao objects to several actions by Defendants: reassigning

Steve Springer, Roe Decl. ¶¶ 6–9; investigating reported violations of statutory standards and agency policies, *id.* ¶¶ 10–15; changing the links available on the VOA website, *id.* ¶ 17; asking to observe coverage discussions, *id.* ¶ 18; and failing to routinely approve J-1 visa sponsorship requests or new contracts, *id.* ¶¶ 19–23.  None of these actions is directed at Ms. Chao herself. Rather, "simply stated," the claim "is that [Ms. Chao] disagree[s] with the judgments made by the Executive Branch" about how to best manage an agency and that the "very existence" of USAGM's supervisory authority chills her speech.  *Laird*, 408 U.S. at 13.  But allegations of "a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Id.* at 13–14.  Claims based on "fear that . . . the agency might in the future take *some other and additional action* detrimental to that individual" are inadequate to establish standing.  *Id.* at 11 (emphasis added); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417–18 (2013) (chilled speech claim inadequate injury absent "certainly impending" government action against plaintiff).

Ms. Chao has not been chilled in her speech, and so lacks any injury at all.  *Laird*, 408 U.S. at 13 n.7.  Even had she been chilled, she has not so much as alleged, much less demonstrated by a clear showing, that Defendants have taken or will take any action "detrimental to" her.  *Id.* at 11.  She therefore lacks standing in her own right.

## III. Plaintiffs' challenge to the rule rescission is without merit.

Plaintiffs have amended their complaint to include a claim that the October 26, 2020, rescission of the June 11, 2020 regulation, Knapp Decl. Ex. 1, ECF No. 27-2 (Repeal), is invalid. Although such a claim was understandably not part of Plaintiffs' initial motion, they now seek to expand the preliminary relief to enjoin the rescission.  Plaintiffs are not entitled to such relief.

This litigation is still at the preliminary relief stage.  Whatever Plaintiffs might be able to demonstrate in future proceedings, at this point they still must make a "clear showing" that (1) they are likely to succeed on the merits of their claim that the rescission is invalid, (2) an

injunction of the rescission is needed to avoid irreparable harm they would otherwise suffer, and

(3) the balance of equities and public interest support an injunction.  Plaintiffs fail at each stage.

> A.  *Plaintiffs lack standing to challenge the rescission, just as they lack standing to assert their other claims.*

As an initial matter, Plaintiffs must demonstrate standing with respect to this new claim.

*Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009).  That is, they must make a "clear

showing" that they have suffered a cognizable injury fairly traceable to the challenged conduct—

the rescission—and redressable by an order of the court.  As explained above, no Plaintiff has

identified a cognizable injury arising from *any* of the challenged conduct.  And certainly

Plaintiffs have not explained how the rescission itself is the cause of any harm they allege they

have suffered or will suffer.  Plaintiffs' unsubstantiated worries that, absent the five-month old

regulation, the agency will crumble are insufficient to establish standing.  Indeed, in Plaintiffs'

telling, the regulation is coextensive with the statutory restrictions that remain in force.  *See*

Second Decl. of Grant Turner ¶ 5, ECF No. 30-10.  Defendants of course disagree with that

contention, but the point remains: at this juncture in the litigation, Plaintiffs have not identified

any injury that they have suffered or will suffer because of the rescission.

> B.  *The rescission is valid and lawful.*

On the merits of the rescission, Plaintiffs level three attacks.  None is likely to succeed.

> 1.  *The rescission is consistent with the IBA.*

Plaintiffs contend that the rescission is "not in accordance with law" because the

rescission recognized that "at times" the CEO may be required to control content.  Pls.' Reply at

17.  Clearly Plaintiffs do not mean that the law *requires* the regulation remain; USAGM

persisted without such a regulation for the first 26 years after passage of the IBA.  It is plainly

consistent with the IBA to repeal the regulation.  Rather, the thrust of Plaintiffs' argument is that

the rescission is invalid because the agency's reasoning rests on a misinterpretation of the law.

