IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GRANT TURNER, et al.,

*Plaintiffs*,

v.

U.S. AGENCY FOR GLOBAL MEDIA, et al.,

*Defendants*.

**Case No. 20-cv-2885**

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

GIBSON, DUNN & CRUTCHER LLP

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Mylan L. Denerstein (admitted *pro hac vice*)
Zainab Ahmad (admitted *pro hac vice*)
Lee R. Crain (D.D.C. Bar No. NY0337)
Alexandra Grossbaum (admitted *pro hac vice*)
Lauren Kole (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166-0193
Tel:  (212) 351-4000
MDenerstein@gibsondunn.com
Zahmad@gibsondunn.com
LCrain@gibsondunn.com
AGrossbaum@gibsondunn.com
LKole@gibsondunn.com

Joshua S. Lipshutz (D.C. Bar No. 1033391)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel: (202) 955-8500
JLipshutz@gibsondunn.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

    I.    Plaintiffs Are Likely To Succeed In Demonstrating That They Have
Standing to Challenge Defendants' Misconduct ...................................... 2

        A.    Defendants' Interference with Ms. Chao's Journalistic
Independence Constitutes Injury in Fact .................................... 2

        B.    The Reputational Harm that Plaintiffs Suffer Confers Article III
Standing ...................................................................................... 5

    II.    Defendants' Remaining Jurisdictional Objections To Ms. Chao's Claims
Lack Merit .............................................................................................. 10

        A.    Defendants Do Not Argue This Court Lacks Jurisdiction To
Address Ms. Chao's Third-Party Standing Claims On Behalf Of
Contractor Journalists. ............................................................. 10

        B.    This Court Has Jurisdiction Over Ms. Chao's First-Party Claims,
Too. ........................................................................................... 11

    III.    Plaintiffs Are Likely to Succeed in Proving that Defendants' Repeal of the
Regulatory Firewall Violated the Administrative Procedure Act ....................... 16

    IV.    Plaintiffs' Revised Proposed Order Reflects Administrable And Workable
Remedies To The Legal And Constitutional Violations Identified In This
Action ..................................................................................................... 23

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Appalachian Power Co. v. E.P.A.*,
208 F.3d 1015 (D.C. Cir. 2000) ............................................................10

*Ass'n of Admin. L. Judges v. Colvin*,
777 F.3d 402 (7th Cir. 2015) ...............................................................15

*Carson v. Merit Sys. Prot. Bd.*,
573 F. App'x 4 (D.C. Cir. 2014) (per curiam) ......................................13

*Cierco v. Mnuchin*,
857 F.3d 407 (D.C. Cir. 2017) ................................................................8

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ..............................................................................23

*City of Lakewood v. Plain Dealer Pub. Co.*,
486 U.S. 750 (1988) ..............................................................................24

*Comm. on Judiciary v. McGahn*,
968 F.3d 755 (D.C. Cir. 2020) (en banc) ............................................3, 4

*Confederated Tribes of Chehalis Reservation v. Mnuchin*,
976 F.3d 15 (D.C. Cir. 2020) ...............................................................13

*D&F Afonso Realty Tr. v. Garvey*,
216 F.3d 1191 (D.C. Cir. 2000) ...........................................................21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ..........................................................................22

*Doe v. Nat'l Bd. of Med. Exam'rs*,
199 F.3d 146 (3d Cir. 1999)..................................................................10

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) .....................................................................21, 22

*Firenze v. N.L.R.B.*,
2013 WL 639151 (D. Mass. Jan. 10, 2013) .........................................13

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003) ..............................................................5

*Fox v. Clinton*,
684 F.3d 67 (D.C. Cir. 2012) ................................................................17

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)...............................................................................10

## TABLE OF AUTHORITIES

*Gonzales v. Oregon*,
   546 U.S. 243 (2006)..................................................................................................17

*Gully v. Nat'l Credit Union Admin. Bd.*,
   341 F.3d 155 (2d Cir. 2003)........................................................................................8

*Ill. Pub. Telecom. Ass'n v. F.C.C.*,
   117 F.3d 555 (D.C. Cir. 1997)...................................................................................21

*Index Newspapers LLC v. United States Marshals Serv.*,
   977 F.3d 817 (9th Cir. 2020) .......................................................................................4

*Kissi v. Panzer*,
   664 F. Supp. 2d 120 (D.D.C. 2009) ...........................................................................10

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...................................................................................................10

*Mahoney v. Donovan*,
   721 F.3d 633 (D.C. Cir. 2013) ...................................................................................15

*Manhattan Community Access Corp. v. Halleck*,
   139 S. Ct. 1921 (2019)...............................................................................................20

*McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of
   Judicial Conference of U.S.*,
   264 F.3d 52 (D.C. Cir. 2001) .......................................................................................6

*Meese v. Keene*,
   481 U.S. 465 (1987)...................................................................................................10

*Miami Herald Pub. Co. v. Tornillo*,
   418 U.S. 241 (1974)...............................................................................................3, 20

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
   606 F.3d 780 (D.C. Cir. 2010) ...................................................................................12

*National Collegiate Athletic Association v. Governor of New Jersey*,
   730 F.3d 208, 220–21 (3d Cir. 2013)...........................................................................6

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
   921 F.3d 1102 (D.C. Cir. 2019) .................................................................................22

*Navab–Safavi v. Broad. Bd. of Governors*,
   650 F. Supp. 2d 40 (D.D.C. 2009) .............................................................................11

*In re Navy Chaplaincy*,
   697 F.3d 1171 .............................................................................................................4

## TABLE OF AUTHORITIES

*New York v. Trump,*
2020 WL 5763775 (D.D.C. Sept. 27, 2020) ...................................................................24

*New York v. United States Dep't of Homeland Sec.,*
2020 WL 4347264 (S.D.N.Y. July 29, 2020) .........................................................25

*Open Tech. Fund v. Pack,*
2020 WL 3605935 (D.D.C. July 20, 2020)................................................... *passim*

*Parsons v. U.S. Dep't of Justice,*
801 F.3d 701 (6th Cir. 2015) ......................................................................................7

*Planned Parenthood Fed'n of Am., Inc. v. Schweiker,*
559 F. Supp. 658 (D.D.C.) ........................................................................................25

*Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.,*
332 F.3d 654 (D.C. Cir. 2003) ..................................................................................17

*Ralis v. RFE/RL,*
770 F.2d 1121 (D.C. Cir. 1985) ............................................................... *passim*

*Sherrill v. Knight,*
569 F.2d 124 (D.C. Cir. 1977) ..................................................................................24

*Shivaee v. Dep't of the Navy,*
1997 WL 222673 (M.S.P.B. Apr. 18, 1997) ...........................................................13

*Shukh v. Seagate Technology, LLC*
803 F.3d 659 (Fed. Cir. 2015)......................................................................................6

*Tripp v. Dep't of Def.,*
284 F. Supp. 2d 50 (D.D.C. 2003) ............................................................................20

*U.S. Lines, Inc. v. Fed. Maritime Comm'n,*
584 F.2d 419 (D.C. Cir. 1978) ..................................................................................23

*United States Telecom Ass'n v. Fed. Commc'ns Comm'n,*
825 F.3d 674 (D.C. Cir. 2016) ....................................................................................4

*United States v. $17,900.00 in U.S. Currency,*
859 F.3d 1085 (D.C. Cir. 2017) ..................................................................................3

*United States v. Mead Corp.,*
533 U.S. 218 (2001)...................................................................................................17

*Vote Forward, et al. v. Dejoy,*
2020 WL 5763869 (D.D.C. Sept. 28, 2020) ............................................................24

# TABLE OF AUTHORITIES

*Weaver v. U.S. Info. Agency,*
    87 F.3d 1429 (D.C. Cir. 1996) ................................................................13, 14, 15

