### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GRANT TURNER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. AGENCY FOR GLOBAL MEDIA,<br>*et al.*,<br><br>Defendants. | Civil Action No. 20-2885 (BAH)<br><br>Chief Judge Beryl A. Howell |

### <u>MEMORANDUM OPINION</u>

In 1942, the first transmission made by Voice of America ("VOA"), the official, publicly funded news outlet of the U.S. government abroad, promised foreign VOA listeners: "The news may be good or bad; we shall tell you the truth."  VOA News, *VOA's First Broadcasts: "The News May Be Good or Bad, We Shall Tell You the Truth*," YOUTUBE, at 0:35–0:39 (Mar. 8, 2012), https://youtu.be/-k3bkvDDfgU.  Consistent with that promise, VOA, the best-known of several U.S.–funded international broadcasting outlets, has "w[o]n the attention and respect of listeners," 22 U.S.C. § 6202(c), by "serv[ing] as a consistently reliable and authoritative source of news" that is "accurate, objective, and comprehensive," *id.* § 6202(c)(1); *see also id.* § 6202(b)(1).  VOA, joined over time by Radio Free Europe/Radio Liberty ("RFE/RL"), Radio Free Asia, the Office of Cuba Broadcasting, and the Middle East Broadcasting Networks, through their efforts to "present a balanced and comprehensive projection of significant American thought and institutions" that "represent[s] America, not any single segment of American society," *id.* § 6202(c)(2); *see also id.* § 6202(b)(2), have exported the cardinal American values of free speech, freedom of the press, and open debate to the dark corners of the world where independent, objective coverage of current events is otherwise unavailable.

The United States' commitment to this cultural export has contributed to the downfall of oppressive regimes around the world, from Nazi Germany to the Soviet Union.  Central to the success of this critical foreign policy work, however, is the premise that, in contrast to the state-run propaganda that dominates media in the countries where VOA and its sister networks broadcast, U.S.–funded international broadcasting outlets combat disinformation and deception with facts, told through an American lens of democratic values.  Thus, "to transform" these outlets "into house organs for the United States Government" would be "inimical to [their] fundamental mission."  *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C. Cir. 1985).  Instead, to provide a model of democratic debate and deliberation informed by the contributions of a free press, VOA and its sister networks must "present the policies of the United States clearly and effectively," alongside "responsible discussions and opinion on these policies."  22 U.S.C. § 6202(c)(3); *see also id.* § 6202(b)(3).  In light of this obligation, these outlets are not intended to promote uncritically the political views and aspirations of a single U.S. official, even if that official is the U.S. President.  To the contrary, their mission of pursuing and producing objective journalism applies just as forcefully to their coverage of the U.S. government and its officials.

Defendant Michael Pack, the current Chief Executive Office ("CEO") of the United States Agency for Global Media ("USAGM"), the agency that oversees U.S.–funded international broadcasting, has allegedly taken a series of steps since his June 4, 2020 confirmation that undermine this mission, and thus the networks' efficacy as a foreign policy tool, at every turn.  Together with his five co-defendants, who are individuals with no discernible journalism or broadcasting experience but nonetheless appointed by Pack to senior political leadership positions within USAGM, Pack has sought to interfere in the newsrooms of the USAGM networks, in violation of their eighty-year practice, enshrined in law, of journalistic

autonomy, and has allegedly worked systematically to eliminate those USAGM employees and network journalists who both oppose his interference and produce journalistic content that, in Pack's view, does not align with the political interests of President Trump.  In pursuit of this goal, Pack allegedly seeks to quash not only coverage that is insufficiently supportive of President Trump, but also any coverage, unless unfavorable, of President Trump's political opponents.

As this Court has previously observed, "[w]idespread misgivings about Pack's actions raise troubling concerns about the future of these great institutions designed to advance the values and interests of the United States by providing access to accurate news and information and supporting freedom of opinion and expression in parts of the world without a free press." *Open Tech. Fund v. Pack* ("*OTF*"), No. 20-1710 (BAH), 2020 WL 3605935, at *2 (D.D.C. July 2, 2020), *appeal filed*, No. 20-5195 (D.C. Cir. July 6, 2020).  Further steps taken by Pack and his appointees since that observation was made only deepen those misgivings and prompt plaintiffs' challenge in the instant suit.  Plaintiffs, five senior management officials at USAGM and the Program Director for VOA, claim that defendants' actions violate the First Amendment, U.S. Const. amend. I, the United States International Broadcasting Act of 1994 ("IBA"), as amended, 22 U.S.C. §§ 6201–16, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and Pack's fiduciary duties to USAGM as its CEO, and exceed Pack's statutory authority, through their disregard for the statutory and regulatory "firewall" intended to protect the USAGM networks from Executive branch interference in their daily operations and journalistic endeavors. Am. Compl. ¶¶ 159–201, ECF No. 36.  Plaintiffs seek an order preliminarily enjoining defendants' "unlawful and unconstitutional conduct."  Pls.' Mot. Prelim. Inj. ("Pls.' Mot.") at 1, ECF No. 12; *see also* Proposed Order, ECF No. 43-3.  Defendants, for their part, counter that the

relief plaintiffs seek is foreclosed because plaintiffs lack standing to bring this action, which in any event is precluded by the exclusive remedial scheme of the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. §§ 1101 *et seq.*  On the merits, they contend that 2016 amendments to the IBA allow Pack, as USAGM's CEO, to reform and restructure the operations of the agency and its networks, while limitations on the First Amendment rights of government employees prevent plaintiffs from pursuing their constitutional claims.  *See generally* Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 27; Defs.' Suppl. Mem. Opp'n Pls.' Mot. Prelim. Inj. ("Defs.' Suppl. Mem."), ECF No. 42.

Upon consideration of the briefing and exhibits submitted by the parties and *amici curiae*, as supplemented after a hearing on the pending motion for preliminary injunctive relief, the Court concludes that plaintiffs have made the requisite showings, including a likelihood of success on the merits of at least one of their claims, to obtain part of the extraordinary relief they seek.  Consequently, as explained in more detail below, their motion is granted in part.

## I.      BACKGROUND

Review of the procedural background follows discussion of the historical and statutory background of U.S.–funded international broadcasting and a summary of plaintiffs' factual allegations against defendants.

### A.      Historical and Statutory Background

Since World War II, the United States has funded and operated broadcast media organizations across the globe to "promote the right of freedom of opinion and expression," 22 U.S.C. § 6201(1), and to advance "the goals of United States foreign policy," *id.* § 6201(4); *see also OTF*, 2020 WL 3605935, at *2; Decl. of Lee R. Crain ("Crain Decl."), Ex. 6, *VOA Through the Years*, VOA PUBLIC RELATIONS (Apr. 3, 2017), ECF No. 12-8; Crain Decl., Ex. 7, MATTHEW C. WEED, CONG. RSCH. SERV., R43521, U.S. INTERNATIONAL BROADCASTING: BACKGROUND

AND ISSUES FOR REFORM ("CRS INT'L BROADCASTING REP.") 1–5 (2016), ECF No. 12-9.  These

organizations include the iconic VOA, which, "[s]ince its first transmission in Germany in

1942, . . . has served as the official news outlet of the United States government in foreign lands

during wars both hot and cold," *Namer v. Broad. Bd. of Governors*, 628 F. App'x 910, 911 (5th

Cir. 2015), and its sister networks, RFE/RL, Radio Free Asia, the Office of Cuba Broadcasting,

and the Middle East Broadcasting Networks (collectively, the "networks"), Am. Compl. ¶¶ 2, 24,

32.

　　"For almost as long as these services have been in existence, debates over the

effectiveness, strategic direction, and necessity of U.S. international broadcasting have

persisted."  CRS INT'L BROADCASTING REP. 1.  Nonetheless, Congress has consistently

determined "that institutional arrangements be such that the stations not lose their 'non-official

status'; to transform [the networks] from independent broadcasters into house organs for the

United States Government was seen as inimical to [their] fundamental mission."  *Ralis*, 770 F.2d

at 1125.  Accordingly, beginning in the 1970s, Congress has codified (and revised) in statute

structures meant to guarantee this independence while guiding the scope of the coverage and

providing for sufficient but cabined Executive branch oversight.

### 1.　*Board for International Broadcasting Act of 1973*

　　The first such statute was the Board for International Broadcasting Act of 1973 ("BIB

Act"), Pub. L. No. 93-129, 87 Stat. 456 (1973), which "established a Board of International

Broadcasting [('BIB')]," *id.* § 3(a), an "independent federal agency created to administer and

provide federal funding to" Radio Free Europe ("RFE") and Radio Liberty ("RL"), CRS INT'L

BROADCASTING REP. 3.  BIB was created as a seven-member bipartisan board, BIB Act

§ 3(b)(1), tasked with funding RFE and RL, *id.* § 4(a)(1), "review[ing] and evaluat[ing] the

mission and operation of" the networks, and "assess[ing] the quality, effectiveness, and professional integrity of their broadcasting within the context of the broad foreign policy objectives of the United States," *id.* § 4(a)(2), among other responsibilities.  *See also* CRS INT'L BROADCASTING REP. 3.  Although BIB was charged with overseeing RFE and RL, Congress intended for the Board to "encourage continuation of the professional integrity and independence of the two radio stations, their chief operating executives, and their staffs."  H.R. Rep. No. 93-510, at 10 (1973).  To formalize that vision, the BIB Act explicitly directed the Board, "[i]n carrying out [its] functions," to "bear in mind the necessity of maintaining the professional independence and integrity of Radio Free Europe and Radio Liberty."  BIB Act § 4(b).  This provision, and its subsequent iteration in later laws, became known as the "statutory firewall," the legal guarantee of the networks' journalistic independence in the face of government oversight.  In accordance with this statutory design, BIB channeled taxpayer funding to RFE and RL, but the two networks remained formally separate from the government and "provid[ed] an example of an independent broadcaster promoting journalistic integrity and democratic principles of a free media."  CRS INT'L BROADCASTING REP. 3.  Over the next twenty years, Congress revisited the BIB Act several times, seeking to refine the balance between Board oversight and independence in the networks' daily operations and broadcasts.[1]

---

[1]    For example, in 1982, Congress amended the BIB Act to merge the board of the now-consolidated RFE/RL and BIB.  Board for International Broadcasting Authorization Act, Fiscal Years 1982 and 1983, Pub. L. No. 97-241, tit. IV, § 403(a), 96 Stat. 296 (1982).  This change was intended "to strengthen" BIB's "oversight authority over the operations of Radio Free Europe/Radio Liberty" and "clearly authorize[]" BIB "to make the major policy and personnel decisions (without, however, becoming involved in daily RFE/RL management)."  S. Rep. No. 97-71, at 31 (1981).  Likewise, in 1985, Congress made explicit that "RFE/RL, Incorporated is responsible for its own management and for daily broadcasts," while BIB, "in an effort to preserve or enhance its ability to properly oversee the operations of RFE/RL, Incorporated, must avoid even the appearance of involvement in daily operational decisions and management of RFE/RL, Incorporated."  Act of Aug. 16, 1985, Pub. L. No. 99-93, tit. III, § 304(a)(5), (8), 99 Stat. 405 (1985).

### 2.      *United States International Broadcasting Act of 1994*

Eventually, in 1994, Congress revisited and consolidated its approach to U.S. government–sponsored international broadcasting activities in the United States International Broadcasting Act of 1994 ("IBA"), Pub. L. No. 103-236, tit. III, 180 Stat. 433 (1994) (codified as amended at 22 U.S.C. §§ 6201–16), which repealed and replaced the BIB Act, *id.* 310(e). The IBA declared that "it is the policy of the United States to promote the right of freedom of opinion and expression, including the freedom 'to seek, receive, and impart information and ideas through any media and regardless of frontiers,' in accordance with Article 19 of the Universal Declaration of Human Rights," *id.* § 302(1), a statement which remains the policy behind U.S. international broadcasting activities to this day, *see* 22 U.S.C. § 6201(1).  To achieve Congress's goal of streamlining international broadcasting, the IBA brought all U.S.–funded, non-military broadcasting activities under the umbrella of the United States Information Agency ("USIA").  IBA § 304(a).  Congress abolished BIB, and, in its place, "established . . . a Broadcasting Board of Governors [('BBG')]" within USIA, *id.* § 304(a), to consist of "eight presidentially appointed, [S]enate-confirmed governors, 'no more than four of whom [could] be from the same political party,' and . . . the Secretary of State, who 'serve[d] as the ninth voting member ex officio,'" *OTF*, 2020 WL 3605935, at *2 (quoting CRS Int'l Broadcasting Rep. 5).  The BBG was charged with oversight of "all broadcasting activities" under the IBA, including VOA, RFE/RL, and the other U.S. government–funded international broadcasting networks.  IBA § 305(a)(1).

The new Board retained all of the powers held by its predecessor, *see id.* § 305(a), and gained two additional authorities of relevance here: (1) the ability "[t]o direct and supervise" the broadcasting activities under its oversight, *id.* § 305(a)(1), and (2) the ability "[t]o ensure that

United States international broadcasting is conducted in accordance with the standards and principles" set forth in the IBA, *see id.* § 305(a)(3).[2]  Those standards and principles, which continue, with some additions and modifications over the years, to govern VOA and network conduct, set forth substantive requirements for the services' programming, including, for example, that broadcasts "shall" "be consistent with the broad foreign policy objectives of the United States," IBA § 303(a)(1); 22 U.S.C. § 6202(a)(1); "shall . . . be consistent with the international telecommunications policies . . . of the United States," IBA § 303(a)(2); 22 U.S.C. § 6202(a)(2); and "shall include" "a balanced and comprehensive projection of United States thought and institutions," IBA § 303(b)(2); 22 U.S.C. § 6202(b)(2), (c)(2), and "clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies," IBA § 303(b)(3); 22 U.S.C. § 6202(b)(3), (c)(3).[3]  Further, VOA and the networks "shall" "not duplicate the activities of private United States broadcasters" or "government supported broadcasting entities of other democratic nations."  IBA § 303(a)(3), (4); 22 U.S.C. § 6202(a)(3), (4).

In an effort to balance the need for oversight and policy uniformity with the independence of the networks, Congress included in the standards and principles requirements that U.S.–funded international broadcasting activities "be conducted in accordance with the highest professional standards of broadcast journalism," IBA § 303(a)(5); 22 U.S.C. § 6202(a)(5), and deliver "news which is consistently reliable and authoritative, accurate, objective, and comprehensive," IBA § 303(b)(1); 22 U.S.C. § 6202(b)(1); *see also* 22 U.S.C.

---

[2]    Notably, the IBA's explication of the BBG's powers omitted the express restrictions on Board interference in the day-to-day management of the services that the 1985 amendments had added to the BIB Act.  *See* IBA § 305.
[3]    Later additions to the standards and principles provide, for example, that VOA and the networks "shall" "promote" democratic values, such as "respect for human rights, including freedom of religion," 22 U.S.C. § 6202(a)(8), and call for "editorials, broadcast by the Voice of America, which present the views of the United States Government," *id.* § 6202(b)(3).

§ 6202(c).  The IBA also preserved the statutory firewall first enacted in the BIB Act.  *See* IBA § 305(c) ("The Director of the United States Information Agency and the Board, in carrying out their functions, shall respect the professional independence and integrity of the International Broadcasting Bureau, its broadcasting services, and grantees."); CRS INT'L BROADCASTING REP. 3–4.  Indeed, the Senate Committee on Foreign Relations, in endorsing this structure, confidently observed that the new "framework protect[ed] the independence and journalistic integrity of the broadcasting entities."  S. Rep. No. 103-107, at 10 (1993); *see also id.* at 49 (finding that the firewall provision "secures the professional independence and integrity of the . . . broadcasting services").[4]

By 2016, however, bipartisan observers had concluded that the BBG's structure resulted in "weak leadership" and "inefficient administrative and personnel management of the agency." CRS INT'L BROADCASTING REP. 1; *see also id.* at 12 (citing testimony of former Secretary of State Hillary Clinton); *id.* at 17 (noting that proposed reform legislation had co-sponsors from both major political parties).  After several unsuccessful efforts at legislative reform, in December 2016, Congress enacted amendments to the IBA, targeted at improving agency management, as part of the thousand-page National Defense Authorization Act for Fiscal Year 2017 ("NDAA"), Pub. L. No. 114-328, tit. XII, subtit. H, § 1288, 130 Stat. 2000, 2548 (2016). The amendments restructured the BBG, most significantly, by creating a presidentially appointed CEO of the BBG, 22 U.S.C. § 6203, and reducing the Board to an advisory role, *id.* § 6205.  The CEO inherited the powers previously exercised by the BBG and gained certain additional powers.  *See id.* § 6204(a)(1)–(22).  As a result, the CEO, acting alone, may now "direct and

---

[4]      In 1998, Congress passed the Foreign Affairs Agencies Consolidation Act of 1998, Pub. L. No. 105-277, div. G, tit. XI–XIII, 112 Stat. 2681 (1998), which, among other efforts to reform American foreign policy infrastructure in the aftermath of the Cold War, abolished USIA, *id.* § 1311, and preserved the BBG as an independent agency, *id.* § 1312(b).

supervise all broadcasting activities," *id.* § 6204(a)(1), "assess the quality, effectiveness, and professional integrity" of network activities, *id.* § 6204(a)(2), "ensure" broadcast activities are consistent with statutory standards and principles, *id.* § 6204(a)(3), (b)(2), and "appoint such personnel for the [CEO] as the [CEO] may determine to be necessary," *id.* § 6204(a)(11).  The statutory firewall, requiring "respect [for] the professional independence and integrity of the Board, its broadcasting services, and the grantees of the Board," remains in place, however, as a limit on the CEO's exercise of his other statutory authorities, *id.* § 6204(b), consistent with the continuing statutory mandate that U.S.–funded international broadcasting "be conducted in accordance with the highest professional standards of broadcast journalism," *id.* § 6202(a)(5). On December 23, 2016, President Obama signed the NDAA, and its amendments to the IBA, into law.  *OTF*, 2020 WL 3605935, at *3.