Contrary to Plaintiffs' assertion, USAGM's interpretation of the relevant statutory provisions is a reasonable one.  There is no doubt that § 6204(b) is ambiguous as to its scope, and USAGM is entitled to deference in its interpretation of that scope.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

The IBA endows the CEO with both broad authority over and substantial responsibility for the networks' broadcast activities.  For example, in addition to his authority to "direct and supervise" the networks, the CEO is tasked with "ensur[ing]" that the networks' broadcasts are "consistent with the broad foreign policy objectives of the United States"; that they "promote respect for human rights, including freedom of religion"; that they are "accurate," and "objective"; and that they present a "balanced and comprehensive projection of United States thought and institutions."  22 U.S.C. §§ 6204(a)(1, 3), 6202(a)(1, 8), (b)(1, 2), (c)(1, 2).  In its rescission, USAGM reasonably interpreted these broad directives as calling for the CEO to sometimes control content.

Admittedly, § 6204(b) also applies an opposite pressure to the CEO, cautioning him to exercise his broad powers with restraint and always to "respect" the networks' "professional independence and integrity."  But the statute does not define the scope of the statutory term "respect" or the phrase "professional independence and integrity."

In this rulemaking, USAGM has not attempted to give a complete account of scope of these terms.  But USAGM has reasonably interpreted the statutory command to "respect" the networks' "professional independence and integrity" as permitting, in some circumstances, some intervention in the networks' editorial decisions.  USAGM concluded that interpreting § 6204(b) as a complete bar to the CEO's occasional direct control would be inconsistent with his statutory obligations to "direct," to "supervise," and to "assess," the networks operations, as well as to "ensure" the networks' adherence to the various standards and principles Congress established. It would also be inconsistent with the President's constitutional duties for his duly appointed and

confirmed officer to abdicate all control over what Congress itself has termed "an essential instrument of United States foreign policy."  22 U.S.C. § 6541(4).

The D.C. Circuit's decision in *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121 (D.C. Cir. 1985), is not to the contrary.  There, the court interpreted a different statute to answer a completely different question: whether the USAGM grantees were "government controlled" for purposes of the Age Discrimination in Employment Act.  In so doing, the court analyzed long-since-repealed regulations that were promulgated under the Board for International Broadcasting Act of 1973, Pub. L. No. 93-129, 87 Stat. 456 (1973 Act).  The court's analysis in *Ralis* focused on the regulations under the 1973 Act and did not address the question here: whether any particular act taken by the Board overstepped its authority and unlawfully infringed the networks' independence.  To the extent the court made any specific pronouncements on this latter topic, they were dicta even as related to the operation of the now-repealed 1973 Act on the precursor agency's relationship to its grantees, and certainly have no controlling effect on the question of what authority *the IBA of 1994* (as modified in 2016) gives to USAGM.

Importantly, the authority granted to the USAGM's predecessor under the 1973 Act was far less than that granted under the 1994 IBA.  The purpose of the 1973 Act was to "Authorize the Continuation of Assistance to Radio Free Europe and Radio Liberty"; it accordingly gave the predecessor Board much narrower power "to make grants"; to "evaluate" and "assess" grantee networks' broadcasting; to "encourage" those networks to be more economical; to develop procedures to validate proper use of grant monies; to hire staff; to spend money and pay per diem; to make annual reports; and to prescribe regulations.[6]  1973 Act § 4(a), 87 Stat. 458–59.

---

[6] Notably, the statute at issue in *Ralis* addressed only the relationship of USAGM's predecessor organization to its corporate *grantees*, Radio Free Europe and Radio Liberty.  Unlike the IBA of 1994, the 1973 Act did not purport to establish any relationship between the agency and Voice of America, which (as distinct from the grantees) is not a corporation but itself a government agency that is part of and subsidiary to USAGM.

Similar to the current law, the 1973 Act cautioned that "[i]n carrying out the foregoing functions, the Board shall bear in mind the necessity of maintaining the professional independence and integrity of" the grantee networks. *Id.* § 4(b). These limited powers are in sharp contrast with the current USAGM CEO's far greater power and responsibility to "direct and supervise all broadcasting activities" and to "ensure" the networks' broadcasting is consistent with the statutory standards and principles. *See* 22 U.S.C. § 6204(a)(1, 3).