*Woodhull Freedom Found. v. United States,*
    948 F.3d 363 (D.C. Cir. 2020) .............................................................................4, 5

*Yantha v. Omni Childhood Ctr., Inc.,*
    2013 WL 5327516 (E.D.N.Y. Sept. 20, 2013) ........................................................6

## Constitutional Provisions

U.S. Const. amend. I ........................................................................................ *passim*

U.S. Const. art. III ...........................................................................................3, 5, 7

## Statutes

5 U.S.C. § 2301 ...............................................................................................13, 14

5 U.S.C. § 2302 ...............................................................................................12, 13

5 U.S.C. § 3105 ....................................................................................................15

5 U.S.C. § 7513 ....................................................................................................11

22 U.S.C. § 6201 ..................................................................................................19

22 U.S.C. § 6202 ........................................................................................ *passim*

22 U.S.C. § 6204 ........................................................................................ *passim*

PL 103-236,
    108 Stat. 382 § 305(a)(1) (1994) .........................................................................19

## Other Authorities

Agency Review Teams, Office of the President Elect
    https://buildbackbetter.com/the-transition/agency-review-teams/ (last visited
    Nov. 12, 2020) ......................................................................................................1

H.R. Conf. Rep. 105–432 (1998) .....................................................................18, 20

*Nancy Cook & Gabby Orr, Trump Aides Privately Plot A Flurry Of Moves In*
    *Their Final 10 Weeks, Politico,* Politico,
    https://www.politico.com/news/2020/11/12/trump-lame-duck-concession-
    436146 (Nov. 12, 2020) .........................................................................................2

**TABLE OF AUTHORITIES**

**Regulations**

22 C.F.R. § 531.1 .............................................................................................22, 23, 25

22 C.F.R. § 531.3 ................................................................................................22, 23

85 Fed. Reg. 36150 .............................................................................................21, 22

## INTRODUCTION

Defendants' supplemental brief only underscores the need for immediate relief in this action.  Defendants remain steadfast that they are *required* to "control the content of the networks' broadcasts," Defs.' Supp'l Br. at 19; Knapp Decl. Ex. 1 (the "Repeal") at 1, even though such government control of journalism contravenes the First Amendment and federal law and Defendants' own concession that "there needs to be separation between us, the political appointees and what journalists are reporting."  Defs.' Supp'l Br. at 24 (quoting Defendant Pack).[1]  This Court should act to ensure that the U.S. Agency for Global Media ("USAGM")—the very agency charged with exporting the First Amendment and the free press around the globe—ceases attacking and suppressing journalism here at home.

Defendants' supplemental brief fails to overcome Plaintiffs' demonstration that preliminary relief is necessary here.  Contrary to Defendants' protestations, Plaintiffs—including Kelu Chao, the Director of Voice of America's Programming—plainly have standing, and the provisions of the Civil Service Reform Act ("CSRA") Defendants invoke simply don't apply.  Defendants' hyperbole notwithstanding, Plaintiffs do not seek an agency takeover—only a cessation of unlawful and unconstitutional conduct.  The revised proposed order Plaintiffs submit with this brief provides clear instruction on what conduct must stop in order to protect Plaintiffs.

With the impending inauguration of President-Elect Joseph R. Biden, Jr., Defendants have little time left to run USAGM.  The President-Elect has already named a USAGM transition team[2] and indicated his intent to relieve Mr. Pack and his team of duty on day one, and to restore

---

[1]  Similarly, in oral argument before the Court, the government stated that the statutory firewall forbade it from influencing "what to broadcast," or "who to broadcast."  *Open Tech. Fund v. Pack*, No. 20-17101 (D.D.C. July 2, 2020), Dkt. No. 14 at 53:1–4.

[2]  Agency Review Teams, Office of the President Elect https://buildbackbetter.com/the-transition/agency-review-teams/ (last visited Nov. 12, 2020).

independence and First Amendment freedoms to the USAGM Networks (the "Networks"). That Defendants' days in power are numbered means immediate injunctive relief is urgently needed.[3] In the mere five months Defendants have been in charge, they have done enormous damage to USAGM, the Networks, and Plaintiffs. They have ruined careers, killed stories, jeopardized the Networks' credibility and reputation, and chilled free and independent journalism, and there is no telling what they might do on their way out the USAGM door. This Court should not let them continue abusing the agency.

**ARGUMENT**

I.   **Plaintiffs Are Likely To Succeed In Demonstrating That They Have Standing to Challenge Defendants' Misconduct**

A.   **Defendants' Interference with Ms. Chao's Journalistic Independence Constitutes Injury in Fact**

Plaintiff Chao has unquestionably suffered injuries to her journalistic independence and editorial discretion due to Defendants' misconduct. As Voice of America's Program Director, Ms. Chao is akin to a managing editor at other journalistic outlets. Second Declaration of Kelu Chao, dated November 12, 2020 ("Chao Decl.") ¶ 2. As such, she is responsible for ensuring the credibility, reliability, and comprehensiveness of Voice of America's journalism and for overseeing the newsroom's reporting, which she ensures is in accord with the highest professional standards of broadcast journalism. *See* 22 U.S.C. § 6202(a)(5); *see generally* Chao Decl. ¶¶ 3–10; Chao Decl. Ex. A. When Defendants prevent the journalists Ms. Chao oversees from engaging in neutral and independent journalism, Ms. Chao is unable to fully exercise her editorial control and judgment—clear injuries in fact. *See* Chao Decl. ¶¶ 10–11.

---

[3]   *See* Nancy Cook & Gabby Orr, *Trump Aides Privately Plot A Flurry Of Moves In Their Final 10 Weeks*, Politico, https://www.politico.com/news/2020/11/12/trump-lame-duck-concession-436146 (Nov. 12, 2020). Plaintiffs further understand that Defendants' misconduct, including directing and actively participating in investigations into alleged journalistic lapses and bias, has continued unabated even as this very motion has been litigated.

Faced with these injuries, Defendants ask the court to ignore Ms. Chao's standing because, they say, she is not entitled to First Amendment protection at all.  Def. Sur-Reply 11.  Defendants are wrong, (Pl. Br. 29; Pl. Reply 21–23; Reporters Committee Amicus Br. at 11-16), but even if they were right, their argument impermissibly conflates "the constitutional standing inquiry with the merits determination that comes later." *United States v. $17,900.00 in U.S. Currency*, 859 F.3d 1085, 1091 (D.C. Cir. 2017).  "When determining whether a plaintiff has Article III standing, the court must assume that the [plaintiff] will prevail on the merits." *Comm. on Judiciary v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc).  Thus, for purposes of standing, the parties must presume that Ms. Chao has First Amendment rights and that Defendants have violated those rights. On that basis, she has standing.

Defendants next claim that because none of their many intrusions upon journalistic independence were "directed at Ms. Chao herself," she could not have suffered any injury.  Def. Sur-Reply 12.  Defendants' arguments misapprehend the import of their own actions and flip the doctrine of chilled speech on its head.

For starters, Defendants' limited account of their First Amendment violations does not include all of the many ways in which Ms. Chao's journalistic interests have been harmed.  For example, Defendants' repeal of the Firewall Regulation by itself constitutes an injury-in-fact to Ms. Chao.  In their repeal, Defendants state they have authority to control the reporting coming out of Ms. Chao's newsroom, Repeal at 19, which plainly infringes upon the First Amendment's guarantee that journalists be free from government interference with their "exercise of editorial control and judgment." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  And Defendants fail to address the effect of their newly promulgated conflicts of interest policy upon Ms. Chao, a policy that has chilled every journalist's exercise of their First Amendment rights

because of its overbreadth and vagueness.  Pl. Br. 35–36; Pl. Reply 21 n.8.  Any attempt to rebut these clear injuries simply conflates standing with the merits.  *See McGahn*, 968 F.3d at 762.