On June 11, 2020, the agency, now known as USAGM, put into effect a new rule, promulgated without notice and comment, interpreting the "statutory firewall."  *Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36,150 (June 15, 2020) [hereinafter *Firewall* Rule].[5]  On October 26, 2020, two weeks after plaintiffs initiated the instant litigation and fifty minutes before defendants filed their Opposition, USAGM rescinded the *Firewall* Rule, *see generally* Decl. of Michael Knapp ("Knapp Decl."), Ex. 1, USAGM Final Rule, Oct. 26, 2020 ("*Firewall* Rule Rescission"), ECF No. 27-2; *see also* Suppl. Decl. of Lee R. Crain ("Suppl. Crain Decl.") ¶ 2, ECF No. 30-1; Suppl. Crain Decl., Ex. 1, *Background on Rescinding a So-Called "Firewall Rule,"* U.S. Agency for Global Media (Oct. 26, 2020), ECF No. 30-2, on the grounds that the regulation inhibited the CEO's performance of his statutory duties, stood in

---

[5]     In 2018, the agency changed its name from the "Board of Broadcasting Governors" ("BBG") to the "United States Agency for Global Media" ("USAGM").  *OTF*, 2020 WL 3605935, at *3 (citing *Firewall* Rule, 85 Fed. Reg. at 36,150 n.1).

tension with the IBA, and impeded USAGM's ability to carry out its mission of promoting American values abroad, *see Firewall* Rule Rescission at 14–30.

### B.      Factual Background

Plaintiffs are career civil servants at USAGM and VOA.  Am. Compl. ¶¶ 17–23.  Grant Turner, Marie Lennon, Shawn Powers, Matthew Walsh, and Hoang Oanh Tran (together, the "original plaintiffs"), are senior management officials at USAGM who have voiced concerns about defendants' actions at USAGM and the networks in various protected fora.  *See id.* ¶¶ 17–21; Crain Decl., Ex. 57, Whistleblower Reprisal Compls. at 4–16, *In re Shawn Powers*, U.S. Dep't of State & Off. of Inspector Gen. & U.S. Off. of Special Couns. (Sept. 29, 2020) ("Whistleblower Compls."), ECF No. 12-59.  On August 12, 2020, the original plaintiffs were placed on paid administrative leave by defendants, Am. Compl. ¶¶ 17–21, allegedly on the grounds that their security clearances had been improperly investigated, *see id.* ¶ 64; Decl. of Grant Turner ("Turner Decl.") ¶¶ 10, ECF No. 12-61; Decl. of Marie Lennon ("Lennon Decl.") ¶ 4, ECF No. 12-66; Decl. of Shawn Powers ("Powers Decl.") ¶ 35, ECF No. 12-70.[6]  Plaintiff Kelu Chao, who joined this action in plaintiffs' Amended Complaint, currently serves as VOA's Program Director, in which capacity she "oversee[s] [VOA]'s production and distribution of television, radio, online, and mobile content" and "provides direction and management support to [VOA]'s News Center and foreign-language services."  Am. Compl. ¶ 23.  She previously filed a pseudonymous declaration in support of the instant motion under the name "John Roe." *See* Decl. of John Roe ("Roe Decl."), ECF No. 12-64.

---

[6]      On August 25 and 26, 2020, at least some of the original plaintiffs were transitioned from administrative leave to investigative leave, pending the completion of new security investigations.  *See* Defs.' Opp'n at 1; Turner Decl. ¶ 10; Powers Decl. ¶ 35.  Plaintiffs are contesting the charges related to their security clearances and employment status, which are not at issue in this litigation, in separate proceedings before the U.S. Office of Special Counsel.  *See* Whistleblower Compls.

Defendants are USAGM, its CEO Michael Pack, and individuals appointed by Pack to senior political leadership positions within USAGM.  *See* Am. Compl. ¶¶ 25–30.  Pack was nominated by President Trump to serve as the first presidentially appointed USAGM CEO in 2018.  *OTF*, 2020 WL 3605935, at *3; *see* Am. Compl. ¶¶ 17–21.  After a two-year delay, on June 4, 2020, the Senate confirmed Pack, and four days later, on June 8, 2020, he was sworn in as CEO of USAGM.  *OTF*, 2020 WL 3605935, at *4.  According to plaintiffs, soon after Pack's confirmation, he and his co-defendants "commenced a series of events designed to fundamentally undermine the networks' independence, in direct conflict with the statutory and regulatory firewall."  Pls.' Mem. P. & A. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mem.") at 9, ECF No. 12-1.  Plaintiffs challenge these actions by Pack and his co-defendants as breaches of the IBA's statutory firewall, the regulatory firewall created by the now-defunct *Firewall* Rule, and the First Amendment.  *See* Am. Compl. ¶¶ 159–201.  Essentially, plaintiffs ask the Court to draw a line between statutorily and constitutionally permissible oversight of VOA and the networks by USAGM's CEO and impermissible efforts by Pack and his allies to exercise control that, in plaintiffs' view, illegally and unconstitutionally interferes with VOA and the networks' journalistic independence and integrity.  Thus, brief description of the particular actions taken by defendants that plaintiffs believe cross this line follows.[7]

### 1.    *Interference with USAGM and Network Personnel*

First, according to plaintiffs, defendants systematically removed USAGM and network employees charged with enforcing the firewall.  Only a week into his tenure, on June 17, 2020, in a series of events dubbed the "Wednesday night massacre" and not at issue in this litigation, Pack unilaterally removed the operational heads and directors of the networks.  *OTF*, 2020 WL

---

[7]     For the purposes of this motion, defendants do not dispute plaintiffs' account of the facts underlying these events.  Transcript of Hearing (Nov. 5, 2020) ("Hr'g Tr.") at 53:7–14, ECF No. 39.

3605935, at *1.  That same day, he reassigned VOA Standards Editor Steve Springer, the person

charged with educating USAGM employees on the firewall and upholding journalistic ethics,

leaving the position vacant.  *See, e.g.*, Am. Compl. ¶¶ 59–63; Turner Decl. ¶¶ 22–23.  On August

12, 2020, Pack placed David Kligerman, USAGM's General Counsel and the author of the

*Firewall* Rule, on administrative leave.  Am. Compl. ¶¶ 58, 64.  To plaintiffs, the sidelining of

Springer and Kligerman signaled a concerted effort by defendants "to remove individuals at the

Agency and the networks who were best positioned to enforce the firewall," thereby breaching

the firewall by deliberately seeking to undermine it.  Pls.' Mem. at 9.

      Plaintiffs further allege that defendants took steps to influence, and, at times, to execute,

employment decisions related to editorial and journalistic personnel at VOA and the networks,

an area previously understood to fall within the networks' discretion pursuant to the firewall.

*See* Decl. of Amanda Bennett ("Bennett Decl.") ¶¶ 12, 14, 20, ECF No. 12-60.  Defendants

allegedly directed Radio Free Asia's director to terminate the network's Executive Editor, which

plaintiffs describe as "a firewall-protected position," *see* Am. Compl. ¶¶ 65–67; Turner Decl.

¶¶ 24–27; Lennon Decl. ¶¶ 14–15; Decl. of Matthew Walsh ("Walsh Decl.") ¶¶ 17–18, ECF No.

12-67; Powers Decl. ¶¶ 27–28, and sought to reassign the journalist hired by VOA as its New

York Bureau Chief, Am. Compl. ¶¶ 68–70; Lennon Decl. ¶ 16.  Pack also declined to sponsor or

renew sponsorship of J-1 visas (non-immigrant cultural exchange visas contingent on

employment in the United States) for foreign journalists employed by VOA.  Am. Compl. ¶¶ 71–

78; Walsh Decl. ¶¶ 20–21; Lennon Decl. ¶¶ 18–19; Turner Decl. ¶¶ 31–35; Roe Decl. ¶¶ 19–22.

Pack's failure to sign these journalists' visa paperwork has the effect of both depriving them of

visas and preventing VOA from controlling the hiring of foreign journalists.  Turner Decl. ¶ 31;

Roe Decl. ¶¶ 20–21.  Pack allegedly plans to replace the previous system of visa sponsorship,

under which the CEO played a purely ministerial role in approving paperwork for journalists selected by one of the networks, *see* Bennett Decl. ¶ 26; Decl. of Sandra Sugawara ("Sugawara Decl.") ¶ 20, ECF No. 12-69; Turner Decl. ¶¶ 31–32; Roe Decl. ¶ 20, with a model under which he will review visa applications on a case-by-case basis, Am. Compl. ¶ 74; Roe Decl. ¶ 19; Decl. of John Coe ("Coe Decl.") ¶ 13, ECF No. 12-62.

### 2.   *Investigation of and Interference with Journalistic Content*

Next, defendants, at Pack's direction, have allegedly sought to interfere directly in the newsrooms at VOA and the networks through content control and investigations into purported breaches of journalistic ethics.  On June 24, 2020, Pack issued a press release stating that the homepage of VOA's website would link to "editorials . . . written by the U.S. government and represent[ing] its views."  Am. Compl. ¶ 101.  Plaintiffs complain that VOA leadership was not consulted before this change in policy, which effectively grants USAGM direct control over content published by VOA.  *Id.*  Further, according to plaintiffs, defendant Samuel Dewey, a political appointee at USAGM, *id.* ¶ 26, has asked to participate in news coverage meetings at VOA and requested that VOA leadership report to him which journalists are assigned to every story under development, *id.* ¶ 91; Turner Decl. ¶ 36; Powers Decl. ¶¶ 25–26; Bennett Decl. ¶¶ 25, 34; Sugawara Decl. ¶¶ 19, 25; Roe Decl. ¶¶ 14–15, 18; Coe Decl. ¶ 12.  Plaintiffs believe that, through these efforts, Dewey has "reach[ed] far within the newsroom and bypass[ed] [VOA] leadership and USAGM procedures in an unlawful attempt to influence coverage."  Pls.' Mem. at 12 (first citing Roe Decl. ¶¶ 14–15, 18; and then citing Crain Decl., Ex. 21, *USAGM Procedures for Violations of the Principles, Standards, or Journalistic Code of Ethics*, U.S. Agency for Global Media (Mar. 12, 2020) ("*USAGM Procedures*"), ECF No. 12-23).

14

Defendants have also initiated investigations into alleged breaches of journalistic ethics and the networks' statutory standards, which are typically carried out by journalists and editors at the networks, not by USAGM officials.  *See* Turner Decl. ¶¶ 29, 49; Lennon Decl. ¶ 25; Decl. of Hoang Oahn Tran ("Tran Decl.") ¶ 17, ECF No. 12-68; Walsh Decl. ¶ 28; Powers Decl. ¶¶ 20–21; Roe Decl. ¶ 11; Decl. of John Doe ("Doe Decl.") ¶¶ 10–16, ECF No. 12-63.  Plaintiffs allege that these "inappropriate investigations" are a barely-concealed effort "to root out perceived 'liberal bias,'" Pls.' Mem. at 12, a theory substantiated by Pack's publicly stated commitment to combating what he describes as USAGM and the networks' "drift to the left" since the passage of the IBA, Crain Decl., Ex. 22, Federalist Radio Hour, *Interview with Michael Pack*, The Federalist ("Pack Interview"), at 07:30–07:35 (Aug. 27, 2020), ECF No. 12-24.[8]

The investigations undertaken by defendants have allegedly focused on coverage they perceive as unduly favorable to President-elect Joe Biden, President Trump's opponent in the 2020 presidential election, or biased against President Trump.  Am. Compl. ¶¶ 83–88, 92–95.  One such investigation, led by Dewey, *id.* ¶ 86, focused on a video posted by VOA's Urdu service, which covered then-candidate Biden's remarks "at an event organized by an American-Muslim nonprofit organization" without providing any context, *id.* ¶ 85; Turner Decl. ¶¶ 29–30; Bennett Decl. ¶¶ 32–33; Roe Decl. ¶¶ 10–15.  Dewey, along with co-defendants Diane Cullo and Emily Newman, interviewed reporters at the service, sought lists of individuals involved in producing the video, and requested access to internal documents related to VOA's review of the video.  Am. Compl. ¶ 87.  The investigation culminated in the placement of the Urdu service's digital managing editor on administrative leave and the termination of four VOA contractors.  *Id.* ¶ 88; Turner Decl. ¶¶ 28–30; Bennett Decl. ¶¶ 32–33; Roe Decl. ¶¶ 10–15.  In contrast,

---

[8]     As the document docketed at ECF No. 12-24 notes, plaintiffs submitted this audio exhibit to the Court via flash drive.

defendants did not investigate a similar clip, published by VOA's Spanish-language service, of a campaign-style video by President Trump encouraging Latino voters to support his reelection. Am. Compl. ¶¶ 83–84.

As evidence that this investigation had a detrimental chilling effect on VOA journalists, plaintiffs contend that, soon after the investigation concluded, a VOA journalist at the Urdu service removed videos from the service's website, including coverage of widespread civil unrest and protests following the death of George Floyd in the summer of 2020, allegedly out of fear that "[d]efendants might view these stories through a particular lens and subject those associated with the stories to punishment." Am. Compl. ¶ 89. In response, Dewey again reached into the VOA newsroom, this time to require the Chief of the Urdu service to "identify content put out during [the] same time period . . . that presents the other side of these issues, namely that regardless of the merit of the [Black Lives Matter movement] or other causes, mass rioting is not acceptable." *Id.* ¶ 90 (emphasis omitted).

A second investigation scrutinized the production and editing of video profiles of First Lady Melania Trump and Dr. Jill Biden, the wife of President-elect Biden. *Id.* ¶¶ 92–97. The profiles, which were posted on VOA's website on July 29, 2020, are of similar length and tone. They describe each woman's background, career, and work in support of various causes, and include clips of them speaking at public events on behalf of their spouses' presidential campaigns. *See* Crain Decl., Ex. 23, *America's First Lady—From Immigrant Model to the White House*, VOA NEWS (July 29, 2020), ECF No. 12-25; *id.*, Ex. 24, *Former Second Lady Vying to Be America's First Lady*, VOA NEWS (July 29, 2020), ECF No. 12-26.[9] Defendants allegedly caused members of USAGM's Human Resources Department to contact multiple VOA reporters

---

[9]     As the documents docketed at ECF Nos. 12-25 and 12-26 note, plaintiffs submitted these video exhibits to the Court via flash drive.

and editors and interrogate them about their involvement in the pieces, the identities of
colleagues who might have participated in their production, and interviewees' opinions as to
whether the profiles were "balanced."  Am. Compl. ¶¶ 92–97; *see also* Doe Decl. ¶¶ 8–16; Coe
Decl. ¶ 11.  The investigation specifically sought to identify the author of language in a separate
profile of Mrs. Trump stating that President Trump "has disparaged immigrants and regularly
attacks perceived adversaries on Twitter."  Am. Compl. ¶ 97.

Plaintiffs claim that defendants' investigations violate USAGM policy with respect to
potential lapses of journalistic ethics, which requires that the network in question undertake the
initial investigation and allows for USAGM involvement only if a widespread pattern of ethics
violations is identified.  Am. Compl. ¶¶ 98–100; *see also USAGM Procedures* at 1–2.  They
further allege that the investigations "have a chilling effect on news coverage," Am. Compl.
¶ 96, as demonstrated by the fact that VOA's central newsroom has decided to abandon stories it
would otherwise pursue out of fear of reprisal by defendants, Powers Decl. ¶ 27; Doe Decl.
¶¶ 17–19; Roe Decl. ¶¶ 25–26.

### 3. *Retaliatory Response to VOA Journalists' Letter and Criticism of Pack's Public Statements About VOA*

Plaintiffs next allege that defendants' response to VOA journalists' expression of
concerns related to public statements made by Pack breached the firewall.  In an August 27, 2020
public interview on a podcast not affiliated with USAGM, Pack made a series of comments
about his role as USAGM CEO and his view of VOA, the networks, and their mission that, to
plaintiffs, signal his disregard for the firewall and his careless attitude towards longtime
employees of USAGM and the networks.  Am. Compl. ¶¶ 123–28; *see also* Pack Interview.
With regard to the firewall, Pack articulated his belief that VOA "is supposed to represent the
Administration's point of view along with legitimate criticism but in a full and forthright

17

manner." Pack Interview at 06:24–06:30. He stated that he only "sort of agree[d] with [the] premise . . . that there needs to be separation between us, the political appointees, and what journalists are reporting," *id.* at 10:12–10:22, and described his "job" as "to drain the swamp, root out corruption, and to deal with . . . issues of bias," *id.* at 09:55–10:10.

Pack elaborated on "drain[ing] the swamp" concerning USAGM, VOA, and network employees by expressing a wish to "expose [purported perpetrators of bias and wrongdoing at USAGM and the networks] to the media." *Id.* at 14:15–14:20. Further, while discussing his decision to withhold J-1 visas for foreign journalists employed by VOA and the networks, Pack remarked that "be[ing] a journalist is a great cover for a spy" and speculated that J-1 visa holders might try to "penetrate[]" USAGM. *Id.* at 22:15–22:35. He stated, "I can't just give these people . . . a J-1 visa . . . or I could be potentially endangering the national security of America." *Id.* at 23:00–23:15. Finally, in an exchange described by one declarant as "loathsome public banter," Coe Decl. ¶ 15, the interviewer asked Pack, during a discussion about reopening VOA's Washington, D.C. headquarters in the midst of the COVID-19 pandemic, "Have you considered banning masks and turning off the air conditioning?" Pack laughed and responded, "Well, we'll have to look into that one." Pack Interview at 17:24–17:31.

Several days after the interview, on August 31, 2020, a group of VOA journalists, led and organized by Steve Herman, VOA's White House Bureau Chief, sent a letter to VOA's Acting Director, Elez Biberaj, expressing their "profound disappointment with the actions and comments of [Pack], which endanger the personal security of Voice of America reporters at home and abroad, as well as threatening to harm U.S. national security objectives." Crain Decl., Ex. 19, Letter from Aline Barros *et al.*, Journalists, Voice of America, to Elez Biberaj, Acting Director, Voice of America (Aug. 31, 2020) ("VOA Journalists Letter") at 1, ECF No. 12-21. Of

particular concern to the journalists was "Pack recklessly expressing that being a journalist is a

'great cover for a spy,'" a statement that, in their view, could place VOA journalists working in

hostile countries in "jeopardy," and his "bantering with a podcast host about turning off the air

conditioning and banning masks inside VOA's headquarters" during the COVID-19 pandemic.

*Id.* The letter called for "competent and professional oversight for VOA and [its] sister media

organizations," *id.* at 2, and expressed "dismay" at Pack's dismissal of "USAGM executives . . .

for . . . attempting to educate the new CEO on avoiding legal violations, as well as guiding him

on the firewall that protects VOA's legally mandated editorial independence," *id.* at 1.  Though

intended as a private communication, this letter was leaked to the media, Am. Compl. ¶ 103, and

was the subject of public reporting by NPR, among other news outlets, *see, e.g.*, Crain Decl., Ex.

26, Tr. of All Things Considered, *Voice of America Journalists Protest Trump Appointees'*

*Actions*, NPR (Sept. 1, 2020, 7:06 PM), ECF No. 12-28.