In any event, even in interpreting the then extant-law and regulations, the *Ralis* court did not purport to establish an unassailable barrier between USAGM and its networks. That is, even if the court were to import from *Ralis*'s very different context an understanding of the networks' independence, the occasional exercise of editorial control would not transform the grantees from non-government entities into government entities, and thus would not contravene *Ralis*. The occasional exercise of direct control is not equivalent to control over day-to-day operations. Government agencies routinely investigate private entities, for example, potentially chilling even lawful conduct. The SEC sometimes affects private entities' hiring and firing decisions when it bars an individual from holding certain positions. *See* 15 U.S.C. § 78u-3(f). The Occupational Safety and Health Administration can obtain an order stopping all work at a factory when, for example, unsafe practices persist. *See* 29 U.S.C. § 662. In all of these cases the government asserts some direct control over the operations of the private entity, but in none does it transform those private entities into government ones. After all, such ad hoc intervention is not equivalent to the "extensive, detailed, and virtually day-to-day supervision" necessary to convert a private entity into a government one under the ADEA. *Ralis*, 770 F.2d at 1125 (quoting *Forsham v. Harris,* 445 U.S. 169, 180 (1980)).

In a similar vein, USAGM concluded only that "at times," Repeal at 19, may the CEO exercise control of the networks' content. In doing so, the CEO does not assert complete control

16

over all day-to-day operations of the network, and so does not contravene even the *Ralis* court's understanding of the very distinct statutory provisions interpreted there.

In the rescission, USAGM identified one example where content control would be necessary: when publication would directly risk harm to U.S. troops.  Repeal at 20.  Plaintiffs' historian identified another example from VOA's history that might have necessitated intervention: During the Cuban Missile Crisis, the Kennedy Administration tasked a foreign service officer with reviewing everything VOA wrote related to the ongoing crisis to ensure its publication did not risk nuclear war.  Decl. of Nicholas J. Cull ¶ 10, ECF No. 30-8.  In such instances, the President's Article II obligations and the CEO's statutory obligations would require—and § 6204(b) would not prevent—intervention in content choices. [7]

Plaintiffs believe that § 6204(b) incorporates an equivalency principle, where the USAGM management can do nothing that wouldn't normally be done by the publisher at a private news organization.  They misread the statute.  Section 6204(b) plainly does not *unambiguously require* USAGM to apply an equivalency principle.  Defendants accordingly do not concede that such a principle provides the proper test.  But even under that incorrect test, § 6204(b)'s admonition to "respect" the networks' "professional independence and integrity" would not raise an insuperable barrier to intervention.  In certain circumstances, a publisher will be involved in and ultimately decide whether to publish a particular story.  Katherine Graham, the *Washington Post*'s then-publisher, for example, bore responsibility for the ultimate decision whether to publish the *Post*'s coverage of the Pentagon Papers.

Nor, contrary to Plaintiffs' suggestion, does § 6204(b) incorporate by reference the "highest professional standards of journalism."  That term appears in § 6202(a)(5) and is one of

---

[7] In 2010, the then-VOA President took the position—in a somewhat different context—that it would not necessarily violate § 6204(b) for the National Security Council to intervene in public communications made by VOA.  *See* Josh Rogin, *Iranian Jamming Jams up the BBG*, *Foreign Policy* (Feb. 17, 2010), https://foreignpolicy.com/2010/02/17/iranian-jamming-jams-up-the-bbg.

the principles that the networks are required to adhere to and that the CEO is required to ensure are adhered to. Those standards—themselves left undefined in the statute—restrict not the CEO, but the networks themselves. Indeed, should the CEO determine the networks fail to follow those standards, it is the CEO who is tasked with "ensuring" adherence.

### 2. *The rescission is constitutional.*

Plaintiffs' second argument is that the rescission is unconstitutional. Here again, Plaintiffs evidently do not mean that it is unconstitutional to repeal the regulation, but rather that one reason given—the need to control content in some circumstances—would be unconstitutional if carried out. But as Defendants have elsewhere explained, *see* Defs.' Opp'n at 27–35, the USAGM networks do not enjoy First Amendment protections.