Ms. Chao's injuries arise not just from infringements upon her editorial discretion, but through Defendants' chilling of her right to exercise that discretion.  As Ms. Chao has testified, she "constantly worr[ies]" that she could be "terminated for overseeing coverage of a story that [Defendants] do not agree with," and that her journalist colleagues feel similarly.  Roe (Chao) Decl. ¶ 25.  The robust record of improper investigations into journalistic content followed by retaliation against journalists for harboring supposed biases establishes the reasonableness of Ms. Chao's fears, and the fears of her colleagues.  *See* Pl. Br. 29–39.

And contrary to Defendants' contentions, Defs.' Supp'l Br. at 12, a plaintiff need not have actually been subjected to retaliation or punishment to be chilled in action.  *See Woodhull Freedom Found. v. United States*, 948 F.3d 363, 370 (D.C. Cir. 2020); *cf. United States Telecom Ass'n v. Fed. Commc'ns Comm'n,* 825 F.3d 674, 739 (D.C. Cir. 2016) ("[Standing] to challenge laws burdening expressive rights requires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law.").  Rather, "[a] chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not based on a fear of future injury that itself is too speculative to confer standing."  *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) (internal quotations and alterations omitted).  Here, "Plaintiffs [have] introduced powerful evidence of the [] Defendants' ongoing, sustained pattern of conduct that resulted in numerous injuries."  *Id.* at 821; *In re Navy Chaplaincy*, 697 F.3d 1171, 1176–77.  The record before the Court amply demonstrates Defendants' practice of targeting journalists over "the content of [VOA] reporting," whenever they perceive that reporting to be insufficiently friendly toward the current

administration or harboring a partisan bias.  *See, e.g.*, Roe Decl. ¶ 25; Pl. Br. 33–39.  Ms. Chao understands that she, too, will suffer Defendants' retribution if she oversees journalism of which Defendants disapprove.  Roe Decl. ¶ 25; *see also* Chao Decl. ¶¶ 10–11.  Her understanding has only been reinforced by Defendants' promise to control journalistic content, Repeal at 19.  In short, the fear of retribution, Roe Decl. ¶ 25, is far from speculative given Defendants' pattern and practice of retaliation against journalists who produce journalistic content that Defendants dislike.

Though Defendants do not address it, Ms. Chao's legally protected interest in editorial discretion and journalistic independence stems not only from the First Amendment, but from the rights conferred upon her by the International Broadcasting Act ("IBA").  The IBA guarantees the "[p]rofessional independence of broadcasters," such as Ms. Chao through imposition of a statutory firewall.  22 U.S.C. §§ 6202(a)(5), 6204(b); Opening Br. at 6-8, 19-29; Reply Br. at 14-16.  As Plaintiffs' unchallenged factual record makes clear, Defendants have made it their mission to bulldoze the firewall, to operate the Networks as a state organ in complete contravention of the highest standards of broadcast journalism, and to undermine Ms. Chao's and other journalists' independence at every turn.  Pl. Br. 19–28; Pl. Reply 14–16; Chao Decl. ¶ 11.  These are injuries in fact, and any attempt to argue otherwise again conflates standing with the merits.  *See Woodhull Freedom Found. v. United States*, 948 F.3d 363, 371 (D.C. Cir. 2020).

### B.     The Reputational Harm that Plaintiffs Suffer Confers Article III Standing

As Defendants concede, a negative impact on "how people who can affect [a plaintiff's] future and his livelihood, and whose judgment may be informed by the information, will perceive him" constitutes an injury in fact.  Def. Sur-Reply 2 (citation omitted); *see, e.g.*, *Foretich v. United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003) ("[I]njury to reputation can constitute a cognizable injury sufficient for Article III standing.").  Faced with the Court's request for additional briefing on this topic, Defendants purport to have surveyed the case law and to have discovered a bright-

line rule:  "To cause a cognizable reputational injury, the defendant must apply a label to the plaintiff, whether through words or actions."  Def. Sur-Reply 1.

But Defendants' rule cannot be found in any precedent, binding or persuasive.  It appears to be a tailor-made creation, designed in an attempt to excuse Defendants' specific misconduct and divert the Court from recognizing the injuries Plaintiffs have suffered from Defendants' unlawful actions.  Though certain cases cited by the parties do involve labels applied to the injured party, *see McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of Judicial Conference of U.S.*, 264 F.3d 52, 57 (D.C. Cir. 2001), none expressly or implicitly establish direct "labeling" as a baseline requirement for reputational injury.

Numerous cases do not comport with Defendants' manufactured jurisdictional rule.  For instance, in *Shukh v. Seagate Technology, LLC*, a scientist alleged that his employer had failed to credit him with certain of his inventions, by failing to include his name on patents.  803 F.3d 659 (Fed. Cir. 2015).  Though the employer had applied no label to the scientist, the Federal Circuit found that he had suffered an injury in fact sufficient to confer standing because "a scientist's professional reputation is influenced by the number of patents on which that scientist is named." *Id.* at 664–66. And Defendants conveniently ignore *National Collegiate Athletic Association v. Governor of New Jersey*, another case in which a reputational injury was found to have occurred in the absence of an individualized label.  730 F.3d 208, 220–21 (3d Cir. 2013) *abrogated on other grounds by Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018) (finding statute that legalized gambling on sports games resulted in cognizable injury because "being associated with gambling is undesirable and harmful to one's reputation.").  Other cases similarly put to rest Defendants' invented rule.  *See Yantha v. Omni Childhood Ctr., Inc.*, 2013 WL 5327516, at *4 (E.D.N.Y. Sept. 20, 2013) (finding cognizable reputational injury to occupational therapist from

employer's use of her name on fraudulently filed insurance claims, because false claims "could plausibly lead insurers to believe that plaintiff was the one submitting false claims").

Even if Defendants' rule was the law (and it is not), Plaintiffs' unchallenged record satisfies the that very standard:  Defendants' words and actions have labeled Plaintiffs and the other journalists at the USAGM Networks as agents of state propaganda.  *See* Supp'l Powers Decl. ¶¶ 19–24.  Contrary to Defendants' assertions, Plaintiffs do not argue that the tarnishing of the Networks' credibility should be imputed to them to satisfy Article III standing.  See Def. Sur-Reply 1.  Rather, Defendants' actions and words have directly damaged Plaintiffs' own reputations; harm to the Networks' reputations are a symptom of the same disease.  Even setting aside Mr. Pack's public allegations that Plaintiffs harbor a political bias that interferes with their job performance, (Crain Decl. Ex. 22 at 7:20–7:45), that Plaintiffs were "incompetent," (Crain Decl. Ex. 15 at 4), or that the journalists Plaintiffs represent or supervise may be spies for foreign governments, (Crain Decl. Exs. 4, 5), Defendants' actions and the language of Defendants' own purported repeal of the firewall regulation announce to the world that the Networks are mouthpieces of the state and their content subject to government control.  Repeal at 19. Defendants' statements and actions communicate "information" to the world, which has informed third-party perceptions of Plaintiffs.  *See Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 707 (6th Cir. 2015) (finding reputational harm existed from report that called a group including plaintiffs a "loosely-organized hybrid gang")

Dr. Shawn Powers's testimony speaks directly to the diminution in professional reputation Plaintiffs have suffered as a result of Defendants' course of conduct.  Dr. Powers, a former tenured professor, has established himself as an expert in international broadcasting and global media. Supp'l Powers Decl. ¶¶ 19–24.  But since Defendants launched their assault on the Networks'

independence, Dr. Powers's professional reputation in the field has suffered a blow.  For example, the Executive Committee of the Association of International Broadcasting ("AIB") has informed him that he may not attend meetings or exercise his committee voting rights so long as Defendants persist in ignoring the Networks' journalistic independence.  *Id.* at ¶ 22.  This tangible change in circumstance represents damage to Dr. Powers's professional reputation that is directly caused by Defendants' misconduct.  That Dr. Powers may be restored as a full member of the AIB's Executive Committee if Defendants cease their misconduct proves his injury and its redressability. And in yet another example of concrete, reputational harm, Dr. Powers and two other Plaintiffs, Matt Walsh and Grant Turner, were disinvited from an annual meeting held by the Directors General 7—a group of publicly funded international broadcasters who are committed to journalistic independence—as a result of Defendants' misdeeds.  Supp'l Powers Decl. ¶¶ 19-21.