       On September 1, 2020, USAGM responded to the journalists' letter through a series of

tweets posted on its spokesperson's official account, @USAGMspox, which branded the letter as

"improper" and contrary to "procedure" and "prescribed protocols," and stated that "USAGM

and VOA leadership are handling the choice of complaint transmission as an administrative

issue."  Crain Decl., Ex. 41, USAGM Spokesperson (@USAGMspox), TWITTER (Sept. 1, 2020,

7:40 AM), ECF No. 12-43.  Soon after, defendants Dewey and Frank Wuco, at Pack's direction,

launched an investigation into Herman, who had organized the journalists.  Am. Compl. ¶ 109;

Crain Decl., Ex. 51, David Folkenflik, *VOA White House Reporter Investigated for Anti-Trump*

*Bias by Political Appointees*, NPR (Oct. 4, 2020, 8:10 PM), ECF No. 12-53; Doe Decl. ¶¶ 14–

15; Roe Decl. ¶ 16; Coe Decl. ¶¶ 15, 19–20.  As part of the investigation, defendants prepared "a

30-page dossier of materials" in an effort, through scrutiny of Herman's recent coverage of the

Trump Administration's response to the COVID-19 pandemic and social media activity, to construct what plaintiffs characterize as "an erroneous case that Herman violated Voice of America's Best Practices Guide or Social-Media Policies."  Am. Compl. ¶ 110; *see also* Roe Decl. ¶ 16; Coe Decl. ¶¶ 19–20.  Defendants forwarded the dossier to Biberaj, VOA's Acting Director, and asked him repeatedly to "do something" about Herman—*i.e.*, require Herman to recuse himself from coverage of the White House or remove Herman from his position as White House Bureau Chief.  Roe Decl. ¶ 16; *see also* Am. Compl. ¶¶ 110–11; Powers Decl. ¶ 28; Coe Decl. ¶¶ 19–20.  Plaintiffs allege that the investigation into Herman, and defendants' resulting "attempts to pressure Biberaj to take action against Herman," were "retaliatory and plainly pretextual."  Am. Compl. ¶ 112.

### 4.      Conflicts-of-Interest Policy

Plaintiffs next challenge a new conflicts-of-interest policy announced by defendants in the wake of the journalists' letter.  Approximately a month after the journalists' letter was sent, on October 4, 2020, Pack sent a policy memorandum, backdated to October 2, 2020, to all employees of VOA and the networks.  Am. Compl. ¶ 105; Coe Decl. ¶ 17; Crain Decl., Ex. 49, Memorandum from Michael Pack, Chief Executive Officer, U.S. Agency for Global Media, to Voice of America *et al.* (Oct. 2, 2020) ("Conflicts Policy"), ECF No. 12-51.  The memorandum claimed to "clarify policies" with respect to conflicts of interests and the potential appearance or creation of conflicts via journalists' use of social media.  Conflicts Policy at 1.  Under "applicable policies," according to the memorandum, "it is a conflict of interest for a journalist to participate personally and substantially in reporting on an issue: (1) in which they have a personal interest or (2) have publically [sic] personally expressed a political opinion."  *Id.*  As examples of potential conflicts under this policy, the memorandum states that "a journalist who

is working in the United States on a J-1 visa must . . . recuse themselves from any story involving J-1 visas"; "a journalist who, in their private capacity, publicly criticizes the U.S. Department of Justice's leadership . . . must recuse themselves from reporting on the Department and the part of the Administration implicated by the criticism"; and a journalist who "expresses personal views on political topics," for example, by liking "a comment or political cartoon that aggressively attacks or disparages the President[,] must recuse themselves from covering the President." *Id.* at 2–3. Plaintiffs interpret the policy as a whole, which fails to define a covered "personal interest," "aggressive attack," or "aggressive disparagement," *see id.*, as a blatant attempt to confer discretion to identify conflicts on USAGM management and to "signal[] that 'attacks' on (i.e., critical coverage of) the President are plainly out of bounds," Am. Compl. ¶ 108.

### 5.   *Defendants' Gross Mismanagement of USAGM*

Finally, according to plaintiffs, defendants allegedly sought to undermine VOA and the networks through gross mismanagement of USAGM. On June 17, 2020, Pack revoked all authority delegated to USAGM senior career staff, including the powers to spend funds, hire personnel, and approve contracts. *See, e.g.*, Am. Compl. ¶¶ 50–53; Walsh Decl. ¶¶ 9–10; Powers Decl. ¶ 14. As a result, plaintiffs claim, "[b]asic tasks like ordering toilet paper and contracting for cleaning services . . . languished," Pls.' Mem. at 9 (citing Turner Decl. ¶ 41; Compl. ¶ 50, ECF No. 1), "essential contracts lapsed," *id.* (citing Compl. ¶ 50; Walsh Decl. ¶ 23; Roe Decl. ¶¶ 23–24), and at least two of the networks nearly missed payroll, *id.* (citing Compl. ¶ 50). Without funding and essential resources, plaintiffs allege, "journalists cannot cover the stories of their choosing, preventing them from acting with journalistic independence or employing

editorial discretion."  Pls.' Mem. at 33 (citing Turner Decl. ¶¶ 35, 39–41; Walsh Decl. ¶ 23; Roe

Decl. ¶¶ 21–24; Compl. ¶ 143).

### C.      Procedural History

On October 8, 2020, plaintiffs filed the instant suit, claiming that defendants' alleged

breaches of the statutory and regulatory firewalls violate the APA (Count I), the First

Amendment (Count II), the IBA (Count III), the *Firewall* Rule (Count IV), and Pack's fiduciary

duties to USAGM as its CEO (Count V).  Compl. ¶¶ 146–77.  Shortly thereafter, on October 13,

2020, they filed the pending motion for preliminary injunctive relief.  *See* Pls.' Mot.[10]  In

accordance with the scheduling order proposed by the parties and adopted by the Court, *see* Min.

Order (Oct. 16, 2020); Min. Order (Oct. 28, 2020), on October 26, 2020, defendants filed their

opposition, *see* Defs.' Opp'n, and on November 2, 2020, plaintiffs submitted their reply, *see* Pls.'

Reply Mem. P. & A. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 30.

On November 4, 2020, the day before the hearing on the pending preliminary injunction

motion, plaintiffs filed an Amended Complaint, adding a new plaintiff, Kelu Chao, VOA's

Program Director, Am. Compl. ¶¶ 22–23, and two additional claims against defendants, *id.*

¶¶ 159–201.  In addition to the five claims included in the original Complaint, alleging that

defendants' actions in contravention of the statutory and regulatory firewalls violate the APA

(Count I), the First Amendment (Count III), the IBA (Count IV), the *Firewall* Rule (Count V),

and Pack's fiduciary duties to USAGM as its CEO (Count VII), the Amended Complaint

includes two new claims, challenging the rescission of the *Firewall* Rule under the APA (Count

---

[10]      On October 22, 2020, *amici* Reporters Committee for Freedom of the Press and sixteen media
organizations submitted a brief in support of plaintiffs' motion.  Br. Reporters Comm. Freedom of the Press & 16
Media Orgs. as *Amici Curiae* Supporting Pls.' Mot. Prelim. Inj. ("Reporters' Comm. Br."), ECF No. 26.  On
November 3, 2020, *amicus* Congressman Eliot Engel, Chairman of the House of Representatives Committee on
Foreign Affairs, also filed a brief in support of plaintiffs.  Br. Congressman Eliot Engel as *Amicus Curiae* Supp.
Pls.' Mot. Prelim. Inj. ("Engel Br."), ECF No. 38.

II) and defendants' alleged violations of the statutory firewall as *ultra vires* (Count VI).  *Id.*

Plaintiffs also filed a Notice of Joinder, indicating that Chao was joining plaintiffs' motion for

preliminary relief.  *See* Notice of Joinder Pl. Kelu Chao Pls.' Mot. Prelim. Inj. ("Notice of

Joinder"), ECF No. 37.  Following a hearing on November 5, 2020, *see* Min. Entry (Nov. 5,

2020), the parties submitted supplemental briefing, *see* Defs.' Suppl. Mem.; Pls.' Suppl. Mem. P.

& A. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Suppl. Mem."), ECF No. 43, which was completed by

November 12, 2020.  Plaintiffs' motion for a preliminary injunction is now ripe for resolution.

## II.     LEGAL STANDARD

A preliminary injunction "is a stopgap measure, generally limited as to time, and

intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial

on the merits can be held.'"  *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  To obtain relief, the moving party must

establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer

irreparable harm in the absence of preliminary relief"; (3) "the balance of equities" is in their

"favor"; and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555

U.S. 7, 20 (2008); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C.

Cir. 2016); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016).  The first

factor is also the "most important factor."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir.

2014); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary

injunction must demonstrate, among other things, 'a likelihood of success on the merits.'"

(quoting *Gonzales v. O Centro Espirita Beneficente União do Vegetal*, 546 U.S. 418, 428

(2006))).[11]

---

[11]     The D.C. Circuit has previously followed a "sliding scale" approach to evaluating preliminary injunctions, but that approach is likely inconsistent with *Winter*, *see Archdiocese of Wash. v. Wash. Metro. Area. Transit Auth.*,

A preliminary injunction "is an extraordinary . . . remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" on each of the four factors. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted) (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, at 129–30 (2d ed. 1995)).  When the requested preliminary relief would alter the status quo, the standard the movant must satisfy is especially "demanding."  *Archdiocese of Wash. v. Wash. Metro. Area. Transit Auth.*, 897 F.3d 314, 319 (D.C. Cir. 2018); *see also Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'" (quoting 7 J.W. MOORE, FEDERAL PRACTICE ¶ 65.04(1), at 1627 (2d ed. 1968))).

## III.   DISCUSSION

Defendants' vigorous challenges to the exercise of subject-matter jurisdiction over plaintiffs' claims are reviewed first and lead to the conclusion that jurisdiction is likely lacking over plaintiffs' statutory and regulatory claims, under the APA and IBA.  *See infra* Part III.A.1. These challenges are therefore not likely to succeed on the merits, and plaintiffs' motion for a preliminary injunction as to these claims is denied.  *See infra* Part III.A.1.b.ii.  At the same time, however, the Court does have jurisdiction over plaintiff Kelu Chao's constitutional claim in Count III.  *See infra id.*  This First Amendment challenge to defendants' management of USAGM is likely to succeed with respect to certain of defendants' actions that impinge on the First Amendment rights of Chao and other journalists at VOA and the networks.  *See infra* Part

---

897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf*), and therefore will not be employed here, *see OTF*, 2020 WL 3605935, at *4 n.6; *Singh v. Carter*, 185 F. Supp. 3d 11, 16–17 (D.D.C. 2016).

III.A.2. Chao has also shown that allowing defendants to continue violating these important constitutional rights will cause her and her colleagues irreparable harm. *See infra* Part III.B. The balance of the equities and the public interest further weigh in favor of preliminary relief enjoining defendants from continuing to engage in certain specified actions. *See infra* Part III.C.

### A.    Plaintiffs Have Established a Likelihood of Success on the Merits.

As to the first factor, plaintiffs assert that they are likely to prevail on the merits of their claims that defendants' actions at USAGM violate the IBA, the APA, the First Amendment, and Pack's fiduciary duties to USAGM as its CEO. *See* Pls.' Mem. at 19–41; Pls.' Reply at 14–21; Pls.' Suppl. Mem. at 16–23. Defendants counter, first, that plaintiffs' suit fails on jurisdictional grounds, *see* Defs.' Opp'n at 6–18; Defs.' Suppl. Mem. at 1–11, and second, that on the merits, plaintiffs challenge actions by defendants that are entirely consistent with applicable law and therefore have not shown any likelihood of succeeding on their claims, *see* Defs.' Opp'n at 18–35; Defs.' Suppl. Mem. at 12–22. "Federal courts cannot address the merits of a case until jurisdiction—the power to decide—is established." *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016); *see also Lovitky v. Trump*, 949 F.3d 753, 758 (D.C. Cir. 2020) ("Before proceeding to the merits of a case, the court must confirm that it has Article III jurisdiction." (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998))). Accordingly, each jurisdictional challenge defendants raise is addressed in turn, followed by consideration of the merits of plaintiffs' claims.

### 1.    *Jurisdiction*

Defendants contend that plaintiffs' suit fails on threshold jurisdictional grounds for two primary reasons. First, they argue plaintiffs cannot establish Article III standing in their own right, Defs.' Opp'n at 7–15; Defs.' Suppl. Mem. at 1–8, 11–12, and consequently cannot assert

third-party standing to invoke the rights of journalists employed by USAGM–funded networks, Defs.' Opp'n at 16–18.  Second, according to defendants, even if plaintiffs had standing, the CSRA, which provides a detailed, exclusive remedial scheme for claims brought by federal employees related to their employment, strips district courts of subject-matter jurisdiction over plaintiffs' claims.  *Id.* at 11–16; Defs.' Suppl. Mem. at 8–11.  Neither argument poses an impediment to the exercise of jurisdiction, albeit as to only one of plaintiffs' claims.

### a.  Standing

Standing is an "'essential and unchanging' component" of jurisdiction, *Hancock*, 830 F.3d at 513 (quoting *DaimerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)), which is "[t]rained on whether the plaintiff is [a] proper party to bring [a particular lawsuit]," *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc) (alterations in original) (quoting *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 799 (2015)).  The standing inquiry "involves 'both constitutional limitations on federal-court jurisdiction,'" under Article III's case-or-controversy requirement, and "'prudential limitations on its exercise,'" *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)), one of which is the third-party standing doctrine plaintiffs invoke, *see, e.g.*, *LaRoque v. Holder*, 650 F.3d 777, 781–82 (D.C. Cir. 2011).[12]  "Until th[is] jurisdictional threshold is crossed, 'the court cannot proceed at all in any cause.'"  *Hancock*, 830

---

[12]     The Supreme Court has observed that "[t]he limitations on third-party standing" may go to the merits of a plaintiff's claim, rather than the court's jurisdiction.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014); *see also* Defs.' Opp'n at 10 (describing third-party standing as "expand[ing] the scope of arguments available to a plaintiff pursuing his own claim").  The Court, however, left "consideration of that doctrine's proper place in the standing firmament" to "another day."  *Lexmark Int'l, Inc.*, 572 U.S. at 127 n.3.  This Court, therefore, remains bound by the D.C. Circuit's rule that third-party standing is a threshold, jurisdictional issue.  *See, e.g.*, *In re Hope 7 Monroe St. Ltd. P'ship*, 743 F.3d 867, 871 (D.C. Cir. 2014); *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 194 n.4 (D.C. Cir. 2013) ("Prudential standing, like Article III standing, is a threshold, jurisdictional concept." (citing *Steffan v. Perry*, 41 F.3d 677, 697 (D.C. Cir. 1994) (en banc))).

F.3d at 513 (quoting *Steel Co.*, 523 U.S. at 94).  Plaintiffs' Article III standing and third-party

standing are thus considered in turn.

### i.   Article III Standing

Article III requires that plaintiffs establish "the irreducible constitutional minimum of

standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), that they have "(1) suffered an

injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that

is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 136 S. Ct.

1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61); *see also Louie v. Dickson*, 964 F.3d 50, 54

(D.C. Cir. 2020).[13]  "The absence of any one of these three elements defeats standing."  *Newdow*

*v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010).  Plaintiffs carry the burden of establishing the

elements of standing "with the manner and degree of evidence required at the successive stages

of litigation."  *Lujan*, 504 U.S. at 561.  "In the context of a preliminary injunction motion,"

plaintiffs must "'show a substantial likelihood of standing under the heightened standard for

evaluating a motion for summary judgment.'"  *Elec. Privacy Info. Ctr. v. Presidential Advisory*

*Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (quoting *Food & Water*

*Watch, Inc. v. Vilsack*, 808 F.3d 905, 912–13 (D.C. Cir. 2015)).  "Thus, the plaintiff[s] cannot

'rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts' that,

---

[13]     Plaintiffs' assertion of third-party standing does not excuse their burden to establish that they have Article III standing in their own right.  *See Craig v. Boren*, 429 U.S. 190, 193–95 (1976); *LaRoque*, 650 F.3d at 781 (noting that the third-party standing doctrine presents a further limitation on plaintiffs "[i]n addition to the[] minimum constitutional requirements" of Article III standing); *Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999) ("Because [the appellant] seeks to raise the rights of third parties . . . he must show that he has standing under Article III, and that he satisfies third party, or *jus tertii*, standing requirements.").  As explained *infra* Part III.A.1.a.ii, the third-party standing doctrine requires plaintiffs to demonstrate, *in addition to* their own Article III standing, a "close relationship" with the third parties whose rights they assert and some "hindrance" to the third parties pursuing their own rights.  *Kowalski*, 543 U.S. at 130.  These factors supplement, rather than supplant, the traditional Article III inquiry.

if 'taken to be true,' demonstrate a substantial likelihood of standing." *Id.* (omission in original) (quoting *Lujan*, 504 U.S. at 561).

If standing "can be shown for at least one plaintiff, [a court] need not consider the standing of the other plaintiffs." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017) (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)); *see also In re Navy Chaplaincy*, 697 F.3d 1171, 1176–78 (D.C. Cir. 2012).  Plaintiff Kelu Chao, VOA's current Program Director, who is responsible for supervising the production of journalistic content and was a last-minute addition to the named plaintiffs, makes out the strongest case for Article III standing of all six plaintiffs.[14]  Accordingly, the analysis that

---

[14]     Plaintiffs argue that the original five plaintiffs (Turner, Lennon, Walsh, Powers, and Tran), who are employed directly by USAGM, rather than an international broadcasting network, have Article III standing on the basis of economic harm and reputational harm.  Pls.' Mem. at 17 (citing *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, Civ. No. 20-1630 (JEB), 2020 WL 523076, at *21 (D.D.C. Sept. 2, 2020)); *see also* Pls.' Reply at 3–6 (describing "damage to [plaintiffs'] own political and professional reputations," *id.* at 5).  Although "[e]conomic harm . . . clearly constitutes an injury-in-fact," *Carpenters Indus. Council*, 854 F.3d at 5, plaintiffs offer no "affidavit or other evidence" to substantiate their claim of monetary injury and therefore have not carried their burden regarding that alleged injury, *Elec. Privacy Info. Ctr.*, 878 F.3d at 377 (quoting *Lujan*, 504 U.S. at 561).
         The reputational harm advanced by all six plaintiffs is also suspect in meeting the requisite injury in fact for jurisdictional purposes.  While courts, including the Supreme Court and the D.C. Circuit, have recognized reputational harm as an injury in fact, *see, e.g.*, Pls.' Reply at 3–5 (collecting cases), reputational harm, like any other alleged injury, must be "concrete and particularized" to establish a cognizable injury in fact.  Plaintiffs claim that they suffer concrete, particularized reputational harm "from [USAGM] serving as an organ of state media, as opposed to an independent journalist[ic] outlet," Hr'g Tr. at 24:19-20, and from "no longer being associated with a responsible media organization" as a result of defendants' actions, *id.* at 25:3-4; *see also* Pls.' Reply at 6 (alleging reputational harm "from being members of an organization that no longer supports journalistic independence").  This argument does not identify a particularized harm to plaintiffs' reputations distinct from harm to the agency's reputation.  Under plaintiffs' theory, any employee of USAGM or its funded networks, and any employee of any other agency who disagrees with the incumbent Administration's policy or management decisions, could bring suit due to reputational harm being associated with controversial policies allegedly harming the reputation of the agency that spills over to taint the reputations of its employees.  To avoid this consequence, plaintiffs argue that USAGM "is unlike any other federal agency," Pls.' Suppl. Mem. at 9, because, as a journalistic organization, USAGM's reputation for independence and integrity directly impacts the professional reputations of the journalists and other professionals it employs, *see id.*; Hr'g Tr. at 24:19–25:4.  While creative, this argument does not alleviate this concern.  Further, the question remains whether plaintiffs' alleged reputational harms, which manifest, if at all, as the result of third parties' alleged negative reactions to defendants' management of USAGM, *see* Pls.' Reply at 3–6; Second Decl. of Shawn Powers ¶¶ 19–21, ECF No. 30-11, are "fairly traceable" to defendants' actions, *see* Defs.' Suppl. Mem. at 1–2, 4 (citing *Cierco v. Mnuchin*, 857 F.3d 407, 418 (D.C. Cir. 2017)).  As Chao has Article III standing to bring plaintiffs' claims, however, the issue of whether the plaintiffs' reputational harm confers standing need not be resolved here.