Voice of America is a government agency; its speech, even in a journalistic capacity, is *government speech*. To be sure, the government may sometimes relinquish that status for a government owned-and-operated entity, inviting courts to apply First Amendment protections. Thus, one court in this district has recognized that the military newspaper *Stars and Stripes* is entitled to First Amendment protections. *Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 57 (D.D.C. 2003). No surprise: In establishing the paper, DoD said the newspaper would provide information "as do commercial daily newspapers" and "in keeping with the principles of the First Amendment." *Id.* at 56.

But Congress has not indicated it wanted similar protections extended to the USAGM networks. Indeed, Congress instead put numerous limits on the networks' speech. Thus, for example, it limited the audiences to whom the networks may direct their speech. 22 U.S.C. §§ 1461(a), 1461-1a(a) (no targeting domestic audiences); *id.* § 6211 (instruction to phase out programming in democratic nations). Congress put explicit limits on the content of speech allowed: the networks' speech must not "duplicate" private journalism, and it must "promote"

18

freedom of religion. *Id.* § 6202(a)(3, 8); *see also id.* § 6202(b)(2, 6, 7). Congress also provided that the networks must carry editorials representing the government's views. *Id.* § 6202(b)(3).

Such restrictions would be, as Plaintiffs put it, "anathema to the First Amendment" if applied to private speech. Pls.' Reply at 18. The government ordinarily cannot require a private newspaper to be balanced in its coverage. It ordinarily cannot require a private newspaper to carry government views. It ordinarily cannot limit the audience to whom a private newspaper directs its speech. And yet Congress has done exactly these things with regard to the USAGM networks, and established a presidentially appointed, Senate-confirmed CEO to enforce its will.

Given the multitude of limitations on the networks' speech that Congress has enacted, Congress did not endow these networks with First Amendment protections. The argument to the contrary rests solely on § 6204(b), which Plaintiffs misconstrue. There, of course, Congress provided that the CEO "shall respect" the networks' "professional independence and integrity." In light of the extensive controls on the networks' speech Congress elsewhere enacted, though, this amorphous statutory command cannot fairly be read to provide the networks with First Amendment protections.

In sum, it is consistent with the Constitution for the CEO to control the content of the networks' broadcasts. The networks are not protected by the First Amendment, and Congress has not extended those protections to the networks by statute.

### 3.   *The rescission is not arbitrary and capricious.*

Plaintiffs offer four reasons to support their argument that the rescission is arbitrary and capricious. None carries weight.

First, Plaintiffs contend that USAGM failed to give sufficient reasons for changing course. They misread the record because the rescission lays out USAGM's reasons quite clearly: the agency determined that the regulation unduly restricted the CEO's authority and hampered his ability to carry out his functions. Repeal at 17–31. Plaintiffs' concern that, absent the

regulation, the networks will not adhere to the "highest professional standards of journalism" and will lose "credibility" is without merit.  The IBA itself requires that the networks adhere to those standards, and that they maintain their credibility by providing balanced, comprehensive, accurate, and objective coverage.  22 U.S.C. § 6202(a)(5), (b)(1, 2).  In repealing the regulation, USAGM did not conclude that it was unnecessary to maintain the highest professional standards of journalism.  Rather, USAGM recognized that the regulation was unnecessary to that end, Repeal at 31, and that any benefits were outweighed by the costs to effective agency management.  Repeal of the regulation has simply returned USAGM to the status that it maintained for the first 20-plus years of its operation under the IBA.

Second, Plaintiffs contend that the repeal is not supported by sufficient fact-finding.  But "'[a]n agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to *particularly deferential* review, as long as they are reasonable,'  and need not rest on 'pure factual determinations.'"  *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) (quoting *In re Core Commc'ns, Inc.,* 455 F.3d 267, 282 (D.C. Cir. 2006) and *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 594 (1981)).  The repeal is born of the agency's experience operating under the regulation for the past five months (the only period in its history that the agency has had a presidentially-appointed and Senate-confirmed CEO in place to execute the authority provided to that office in the 2016 amendments to the IBA); that experience informed USAGM's conclusion that the regulation was unwieldy and unwarranted.  Repeal at 19–23.  Deference to that experience is warranted, as an agency's "decision regarding its internal procedures lies peculiarly within the agency's discretion."  *Am. Trucking Ass'ns, Inc. v. United States*, 627 F.2d 1313, 1325–26 (D.C. Cir. 1980).