Defendants may not dismiss these particularized and concrete harms as the result of "unfettered choices" made by independent actors.  Def. Sur-Reply 1, 4.  The tangible results of reputational harm *necessarily* involve the decisions made by third parties who are influenced by a plaintiff's reputation.  *See Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 162 (2d Cir. 2003) (finding that a credit union manager suffered reputational harm because a determination would tarnish her reputation, effectively ending her career in an industry dependent on security). Simply put, reputations don't exist in a vacuum.  As Dr. Powers's testimony establishes, his concrete harm is a manifestation of the manner in which Defendants have impacted how he is publicly perceived.  *See Cierco v. Mnuchin*, 857 F.3d 407, 418–19 (D.C. Cir. 2017) (holding that even where unfettered choices made by independent actors cause harm, causation is satisfied where there is "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress").

Finally, with the law and facts against them, Defendants invoke an invented parade of horribles, claiming that, if Plaintiffs' reputational harms suffice, any agency could be "subject to litigation any time one of their employees disagreed with their actions," and describing hypothetical lawsuits brought by employees of the Department of Justice, or the Department of Agriculture.  Def. Sur-Reply 1, 3.  That argument falls flat for two reasons.  *First*, USAGM and its Networks are unlike any other federal agency.  As state-funded outlets for neutral, accurate, and credible news, they are unique in that credibility and independence—*i.e.*, reputation—are their lifeblood.  *See* 22 U.S.C. § 6202(b)(1); *see also Ralis v. RFE/RL*, 770 F.2d 1121, 1125 (D.C. Cir. 1985) ("Congress's intent has been manifest that [USAGM Networks] are to enjoy independence in programming and broadcasting decisions.").  No matter how many hours of broadcasting the Networks produce, they will fall short of their statutory mandate if they lack an audience.  The attention of their audience is dependent upon their credibility.  22 U.S.C. § 6202(c) ("To be effective, the Voice of America must win the attention and respect of listeners.").[4]  In any event, Defendants' hypotheticals are inapposite, as they lack any indication that the plaintiffs in those "cases" presented any concrete, particularized reputational damage as Plaintiffs have here.  The harm that Defendants have wrought has lowered Dr. Powers's reputation in his field, and caused him to be disinvited to critical Board meetings with international broadcasting luminaries.  If that type of specific, concrete harm is insufficient, no reputational injury could be.

---

[4] Defendants' implication that some might "celebrate" their control of journalistic content is a red herring.  It is inconceivable that anyone in the fields of journalism or international broadcasting, whose opinions determine Plaintiffs' professional reputations, would celebrate a journalistic outlet's devolution into state-controlled propaganda.  Defendants' appeal to potential competing "public views" of which policy will advance USAGM's interest is similarly misleading.  Def. Sur-Reply 5.  Congress has already determined USAGM's interest is furthered by a strict observance of the statutory firewall.  22 U.S.C. § 6202(a)(5); 22 U.S.C. § 6204(b); Amicus Br. of Congressman Eliot Engel, Dkt. No. 34-1.

Plaintiffs are also likely to succeed in demonstrating that this Court can redress their reputational harms.[5]  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  As Defendants acknowledge, the degree of proof required to establish a likelihood of success in demonstrating reputational harm varies with the circumstances:  while certain reputational harms may be proven with expert evidence and data analytics, other reputational harms are obvious.  Def. Sur-Reply 7 (comparing *Meese v. Keene*, 481 U.S. 465 (1987), with *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 153 (3d Cir. 1999)).  Plaintiffs' reputational harms fall in the latter category.  As the record establishes, credibility and independence are crucial in the fields of journalism and global media.  Roe Decl. ¶¶ 22, 26; Coe Decl. ¶¶ 4, 21, 22–27; Doe Decl. ¶¶ 19, 23–25; Supp'l Powers Decl. ¶¶ 18–24; Cull Decl. ¶ 18; Chao Decl. ¶¶ 9–10.  The harm Plaintiffs suffer from being tarred as cogs in a propaganda machine is plain.[6]

## II.   Defendants' Remaining Jurisdictional Objections To Ms. Chao's Claims Lack Merit.

### A.   Defendants Do Not Argue This Court Lacks Jurisdiction To Address Ms. Chao's Third-Party Standing Claims On Behalf Of Contractor Journalists.

---

[5]  Defendants contend throughout their brief that Plaintiffs must make a "clear showing," as if that language imposes some heightened burden.  Not so.  Plaintiffs' burden is to clearly established show only that they are likely to succeed on the merits—or, in other words, that they are likely to succeed in proving their claims by a preponderance of the evidence.  *Cf. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 366 (1974) ("In the normal civil suit . . . the preponderance of the evidence[] standard is employed.").

[6]  Defendants attempt to insert into their standing section an argument that their violations of the First Amendment and the statutory and regulatory firewall do not constitute final agency actions, Def. Sur-Reply 6–7, despite acknowledging that the Court has not requested supplemental briefing on this topic, *id.* at 1.  But Defendants had the opportunity to make this argument in their opposition papers and failed to do so.  Pl. Reply 11.  In so doing, Defendants forfeited that argument, and may not belatedly raise it now.  *See, e.g.*, *Kissi v. Panzer*, 664 F. Supp. 2d 120, 123 (D.D.C. 2009).  At any rate, Defendants' argument fails on the merits.  As this Court held in *Open Technology Fund*, violations of the IBA's statutory firewall are final agency actions.  *Open Tech. Fund v. Pack*, 2020 WL 3605935, at *5, n.8 (D.D.C. July 20, 2020) ("*OTF*") ("[P]laintiffs have also alleged an APA claim, asserting that Pack's violation of the statutory firewall . . . [is] agency action[] that [is] arbitrary and capricious, [an] abuse[] of discretion, and [a] violation[] of law. . . . Plaintiffs have been adversely affected by final agency action, and thus they may proceed under the APA.").  Defendants' firewall violations are "consummation[s] of the[ir] decisionmaking process" to take these actions, and "legal consequences . . . flow" from them.  *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (internal quotation marks omitted)  Each individual violation creates "obligations" and issues "marching orders" that control content.  *Id.* at 1023.

Defendants contend that Ms. Chao's claims are subject to the Civil Service Reform Act ("CSRA"). But even if CSRA applied to some of her claims (and it does not, *see infra* 11–16; Reply Br. at 9–11), it does not apply to her third-party claims.

Defendants in their supplemental brief challenge Ms. Chao's injury-in-fact, but not the other two elements of third-party standing. They do not challenge that she has a sufficiently close relationship with Network journalists; nor do they in their supplemental brief challenge that the journalists are hindered in pursuing their own claims. *See* Opening Br. at Reply Br. at 3–9; Joinder of Plf. Chao at 2–3. And Defendants have *never* disputed that contractors are not subject to CSRA or that numerous journalists for whom Ms. Chao (and the original Plaintiffs) have third-party standing are contractors. Turner Supp'l Decl. ¶ 10; Chao Decl. ¶¶ 5, 7. *Navab–Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 67 n.14 (D.D.C. 2009), *aff'd sub nom. Navab–Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011). CSRA has no bearing on Plaintiffs' third-party claims brought on behalf of contractors, and thus does not stand in the way of this Court granting relief.