28

follows focuses on her ability to satisfy the three elements of injury in fact, causation, and redressability.

The parties primarily dispute the presence of an injury in fact.  An injury in fact requires "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560–61; *see also U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016).  With respect to all seven counts in the Amended Complaint, Chao asserts that she has suffered injuries in fact to her First Amendment rights as a result of defendants' interference in VOA's newsroom.  Though defendants protest that Chao, as an employee of the federal government, "is not entitled to First Amendment protections" in her job, Defs.' Suppl. Mem. at 11; *see also id.* at 18–19; Defs.' Opp'n at 27–35, "[w]hen determining whether a plaintiff has Article III standing, the court must assume that the [plaintiff] will prevail on the merits," *Comm. on Judiciary of U.S. House of Representatives*, 968 F.3d at 762; *see also Estate of Boyland v. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019).  Chao asserts injury in fact as a result of what she views as the unlawful interference by defendants, since June 8, 2020, *see supra* Part I.B, with her "exercise of editorial control and judgment," the regulation of which cannot "be exercised consistent with First Amendment guarantees of a free press," *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *see also* Pls.' Suppl. Mem. at 3–4.  For the purposes of the standing inquiry, the Court must treat this claim as true.  *See, e.g.*, *LaRoque*, 650 F.3d at 785 ("[I]n assessing plaintiffs' standing, we must assume they will prevail on the merits of their constitutional claims."); *Common Cause v. Biden*, 909 F. Supp. 2d 9, 18 (D.D.C. 2012) ("In assessing Plaintiffs' standing, the Court assumes that Plaintiffs will prevail on the merits of their constitutional claims." (citing *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008))).

Chao claims that the policies adopted by defendants; their management of USAGM, VOA, and the networks; their efforts to force their way into the newsroom through personnel actions, investigations, direct contact with journalists, and input into content; and their rescission of the *Firewall* Rule render her "unable to fully exercise [the] editorial control and judgment" necessary for her to do her job, in violation of the First Amendment.  Pls.' Suppl. Mem. at 2; *see also* Second Decl. of Kelu Chao Further Supp. Pls.' Mot. Prelim. Inj. ¶¶ 10–11 ("Second Chao Decl."), ECF No. 43-1; *supra* Part I.B.  She further argues that her injuries consist not only of "infringements upon her editorial discretion," but also of "[d]efendants' chilling of her right to exercise that discretion," Pls.' Suppl. Mem. at 4; *see also id.* at 2–5, by creating an atmosphere of fear at VOA and the networks, *see* Roe Decl. ¶¶ 25–26; Second Chao Decl. ¶¶ 10–11.  To that end, Chao declares that she, along with her editor and journalist colleagues, "constantly worr[y]" that they could be "terminated for overseeing coverage of a story that [defendants] do not agree with," Roe Decl. ¶ 25, and is "concerned that overseeing and protecting honest reporting could cost [their] livelihood[s]," *id.* ¶ 26.[15]

Defendants contend that Chao has not established any cognizable injury in fact because she "does not allege that she has actually been prevented from engaging in any speech," "[n]or does she identify any concrete or imminent threat that [d]efendants will act to control her speech."  Defs.' Suppl. Mem. at 11.  Defendants are correct that "allegations of 'a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific harm.'"  Defs.' Suppl. Mem. at 12 (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1973)).  Nonetheless, post-*Laird* cases plainly establish that a subjective chill of First Amendment rights,

---

[15]     Plaintiffs' Notice of Joinder argues that Chao also suffered injury in fact from the impact of defendants' actions on "'[VOA]'s competitive edge in multiple crowded media markets abroad,' after Ms. Chao and her colleagues have given so much to build and maintain VOA's audiences."  Notice of Joinder at 2 (quoting Roe Decl. ¶ 13).  This argument appears to be abandoned in their Supplemental Memorandum.  *See* Pls.' Suppl. Mem. at 2–5.

paired with a credible threat of imminent, adverse government action against the claimant, may

create a cognizable injury. *See, e.g.*, *Susan B. Anthony List v. Driehaus* ("*SBA List*"), 573 U.S.

149, 159 (2014); *U.S. Telecom Ass'n*, 825 F.3d at 739; *Act Now to Stop War & End Racism*

*Coal. v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009) ("While 'subjective "chill"

alone will not suffice to confer standing on a litigant . . .' imminent threats commonly suffice."

(quoting *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1194 (D.C. Cir. 1992))); *Seegars v.*

*Gonzales*, 396 F.3d 1248, 1251–52 (D.C. Cir. 2005) (same).[16]

  Thus, in the context of a pre-enforcement challenge to a law that burdens a plaintiff's

First Amendment rights, the injury in fact requirement is satisfied by the plaintiff's

demonstration of an "'intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by [government policy].'" *U.S. Telecom Ass'n*, 825 F.3d at

740 (quoting *SBA List*, 573 U.S. at 159); *see also Woodhull Freedom Found. v. United States*,

948 F.3d 363, 371–72 (D.C. Cir. 2020). The injury is deemed "sufficiently imminent," *SBA List*,

573 U.S. at 159, upon "a credible statement by the plaintiff of intent to commit violative acts and

a conventional background expectation that the government will enforce the law [or its

policies]," *U.S. Telecom Ass'n*, 825 F.3d at 739 (quoting *Act Now to Stop War & End Racism*

*Coal.*, 589 F.3d at 435); *see also SBA List*, 573 U.S. at 159; *Atlas Brew Works, LLC v. Barr*, 820

F. App'x 4, 6 (D.C. Cir. 2020) (recognizing the availability of "a pre-enforcement First

Amendment challenge to a government policy").[17] Chao's theory of injury is closely analogous

---

[16] Plaintiffs rely on a Ninth Circuit case for the proposition that a "chilling of First Amendment rights can constitute a cognizable injury" standing alone. Pls.' Suppl. Mem. at 4 (quoting *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020)). The D.C. Circuit has not adopted this rule. *See Woodhull Freedom Found. v. United States*, 948 F.3d 363, 371 (D.C. Cir. 2020) ("[A] plaintiff must still demonstrate more than a subjective chill to establish an injury-in-fact[.]" (citing *Seegars*, 396 F.3d at 1252; *Am. Library Ass'n*, 956 F.2d at 1194)).

[17] The rule of *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), maintaining that an allegation of chilled speech is not cognizable absent "certainly impending" government action against a plaintiff, *id.* at 417–18, on which defendants rely, *see* Defs.' Suppl. Mem. at 12, is inapposite. *Clapper* concerned the chilling effect of a statute

to a pre-enforcement challenge, and so she may establish a cognizable, non-speculative injury in fact by demonstrating her intent to exercise editorial and journalistic discretion and independence of the sort defendants have made a habit of penalizing, *see supra* Part I.B, and a reasonable expectation that defendants will continue to restrict and penalize acts of editorial and journalistic independence which they perceive to be insufficiently supportive of only President Trump.  *See, e.g.*, *supra* Part I.B.3 (describing defendants' investigations of journalists responsible for video profiles that included coverage of Dr. Jill Biden and of VOA's Urdu service for coverage of then-candidate Biden's remarks at an event).

As VOA's Program Director, Chao occupies a position similar to a Managing Editor at other news organizations and is responsible for "planning, directing, and coordinating all of [VOA's] broadcasting services . . . and its programming activities on digital, radio, television, and the web."  Second Chao Decl. ¶ 2; *see also id.* ¶¶ 3–10; *id.*, Ex. A, Position Description for Program Director, Voice of America ("Position Description") at 1–3, ECF No. 43-2.  She is specifically charged with "[e]stablish[ing] and assur[ing] adherence to production and journalism standards," "[e]xercis[ing] news and editorial judgment," Position Description at 1, and "[e]nsur[ing] that material used in programs meets the requirements of the VOA Charter, including the requirement to provide consistently reliable and authoritative news that is accurate, objective, balanced and comprehensive," *id.* at 2; *see also* Second Chao Decl. ¶¶ 3, 11.

---

allowing for government surveillance of certain communications on the speech of plaintiffs who believed that their future communications might be targeted.  *See* 568 U.S. at 406–07.  Plaintiffs alleged injury in fact not because their intended speech would violate the statute in question, but rather because the possibility of the statute being applied to surveil their lawful speech would deter them from engaging in such speech.  Faced with this attenuated chain between the plaintiffs' intended First Amendment activity and the potential harm, the Court required that any cognizable injury be "certainly impending."  *See id.* at 417–18.  In contrast, when plaintiffs' own intended First Amendment activities would run afoul of a potentially unconstitutional policy, the enforcement of which would directly cause injury, the Supreme Court has made clear that the more lenient "sufficiently imminent" standard applies. *See SBA List*, 573 U.S. at 159.

Chao's intended conduct of continuing to carry out these duties is "'arguably affected with a constitutional interest' because [it] involves speech." *Woodhull Freedom Found.*, 948 F.3d at 372 (internal citation omitted) (quoting *SBA List*, 573 U.S. at 161).  Chao contends that her planned conduct could well violate the *Firewall* Rule Rescission, the conflicts-of-interest policy, and defendants' unwritten rules that editors and journalists should produce only coverage amenable to defendants' political views and defer to defendants' allegedly unconstitutional interference in VOA's newsroom.  Pls.' Suppl. Mem. at 2–5; Second Chao Decl. ¶¶ 10–11.  To the extent that Chao's full exercise of her First Amendment rights as an editor and a journalist in fact comes into conflict with defendants' vision for the USAGM networks, as the record in this case reveals, *see supra* Part I.B, Chao indeed faces a credible threat of adverse action. Defendants' extensive pattern of penalizing those USAGM and network employees whom defendants regard as insufficiently supportive of President Trump has resulted in the termination, discipline, and investigation of multiple employees and journalists.  *See id.*  This pattern of conduct, bolstered by Pack's blunt public statements of his intent to "drain the swamp" as applying to VOA, *see supra* Part I.B.3, support a strong inference that defendants would not hesitate to move against Chao should she violate defendants' restrictions on First Amendment expression at Pack's USAGM.  Chao has stated cognizable injuries in fact to her First Amendment rights.

The remaining two elements of standing—causation and redressability—"typically 'overlap as two sides of a causation coin,'" because "if a government action causes an injury, enjoining the action usually will redress that injury."  *Carpenters Indus. Council*, 854 F.3d at 6 n.1 (quoting *Dynatlantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997)).  Such is the case here.  Chao's First Amendment injuries are "fairly traceable" to defendants' actions;

indeed, defendants are the sole cause of her injuries.  Likewise, an order enjoining defendants

from further interference with Chao's First Amendment rights would restore her editorial

discretion and eliminate any chilling effects.  Chao has thus established Article III standing in

her own right with respect to all seven claims in the Amended Complaint.

### ii.    Third-Party Standing

Chao also has third-party standing to raise claims on behalf of VOA and the networks'

journalists.  Third-party standing is available to plaintiffs who, in addition to their own Article III

standing, can successfully demonstrate a "close relationship" with the third parties whose rights

they assert and some "hindrance" to the third parties pursuing their own rights.  *Kowalski*, 543

U.S. at 130; *see also Powers v. Ohio*, 499 U.S. 400, 411 (1991); *Am. Immigr. Laws. Ass'n v.

Reno*, 199 F.3d 1352, 1361–62 (D.C. Cir. 2000); *Lepelletier v. FDIC*, 164 F.3d 37, 42–43 (D.C.

Cir. 1999).  These limitations are intended to "avoid 'the adjudication of rights which those not

before the Court may not wish to assert' and to ensure 'that the most effective advocate of the

rights at issue is present to champion them.'"  *LaRoque*, 650 F.3d at 781–82 (quoting *Duke

Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 80 (1978)).

As to the first factor, Chao has a sufficiently "close relationship" with both the journalists

she oversees at VOA and journalists at the other USAGM networks.  Such a relationship exists

when there is "an identity of interests between the parties such that the plaintiff will act as an

effective advocate of the third party's interests." *Lepelletier*, 164 F.3d at 44.  Though

confidential or contractual relationships, for example, those between doctors and patients,

attorneys and clients, and vendors and vendees, have most often been found to support third-

party standing, *see* Defs.' Opp'n at 16–17 (collecting cases), neither the Supreme Court nor the

D.C. Circuit has ever "required" such a relationship, *see, e.g.*, *Lepelletier*, 164 F.3d at 44

(recognizing a "close relationship" between an independent money finder and his prospective

customers).  In her role as VOA's Program Director, Chao directly supervises almost 1,300

journalists, full-time employees of VOA as well as contractors, and 200 technical employees.

Second Chao Decl. ¶ 3.  She is charged with ensuring that each of these individuals "adhere[s] to

production and journalism standards" and "provide[s] consistently reliable and authoritative

news that is accurate, objective, balanced and comprehensive."  Position Description at 1–2.

Although Chao does not supervise journalists at the other USAGM networks, they, too, operate

under the IBA and therefore are subject to the same statutory restrictions, mandates, and

principles as their VOA counterparts.  Moreover, as explained *supra* Part I.B, defendants'

allegedly illegal actions have transpired within not only VOA but the other networks as well.

Chao thus shares with both VOA and network journalists an "interest in enforcing the firewall,

protecting the independence and credibility of the networks' reporting, upholding the First

Amendment, and sparing USAGM from [d]efendants' gross mismanagement."  Pls.' Reply at 6.

Given her decades-long career at VOA, *see* Am. Compl. ¶¶ 22–23, and broad responsibility for

implementation of the journalistic principles disputed in this litigation, *see* Second Chao

Decl.¶ 3, Chao is without doubt among "the most effective advocate[s] of the rights at issue,'"

*LaRoque*, 650 F.3d at 781–82 (quoting *Duke Power Co.*, 438 U.S. at 80).

     As to the second factor, the journalists Chao supervises at VOA and their network

colleagues are hindered in protecting their own rights.  To satisfy the hindrance requirement, a

plaintiff need only show that "there is some impediment to the real party in interest's ability to

assert his own legal rights."  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 31 (D.D.C. 2010) (citing

*Singleton v. Wulff*, 428 U.S. 106, 118 (1976)).  Even that lenient standard may be further

"relax[ed]" when a plaintiff asserts "First Amendment claims."  *Reese Brothers, Inc. v. U.S.*

*Postal Serv.*, 531 F. Supp. 2d 64, 69 (D.D.C. 2008) (first citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); and then citing *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)).  Pseudonymous journalists have asserted that they believe, were they to sue in their own names, they would face "employment retaliation," Coe Decl. ¶ 23; *see also* Doe Decl. ¶ 20, their "career[s] and professional li[ves] would be at serious risk," Coe Decl. ¶ 27; *see also* Doe Decl. ¶¶ 23, 25, and any J-1 visa holders among them would "risk losing their homes or livelihoods concretely," Coe Decl. ¶ 27; *see generally id.* ¶¶ 22–27; Doe Decl. ¶¶ 20–25.  These impediments are enough to demonstrate a hindrance to the journalists' assertion of their own rights.  *See, e.g.*, *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) (finding sufficient hindrance where third party faced potential of retaliation by employer); *Reese Brothers, Inc.*, 531 F. Supp. 2d at 70 (granting third-party standing on the basis of "merely a danger of chilled speech").

Chao therefore has standing in her own right and on behalf of journalists at VOA and the networks.  The next question is whether she survives the second jurisdictional hurdle defendants raise: namely, that of the Civil Service Reform Act.

### b.  Civil Service Reform Act

Federal courts are courts of limited jurisdiction.  Accordingly, "[w]ithin constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider."  *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Bowles v. Russell*, 551 U.S. 205, 212 (2007)).  If Congress creates "a special statutory review scheme," courts presume "that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies."  *Id.* (quoting *City of Rochester v. Bond*, 603 F.2d 927, 931 (D.C. Cir. 1979)); *see also Mapes v. Reed*, Civ. No. 20-223 (JEB), 2020 WL 5545397, at *2 (D.D.C. Sept. 16, 2020).

Defendants argue first, that the CSRA is such a scheme, and second, that Chao's claims fall squarely within its purview.  *See* Defs.' Opp'n at 11–16; Defs.' Suppl. Mem. at 8–11.  Though they are correct about the former, they are wrong about the latter.

### i.   *CSRA Structure and Principles*

The CSRA "establishes a framework for evaluating personnel actions taken against federal employees" through a series of graduated administrative procedures, "depending on an action's severity."  *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012).  Under the CSRA's "comprehensive and exclusive" remedial scheme, *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir.), *cert. denied*, 558 U.S. 989 (2009), an employee may appeal a major adverse employment action, for example, termination or demotion, *see* 5 U.S.C. § 7512, to the Merit Systems Protection Board ("MSPB"), *id.* § 7513(d).  If she does not prevail before the MSPB, the employee may pursue judicial review of her claims in the Federal Circuit. *Id.* § 7703.  An employee cannot, however, directly challenge more minor adverse employment actions before the MSPB.  The CSRA instead provides that, to challenge these less significant "personnel actions," the implementation of which constitute "prohibited personnel practices," *see id.* § 2302(a), (b), an employee must file a complaint in the U.S. Office of Special Counsel ("OSC"), *id.* § 1214(a)(1)(A).  OSC then investigates the complaint "to determine whether there are reasonable grounds" to believe a violation of the statute has occurred.  *Id.* § 1214(b)(2)(A).  If OSC determines that such grounds exist, it "shall report the determination together with any findings or recommendations" to the MSPB and the agency.  *Id.* § 1214(b)(2)(B).  If the agency does not comply with OSC's recommendations or otherwise act, OSC may, but is not required to, petition the MSPB for an order requiring the agency to take corrective action.  *Id.* § 1214(b)(2)(C).  Though an employee can appeal an adverse final determination by the MSPB

to the Federal Circuit, *see id.* §§ 1214(c), 7703(b), the CSRA does not grant the employee any

further administrative or judicial review if OSC declines to petition the MSPB.