Third, Plaintiffs contend that USAGM "failed . . . to consider the impact of [its] assertion of broad content-control authority on the credibility of the USAGM networks."  Pls.' Reply at 20.  But USAGM asserted authority to control content only "at times."  In any event, it is

Congress and the Constitution that provide for such control, not the agency's repeal.  Plaintiffs also argue that USAGM failed to consider a partial rescission, yet they do not suggest what parts of the regulation USAGM might have retained.  And contrary to Plaintiffs' intimation, no precedent requires an agency to perform a line-by-line analysis of an existing regulation when repealing it or enacting a new one.  The cases Plaintiffs cite stand for the unremarkable proposition that when faced with a discrete number of choices, the agency must consider each choice or else it has "failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In *State Farm,* the existing regulation provided two means of compliance: automated seatbelts or airbags.  *Id.* at 46.  The agency was faced with either keeping the existing regulation, repealing it altogether, or sticking with just one of the two requirements.  The agency failed to consider keeping the airbags, and so acted arbitrarily.  *Id.* at 51.  So too in *DHS v. Regents*, which related to the repeal of the Deferred Action for Childhood Arrivals program: The existing policy provided both removal deferral and substantial attendant benefits.  140 S. Ct. 1891, 1901 (2020).  The agency was faced with keeping the regulation, repealing it altogether, or keeping just one aspect of it.  The agency failed to consider maintaining its deferral policy even as it eliminated the benefits.  *Id.* at 1912.

The scenarios presented in *State Farm* and *Regents* do not exist here.  Plaintiffs have not identified a reasonable alternative that the agency failed to consider, and so they have failed to show that the agency acted arbitrarily or capriciously.  *Cf. N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.*, 878 F.3d 271, 305–06 (D.C. Cir. 2017) ("[T]he force of the evidence and argument that [the agency] must offer to defend its choice will vary with the force of the proponent's evidence and argument." (quoting *Bldg. & Const. Trades Dep't, AFL-CIO v. Brock*, 838 F.2d 1258, 1271 (D.C. Cir. 1988))).  Indeed, even where an alternative had been presented to an agency for consideration *before* it made a decision, an agency's "decision

regarding its internal procedures lies peculiarly within the agency's discretion." *Am. Trucking Ass'ns*, 627 F.2d at 1325–26 (upholding rule related to internal procedures even when reason for rejecting alternatives was "sketchy and conclusory").

Fourth, Plaintiffs argue that the reasons given for the repeal are pretextual, and that the true reason for the repeal was to obtain a litigation advantage. This is simply false; as Defendants represented in their opposition and again on the record during the hearing on Plaintiffs' motion, Defendants began the process of repealing the regulation well in advance of this litigation. Moreover, the Supreme Court has recently emphasized that "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons," and "may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019). The government is entitled to a presumption of regularity, and Plaintiffs' bare assertions of malfeasance are inadequate to overcome that presumption.

> C. *Plaintiffs have not shown that enjoining the rescission is necessary to avert irreparable harm or that doing so is in the public interest.*

It bears repeating: Even if Plaintiffs had standing to challenge the rescission and were correct that the rescission is unlawful, they *still* must show that an injunction is warranted to avoid irreparable harm that they would suffer in the absence of an injunction. Plaintiffs' theory of irreparable harm is that, absent an injunction, third parties will be chilled in the exercise of their First Amendment rights. Plaintiffs, including Ms. Chao, have not alleged that they themselves have curtailed their expressive activities because of the repeal of the regulation. Even in the context of a chilled speech claim, "a litigant 'has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others.'" *Laird*, 408 U.S. at 13 n.7

(quoting *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972)); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975).