## B. This Court Has Jurisdiction Over Ms. Chao's First-Party Claims, Too.

Even if Ms. Chao did not have third-party standing vis-à-vis contractor journalists' claims (she does), this Court would still have jurisdiction, CSRA notwithstanding. This is not an employment dispute, but rather a dispute regarding statutorily required journalistic independence and free speech. Plaintiffs raise their journalistic claims separate and apart from any employment or personnel action against them. CSRA is irrelevant.

That Defendants can't even figure out which provision of CSRA *might* apply makes clear that their CSRA arguments lack all merit. Defendants, for instance, originally invoked provisions providing remedies for "adverse actions," Opp. 12, even though they multiple times conceded that no Plaintiff here challenges any such adverse action, and Ms. Chao has suffered none directed "against" her at all, *see* 5 U.S.C. §§ 7513(b), (d). Def. Sur-Reply 9; Opp. 12. Similarly, although

Defendants once invoked CSRA provisions relating to "disclosures" of unlawfulness, Opp. 12, they now appear to abandon those provisions as well.  For good reason:  the "disclosure" provisions to which Defendants referred afford remedies only for whistleblower-type retaliation not relevant to this case.  *Compare* Opp. 12, *with* 5 U.S.C. § 2302(b)(8) ("prohibited personnel practice" includes "tak[ing] or fail[ing] to take . . . a personnel action . . . *because of* . . . any disclosure" of unlawfulness or gross mismanagement (emphasis added)).  And although Defendants misleadingly invoked procedures for "grievances," Opp. 13, they now appear to have dropped that provision, too.  The "grievances" procedures are relevant only as to employees that have entered into a collective bargaining agreement.  *See Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 606 F.3d 780, 783 (D.C. Cir. 2010) ("Congress established a distinct regulatory framework for collective bargaining between federal agencies and their employees under the Federal Service Labor–Management Relations Statute, which was passed as part of the Civil Service Reform Act of 1978 and codified in Chapter 71 of Title 5 of the U.S. Code.").

Recognizing *none* of the provisions they previously invoked have anything to do with this case, Defendants advance a new argument in their supplemental brief as applied to Ms. Chao, now invoking 5 U.S.C. §§ 2302(a)(2)(A)(xii) and 2302(b)(12).  Those provisions address "any other significant change in duties, responsibilities, or working conditions," *id.* § 2302(a)(2)(A)(xii), and provide remedies where those significant changes "violate[] any law, rule, or regulation implementing, or *directly concerning, the merit system principles contained in section 2301 of this title*," *id.* § 2302(b)(12) (emphasis added); Opp. 9.  This argument fails for three reasons.

*First*, Ms. Chao challenges no "significant changes" to her "duties, responsibilities, or working conditions," as those statutory terms of art entail.  She remains Voice of America's Director of Programming and is still charged with supervising journalists and journalism.

12

Defendants have not adjusted her "working conditions"—and not every action that affects an employee is a "significant change" to a "working condition."  *See Carson v. Merit Sys. Prot. Bd.*, 573 F. App'x 4 (D.C. Cir. 2014) (per curiam) (email message from supervisor that said employee "acted inappropriately" was not a "significant change in duties, responsibilities, or working conditions"); *Shivaee v. Dep't of the Navy*, 1997 WL 222673 (M.S.P.B. Apr. 18, 1997) (duty site move was not a significant change in working condition).  Defendants have attacked Ms. Chao's and Voice of America's journalism and editorial integrity, but it cannot possibly be that any government action affecting Ms. Chao's work constitutes a "working condition" subject to CSRA regardless of whether she challenges some employment action taken against her.  *Cf. Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1434 (D.C. Cir. 1996); *Firenze v. N.L.R.B.*, 2013 WL 639151, at *8 (D. Mass. Jan. 10, 2013) (CSRA inapplicable where there was "no allegation that a prohibited 'personnel action' has taken place *vis-à-vis* the First Amendment.").

*Second*, even if Ms. Chao's claims related to a "significant change" to her "duties, responsibilities, or working conditions," CSRA would not cover her challenges to Defendants' breaches of the statutory firewall.  Defendants claim that the change in Ms. Chao's "working conditions" is a "prohibited" practice subject to CSRA remedies set out in 5 U.S.C. § 2302(b)(12).  But that provision covers only violations of "any law, rule, or regulation *implementing, or directly concerning, the merit system principles contained in section 2301 of this title*."  5 U.S.C. § 2302(b)(12) (emphasis added).  A change in working conditions, therefore, is not a prohibited personnel action falling under CSRA unless it is unlawful based on the merit systems principles in Section 2301.  *Confederated Tribes of Chehalis Reservation v. Mnuchin*, 976 F.3d 15, 21 (D.C. Cir. 2020)  (applying the "series-qualifier canon" of statutory interpretation).  Those principles include ensuring "[r]ecruitment" of "qualified individuals," § 2301(b)(1), "fair and equitable

treatment" among employees, § 2301(b)(2), equal pay for equal work, § 2301(b)(3), and others. But none of them relate to the statutory firewall or statutorily protected journalistic independence or refer to "unlawful" action in general. Ms. Chao's statutory claims therefore do not implicate any merit systems principles and thus fall beyond the latest provision of CSRA Defendants invoke.

*Third*, CSRA does not stand in the way of Ms. Chao's constitutional claims as the D.C. Circuit's decision in *Weaver* makes clear. In *Weaver*, the plaintiff, a writer at Voice of America, challenged a prepublication review procedure for any writing on any matters of "official concern" relating to Voice of America and foreign policy. 87 F.3d at 1431. Weaver was formally admonished for failing to comply with the review process when she wrote a scathing critique of Voice of America. She challenged both the prepublication review procedure and the oral admonishment. *Id.* at 1432. Although the D.C. Circuit recognized that Weaver's "constitutional claim" was "intertwined with her CSRA claim" regarding her admonishment (a personnel action) "in the most absolute manner imaginable," the Court allowed her constitutional claim to proceed, even though she had not exhausted administrative remedies for her oral admonishment. *Id.* at 1433-34. Because her constitutional claims could have been brought to court even had she never been admonished, she did not need to exhaust those claims prior to seeking relief in court. *Id.*

The same is true here. Even had Ms. Chao suffered no change to her "working conditions" whatsoever (and she has not), she could bring an action challenging the impending chill on her journalistic activities regardless. *See supra* 2–4; Opening Br. at 33–36. As the D.C. Circuit explained in *Weaver*, there is "no reason" for "disabling" Ms. Chao "from pursuing in federal court a constitutional claim that under First Amendment principles is as final, ripe and free from exhaustion difficulties as it need be, and that she has standing to pursue," even if "she has also

experienced a personnel action related to that claim." *Id.* For this reason, courts regularly allow federal employees' constitutional claims to proceed. *See* Reply Br. at 10 (collecting cases).[7]

*Mahoney v. Donovan*, 721 F.3d 633 (D.C. Cir. 2013) does not counsel otherwise. Notably, *Mahoney*, which did not involve a First Amendment or constitutional challenge at all, involved a challenge to specific employment-related actions that affected an employee's rights under 5 U.S.C. § 3105—a provision falling within the same exact title of the U.S. Code in which CSRA sits. Additionally, the actions challenged in that case were directly taken against the plaintiff—like reassigning plaintiff's workload. *Id.* at 632. The court ultimately held that it lacked jurisdiction under CSRA only where there was "no . . . concern[]" that construing "working conditions" to include the actions complained of by the plaintiff was consistent with "what Congress intended." *Id.* at 637. Here, in contrast, Defendants would have every First Amendment claim, and any resulting change in working condition, fall within the CSRA's ambit, regardless of whether a separate employment action has been taken against the complaining employee. That cannot possibly be "what Congress intended." Moreover, here, unlike in *Mahoney*, Ms. Chao has identified no "significant change" in her "working condition" as those terms of art are defined, and the statutory firewall breaches she challenges are not relevant to any CSRA provision. *Mahoney*, 721 F.3d at 634. Defendants offer no reason to extend *Mahoney* to the unique facts of this "unusual case," Opp. 5 —particularly where *Mahoney*'s "sound[ness]" has been called into serious "doubt." *Ass'n of Admin. L. Judges v. Colvin*, 777 F.3d 402, 405 (7th Cir. 2015) (Posner, J.).