Most relevant here, "personnel actions" that fall within OSC's purview include "any . . .

significant change[s] in duties, responsibilities, or working conditions." *Id.* § 2302(a)(2)(A)(xii).

The CSRA enumerates thirteen circumstances under which personnel actions become

"prohibited personnel practices," which must be brought before OSC in the first instance. *Id.*

§ 2302(b).  One of those thirteen "prohibited personnel practices" occurs when a "personnel

action" violates "any law, rule, or regulation implementing, or directly concerning, the merit

system principles" listed in the statute. *Id.* § 2302(b)(12).  These principles require, in relevant

part, "proper regard for [employees'] constitutional rights." *Id.* § 2301(b)(2).  Consequently,

personnel actions that implicate violations of constitutional rights, including alleged violations of

the First Amendment, are therefore prohibited personnel practices that generally fall within the

CSRA's exclusive remedial scheme. *See, e.g.*, *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1432

(D.C. Cir. 1996) ("Among the merit system principles in § 2301 is the requirement that all

employees be treated with proper regard for their privacy and constitutional rights.  So it is a

prohibited personnel practice to take a personnel action that unconstitutionally burdens an

employee's speech." (internal quotations omitted)); *Suzal v. Dir., U.S. Info. Agency*, 32 F.3d 574,

580 (D.C. Cir. 1994) ("[O]ur cases make clear that it is a 'prohibited personnel practice' to [take

a personnel action against] someone because he ignored unconstitutional restrictions on his

freedom of speech.").

The CSRA "sets out the method for covered employees to obtain review of adverse

employment actions" in such "painstaking detail" that, as the Supreme Court has explained, "it is

fairly discernible that Congress intended to deny [covered] employees an additional avenue of

review in district court." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11–12 (2012).  This Circuit has

likewise concluded, even before *Elgin*, that the CSRA's remedial scheme is "exclusive" and

"constitutes *the* remedial regime for federal employment and personnel complaints."  *Nyunt v.*

*Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009) (collecting cases); *see*

*also Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005) (finding that the CSRA's "remedial

provisions are exclusive, and may not be supplemented by the recognition of additional rights to

judicial review having their sources outside the CSRA").  Accordingly, "covered employees

appealing covered agency actions" must "proceed exclusively through the statutory review

scheme, even in cases in which the employees raise constitutional challenges to federal statutes."

*Elgin*, 567 U.S. at 10; *see also Steadman v. Gov., U.S. Soldiers & Airmen's Home*, 918 F.2d 963,

967 (D.C. Cir. 1990) ("[F]ederal employees may not circumvent [the CSRA's] structure even if

their claim is based as well on the Constitution.").

The CSRA thus generally deprives district courts of subject-matter jurisdiction over

claims within its ambit, that is, claims brought by covered employees challenging covered

employment actions.  *See, e.g.*, *Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 174–75

(D.C. Cir. 2013); *Mahoney v. Donovan*, 721 F.3d 633, 635–36 (D.C. Cir. 2013); *Weaver*, 87 F.3d

at 1434.  This preclusive effect is extensive.  As to covered employees, the Supreme Court has

determined that the CSRA "entirely foreclose[s] judicial review to employees to whom the

CSRA denies statutory review" and "similarly indicates that extrastatutory review is not

available to those employees to whom the CSRA grants administrative and judicial review."

*Elgin*, 567 U.S. at 11 (citing *United States v. Fausto*, 484 U.S. 439, 443 (1988)).  As to covered

actions, beyond restricting judicial review of covered constitutional claims, the CSRA prevents

district courts from deciding the merits of APA claims challenging an agency's

"'systemwide' . . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt*, 589 F.3d at 449 (quoting *Fornaro*, 416 F.3d at 67–69), or its decision to engage in "'a *type* of personnel action' the [CSRA] does not cover," *Mahoney*, 721 F.3d at 635–36 (emphasis in original) (quoting *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009)); *see generally Grosdidier*, 560 F.3d at 497 (holding that federal employees "may not circumvent the [CSRA's] requirements and limitations by resorting to the catchall APA to challenge agency employment actions"). The CSRA even reaches so far as to preclude statutory claims concerning adverse employment actions that it does not cover, for which recourse to "the CSRA scheme ultimately would provide no relief." *Nyunt*, 589 F.3d at 449. As the D.C. Circuit has put it bluntly: "what you get under the CSRA is what you get," even if what you get is nothing at all. *Fornaro*, 416 F.3d at 67.

The CSRA's preclusive orbit is vast, but not all-encompassing in at least one respect relevant here.[18] The scope of preclusion depends at least in part on the nature of an aggrieved employee's alternative cause of action. When a plaintiff seeks to circumvent the CSRA's remedial structure through claims brought under the APA and other statutes, preclusion extends even to "type[s] of personnel action[s]" not explicitly listed in the CSRA. *Mahoney*, 721 F.3d at 635 (emphasis omitted) (quoting *Filebark*, 555 F.3d at 1013). In contrast, with respect to constitutional claims, even in cases centering on CSRA–covered actions, the Supreme Court has considered the availability of "meaningful review" in an Article III judicial forum when evaluating the scope of the CSRA's exclusive remedial scheme, *Elgin*, 567 U.S. at 10, and the

---

[18] The text of the CSRA provides a second exception, not relevant here, for "mixed cases," that is, cases alleging both an adverse employment action under 5 U.S.C. § 7512 that can be directly appealed to the MSPB (bypassing OSC), *see* 5 U.S.C. § 7701, and discrimination prohibited by another federal statute, such as Title VII of the Civil Rights Act of 1964 or the Age Discrimination in Employment Act of 1967. Plaintiffs may file mixed cases in district court in the first instance. *See* 5 U.S.C. §§ 7702, 7703; *Kloeckner*, 568 U.S. at 604 (holding that "the CSRA routes" mixed cases "to district court").

D.C. Circuit has similarly consistently determined that federal employees have "a right to federal court review of their constitutional claims," *Weaver*, 87 F.3d at 1433.  For employees challenging major employment actions and employees challenging prohibited personnel practices whose complaints are the subject of OSC petitions to the MSPB to resolve, the CSRA itself satisfies this requirement, because this administrative process concludes with a final decision by the MSPB that is appealable to the Federal Circuit, "an Article III court fully competent to adjudicate petitioners' [constitutional] claims."  *Elgin*, 567 U.S. at 17.

For employees challenging prohibited personnel practices that OSC declines to bring before the MSPB, the CSRA does not specify a path to judicial review of constitutional claims. Congressional silence notwithstanding, this Circuit has found, and defendants do not contest, *see* Defs.' Suppl. Mem. at 9, that aggrieved employees without recourse to the Federal Circuit under the CSRA may bring their constitutional claims for equitable relief in district court, *see, e.g.*, *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 534 (D.C. Cir. 2015) (observing that "the CSRA d[oes] not preclude judicial review of . . . constitutional claims altogether" because "[c]ivil servants and job applicants c[an] still 'seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights'" (quoting *Spagnola v. Mathis*, 859 F.2d 223, 229–30 (D.C. Cir. 1988) (en banc) (per curiam))); *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 494–95 (D.C. Cir. 1988).  Nonetheless, even for "claims arising directly under the Constitution," the CSRA's exhaustion requirement is a "jurisdictional prerequisite."  *Weaver*, 87 F.3d at 1433; *see also Steadman*, 918 F.2d at 967 ("When [an employee's] statutory and constitutional claims are 'premised on the same facts' and the CSRA remedy 'would have been fully effective in remedying the constitutional violation,' exhaustion [of CSRA remedies] is mandated." (quoting *Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984))).

A narrow exception to this exhaustion rule for employees otherwise covered by the CSRA is recognized, however.  An employee whose "constitutional claim raises issues totally unrelated to the CSRA procedures . . . can . . . come directly to district court" without satisfying the exhaustion requirement.  *Steadman*, 918 F.2d at 967; *see also Weaver*, 87 F.3d at 1433–34 (finding that the exhaustion requirement applies only when constitutional claims "are premised on the same facts as the plaintiff's CSRA claims and the CSRA remedy would have been fully effective in remedying the constitutional violation" (internal quotations omitted)); *Andrade*, 729 F.2d at 1492 (holding that exhaustion of CSRA remedies is not required when there is "complete divergence between the issues presented by the constitutional and personnel/statutory claims").  This loophole to CSRA preclusion is admittedly a narrow one, and does not excuse the exhaustion requirement for claims, that, while framed as constitutional challenges, are in truth a disguised "vehicle" to challenge CSRA–covered personnel actions or practices.  *Elgin*, 567 U.S. at 22; *see also id.* at 15 ("[The CSRA's] exclusivity does not turn on the constitutional nature of an employee's claim, but rather on the type of employee and the challenged employment action."); *Steadman*, 918 F.2d at 967 (noting that direct judicial review of constitutional claims will be available "[o]nly in the unusual case").  When it applies, however, as defendants acknowledge, *see* Defs.' Suppl. Mem. at 10, the exception allows district courts to exercise subject-matter jurisdiction over constitutional claims for which plaintiffs have not exhausted their CSRA remedies.  The question next addressed is whether Chao's claims fall within this narrow exception.

### ii.    *Application to Chao*

Plaintiffs concede that Chao has not filed a complaint with OSC or otherwise sought to avail herself of the CSRA's remedial scheme.  *See* Pls.' Suppl. Mem. at 10–16.  They argue

instead that the CSRA "would not cover" Chao's claims related "to the statutory firewall or statutorily protected journalistic independence or . . . 'unlawful' action in general," that is, her APA (Counts I, II, and V), IBA (Counts IV and VII), and ultra vires claims (Count VI), Pls.' Suppl. Mem. at 14, while her constitutional claim (Count III) does not challenge a change to "working conditions" within the CSRA's meaning and therefore is not subject to the CSRA's exhaustion requirement, Pls.' Suppl. Mem. at 12–14.

As explained above, the CSRA plainly precludes judicial review of statutory claims by covered employees related to their employment, whether (or not) the allegations amount to a "personnel action" or "prohibited personnel practice" explicitly enumerated in the CSRA or the CSRA provides a remedy for such claims.  *See supra* Part III.A.1.b.i; *see also Nyunt*, 589 F.3d at 449 ("[F]ederal employees," such as plaintiff "an international radio broadcaster [at] [VOA]," "may not bring employment and personnel suits . . . under the APA."); *Graham v. Ashcroft*, 358 F.3d 931, 934 (D.C. Cir. 2004) ("[E]mployees with judicial review rights under the CSRA may not obtain judicial review of personnel actions outside the bounds of the CSRA[.]"); Defs.' Opp'n at 13–14.  Accordingly, the Court likely lacks subject-matter jurisdiction over Counts I, II, IV, V, VI, and VII, making a likelihood of success on these claims highly doubtful for purposes of the requested preliminary injunction.

Jurisdiction, then, turns on whether Chao's constitutional claim (Count III) is likely exempt from the CSRA's exhaustion requirement because she does not contest the constitutionality of a covered "working condition."  Defendants argue that Chao's "basic contention," understood to be a claim that defendants' actions "have affected, or might affect, the conditions of her employment or the way she does her job," falls "squarely within the CSRA's structure" as a "significant change in her working conditions" that allegedly violates her

constitutional rights.  Defs.' Suppl. Mem. at 10; *see also id.* at 10–12; 5 U.S.C. §§ 2301(b)(2), 2302(a)(2)(A)(xii), (b)(12).  Plaintiffs counter that, because Chao's daily responsibilities have not changed, her "working conditions" have not been affected and her claim does not raise, directly or indirectly, a challenge to a "prohibited personnel practice," Pls.' Suppl. Mem. at 11–12, thereby avoiding triggering CSRA coverage.

The CSRA does not define "working conditions."  Plaintiffs assert that "not every action that affects an employee is a 'significant change' to a 'working condition,'" Pls.' Suppl. Mem. at 13, while defendants assume that the term encompasses any change that "pertains directly to the employment relationship and the performance of the employee's work," Defs.' Suppl. Mem. at 10.  The Supreme Court, in interpreting "working conditions" in the labor-management provisions of the CSRA, has said that the term "more naturally refers, in isolation, only to the 'circumstances' or 'state of affairs' attendant to one's performance of a job," not to the agreed-upon terms of employment.  *Fort Stewart Schs. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 645 (1990).  Likewise, the D.C. Circuit, interpreting the same provision, has found that "working conditions" as a term of art "ordinarily calls to mind the day-to-day circumstances under which an employee performs his or her job."  *Dep't of Def. Dependents Schs. v. Fed. Lab. Rels. Auth.*, 863 F.2d 988, 990 (1988).  In other words, these courts have determined that the term  "working conditions" generally refers to the daily, concrete parameters of a job, for example, hours, discrete assignments, and the provision of necessary equipment and resources.

Viewed through this lens, Chao's constitutional claim does not relate to "working conditions."  She challenges defendants' alleged transformation, in a matter of months, of VOA and the networks from media outlets committed to editorial and journalistic independence and integrity into "organ[s] of state media" that actively suppress the First Amendment rights of their

employees.  Hr'g Tr. at 24:19.  Chao thus does not allege a change in the conventionally

understood circumstances of her employment, like a change in schedule or chain of command.

She alleges instead major shifts to the background assumptions behind doing journalism at VOA

and the networks.  VOA and the networks' "autonomy and . . . commitment to providing

objective news coverage" have long been their calling card to audiences abroad.  *OTF*, 2020 WL

3605935, at *1.  "[C]redibility and independence are [their] most essential assets," Second Chao

Decl. ¶ 10, and the firewall provisions of the IBA, as described above, erect deliberate barriers

between VOA and the networks, on one side, and their managers in the Executive branch, on the

other, to preserve those assets, *see supra* Part I.A.  In this *sui generis* environment, unique

among government agencies, *see* Hr'g Tr. 24:6–25:4; Pls.' Suppl. Mem. at 9, dramatic shifts in

policy and practice that implicate the very constitutional rights on which U.S.–funded

international broadcasting is predicated are outside the bounds of a "working condition."

Indeed, VOA's *Best Practices Guide* makes clear that preservation of the firewall and the

concomitant "credibility of reporting by U.S. international broadcasters" presents a "legal issue"

to be handled between VOA management and USAGM officials.  Crain Decl., Ex. 18, *Best

Practices Guide*, Voice of America (2020) ("*Best Practices Guide*") at 100, ECF No. 12-20.

Thus, "directive[s] from outside the newsroom, including from USAGM" that run the risk of

"directly intrud[ing] on VOA's professional independence and interfer[ing] with news coverage"

speak to the mission and policies behind U.S.-funded international broadcasting and are

governed by the statutory firewall.  *Id.*  In contrast, requests from supervisors or editors "for

relevant editorial script or video changes in a story" are "part of the everyday nature of

journalism" and do not implicate the firewall.  *Id.* at 101.  The latter speaks to the daily

supervisor-employee relationship and is a working condition; the former implicates

constitutional values and rights and is not.  That violations of constitutional rights and other

egregious offenses are frequently found to fall outside the CSRA's defined "personnel actions,"

including "working conditions," supports this conclusion.  *See, e.g.*, *Gustafson v. Adkins*,

803 F.3d 883, 890 (7th Cir. 2015) (finding that supervisor's conduct in installing covert

surveillance equipment in female changing area "extends beyond the bounds of 'personnel

action,' as defined by the CSRA"); *Stewart v. Evans*, 275 F.3d 1126, 1130 (D.C. Cir. 2002)

(holding that claims related to a "warrantless search" of an employee's property are not

precluded by the CSRA); *Brock v. United States*, 64 F.3d 1421, 1424 (9th Cir. 1995) (finding

that rape and sexual abuse of an employee by a supervisor was not a "working condition").[19]

Chao's constitutional claim is thus sufficiently distinct from any CSRA–covered change

in "working conditions" to allow the exercise of jurisdiction even in the absence of CSRA

exhaustion, as the D.C. Circuit's decision in *Weaver* makes clear.  In *Weaver*, the Circuit found

that a VOA employee need not exhaust her CSRA remedies to challenge a prepublication review

requirement that required her to submit "all speaking, writing, and teaching material on matters

of 'official concern' to [her] employer[] for review."  87 F.3d at 1431.  The plaintiff failed to

---

[19]     *Mahoney v. Donovan*, a case in which the D.C. Circuit construed the term "working conditions" to encompass an administrative law judge's APA challenge to his supervisor's method of assigning cases, the failure to provide access to legal research resources, *ex parte* communications between his supervisor and a litigant appearing before him, and the agency's practice of providing advance notice to the Department of Justice in certain circumstances, *see* 721 F.3d at 636, is not to the contrary.  The ALJ's complaints in that case concerned the quotidian daily matters that are traditionally understood as "working conditions."  Though the court found that actions which "affect the ability of [employees] to do their jobs efficiently and effectively" may "affect working conditions," *id.*, it applied that standard only to the alleged failure to provide access to docket numbers and other research tools.  Further, the Circuit acknowledged that the last two allegations, which implicated the ALJ's "decisional independence," were "less clear[ly]" working conditions within the meaning of the statute.  *Id.*  The panel chose to interpret "working conditions" to encompass interference with an ALJ's decisional independence primarily because that interpretation was most "consistent with the language and structure of the [CSRA]."  *Id.* at 637.  *But see Ass'n of Admin. Law Judges v. Colvin*, 777 F.3d 402, 405 (7th Cir. 2015) (finding that claim of interference with ALJ's "decisional independence" was not precluded by the CSRA where preclusion would "nullify the express protection of such independence" in the APA, *see* 5 U.S.C. §§ 554(d)(2), 3105).  Here, Chao claims a constitutional basis for the editorial independence she seeks to vindicate.  Mindful that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," *Webster v. Doe*, 486 U.S. 592, 603 (1988), the logic of *Mahoney* does not control because a close call of statutory interpretation should be resolved in a constitutional claimant's favor.

comply with the requirement and, as a result, was formally admonished.  *Id.* at 1432.  Her First

Amendment claims related to the admonishment, a "disciplinary or corrective action" covered by

the CSRA as a "personnel action," *see* 5 U.S.C. § 2302(a), were precluded until she exhausted

CSRA remedies.  *Weaver*, 87 F.3d at 1433–34.  Her constitutional challenge to the policy itself,

however, framed as a "simple pre-enforcement attack on a regulation restricting employee

speech," *id.* at 1434, "s[tood] independently of the oral admonishment . . . and therefore it

raise[d] no exhaustion problem," *id.* at 1432.  Likewise, Chao alleges that the policies and

procedures introduced by defendants restrict her First Amendment rights even though her

working conditions have not yet been altered.  *See Firenze v. NLRB*, Civ. A. No. 12-10880-PBS,

2013 WL 639151, at *8 (D. Mass. Jan. 10, 2013) (finding that the CSRA did not preclude pre-

exhaustion exercise of jurisdiction over an employee's First Amendment challenge to a rule

preventing employees from publicizing grievances at work because "the promulgation . . . of

such a rule" was not a "personnel action" under the statute and "there [was] no allegation that

[any other] prohibited 'personnel action' ha[d] taken place *vis-à-vis* the First Amendment

claim").  Her claim is analogous to a pre-enforcement challenge to defendants' allegedly

unconstitutional interference with her First Amendment rights, distinct from and antecedent to

her experiencing a covered personnel action.