USAGM has determined that the regulation is contrary to the public interest because it interferes with the agency's effective management.  It accordingly rescinded the regulation. Absent the regulation, Plaintiffs remain protected by whatever statutory and constitutional rights they have.  That is, if the Court concludes (contrary to Defendants' argument) that the Plaintiffs' rights are being violated, the Court can address those violations without enjoining the rescission. Indeed, Plaintiffs conceded that their claims do not rest on the regulation.  PI Hr'g Tr. at 9:7–:14. Accordingly, Plaintiffs have failed to show that enjoining the rescission is in the public interest.

**IV.   CEO Pack did not say he would turn off the air conditioning and ban masks.**

The Court expressed concern with Plaintiffs' suggestion that Mr. Pack engaged in "loathsome public banter such as his statement that he was turning off the air conditioning and banning masks inside VOA's headquarters, as part of his effort to 'drain the swamp.'"  Decl. of John Coe ¶ 15, ECF No. 12-62.  CEO Pack made no such statement.

The quoted paragraph of Mr. Coe's declaration describes a letter sent by a group of VOA journalists, and is not an accurate account of CEO Pack's actual statements.  The letter itself was submitted to the Court as Exhibit 19 to litigation counsel's declaration, *see* Aug. 30, 2020, Letter to E. Biberaj from Voice of America Journalists, at 2, ECF No. 12-21, and refers to an interview Mr. Pack gave in August 2020.  *See* Mem. of P. &A. in Supp. of Pls.' Mot. for Prelim. Inj., at 38-39, ECF No. 12-1 (describing the interview).  That interview itself was also submitted to the Court, as multimedia Exhibit 22[8] to litigation counsel's declaration.  *See* Decl. of Lee Crain ¶ 23, ECF 12-2.

---

[8]  For the Court's convenience, the interview is available at: <https://youtu.be/7A43zYFQFIQ>. The relevant segment begins at 17:03 and continues to 18:09.

As is apparent from the interview itself, CEO Pack earnestly explains the structure of the USAGM networks and the professional diversity of its workforce.  He notes that "one of the challenges of taking over an agency at this moment in time is sorting all of this out, especially during COVID.  The building where, um, the headquarters building, the Cohen Building here in Washington, DC, is largely empty; we're bringing people back as we move from Phase I."  At that point he is interrupted by the interviewer who asks, in apparent jest, whether Mr. Pack has "considered banning masks and turning off the air conditioning? That's my prescription for federal agencies."  Mr. Pack responds, "yea—well—that's—we'll have to look into that one" before immediately returning to his point that "it's been hard to get to know the employees when you're working largely from home."  *Id.* at 17:07–36

Listening to the interview itself belies any contention that CEO Pack seriously suggested banning masks and turning off the air conditioning.  Throughout the interview CEO Pack soberly and sincerely describes the challenges USAGM faces and the importance of its mission.  He calls for "celebrat[ing]" the "heroic" journalists carrying out USAGM's mission, *id.* at 18:18–32, and reaffirms his view that "there needs to be separation between us, the political appointees and what journalists are reporting; I would never tell a journalist how to cover a story or what to say," *id.* at 10:15–25.  Perhaps CEO Pack's immediate response to the interviewer's joke was inartful, or perhaps, in retrospect, the wiser course would have been to push back on an offensive joke rather than to move on.  But Mr. Pack absolutely did not propose banning masks and turning off the air conditioning, and he clearly did not agree with his interviewer's suggestion.  Any implication that he did flatly mischaracterizes the facts.

Dated: November 10, 2020                    Respectfully submitted,

                                            JEFFREY B. CLARK
                                            Acting Assistant Attorney General

                                            CHRISTOPHER HALL
                                            Assistant Branch Director
                                            Federal Programs Branch

                                            /s/ *Michael F. Knapp*
                                            MICHAEL F. KNAPP (Cal. Bar No. 314104)
                                            CHRISTOPHER M. LYNCH
                                               (D.C. Bar No. 1049152)
                                            Trial Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street NW
                                            Washington, DC 20005
                                            Phone: (202) 514-2071
                                            Fax: (202) 616-8470
                                            Email: michael.f.knapp@usdoj.gov

                                            *Counsel for Defendants*