---

[7] *Weaver* did not "pertain[] to the employee's activities outside of work," as Defendants contend, Def. Sur-Reply 10, but rather involved a pre-publication review of matters of "official concern" and an oral admonishment—a clear personnel action against the plaintiff. The point in *Weaver* was not, as Defendants claim, that no personnel action occurred; the point was that plaintiff's First Amendment claim survived separate and apart from that employment action. Here, too Plaintiffs' claims "stand[] independently" of any personnel action at issue. *Id.* at 1432, 1434.

Defendants were right to suggest the Court "need not dally long," Opp. 13, over CSRA procedures:  a read of Congress's chosen words shows that CSRA doesn't apply.

## III.  Plaintiffs Are Likely to Succeed in Proving that Defendants' Repeal of the Regulatory Firewall Violated the Administrative Procedure Act

Defendants' putative repeal of the regulatory firewall has no bearing on the legal claims in this case.  The firewall is baked into the IBA and requires the very "equivalency" test that this Court identified in *OTF*, 2020 WL 3605935, at *11, n.19, as Defendants effectively conceded at argument, H'rg Tr. (Nov. 5, 2020), Dkt. no. 39 ("Tr.") 62:22-24.  The attempted repeal of the firewall regulation does have practical significance:  the broad invocations of content-control authority in that repeal—and in Defendants' brief—do serious damage to Plaintiffs, the Networks' independence, and the credibility of their journalism.  Def. Sur-Reply 19 ("[I]t is consistent with the Constitution for the CEO to control the content of the networks' broadcasts."); *see* Chao Decl. ¶¶ 10–11.  The firewall regulation is a distillation and an expression of historical practice at the Networks, and ensures USAGM's compliance with law.  While the regulation was not codified into regulation prior to 2020, the principles it embodies have been at the core of the relationship between government officials and the Networks for decades.[8]  This Court should enjoin the putative repeal and restore the Networks' independence and the protection the regulation affords to Ms. Chao and the journalists she manages and supervises.  It is unlawful, unconstitutional, arbitrary and capricious.

*Unlawful.*  As an initial matter, the regulation repeal is not entitled to *Chevron* deference.  Such deference "is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming

---

[8]  Voice of America's Best Practices Guide ("Best Practices Guide") provides a detailed description of the firewall which parallels the purportedly repealed regulation.  The current version is Exhibit 18 to the Declaration of Lee R. Crain, Dkt. 12-20, but the guide has existed in similar form for decades.

deference was promulgated in the exercise of that authority.'"  *Fox v. Clinton*, 684 F.3d 67, 76 (D.C. Cir. 2012) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255–56 (2006)).  Such is not the case here: defendants have failed to identify anything suggesting that "Congress has 'delegated authority to [USAGM] generally to make rules carrying the force of law,'" or that USAGM's interpretation of the IBA is subject to any special solicitude.  *Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 659 (D.C. Cir. 2003) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).  Nor do Defendants explain why the regulation they purported to repeal—promulgated by the same agency—isn't entitled to the exact deference they now seek.

In any event, *Chevron* deference, even if it applies, does not support the regulation repeal.  Defendants' interpretation of the statutory command to "respect" the Networks' "professional independence and integrity" as broadening their authority such that they must control content contravenes the plain text of the IBA and the firewall.  Section 6204(b) is not ambiguous:  As this Court noted in *OTF*, and as Defendants concede in their Reply, "the statute 'protect[s] against interference with and maintaining the professional independence of the agency's journalists and broadcasters and thus their credibility as sources of independent news and information.'"  Reply 7 (quoting *OTF*, 2020 WL 3605935, at *2).  Section 6204(b) qualifies each power ascribed to the CEO, stating that the CEO "shall *respect* the professional independence and integrity of the . . . broadcasting services," in carrying out the powers delineated in section 6204(a).  22 U.S.C. § 6204(b) (emphasis added).  "Respect," both by its definition, and as read in context of the IBA more broadly, means that Defendant Pack must "refrain from interfering with," the Networks' journalistic activities.  Reply 14 (citing Merriam-Webster, https://bit.ly/35HEfwO).

The requirement that the Networks adhere to the highest standards of journalism itself unambiguously requires the existence of the firewall.  Congress made this clear in the legislative

history behind the IBA, saying that it "provide[s] a '*firewall*' [around] the broadcasters *to ensure the integrity of the journalism*." H.R. Conf. Rep. 105–432 (1998) (emphasis added). Professional standards of journalism require journalists to conduct their work without undue influence from external parties, including the government. Indeed, the Best Practices Guide provides that:

> The 'firewall' exists to maintain the credibility of reporting by U.S. international broadcasters. The firewall is violated whenever another U.S. government agency or a U.S. government official tries to influence our work by putting undue pressure on a VOA journalist or on the agency itself or takes any other action that may undermine the journalistic credibility or independence of VOA journalists. This protection arises from numerous provisions of the International Broadcasting Act (IBA), the Agency's governing statute.

Best Practices Guide at 100; *see also* Bennett Decl. ¶¶ 15, 23–36; Sugawara Decl. ¶¶ 7, 12, 17–25; Carroll Decl. ¶¶ 12–16; Capus Decl. ¶¶ 23, 26–27; Cull Decl. ¶¶ 9, 12, 18.

The D.C. Circuit's decision in *Ralis v. RFE/RL, Inc.* further makes plain that the USAGM Networks are *not* "government controlled" entities.[9] 770 F.2d 1121, 1124–25 (D.C. Cir. 1985). Although Defendants are correct that *Ralis* focused on the regulations under the 1973 version of the IBA, the current version of the IBA employs even stronger language than its predecessor, and articulates the distance that must be maintained between the Executive Branch and USAGM on the one hand, and the Networks on the other. *Compare* International Broadcasting Act of 1973 ("[T]he Board *shall bear in mind* the necessity of maintaining the professional independence and integrity of [the Networks]." (emphasis added)) *with* 22 U.S.C. § 6204(b) ("The Secretary of State and the Chief Executive Officer, in carrying out their functions, *shall respect* the professional independence and integrity of [the Networks].").  Moreover, the authorities granted to the head of USAGM, whether that head be the Broadcasting Board or the CEO, have remained consistent.

---

[9]  That *Ralis* concerned a grantee network, rather than Voice of America, is of no moment; all of the Networks enjoy the same statutory and First Amendment protections. *See* 22 U.S.C. §§ 6202(a)(5); 6204(b).

Those powers are limited to "direct[ing] and supervis[ing] all *broadcasting activities*" and "network operations," not all journalistic content or editorial decisionmaking.  22 U.S.C. § 6204(a).[10]  As the D.C. Circuit recognized in *Ralis* and this Court in *OTF*, the duties assigned to the CEO are big-picture and strategic, not the day-to-day interference Defendants are engaged in nor the content control rights they claim.  *Ralis*, 770 F.2d at 1125; *OTF*, 2020 WL 3605935, at *12, n.19; Repeal at 19; Def. Sur-Reply 19.[11]  And although the CEO has the authority to direct "broadcasting" activities,[12] that language is best read as permitting the CEO to manage USAGM's distribution infrastructure, not as handing the CEO control over the journalism.