The Supreme Court's subsequent statement in *Elgin* that the CSRA precludes direct

judicial review even of those constitutional claims that are an indirect "vehicle" to challenge

personnel actions may have weakened the rule of *Weaver* and raised the barriers to entry into

district court.[20]  Nonetheless, both *Elgin*'s and *Weaver*'s guidance remains particularly

---

[20]     At least one other district court has concluded that, because *Elgin* "clarified" the impact of the CSRA's
preclusive effect on constitutional claims and found those claims to be precluded when they are a "vehicle" to
challenge a covered employment action, *Weaver* no longer "stand[s] for the proposition that [a district court] has
jurisdiction" over purely constitutional claims that do not implicate CSRA–covered actions.  *Nat'l Ass'n of Immigr.*

applicable in a case such as this, where Chao has not been the subject of any covered "personnel action."  *Cf. Elgin*, 567 U.S. at 15, 22 (emphasizing that CSRA exclusivity turns "on the type of the employee and the challenged employment action," *id.* at 15, and applied to petitioners' requested relief "to reverse the removal decisions, to return to federal employment, and to receive . . . compensation," all of which were "precisely the type of personnel action" and "kinds of relief" subject to administrative process under the CSRA, *id.* at 22).  The statutory text and Circuit precedent thus confirm that Chao's constitutional claim presents the "unusual case" in which CSRA–covered working conditions and her allegations so completely diverge that exhaustion is not required.[21]

This question is a close one, and defendants have proffered a strong argument that, because defendants' actions change "the way [Chao] performs her job," they are changes to "working conditions" covered by the CSRA, subject to the jurisdictional exhaustion requirement. Defs.' Suppl. Mem. at 10; *see also id.* at 10–11.  At this preliminary stage, however, especially given the non-traditional nature of the potential "working conditions" at issue, the actions Chao challenges appear to fall outside the "working conditions" covered by the CSRA.  She has not been the target of any other "personnel action" and therefore "raise[s] issues totally unrelated to

---

*Judges v. McHenry*, No. 1:20-cv-000731, 2020 WL 4693166, at *7 (E.D. Va. Aug. 6, 2020).  That conclusion by a district court outside this Circuit is, of course, not binding, and this Court disagrees based on a close reading of the two cases.  Moreover, the D.C. Circuit has not rejected *Weaver* in *Elgin*'s wake.

[21]     The *Elgin* majority also expressed concern that allowing constitutional claims related to CSRA–covered actions to proceed outside the CSRA's remedial scheme would "create the possibility of parallel litigation," 567 U.S. at 14, and "deprive the aggrieved employee, the MSPB, and the district court of clear guidance about the proper forum for the employee's claims at the outset of the case," *id.* at 15.  Admittedly, this case could implicate both concerns: the original five plaintiffs are in the midst of challenging their placement on administrative leave before OSC, *see* Whistleblower Compls., and the line between Chao's CSRA–exempt claims and future, potentially CSRA–covered constitutional claims may be fuzzy.  Chao herself, however, has no recourse to the CSRA remedies at present because defendants have taken no adverse action against her, and the original plaintiffs, who are pursing CSRA remedies, likely lack standing to bring their related claims in district court, *see supra* Part III.A.1.a.i. Moreover, litigation brought in different fora by different groups of plaintiffs, each of whom can access only one forum, does not present the threat of parallel litigation that the Supreme Court sought to discourage.  Additionally, cases such as Chao's, in which the constitutional claim stands truly independent of a CSRA–covered action, will be rare, minimizing the risk of confusion.

the CSRA procedures." *Steadman*, 918 F.2d at 967. That Chao's and others' constitutional

rights hang in the balance only bolsters this conclusion.[22]

Finally, plaintiffs argue that, because Chao has third-party standing to raise the rights of

contract journalists at VOA and the networks, *see supra* Part III.A.1.a.ii, who are not subject to

the CSRA, any claims that she is precluded from bringing in her own right can advance on the

contractors' behalf. Pls.' Suppl. Mem. at 10–11; *see also* Pls.' Reply at 9. For purposes of the

CSRA's ban on "prohibited personnel practices," the statute defines three categories of covered

employees. *See* 5 U.S.C. § 2302(a)(2)(B). Individuals who work for the federal government in

other capacities, for example, as contractors or as employees of the Legislative branch (who are

excepted from the statute's coverage), therefore cannot pursue administrative remedies under

these CSRA provisions. *See, e.g.*, *Davis v. Billington*, 681 F.3d 377, 384 (D.C. Cir. 2012)

(finding that "none of the [chapters of the CSRA governing personnel actions] provide

procedural rights or remedial measures for civil-service employees of non-Executive agencies");

*Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 67 n.14 (D.D.C. 2009), *aff'd sub*

*nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011) ("[B]ecause plaintiff is a

---

[22]     Even if Chao's claims challenge covered "working conditions," this Court would not be deprived of all
jurisdiction. Though not addressed by the parties, when a plaintiff subject to an administrative exhaustion
requirement seeks preliminary equitable relief, "[i]f the court may eventually have jurisdiction of the substantive
claim, the court's incidental equitable jurisdiction, despite the agency's primary jurisdiction, gives the court
authority to impose a temporary restraint in order to preserve the status quo pending ripening of the claim for
judicial review." *Wagner v. Taylor*, 836 F.2d 566, 571 (D.C. Cir. 1987); *see also Sampson v. Murray*, 415 U.S. 51,
83 (1974); *DeNovellis v. Shalala*, 135 F.3d 58, 62 (1st Cir. 1998) (recognizing the availability of "injunctive relief
on claims by federal government employees that their civil service rights have been violated," even where
administrative remedies have not been exhausted, subject to a finding of "genuinely extraordinary" irreparable
harm); *Abbott v. United States*, 144 F.3d 1, 5 (1st Cir. 1998) (same); *Sataki v. Broad. Bd. of Governors*, 733 F. Supp.
2d 22, 42 (D.D.C. 2010) ("While Plaintiff [a network journalist]'s failure to exhaust will . . . bar this Court from
deciding the merits of Plaintiff's claims, it does not necessarily deprive the Court of jurisdiction over Plaintiff's
Motion for a Preliminary Injunction."); *Jordan v. Evans*, 355 F. Supp. 2d 72, 77 (D.D.C. 2004) ("[T]his Court is not
barred from considering [a government employee's] claim for injunctive relief even though she may not have
exhausted her administrative remedies[.]."). If Chao were to file a complaint with OSC that OSC chose not to
present to the MSPB, she would then be able to bring her claims in this Court. *See supra* Part III.A.1.b.i. Even
without exhaustion of CSRA–covered claims, then, preliminary equitable relief in this Court is available to her upon
a showing of "genuinely extraordinary" irreparable harm.

contractor and not an employee, the Civil Service Reform Act of 1978 has no application here." (internal citation omitted)).

The Supreme Court has cautioned, however, that "the absence of provision for [certain] employees to obtain judicial review is not an uninformative consequence of the limited scope of the [CSRA], but rather manifestation of a considered congressional judgment that they should not have statutory entitlement to review for adverse action."  *Fausto*, 484 U.S. at 448–49; *see also Davis*, 681 F.3d at 386 ("We are satisfied that Congress omitted the subset of employees that includes [plaintiff] from the remedial protections of the CSRA . . . intentionally . . . . And . . . 'it is where Congress has intentionally withheld a remedy that we must most refrain from providing one[.]'" (quoting *Wilson v. Libby*, 535 F.3d 697, 709 (D.C. Cir. 2008))); *Graham*, 358 F.3d at 934 ("[I]n not granting review to *some* employees under the CSRA for actions covered by the CSRA, Congress meant to preclude those employees from securing review under other avenues." (emphasis in original)).  As a result, both because of and despite the fact non-covered government workers lack any CSRA remedy, judicial review of claims related to CSRA–covered actions brought by such employees, other than claims for equitable relief for constitutional wrongs, is also precluded.[23]  Tellingly, the single case plaintiffs cite in support of the availability of judicial review for contractors involved only constitutional claims. *See Navab-Safavi*, 650 F. Supp. 2d at 49.  Thus, USAGM contractors likely are equally unable to

---

[23]     *See, e.g.*, *Davis*, 681 F.3d at 385–86 (finding that the CSRA precluded creation of a *Bivens* cause of action for First and Fifth Amendment violations alleged by an employee who, because he worked for the Legislative branch, was not covered by the CSRA, despite the unavailability of a CSRA remedy to him); *Lamb v. Holder*, 82 F. Supp. 3d 416, 421 (D.D.C. 2015) ("[Plaintiff] is excluded from the CSRA provisions regarding termination, and therefore his termination is not subject to judicial review."); *Peter B. v. CIA*, 620 F. Supp. 2d 58, 69 (D.D.C. 2009) ("Although CIA employees are excluded from those employees permitted to invoke the CSRA's review procedures, their exclusion does not leave them 'free to pursue whatever judicial remedies [they] would have had before enactment of the CSRA.'" (quoting *Fausto*, 484 U.S. at 447)).

pursue Counts I, II, IV, V, VI, and VII.  The status of their constitutional claims need not be resolved in light of the finding that Chao's constitutional claim is not precluded by the CSRA.[24]

The Court therefore has subject-matter jurisdiction only over Chao's constitutional claim (Count III).  The likelihood of success on the merits of that claim are considered next.

### 2.    *First Amendment Claim*

Count III of the Amended Complaint, Chao's only claim that likely survives the preclusive effect of the CSRA, seeks injunctive relief under the First Amendment.  *See* Am. Compl. ¶¶ 173–79.  Chao alleges that defendants' actions in breach of the firewall violate the First Amendment by "unconstitutionally restraining rights under the First Amendment's guarantees of free speech and freedom of the press"; "unconstitutionally retaliating" against journalists and editors who engage in protected First Amendment activity; "unconstitutionally discriminating based on perceived viewpoint"; and imposing a "vague and overbroad conflict of interest policy that confers on [defendants] unconstitutionally unfettered discretion to suppress speech."  *Id.* ¶ 174.  Defendants challenge the likelihood of success of this claim on several grounds, none of which are persuasive at this juncture.

### a.  Cause of Action

At the outset, defendants contend that Count III fails because there is no "cause of action against the federal government under the First Amendment itself."  Defs.' Opp'n at 19 (citing *Am. Road & Transp. Builders Ass'n v. EPA*, 865 F. Supp. 2d 72, 83 (D.D.C. 2012), *aff'd*, No.

---

[24]    While contractors are not "covered employees" under the CSRA, they may be subject to the exclusive remedial scheme of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.*, which "established a comprehensive framework for resolving contract disputes between executive branch agencies and government contractors," *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 521 (D.C. Cir. 2010).  The parties did not address this potentially preclusive statute in their briefing or at the hearing, however.  Depending on the precise terms of the contracts and the specific allegations at issue, the contractors' claims, both statutory and constitutional, could fall within the Contract Disputes Act's ambit.  *See, e.g.*, *Nat'l Star Mail Route Contractors Ass'n v. U.S. Postal Serv.*, 223 F. Supp. 3d 14, 33 & n.14 (D.D.C. 2016) (noting that a cause of action "on the contract," and therefore precluded by the Contract Disputes Act, could lie for alleged "statutory and constitutional violations").

12-5244, 2013 WL 599474 (D.C. Cir. Jan. 28, 2013); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525–26 (9th Cir. 1989)). The Supreme Court, however, has "long held that federal courts may in some circumstances grant injunctive relief against" federal officials who act in "violation[] of federal law" or the Constitution. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). Despite this tradition of keeping the courthouse doors open to constitutional claimants, defendants argue that section 702 of the APA, which provides a private cause of action for and waives sovereign immunity with respect to claims "that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority," 5 U.S.C. § 702, forecloses any equitable cause of action. Defs.' Opp'n at 19–20. As explained above, however, Chao's APA claims are precluded by the CSRA. *See supra* Part III.A.1.b.ii; *see also Fornaro*, 416 F.3d at 66–67. Under defendants' reasoning, the CSRA cuts off Chao's APA claims and, though not themselves viable, those APA claims, in turn, cut off her ability to seek equitable relief directly under the First Amendment. Under the government's view of the law then, Chao is left with no way to present her claims to a federal court.

Yet, where cognizable constitutional claims are at stake, Chao must be able to proceed in an Article III forum under some cause of action. *Cf. Sierra Club v. Trump*, 929 F.3d 670, 697 (9th Cir. 2019) ("It cannot be that simply by pointing to any statute, governmental defendants can foreclose a constitutional claim."). Further, neither the Supreme Court nor this Circuit has identified in the CSRA the requisite congressional "intent to foreclose" equitable relief entirely. *Armstrong*, 575 U.S. at 328 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 647 (2002)); *see also supra* Part III.A.1.b.i. Indeed, *Elgin* itself addressed the viability of petitioners'

"constitutional claims for equitable relief." 567 U.S. at 8. Although the Court held that such claims, at least when they present a "vehicle" through which to challenge a CSRA–covered adverse employment action, are subject to the administrative review process, *id.* at 22, it nowhere cast doubt on the availability to the petitioners of the equitable cause of action they pled. To the contrary, the Court determined that their equitable claims could in fact be raised during CSRA proceedings in anticipation of their eventual review by the Federal Circuit. *See id.* at 17. Likewise, the D.C. Circuit in *Weaver*, which addressed the merits of the plaintiff's challenge to a prepublication review regulation under First Amendment, not APA, principles, *see* 87 F.3d at 1439–43, appears to have proceeded under precisely the cause of action Chao pleads here. Chao, too, may advance her claim for equitable relief directly under the First Amendment.

### b.  Legal Standard

Next, the parties dispute the level of First Amendment protection to which plaintiffs, as government employees, are entitled. Defendants argue that Chao and the VOA and network journalists for whom she stands as a representative are "civil servant[s]," Defs.' Opp'n at 27 (alteration in original) (quoting Roe Decl. ¶ 28), with "no First Amendment protection for speech taken pursuant to their official duties," *id.*; *see also id.* at 27–35. Plaintiffs and *amici*, in contrast, contend that, despite their status as government employees, VOA and network employees are entitled to the full panoply of First Amendment protections owed to the press because of their special status as journalists. Relying on the premise that "'the notion of the "press" should be given a broad meaning,'" Pls.' Mem. at 29 (quoting *Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 55 (D.D.C. 2003)), they suggest that "the mere fact that a journalistic outlet is funded (or even owned) by the government does not strip that organization of its First Amendment protection," *id.*; *see also* Pls.' Reply at 21–23; Reporters' Comm. Br. at 11–16. This position is bolstered,

they claim, by the IBA's firewall provisions, which "incorporate First Amendment standards against which Congress has insisted that management of the networks be measured."  Reporters' Comm. Br. at 11 (citing *Tripp*, 284 F. Supp. 2d at 56).

The question of which First Amendment standard controls disputes between journalists at U.S.–funded international broadcasting outlets and their managers in the Executive branch with regard to the application of the firewall and the journalists' performance of their core editorial and journalistic functions is, as *amici* note, a question of first impression.  *See* Reporters' Comm. Br. at 12; *cf. Tripp*, 284 F. Supp. 2d at 55 (noting that the D.C. Circuit has not "provided any guidance as to what characteristics should bring a publication within the scope of the First Amendment").  To begin, this Circuit has consistently treated VOA and network employees and contractors as government employees, subject to employee-speech restrictions, when reaching the merits of their First Amendment claims.  *See, e.g.*, *Navab-Safavi*, 637 F.3d at 315–18; *Weaver*, 87 F.3d at 1440–43; *Jangjoo v. Broad. Bd. of Governors*, 244 F. Supp. 3d 160, 170–72 (D.D.C. 2017); *Suzal v. Kopp*, Civ. A. No. 91-0957-LFO, 1991 WL 126030, at *2–4 (D.D.C. June 28, 1991), *aff'd sub nom. Suzal v. Dir., U.S. Info. Agency*, 32 F.3d 574 (D.C. Cir. 1994).[25] Thus, defendants contend that the Supreme Court's articulation of the employee-speech doctrine in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), controls.

---

[25]     For this reason, plaintiffs' calls for VOA and the networks to be regarded as "credible, professional news outlets, vested with full First Amendment protections," fail.  Pls.' Reply at 22; *see also* Pls.' Mem. at 29; Reporters' Comm. Br. at 11–16.  Plaintiffs' reliance on *Tripp v. Department of Defense*, 284 F. Supp. 2d 50 (D.D.C. 2003), to support their view that VOA and the networks are "entitled to the First Amendment protections reserved to the press," Pls.' Mem. at 29 (citing *Tripp*, 284 F. Supp. 2d at 55–57), is misplaced.  In *Tripp*, another Judge on this Court concluded that a newspaper "published and financed" by the Department of Defense was entitled to full First Amendment protections, 284 F. Supp. 2d at 55 n.3, but cited no direct judicial authority in reaching this conclusion, relying instead largely on explicit statements by Congress that the publication should "enjoy the full protection of the First Amendment," *id.* at 56 (citing H.R. Rep. 101-121, at 838 (1989)).  Congress has made no equivalent declarations in its passage of or deliberations regarding the BIB Act, the IBA, VOA, or the networks.  *See supra* Part I.A.