*Unconstitutional.*  Congress made clear in enacting the IBA that "the policy of the United States is to promote the right of freedom of opinion and expression" and that the "[o]pen communication of information and ideas" is among the United States' interests in creating and operating the USAGM Networks.  22 U.S.C. § 6201.  Congress not only endowed the Networks with First Amendment protections, it also imposed limitations on Defendants to ensure those rights are not violated, as discussed above.  The firewall is woven into the IBA, and the CEO's role is restrained because journalists employed by the Networks do and should enjoy First Amendment protections.

---

[10]  At oral argument, Defendants conceded that their "argument [does not] turn on" the CEO's powers "being broader," and suggested that the statutory text had changed by adding language authorizing the CEO to "direct and supervise." Tr. at 59:14-21.  But that language appeared in the original IBA as well, *see* PL 103-236, 108 Stat. 382 § 305(a)(1) (1994) ("The Board shall have the following authorities: (1) To direct and supervise all broadcasting activities conducted pursuant to this title . . . .").  And in any event, this language should be read consistent with his other overarching authorities, such as the duties "[t]o review and evaluate the mission" and "review engineering activities."  22 U.S.C. § 6204(a)(2), (7).

[11]  Defendants' brief cites Professor Cull's declaration for their proposition that "the President's Article II obligations and the CEO's statutory obligations would require—and § 6204(b) would not prevent—intervention in content choices," *see* Def. Sur-Reply 17, but his declaration plainly supports the opposite conclusion.  Voice of America's pushback against exceptional governmental interference during the Cuban Missile Crisis and the Vietnam War is exactly what led to the codification of the firewall that exists today "to ensure separation and prevent future interferences."  Cull Decl. ¶ 12; *see id.* ¶¶ 13–14; *see also, e.g.*, Bennett Decl. ¶¶ 21–22 (describing instances where the Department of State has been treated as outside of the firewall); First Powers Decl. ¶¶ 31–32 (same).

[12]  For this reason USAGM, and not the Networks, made the decision to increase its investments in broadcasting to particular nations like Russia, China, and North Korea over the past five years.  *See* Supp'l Powers Decl. ¶ 18.

As Defendants acknowledged, government-owned journalistic outlets can enjoy First Amendment protections, as the court recognized in *Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 57 (D.D.C. 2003); *cf. Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931-32 (2019) ("extensive regulation" and funding of a public access channel did not convert that channel into government actor subject to First Amendment).   The D.C. Circuit found that the same protections exist for USAGM Networks in *Ralis*, 770 F.2d at 1125–26, and Congress made clear that such protections apply to Voice of America as well, 22 U.S.C. §§ 6202(a)(5), 6204(b).   The legislative history proves that the IBA ensures "the journalists themselves will be *shielded from political interference*."   H.R. Conf. Rep. 105–432 (1998) (emphasis added).   President Obama reiterated this principle in his signing statement accompanying the 2016 National Defense Authorization Act, articulating that the statute "protect[s] against interference with and maintain[s] the professional independence of the agency's journalists and broadcasters and thus their credibility as sources of independent news and information.'"   Compl. ¶ 37; *OTF*, 2020 WL 3605935, at *2.   As in *Tripp*, the First Amendment applies here and plainly precludes government officials from interfering with or censoring journalistic content.   *Tornillo*, 418 U.S. at 258.

The "limits" Defendants say apply to USAGM Networks do not restrict content and do not at all limit the applicability of the First Amendment.   *See* Tr. at 12:1–13:19.   In the same way a private newspaper or publisher can impose certain scope limitations on a newspaper's coverage, *id.*, the statutory instructions to not "duplicate" private journalism and to promote religious freedom, *see* Def. Sur-Reply 18–19, does not detract from the independence and editorial control of the journalists.   Indeed, as the court recognized in *Tripp*, First Amendment protection can exist even where governmental actors place certain *ex ante* limitations on a newspaper's coverage.   284 F. Supp. 2d at 55–57; Reporters Committee Amicus at 14-16; *cf. Halleck*, 139 S. Ct. at 1932

20

("extensive regulation" not enough to convert private actor into government actor).  Nor do any of the "limits" Defendants identify disturb the firewall—a core "highest professional standard[] of broadcast journalism."  *See, e.g.*, Bennett Decl. ¶ 10, 13; Capus Decl. ¶ 30; Cull Decl. ¶ 18.

    ***Arbitrary & Capricious.***  Defendants' arguments confirm that the repeal itself rests on an "*ipse dixit* conclusion" that "epitomizes arbitrary and capricious decisionmaking."  *See, e.g.*, *Ill. Pub. Telecom. Ass'n v. F.C.C.*, 117 F.3d 555, 564 (D.C. Cir. 1997); *D&F Afonso Realty Tr. v. Garvey*, 216 F.3d 1191, 1196–97 (D.C. Cir. 2000).  This Circuit's prohibition on such agency action nixes Defendants' attempts to rehabilitate the repeal.  For example, Defendants argue that they need not provide "sufficient fact-finding" to support the repeal because it "is born of the agency's experience operating under the regulation for the past five months."  Def. Sur-Reply 20.  But, while the repeal claims Pack's "experience operating under" the firewall regulation showed it to be "unworkable," the repeal cites not *a single instance* where the regulation actually hindered Pack from doing anything.  *See id.* at 19–24.  Indeed, given the record in this action, Mr. Pack simply ignored the regulation altogether, belying any notion of unworkability.  *See, e.g.*, Opening Br. 8–16, 19–40.  There are thus no facts in the record before the Court to justify the repeal.

    Ironically, in responding to Plaintiffs' arguments that the repeal does not provide "a reasoned explanation . . . for disregarding [the] facts and circumstances that underlay" the firewall regulation's promulgation, Pl. Reply 19 (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)), Defendants argue that "[r]epeal of the regulation has simply returned USAGM to the status that it maintained for the first 20-plus years of its operation under the IBA."  Def. Sur-Reply 20.  That is false.  The regulation itself was promulgated to codify USAGM's "longstanding practice" of not interfering with the Networks as required by the IBA, 85 Fed. Reg. 36150–01—practices the repeal makes clear Defendants intend to cast aside, Repeal at 19; Defs. Supp'l Br. at

19.  Moreover, while Defendants claim that "the regulation was unnecessary" to maintaining "the highest professional standards of journalism," Def. Sur-Reply 20, neither they nor the repeal ever says *why*, or how those standards will be maintained without the regulation, which itself made the factual findings (further corroborated by the undisputed record in this case) that its precepts reflected those very standards, 22 C.F.R. § 531.1.  This is beyond impermissible *ipse dixit*; Defendants have "ignore[d] [USAGM]'s prior factual findings that contradict its new policy."  *See also Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1111 (D.C. Cir. 2019).

Similarly off base is Defendants' posturing that they did not run afoul of the requirement that an agency must "consider important [aspects] of the problem" involved in the repeal.  Reply 20 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910 (2020)).  Defendants try to dodge this requirement by arguing that the repeal did not have to consider whether, say, it harmed "the credibility of the USAGM networks," because "USAGM asserted authority to control content only 'at times.'"  Def. Sur-Reply 20.  Even were that right, Defendants needed to consider how the repeal would impact credibility in light of the fact that the firewall regulation was promulgated precisely because USAGM previously thought full editorial independence—not "at times" independence, *id.*—was "essential to ensuring the continued credibility" of the Networks, 85 Fed. Reg. 36150–00.  *See Navarro*, 136 S. Ct. at 2126.  Defendants' repeal offered no such consideration.  This is fatal.