The Supreme Court in *Garcetti* held that "when public employees make statements pursuant to their official duties, the employees are not speaking as [private] citizens for First Amendment purposes," *id.* at 421, and thus have "no First Amendment cause of action based on his or her employer's reaction to the speech," *id.* at 418; *see also Mpoy v. Rhee*, 758 F.3d 285, 290–91 (D.C. Cir. 2014) (holding that public employee speech made "pursuant to . . . official duties" is not protected even when the speech falls outside the employee's job description).  The decision refined the employee-speech rule of *Pickering v. Board of Education*, 391 U.S. 563 (1968); *see also Connick v. Myers*, 461 U.S. 138, 146–49 (1983), which set forth a "public concern" analysis and balancing test to determine when public employees' speech is protected, *see Pickering*, 391 U.S. at 568.  Post-*Garcetti,* government employees generally have no First Amendment protection with respect to speech made "pursuant to their official duties," *Garcetti*, 547 U.S. at 421, and enjoy limited protection under *Pickering* for speech undertaken "as a citizen on a matter of public concern," *id.* at 418; *see also Lane v. Franks*, 573 U.S. 228, 237 (2014); *Baumann v. District of Columbia*, 795 F.3d 209, 215–16 (D.C. Cir. 2015).

Perhaps recognizing that *Garcetti*'s near-elimination of First Amendment rights poses a particular threat to those uniquely situated public employees whose official duties necessarily entail free speech, the Supreme Court noted in that decision that First Amendment expression "related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by . . . employee-speech jurisprudence."  *Garcetti*, 547 U.S. at 425; *see also id.* at 438 (Souter, J., dissenting) (cautioning against extension of the employee-speech doctrine "to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write 'pursuant to . . . official duties'" (omission in original)).  This potential limitation on *Garcetti*'s reach

acknowledges the special status of teachers and academics in the First Amendment tradition. *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) ("We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned.  That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.").

Following in that tradition, at least two circuits have found that *Garcetti* does not apply to the teaching and writing activities, undertaken "pursuant to their official duties," of faculty members at public universities.  *See Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) ("[I]f applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court."); *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011) ("We are . . . persuaded that *Garcetti* would not apply in the academic context of a public university[.]").  These circuits have chosen to apply the greater protections of *Pickering* to public university professors' core functions of teaching and writing because of their special status under the First Amendment, while recognizing that *Garcetti* controls speech related to activities undertaken "pursuant to official duties" outside that heartland.  *See Demers*, 746 F.3d at 413 (suggesting that "mere squabbles over jobs, turf, or ego" would be governed by *Garcetti*); *Adams*, 640 F.3d at 563 ("There may be instances in which a public university faculty member's assigned duties include a specific role in declaring or administering university policy, as opposed to scholarship or teaching.  In that

circumstance, *Garcetti* may apply to the specific instances of the faculty member's speech carrying out that duty.").

Freedom of the press holds an equally exalted place in the First Amendment firmament. *See, e.g.*, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 548 (1976) ("'Our liberty depends on the freedom of the press, and that cannot be limited without being lost . . . .'" (omission in original) (quoting 9 PAPERS OF THOMAS JEFFERSON 239 (J. Boyd ed., 1954))); *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) ("In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy.  The press was to serve the governed, not the governors."); *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) ("A broadly defined freedom of the press assures the maintenance of our political system and an open society."); *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937) ("[I]mperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion . . . .  Therein lies the security of the Republic, the very foundation of constitutional government."); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931) ("'The liberty of the press is indeed essential to the nature of the free state [and] consists in laying no previous restraints upon publications[.]'" (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *151, *152)).  Thus, like the speech of government-employed academics, the speech of government-employed editors and journalists "implicates additional constitutional interests" not fully accounted for by *Garcetti* and suggests another potential limitation on the reach of *Garcetti*'s restrictive employee-speech doctrine.  547 U.S. at 425.

Against this backdrop of the weighty First Amendment interests in protecting freedom of the press and the heightened protection assigned to equivalent interests of public employees in

the academic context, the logical conclusion is that *Garcetti* does not apply to the core editorial

or journalistic functions of government-employed journalists.  Though, as the Ninth and Fourth

Circuits have acknowledged, speech made "pursuant to official duties" outside of these functions

remains subject to *Garcetti*, speech made in relation to editorial and journalistic activities is

protected under the First Amendment, using the analysis set forth in *Pickering*.[26]  To merit First

Amendment protection under *Pickering*, a government employee must show, first, that her

speech addressed "matters of public concern," *Pickering*, 391 U.S. at 568; *see also Connick*, 461

U.S. at 145–46, and, second, that her interest "in commenting upon matters of public concern"

outweighs "the interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees," *Pickering*, 391 U.S. at 568.

The first step of the *Pickering* analysis—determining whether speech involves a matter of

public concern—is an "analysis" that "must take into account 'the content, form, and context' of

the employee's speech, 'as revealed by the whole record.'"  *LeFande v. District of Columbia*

("*LeFande I*"), 613 F.3d 1155, 1159 (D.C. Cir. 2010) (quoting *Connick*, 461 U.S. at 147–48).

Generally, "'speech relates to a matter of public concern' if it is 'of political, social, or other

concern to the community,'" *id.* (quoting *Hall v. Ford*, 856 F.2d 255, 259 (D.C. Cir. 1988)), with

particular consideration given to "speech that concerns issues about which information is needed

or appropriate to enable members of society to make informed decisions about the operation of

their government," *id.* (internal quotations omitted); *see also Demers*, 746 F.3d at 415 (adopting

---

[26]     This rule is consistent with previous decisions of the D.C. Circuit applying the employee-speech
framework to claims brought by VOA and network employees and contractors.  The D.C. Circuit in *Weaver*, a pre–
*Garcetti* case, applied *Pickering* to decide the merits of that plaintiff's pre-enforcement challenge to a prepublication
review requirement enforced by USIA.  *See* 87 F.3d at 1440–43.  Likewise, in its only post-*Garcetti* decision
reaching the merits of a First Amendment claim brought by a VOA contractor, the D.C. Circuit applied *Pickering*
without reference to *Garcetti*.  *Navab-Safavi*, 637 F.3d at 315–18.  Though at least one district court in this Circuit
has applied *Garcetti* to a VOA employee's First Amendment claims, *see Jangjoo*, 244 F. Supp. 3d at 170–72, that
case centered on internal emails sent by an employee "air[ing] grievances against" his supervisors and therefore did
not implicate the employee's editorial or journalistic functions, *id.* at 170.

a "liberal construction of what an issue of public concern is under the First Amendment" (internal quotations omitted)).

At the second step, in balancing the employee's interest in protected speech against the government's interest in promoting efficiency, courts consider "'whether the [speech] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise,'" *LeFande v. District of Columbia* ("*LeFande II*"), 841 F.3d 485, 494 (D.C. Cir. 2016) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)), in addition to "the content, manner, time and place of the speech," *O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998) (citing *Connick*, 461 U.S. at 152–53). The D.C. Circuit has applied a sliding-scale approach at this stage, under which "a 'stronger showing' of interference with the employer's operation 'may be necessary if the employee's speech more substantially involve[s] matters of public concerns.'" *LeFande II*, 841 F.3d at 494 (quoting *Connick*, 461 U.S. at 152).

When an employee brings a pre-enforcement or other challenge to an employer's "generally applicable" statute, regulation, policy, or practice, "as opposed to a particularized disciplinary action," additional considerations inform the second step of the *Pickering* analysis. *Weaver*, 87 F.3d at 1439. For example, the court should weigh the relevant First Amendment interests of "present and future employees," as well as the interest of "potential audiences" in having access to a diverse array of expression. *United States v. Nat'l Treasury Emps. Union* ("*NTEU*"), 513 U.S. 454, 468 (1995). In addition, the court should evaluate the potential negative impacts of prior restraints on speech. *Weaver*, 87 F.3d at 1439–40. These include any chilling of speech, *see, e.g.*, *NTEU*, 513 U.S. at 468–69, grants to the employer of limitless

discretion to approve or disapprove of speech that invite the potential for viewpoint

discrimination, *see, e.g.*, *Sanjour v. EPA*, 56 F.3d 85, 96–97 (D.C. Cir. 1995) (en banc), and the

risk of self-censorship by employees, *see, e.g.*, *Harman v. City of New York*, 140 F.3d 111, 120

(2d Cir. 1998); *see also Am. Fed'n of Gov't Emps. v. District of Columbia*, No. Civ. A. 05-0472

(JDB), 2005 WL 1017877, at *7–8 (D.D.C. May 2, 2005).  Finally, with respect to pre-

enforcement challenges, the D.C. Circuit has established the proper balance between the

employee's and the employer's respective interests: to pass constitutional muster, the challenged

rule must be no more restrictive than "'reasonably necessary to protect' various government

interests."  *Weaver*, 87 F.3d at 1436 (citing *NTEU*, 513 U.S. at 474); *see also Latino Officers*

*Ass'n v. Safir*, 170 F.3d 167, 171–72 (2d Cir. 1999) (same); *Am. Fed'n of Gov't Emps.*, 2005 WL

1017877, at *7–8.

### c.  Application to Chao's First Amendment Claim

Whether Chao has a likelihood of success on the merits of her First Amendment claim

turns on whether the balance reached under the refined version of the *Pickering* analysis,

described above, tilts in her favor as to the particular actions of defendants she challenges.  Each

step of the test is considered in turn.

### i.  *Speech on "Matters of Public Concern"*

All of the present and prospective speech Chao seeks to protect satisfies the first

*Pickering* requirement, that employee speech must address "matters of public concern."

*Pickering*, 391 U.S. at 568.  Her allegations regarding the creation and content of news coverage

at VOA and the networks seek to protect speech that centers on current events and is therefore by

definition "of political, social, or other concern to the community."  *LeFande I*, 613 F.3d at 1159

(internal quotations omitted).  Likewise, her allegations related to potential retaliation against

employees for raising concerns about defendants' management of USAGM, VOA, and the networks relate to speech "about the operation of . . . government."  *Id.* (internal quotations omitted).

### ii.   Balancing

At the second step in the *Pickering* analysis, because Chao challenges "generally applicable" policies and practices of defendants rather than a "particularized disciplinary action" taken against her, *Weaver*, 87 F.3d at 1439, the question is whether the restrictions defendants have allegedly imposed on Chao's and her colleagues' speech are no more restrictive than "'reasonably necessary to protect' various government interests," *id.* at 1436 (quoting *NTEU*, 513 U.S. at 474).  In the unique context of the editorial and journalistic activities undertaken at VOA and the networks, the determination of which measures are "reasonably necessary" to promote the efficiency of the public services these outlets perform is informed by the IBA.

The IBA implements a carefully constructed balance between CEO authorities, intended to streamline agency management and promote efficiency, *see* 22 U.S.C. § 6204(a), and preservation of VOA and the networks' "professional independence and integrity," *id.* § 6204(b). That statutory scheme reflects a considered congressional determination that USAGM's pursuit of agency efficiency is cabined by the mandate that U.S.–funded international broadcasting "be conducted in accordance with the highest professional standards of broadcast journalism."  *Id.* § 6202(a)(5).  As the D.C. Circuit put it in interpreting the BIB Act, USAGM is "given evaluative and review responsibilities" while "day-to-day control [is] left to the stations themselves."  *Ralis*, 770 F.2d at 1125.  Thus, except where the 2016 amendments to the IBA now specifically entrust a particular function to the CEO, USAGM's cabined evaluative and review responsibilities are likely to be "reasonably necessary" to ensure the efficiency of agency

operations and the effective provision of the networks' public services.  In contrast, with respect

to core editorial and journalistic activities governed by *Pickering*, the IBA indicates that actions

by USAGM that implicate day-to-day control of the networks are presumptively unnecessary,

given the bifurcated roles that Congress has intentionally created.  The inclusion, through the

statutory firewall, of a mandate for USAGM to respect the outlets' "professional independence

and integrity" reflects that Congress determined this interest to be of greater public importance

than the general government interest in efficiency.  22 U.S.C. § 6204(b).  Indeed, this Circuit has

recognized that USAGM and its media outlets have an interest in maintaining an appearance of

"the highest journalistic credibility" that is owed weight in the *Pickering* analysis.  *Navab-Safavi*,

637 F.3d at 316.  With these background principles in mind, the constitutionality of each of

defendants' challenged actions is considered next.

### (I)  *Interference with USAGM and Network Personnel*

First, Chao alleges that defendants' (1) removal of USAGM General Counsel and author

of the *Firewall* Rule David Kligerman; (2) refusal to sponsor or renew sponsorship of J-1 visas

for VOA foreign journalists; and (3) reassignment of VOA Standards Editor Steve Springer and

interference with Radio Free Asia's Executive Editor and VOA's New York Bureau Chief, *see*

*supra* Part I.B.1, violate the First Amendment as acts of "governmental influence on a [media

outlet's] staffing decisions," Pls.' Mem. at 30.  The First Amendment protects private media

outlets' "choice of writers" because personnel decisions "affect[] the expressive content" of

publications.  *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 962 (9th Cir. 2010) (citing

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572–73 (1995)).  In the

*Pickering* context, however, the impact of defendants' efforts to exert control over VOA and the

networks' choice of journalistic personnel must be weighed against USAGM's interests in fulfilling its statutory mandate and ensuring the functioning of U.S. international broadcasting.

First, as to Kligerman, Chao argues that his placement on administrative leave "reflects [d]efendants' true goal: to exert control over journalistic content without facing pushback." Pls.' Mem. at 32. Though that motive may well underlie defendants' removal of Kligerman, the IBA vests the CEO with specific authority "[t]o appoint such personnel for the [CEO] as the [CEO] may determine to be necessary." 22 U.S.C. § 6204(a)(11). The statute thus suggests a congressional decision that CEO control over USAGM employees is "reasonably necessary" to the agency's efficient performance of its duties. Further, Chao does not allege any direct impact of Kligerman's removal on her or her colleagues' exercise of First Amendment rights, beyond its symbolic weight as an indicator of defendants' general disregard for the statutory firewall. Kligerman's removal is thus not likely to be found unconstitutional.

Second, with respect to J-1 visa applications, plaintiffs contend that Pack's refusal to follow USAGM's longstanding practice of ministerial approval of the applications limits VOA's "ability to determine the content of [its] coverage," in violation of journalists' First Amendment rights. Pls.' Mem. at 32. The BBG and Pack's immediate predecessor may well have had a practice of "ministerially" approving visa applications, as plaintiffs contend, *id.* at 11; *see also id.* at 10–11, which gave VOA greater control over hiring of foreign journalists, *see id.* at 32. Nonetheless, USAGM and its affiliated networks are authorized by statute to employ foreign nationals only "when suitably qualified United States citizens are not available," 22 U.S.C. § 1474(1), a limit that, as defendants point out, USAGM "has sometimes been accused of ignoring," Defs.' Opp'n at 25 (citing *Nyunt*, 589 F.3d at 447; *Grosdidier*, 560 F.3d at 496; *Broad. Bd. of Governors v. Am. Fed'n of Gov't Emps. Local 1812*, 66 F.L.R.A. 380 (2011)). In

light of this provision and the CEO's authority under the IBA to "supervise" VOA and the networks' employment of foreign journalists, *see* 22 U.S.C. § 6204(a)(1), Pack, as CEO, has made a reasonable determination that he has a statutory obligation to give J-1 visa applications greater scrutiny than they have received in the past.  His decision to implement this choice at a programmatic level, without rejecting the applications of specific individual J-1 visa holders while approving others, suggests that it falls within the ambit of USAGM's "evaluative and review responsibilities."  *Ralis*, 770 F.2d at 1125.

Pack's abandonment of the practice of rubber-stamping J-1 visas at VOA's request has undoubtedly had a chilling effect on foreign journalists employed by VOA, who are "incentiviz[ed] . . . to curry his favor" through their stories in order to preserve their visas.  Pls.' Mem. at 12.  In assessing the constitutionality of an employer's prior restraint on speech, however, the degree of "interfer[ence] with the regular operation of the enterprise" posed by removal of the restraint must be considered, and the employer is owed "a wide degree of deference" as to its judgment in this regard.  *LeFande II*, 841 F.3d at 494 (internal quotations omitted).  The express statutory restriction on the hiring of foreign journalists, in combination with Pack's supervisory responsibilities, indicates that at least some active CEO involvement in the J-1 visa process is reasonably necessary for USAGM to operate in compliance with its statutory mandate.  Pack's decision to review such applications on a case-by-case basis is therefore not "unwarranted" or unduly "burdensome" on VOA and the networks' ability to retain foreign journalists and likely survives *Pickering*.  *Id.* at 496.

Third, in contrast to Pack's scrutiny of J-1 visas prior to authorizing, Pack's interference with individual editors and journalists at VOA and the networks falls outside the powers granted to him by the IBA and beyond USAGM's evaluative role.  Except where other statutory

provisions compel a different conclusion, the CEO's direct personnel authority is limited to the power "[t]o appoint such personnel for the [CEO] as the [CEO] may determine to be necessary"—in other words, to the appointment of USAGM, not VOA or network, personnel.  22 U.S.C. § 6204(a)(11).  Further, while a programmatic approach to assessing J-1 visa applications is likely among the "evaluative and review responsibilities" entrusted to USAGM, efforts to influence or make personnel decision with respect to editorial and journalistic employees unquestionably constitute "day-to-day" management of the sort left to VOA and the networks. *Ralis*, 770 F.2d at 1125.  Thus, the IBA clearly indicates that interference by USAGM officials with VOA and the networks' editorial and journalistic personnel is not "reasonably necessary" under *Pickering*.

On the other side of the scales, Chao alleges that defendants' actions concerning Springer, Radio Free Asia's Executive Editor, and VOA's New York Bureau Chief "hamper[]" the First Amendment right of VOA and network editors and journalists to control the content they produce by removing certain voices from the newsroom altogether.  Pls.' Mem. at 32.  In particular, the removal and non-replacement of Springer, VOA's Standards Editor, poses an impediment to journalists' First Amendment right to produce content "of the highest quality," Pls.' Mem. at 22, in furtherance of VOA's interest in maintaining "the highest journalistic credibility," *Navab-Safavi*, 637 F.3d at 316; *see also, e.g.*, Turner Decl. ¶¶ 22–23; Lennon Decl. ¶ 15; Walsh Decl. ¶¶ 17–18; Powers Decl. ¶ 27; Bennett Decl. ¶¶ 22–24; Doe Decl. ¶ 18; Roe Decl. ¶¶ 7–9.  Without any showing of reasonable necessity, let alone a compelling one, to weigh against the First Amendment interests that defendants' personnel actions against individual editors and journalists at VOA and the networks threaten, the personnel actions taken directly against such personnel are likely to be found unconstitutional.

### *(II)  Investigation of and Interference with Journalistic Content*

Next, Chao alleges that defendants' efforts to interfere in the newsrooms at VOA and the networks through content control and investigations into supposed breaches of journalistic ethics are unconstitutional.  *See supra* Part I.B.2.  As to content control, she claims that defendants' (1) decision to post U.S. government editorials on VOA's website, (2) requests to participate in news coverage meetings, and (3) efforts to oversee journalists' assignments constitute unlawful attempts to influence content and chill speech.  *See supra* Part I.B.2.