Defendants are wrong that *Plaintiffs* were required to offer a "reasonable alternative" to full rescission that Defendants might have considered.  Def. Sur-Reply 21.  When an agency repeals a regulation, the burden is on the agency to consider alternatives less than full repeal.  *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913.  If Defendants thought Section 531.3(c) had too many restrictions, they could have revised that provision, yet kept intact the regulation's

commitment to editorial independence, 22 C.F.R. § 531.1(b).  They could have retained the regulatory equivalency standard, *id.* § 531.3(e)(3), or refined the defined terms Defendants found "confusing."  Defendants considered none of these obvious other options, nor any other.

And while Defendants claim they are "entitled to a presumption of regularity," Def. Sur-Reply 22, that "presumption 'is not to shield action from a thorough, probing, in-depth review.'" *U.S. Lines, Inc. v. Fed. Maritime Comm'n*, 584 F.2d 519, 526 (D.C. Cir. 1978) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)).  Nor is Defendants' invocation of that presumption applicable in this case and on this record—a record supported by more than a dozen declarations and over 70 exhibits setting forth in exhaustive detail their entirely irregular "management" of the agency.  *See, e.g.*, Opening Br. 8–16, 19–40.

Similarly, Defendants' unsupported assertion that the "process of repealing the regulation" commenced "well in advance of this litigation" does not rebut the pretextual nature of the repeal. As Defendants conceded at argument, Defendants recognized the putative repeal "would have a direct impact on the litigation" and that "the filing of this complaint underscores for the agency the threat with which some would interpret the regulation." Tr. 51:8–17.

## IV.   Plaintiffs' Revised Proposed Order Reflects Administrable And Workable Remedies To The Legal And Constitutional Violations Identified In This Action

Pursuant to the Court's permission granted at the end of oral argument, Tr. at 71:1-16, Plaintiffs submit with this brief a revised proposed order on this motion.  As Plaintiffs' revised proposed order makes clear, this Court can enter a specific, clearly delineated order to require Defendants to abide by the standards set by the First Amendment and the statutory and regulatory firewalls.  *See Ralis*, 770 F.2d at 1125 (Board "given evaluative and review responsibilities with respect to the two stations, but day-to-day control was left to the stations themselves.").  The order would provide to USAGM the ability to exercise its big-picture authority—such as by permitting

23

it to engage in random, post-hoc content review investigations pursuant to the Policy of Editorial Lapses (and in line with best practices at other public service media organizations like NPR, PBS, and the BBC)—yet would ensure preservation of full editorial independence, as federal law requires. *See OTF*, 2020 WL 3605935, at *12, n.19.

The proposed order also effectuates meaningful constitutional standards, such as the obligation to promulgate "explicit and meaningful" content-neutral standards governing J-1 visa applications, *Sherrill v. Knight*, 569 F.2d 124, 131 (D.C. Cir. 1977), prohibiting raw invocation of "reasons of security" to deny visa sponsorship, *id.* at 130, and prohibiting "unfettered discretion" of government actors over expressive conduct, *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988).  In addition to standards articulated in the caselaw, the proposed order relies on longstanding USAGM and Network policies including the Procedures for Editorial Lapse and Voice of America's Best Practices Guide, all of which provide workable standards for Defendants to adhere to in ceasing their unlawful and unconstitutional activities, and standards this Court can administer in remedying the unlawful and unconstitutional acts identified in this case.

Courts have not shied away from granting preliminary injunctive relief against federal agencies where agencies have deviated from their legal and constitutional obligations.  Relief granted to remedy these legal and constitutional harms is often wide-ranging and far-reaching. *See, e.g.*, *Vote Forward, et al. v. Dejoy*, 2020 WL 5763869, at *13 (D.D.C. Sept. 28, 2020) (granting preliminary injunction against U.S. Postal Service enjoining policy to limit late and extra trips by mail carriers which could impact delivery of mail-in ballots); *id.* Minute Order entered on October 27, 2020 (granting emergency motion to enforce and monitor compliance with preliminary injunction; requiring agency to promulgate specific notices and policies and to file daily data reports with court to ensure compliance); *New York v. Trump*, 2020 WL 5763775, at

*13 (D.D.C. Sept. 27, 2020) (enacting similar preliminary injunction, including a preclusion on removing mail processing machines); *New York v. United States Dep't of Homeland Sec.*, 2020 WL 4347264, at *14 (S.D.N.Y. July 29, 2020) (preliminarily enjoining DHS rule redefining "public charge" as rule could deter individuals from getting tested and treated for COVID-19); *Planned Parenthood Fed'n of Am., Inc. v. Schweiker*, 559 F. Supp. 658, 670 (D.D.C.), *aff'd sub nom. Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983) (preliminarily enjoining rule requiring parental notification for minors seeking contraceptives). Where necessary to enforce the law, courts have not hesitated to deploy their equitable powers.

The proposed order would restore the Networks' independence and integrity and remove the propagandistic stain Defendants have placed on the agency.  Indeed, it would ensure the agency can survive the last months of Defendants' stewardship without further harm.[13]

## CONCLUSION

Plaintiffs respectfully request that this Court grant Plaintiffs' motion for a preliminary injunction and enter an order substantially similar to the order Plaintiffs have proposed as well as preliminarily enjoin the Repeal of the firewall regulation, 22 C.F.R. § 531.1, *et seq.*

---

[13]  The Court was right to take issue with Mr. Pack's statements regarding COVID-19, including his statement, in response to an interviewer's suggestion about "banning masks and turning off the air conditioning" in Network offices, that "we'll have to look into that one."  Def. Sur-Reply 23–24.  Although Defendants shrug this statement off as merely a "inartful" joke, his "joke" is far from the extent of his misdeeds relating to the pandemic. Defendants have actively derailed USAGM's plans and abilities to protect its employees.  In August, for instance, Pack placed two key career staff in charge of USAGM's response plan for protecting "employees during the COVID-19 pandemic" on "administrative leave."  Lennon Decl. ¶ 4; Walsh Decl. ¶¶ 5–6.  Further, Pack "ignored" several proposals made by career staff about what USAGM should do "as part of its COVID-19 (coronavirus) response plan," Tran Decl. ¶ 14, and terminated a temperature screening system that career staff had worked to put in place after it was approved by USAGM's previous CEO, Plaintiff Turner.  The proposals included an "updated face mask policy reminder" to let employees know "about the mandatory usage" of masks "and the enforcement and discipline" policies in place for employees who did not follow the plan.  *Id.*  Moreover, Mr. Pack's team has shown a flagrant disregard for wearing masks and for the health of USAGM employees, including forcing one Plaintiff to come into the office despite serious "health concerns" and "high risk[s] to [that plaintiff and her] family."  Lennon Decl. ¶ 8.  Defendants forced this Plaintiff to come into the office for in-person meetings during which none of the Defendants in attendance were wearing masks, "in direct violation of the COVID-19 policies I had helped institute for the agency."  *Id.*  The Court's concern that Defendants are not taking seriously the health and safety of USAGM employees are serious and legitimate, Pack's "joke" notwithstanding.

Dated:  November 12, 2020

GIBSON, DUNN & CRUTCHER LLP


By:   */s/* Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com


Mylan L. Denerstein (admitted *pro hac vice*)
Zainab Ahmad (D.D.C. Bar No. NY0345)
Lee R. Crain (D.D.C. Bar No. NY0337)
Alexandra Grossbaum (admitted *pro hac vice*)
Lauren M. Kole (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166-0193
Tel:  212.351.4000
MDenerstein@gibsondunn.com
Zahmad@gibsondunn.com
LCrain@gibsondunn.com
AGrossbaum@gibsondunn.com
LKole@gibsondunn.com


Joshua S. Lipshutz (D.C. Bar No. 1033391)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
JLipshutz@gibsondunn.com


*Counsel for Plaintiffs*