First*,* regarding the VOA editorials, the IBA specifically requires that U.S. international broadcasting "shall include" "editorials, broadcast by the Voice of America, which present the views of the United States Government."  22 U.S.C. § 6202(b)(3).  Thus, this particular use of VOA as a mouthpiece for U.S. government views is plainly anticipated by and written into the IBA.  Plaintiffs attempt to dismiss this statutory mandate by arguing that it does not "require any USAGM network to publish content written by the government [or] give any government official the authority to dictate how opinion pieces are presented and where."  Am. Compl. ¶ 101 n.27.  They do not, however, allege that any VOA journalists are assigned to write these editorials or to post them under their names.  The "manner" of the speech at issue, then, *O'Donnell*, 148 F.3d at 1135, burdens the First Amendment rights of VOA in the abstract rather than individual employees.  Under *Pickering*, this organizational interest of a subagency does not outweigh the deference owed to the determination of VOA's parent agency that posting editorials on VOA's homepage is "reasonably necessary" to facilitate compliance with a statutory provision that imposes explicit content requirements on VOA.

Second, defendants' requests to participate in news coverage meetings and efforts to directly oversee journalists' assignments constitute direct communications with network

journalists that run the risk of impermissibly influencing content and chilling speech. Government action rises to the level of chilling speech "'when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'"  *Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)).  In response to the knowledge that defendants are monitoring VOA and network coverage and reaching out to individual journalists directly with questions about coverage, journalists and editors have already refrained from engaging in certain speech and are likely to continue doing so.  They are less willing to take on controversial but important stories and exercise greater caution in making statements that may offend defendants, who have already made clear that speech insufficiently supportive of President Trump may prompt critical and adverse actions.  *See* Doe Decl. ¶¶ 17–19; Roe Decl. ¶¶ 25–26.

Chao points to defendants' investigations of VOA's Urdu service and VOA's video profiles of Mrs. Trump and Dr. Biden as paradigmatic examples of the unconstitutional pattern at work.  In both cases, the VOA coverage, though not even critical of or otherwise unfavorable to President Trump, highlighted activities of President Trump's political opponent and his spouse, prompting defendants to seek out the individual employees behind the coverage, to interrogate their colleagues, and to impose penalties up to and including termination.  *See supra* Part I.B.2. Not only were VOA employees thus penalized for their speech, as a result of the Urdu service investigation, other employees actually removed content perceived to be objectionable to defendants from VOA's website and defendant Dewey demanded that the Chief of the Urdu service identify content put out by the service that expressed viewpoints in opposition to the Black Lives Matter movement.  *See id.*; *see also* Roe Decl. ¶ 13 ("As a senior newsroom manager wrote to Voice of America's leadership, '[w]e have reached a point where we, in the

News Center, are at least as worried about self-censorship as we are about bias and think we need to be equally vigilant against both.'" (alteration in original)).  In addition to their chilling effects, these intrusions into the newsroom appear to be one-sided.  While content perceived as "anti-Trump" or "pro-Biden" came under defendants' scrutiny, similar coverage of President Trump by VOA's Spanish-language service was not investigated at all.  *See supra* Part I.B.2. The investigations, then, not only penalize and chill speech, they appear to do so on the basis of perceived viewpoint.  These considerations, which have sweeping implications for the current and prospective speech of present and future employees, weigh heavily against defendants in the *Pickering* analysis.  *See, e.g.*, *NTEU*, 513 U.S. at 468; *Weaver*, 87 F.3d at 1439; *Sanjour*, 56 F.3d at 96–97.

Defendants argue that these investigations and defendants' other efforts to monitor news coverage fall within the CEO's duties under the IBA to "supervise" VOA and the networks, 22 U.S.C. § 6204(a)(1), "to assess the quality, effectiveness, and professional integrity of" broadcast activities, *id.* § 6204(a)(2), and "[t]o ensure," *id.* § 6204(a)(3), that VOA and the networks present "a balanced and comprehensive projection of United States thought and institutions," *id.* § 6202(b)(2); *see also* Defs.' Opp'n at 25–26.  In light of the IBA's separation of evaluative and review responsibilities from the day-to-day responsibilities assigned to the networks, *see Ralis*, 770 F.2d at 1125, any argument that it is "reasonably necessary" under the IBA regime for USAGM to carry out investigations and disciplinary measures in response to discrete stories or of particular individuals is questionable at best.  More importantly for present purposes, more tailored methods, short of defendants stepping into the newsroom themselves, are available if defendants wish to monitor VOA and network coverage in order to carry out their statutory responsibilities.  For example, VOA's *Best Practices Guide* anticipates that USAGM

"leadership" will "communicate[] challenges to VOA's reporting down the chain," presenting

one alternative forum through which defendants could seek information about VOA stories.  *Best*

*Practices Guide* at 101 (emphasis omitted).  Likewise, USAGM's policy on potential ethics

violations describes a graduated process for investigations, under which the network carries out

initial investigations of discrete situations and USAGM becomes involved only if a widespread

pattern of breaches at VOA or one of the networks comes to light.  *See USAGM Procedures* at

1–2.  Defendants' direct communications with and investigations of VOA and the networks'

journalists are therefore not "reasonably necessary" and are likely to be found unconstitutional

under *Pickering*.

### (III)  Retaliatory Response to VOA Journalists' Letter and Criticism of Pack's Federalist Radio Hour Interview

Chao further challenges defendants' response to the VOA journalists' letter, which, she

claims, led to a series of threatening tweets posted on the USAGM spokesperson's official

Twitter account and the retaliatory investigation of VOA's White House Bureau Chief, Steve

Herman, who had organized the journalists.  *See supra* Part I.B.3.  The letter itself was an

internal communication, made by VOA journalists, concerning defendants' management of

USAGM and its impact on their ability to perform their duties.  *See* VOA Journalists Letter.  As

speech related to defendants' management of USAGM and its impact on VOA journalists'

performance of their editorial or journalistic functions, not actually made as part of but rather to

protect the performance of those duties, the letter may not be exempt from *Garcetti* under the

framework articulated above.  *See supra* Part III.A.2.b; *Jangjoo*, 244 F. Supp. 3d at 170 (treating

a VOA employee's internal letter "air[ing] grievances" against his supervisors and alleging

"mismanagement and other abuses of their authority" as speech made "in his official capacity");

*cf. Adams*, 640 F.3d at 563 (raising the possibility that public university professors' speech about

"university policy" might fall under *Garcetti*).  If, upon a fuller examination of the merits, *Garcetti* were found to apply, the letter would likely be entitled to no First Amendment protection because, as a letter reporting alleged misconduct by USAGM management that interferes with VOA journalists' ability to do their jobs, it was undertaken "pursuant to official duties."  *See, e.g.*, *Mpoy*, 758 F.3d at 290–91 ("'In our cases applying *Garcetti*, we have consistently held that a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command.'" (quoting *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009))).  At this time, then, it appears that plaintiffs are not likely to succeed in challenging the chilling effect of USAGM's tweets or the investigation into Herman as an act of retaliation, though this question need not be fully resolved at this preliminary stage.  *See Aamer*, 742 F.3d at 1041 ("[W]e are addressing only petitioners' *likelihood* of success on the merits, not the actual merits of their claim.").

Although the investigation into Herman was allegedly undertaken as an act of retaliation, *see, e.g.*, Pls.' Mem. at 35, as described above, it focused particularly on Herman's coverage of the Trump Administration and his politically oriented activities on social media, *see supra* Part I.B.3.  The Herman investigation therefore posed the same risks of chilling speech and engaging in impermissible viewpoint discrimination introduced by defendants' other investigations into individual stories or journalists.  As in those cases, defendants had a less intrusive means of pursuing their concerns, through the investigative process set forth in USAGM's policy on potential ethics violations, at their disposal.  *See USAGM Procedures* at 1–2.  Therefore, while the organization and drafting of the journalists' letter may not be protected under the First Amendment, defendants' investigation of Herman imposes an unconstitutional prior restraint not

just on Herman's speech, but also on the speech of Chao and other editors and journalists at VOA and the networks, unlikely to survive *Pickering*.

### (IV)  Conflicts-of-Interest Policy

Chao's fourth set of allegations concerns the conflicts-of-interest policy announced by defendants, which she characterizes as unconstitutionally vague and overbroad.  *See supra* Part I.B.4.  The new policy in fact appears to be consistent with, or in some ways, more lenient than, standard journalistic practices with respect to conflicts of interest at credible news organizations.[27]  Plaintiffs target the policy largely because of the discretion allegedly conferred on defendants to identify conflicts and restrict speech on that basis, but in fact, the example conflicts the policy provides, described in detail above, *see id.*; Conflicts Policy at 3–4, outline the contours of its restrictions with sufficient clarity: journalists may not cover stories in which they have a personalized stake and may not report on political issues or figures as to which they have publicly expressed personal opinions that could call their neutrality as reporters into question.  Plaintiffs fear that this facially neutral policy might be applied in a manner that discriminates on the basis of viewpoint, *see, e.g.*, Pls.' Mem. at 35–36, but, at present, do not allege that any discriminatory application has occurred.[28]  So long as the policy is applied

---

[27]    *Compare* Conflicts Policy at 3 (suggesting that VOA and network journalists "consider whether recusal or mitigation is required" after expressing a political opinion on social media), *with, e.g.*, Crain Decl., Ex. 32, *Ethical Journalism: A Handbook of Values and Practices for the News and Editorial Departments*, N.Y. TIMES 7, 16, 25 (2004), ECF No. 12-34 (preventing journalists from reporting in cases that could give rise to an actual conflict or the appearance of a conflict, *id.* at 7, 25, and stating that journalists "may not campaign for, demonstrate for, or endorse" candidates or political causes and "may not wear campaign buttons or . . . display any other insignia of partisan politics," *id.* at 16), *and* Crain Decl., Ex. 33, *Los Angeles Times Ethics Guidelines*, L.A. TIMES 12–14 (2014), ECF No. 12-35 (noting that "[s]taff members should avoid public expressions or demonstrations of their political views, whether on bumper stickers, lawn signs, blog posts, social media or online comments," *id.* at 12, and reserving to the paper the right to "restrict a staff member's assignment" on the basis of a real or perceived conflict, *id.* at 14), *and* Crain Decl., Ex. 34, *Associated Press Statement of News Values and Principles*, ASSOCIATED PRESS 10 (2020), ECF No. 12-36 ("[AP employees] must refrain from declaring their views on contentious public issues in any public forum, whether through blogs, social networks, comments pages, petitions, bumper stickers or lapel buttons.").

[28]    A challenge brought by a VOA or network employee alleging discriminatory application of the policy on the basis of political bias would likely be precluded by the CSRA as a challenge to a "prohibited personnel practice."  *See supra* Part III.A.1.b.i.

evenhandedly, it does not pose an undue burden on journalists' speech beyond the restraint that compliance with any news organization's journalistic ethics policies would typically require.

Further, Pack, as CEO, is charged with "ensur[ing] that United States international broadcasting is conducted in accordance with the standards and principles contained" in § 6202 of the IBA.  22 U.S.C. § 6204(a)(3).  Among the standards and principles is a requirement that VOA and the networks deliver "news which is consistently reliable and authoritative, accurate, objective, and comprehensive."  *Id.* § 6202(b)(1).  Pack's determination that clarifications to the existing conflicts-of-interest policies were "reasonably necessary" to ensure compliance with this mandate and the continued credibility of VOA and the networks is owed deference.  *See Navab-Safavi*, 637 F.3d at 316 (finding that USAGM and its media outlets have a shared interest in maintaining "the highest journalistic credibility" that is owed weight in the *Pickering* analysis).  USAGM's interest in credibility, which Chao herself concedes is one of VOA and the networks' "most essential assets," Second Chao Decl. ¶ 10, likely outweighs the minimal burden on employee speech imposed by the conflicts-of-interest policy on its face.  Plaintiffs are not likely to succeed in challenging the policy under *Pickering.*

### (V)   *Defendants' Gross Mismanagement of USAGM*

Finally, Chao contends that defendants' "gross mismanagement" of USAGM, including budget freezes and revocation of delegated authorities allowing USAGM senior staff to spend money, hire, and enter contracts for essential supplies and services, *see supra* Part I.B.5, "prevent[s] [editors and journalists] from acting with journalistic independence or employing editorial discretion in violation of their First Amendment rights," Pls.' Mem. at 33.  Plaintiffs do not make entirely clear how budget cuts and similar practical issues of agency management implicate their First Amendment rights.  It cannot be that government employees, even those

government employees carrying out editorial and journalistic functions, have a protected First Amendment right to the provision of funding and supplies to their agency at optimal levels. Obviously, even private sector journalists are subject to practical constraints on their First Amendment rights imposed by financial realities.

Plaintiffs' real objection is to what they perceive as defendants' "severely hamstringing [USAGM's] ability to fulfill its mandate."  Pls.' Mem. at 15.  Whether defendants' management of USAGM represents good policy or effective agency oversight is, however, a separate—and nonjusticiable—issue from the First Amendment rights at issue in this litigation.  Moreover, the IBA specifically grants the CEO authority "[t]o make and supervise grants and cooperative agreements for broadcasting and related activities," 22 U.S.C. § 6204(a)(5), "[t]o allocate funds appropriated for international broadcasting activities," *id.* § 6204(a)(6), "[t]o . . . procure, rent, or lease supplies, services, and other property for journalism, media, protection, and broadcasting," *id.* § 6204(a)(10), and "[t]o obligate and expend, for official reception and representation expenses, such amount as may be made available through appropriations," *id.* § 6204(a)(12). Common sense dictates that it is "reasonably necessary" for the CEO to have control over agency funds and the distribution and use thereof.  Weighed against the ambiguous First Amendment interests plaintiffs identify, this logic is likely to prevail under *Pickering*.

In sum, Chao has demonstrated a likelihood of success on the merits of her First Amendment claim insofar as she alleges that defendants have violated her and her colleagues' First Amendment rights by taking or influencing personnel actions against individual journalists or editors, attempting directly to monitor VOA and network content through communications with individual editors or journalists, and undertaking their own investigations of alleged discrete breaches of journalistic ethics.

### B.      Absent Preliminary Relief, Chao and VOA Journalists Will Suffer Immediate, Irreparable Harm.

Chao and the VOA and network employees for whom she stands as representative will suffer immediate irreparable harm in the absence of an injunction.  The D.C. Circuit has explained that "'a prospective violation of a constitutional right constitutes irreparable injury for . . . purposes' of 'seeking equitable relief.'"  *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (omission in original) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). Thus, "[t]he loss of First Amendment 'freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury."'"  *Pursuing Am's Greatness*, 831 F.3d at 511 (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (same).  As explained above, Chao and her colleagues are likely to succeed in showing that defendants' actions have already violated and continue to violate their First Amendment rights because, among other unconstitutional effects, they result in self-censorship and the chilling of First Amendment expression.  These current and anticipated harms are sufficient to demonstrate irreparable harm.  *See Archdiocese of Wash.*, 897 F.3d at 334 ("[T]he deprivation of constitutional rights constitutes irreparable injury . . . to the extent such deprivation is shown to be likely.").[29]

### C.      The Balance of Equities and the Public Interest Favor Injunctive Relief.

Turning to the final factors, plaintiffs must demonstrate that the balance of the equities and the public interest weigh in favor of preliminary relief.  That burden is met.  The parties

---

[29]      Defendants originally argued that this factor weighed against injunctive relief because the five original plaintiffs' loss of employment, reputational harms, and alleged difficulty in repairing the damage done to USAGM by defendants did not constitute irreparable harm, nor could they demonstrate irreparable harm by relying on the First Amendment rights of third-party journalists.  *See* Defs.' Opp'n at 36–39.  The subsequent joinder of Chao, who experiences irreparable harm to her own First Amendment rights as a result of defendants' actions, renders these arguments moot.

appear to agree, *see* Pls.' Mem. at 16; Defs.' Opp'n at 39–43, that because the government is the non-movant, "the balance of equities and public interest[] factors . . . 'merge,'" *Karem*, 960 F.3d at 668 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)), and "generally call for weighing the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined," *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019) (citing *Pursuing Am.'s Greatness*, 831 F.3d at 511).  That this factor favors plaintiffs is self-evident. "'[T]he Constitution is the ultimate expression of the public interest,'" *Gordon*, 721 F.3d at 653 (quoting *Llewelyn v. Oakland Cnty. Prosecutor's Off.*, 402 F. Supp. 1379, 1393 (E.D. Mich. 1975)), and consequently, government actions in contravention of the Constitution are "always contrary to the public interest," *id.*

In the context of assessing plaintiffs' request for relief from constitutional violations, defendants' argument that the balance of equites and public interest "tip sharply in favor of the government" because injunctive relief would prevent Pack "from exercising effective control over an important tool of foreign policy," Defs.' Opp'n at 39; *see also id.* at 39–41, is unavailing. Put simply, "[t]he Constitution does not permit [the government] to prioritize any policy goal over" constitutional rights.  *Gordon*, 721 F.3d at 653.  This maxim rings especially true here, where respect for First Amendment rights in fact aligns with, rather than frustrates, the foreign policy goal, set forth by Congress in the IBA, of "promot[ing] the right of freedom of opinion and expression, including the freedom 'to seek, receive, and impart information and ideas through any media and regardless of frontiers.'"  IBA § 302(1); 22 U.S.C. § 6201(1).  To this end, Congress has consistently determined that "the professional independence and integrity" of U.S.–funded international broadcasting outlets is key to achieving that goal.  22 U.S.C. § 6204(b); *see also Ralis*, 770 F.2d at 1125 ("It was deemed important by Congress [in the BIB

Act] that institutional arrangements be such that the stations not lose their 'non-official status'; to transform Radio Free Europe and Radio Liberty from independent broadcasters into house organs for the United States Government was seen as inimical to the fundamental mission of those stations."); *supra* Part I.A.  That U.S. foreign policy with respect to U.S.–funded international broadcasting is centered on the promotion and exportation of First Amendment values only bolsters the inevitable conclusion that enforcement of VOA and network editors' and journalists' First Amendment rights is in the public interest.

## IV.      CONCLUSION

For the reasons explained, plaintiffs' motion for a preliminary injunction is denied as to defendants' alleged violations of the IBA, the APA, and Pack's fiduciary duties to USAGM and their alleged activities in excess of Pack's statutory authority.  Plaintiffs' motion is granted as to defendants' alleged violations of the First Amendment, insofar as those violations relate to defendants' taking or influencing personnel actions against individual journalists or editors, attempting to influence content through communications with individual journalists or editors, and investigating purported breaches of journalistic ethics.  Defendants will be preliminarily enjoined from continuing these activities.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: November 20, 2020

_____
BERYL A. HOWELL
Chief Judge